**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE: INCLUSIVE ACCESS COURSE MATERIALS ANTITRUST LITIGATION |
| This Document relates to: |
| **20cv06339** |

MASTER FILE NO.
20 MDL No. 2946 (DLC)


<u>**JURY TRIAL DEMANDED**</u>


<u>**PLAINTIFF RETAILERS' SECOND AMENDED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND SUMMARY OF THE
        ALLEGATIONS .......................................................................................1

II.     PARTIES .................................................................................................20

        A.      The Plaintiff Retailers ..............................................................20

        B.      Defendants ..............................................................................21

                1.      The Publishers ...............................................................22
                        a.   Cengage...............................................................22
                        b.   McGraw-Hill........................................................23
                        c.   Pearson................................................................23

                2.      The Defendant Retailers. ...............................................24
                        a.   Barnes & Noble....................................................24
                        b.   Follett .................................................................24

                3.      The Trade Association/EPEG .........................................25

                4.      The Universities (currently not named as Parties) ........26

III.    JURISDICTION AND VENUE .................................................................29

IV.     FACTS ....................................................................................................31

        A.      Course Materials Industry........................................................31

                1.   Course Materials Products and Players.................................31

                2.   The Retail Channel ..............................................................37

                3.   Trade Associations...............................................................39

                4.   Course Material Prices.........................................................42

        B.      Inclusive Access.......................................................................46

                1.   The Inclusive Access Scheme...............................................46

                2.   Defendants Artificially Shift the Market to Inclusive Access ............49

                3.   Defendants' Use of Exclusivity Agreements........................54

                4.   Inclusive Access Is an Inferior and Unwanted Product......................58

5.  Inclusive Access Is Not More Affordable ...........................................61

6.  Defendants' Inclusive Access Scheme Harms Competition...............68

7.  Defendants Have Blocked Student Opt-Outs .....................................71

C.  Relevant Markets .......................................................................................77

1.  Product Markets .................................................................................77

2.  Geographic Markets...........................................................................80

3.  Market Conditions .............................................................................81

D.  Anticompetitive Agreements and Behavior ...............................................91

1.  The Conspiracy ..................................................................................91

2.  Exclusive Dealing ............................................................................103

3.  Price Discrimination ........................................................................108

4.  Additional Anticompetitive Conduct................................................112

5.  Continuing Conspiracy and Fraudulent Concealment .....................113

6.  Anticompetitive Effects ...................................................................116

V.  INTERSTATE TRADE AND COMMERCE ....................................................118

VI.  CLASS ALLECTIONS ...................................................................................119

VII.  CLAIMS FOR RELIEF .................................................................................122

COUNT 1: RESTRAINT OF TRADE (15 U.S.C. § 1) – CONSPIRACY IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST
PUBLISHERS AND EPEG .............................................................................122

COUNT 2: RESTRAINT OF TRADE (15 U.S.C. § 1) – CONPIRACY IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST
DEFENDANT RETAILERS .............................................................................126

COUNT 3: RESTRAINT OF TRADE (15 U.S.C. § 1) – CONSPIRACY IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST
ALL DEFENDANTS .......................................................................................128

COUNT 4: MONOPOLIZATION (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS ..................................131

COUNT 5: CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS .........................135

COUNT 6: ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS .........................137

COUNT 7: PRICE DISCRIMINATION (15 U.S.C. § 13(a)) – AGAINST THE PUBLISHERS ................................................................139

COUNT 8: PRICE DISCRIMATION (15 U.S.C. § 13(f)) –AGAINST THE DEFENDANT RETAILERS ............................................................141

COUNT 9: INJUNCTIVE RELIEF (15 U.S.C. § 26) – AGAINST ALL DEFENDANTS PURSUANT TO SECTION 16 OF THE CLAYTON ACT ...142

COUNT 10: CLAIMS UNDER ARKANSAS LAW (VIOLATIONS OF ARK. CODE ANN. §§4-75-201, *et seq*. AND UNJUST ENRICHMENT ........142

A.    The Arkansas Unfair Practices Act (Against the Publishers and Defendant Retailers) ..............................................................142

B.    Unjust Enrichment (Against the Publishers and Defendant Retailers) ...144

COUNT 11: CLAIMS UNDER KENTUCKY LAW (VIOLATIONS OF KY. REV. STAT. ANN. §§ 365.020, *et seq*. AND UNJUST ENRICHMENT .145

A.    The Kentucky Unfair Practices Act (Against the Publishers and Defendant Retailers) ..............................................................145

B.    Unjust Enrichment (Against the Publishers) ..........................................146

COUNT 12: CLAIMS UNDER NEW MEXICO LAW (VIOLATIONS OF N.M.S.A. 1978 §§ 57-12-1, *et seq*., AND §§ 57-14-1, *et seq*. AND UNJUST ENRICHMENT ................................................................147

A.    The New Mexico Unfair Practices Act (Against the Publishers) ..........147

B.    The New Mexico Price Discrimination Act (Against the Publishers and Defendant Retailers) ..............................................................148

C.    Unjust Enrichment (Against the Publishers and Defendant Retailers) ...149

COUNT 13: CLAIMS UNDER TENNESSEE LAW (UNJUST ENRICHMENT AGAINST PUBLISHERS).................................................................................150

COUNT 14: CLAIMS UNDER TEXAS LAW (VIOLATIONS OF TEX. BUS. & COM. CODE §§ 15.01, et seq. AND UNJUST ENRICHMENT) ........151

    A.    The Texas Free Enterprise and Antitrust Act of 1983 (Against the Publishers and Defendant Retailers) ........................................................151

    B.    Unjust Enrichment (Against the Publishers and Defendant Retailers)....152

VIII.    JURY DEMAND ...................................................................................153

IX.    PUNITIVE AND TREBLE DAMAGES...............................................153

X.    ATTORNEYS' FEES ...........................................................................154

XI.    CONCLUSION AND PRAYER FOR RELIEF ...................................154

Plaintiffs Campus Book Company, Inc., BJJ Corporation, CBSKY, Inc., CBSNM, Inc., and Renttext.com, Inc. (collectively, the "**Plaintiff Retailers**"), who on their own behalf and on behalf of others similarly situated (the "**Independent Collegiate Retailers**" or "**Class members**") file this Second Amended Class Action Complaint against Defendants Cengage Learning, Inc., McGraw-Hill Global Education Holdings, LLC, and Pearson Education, Inc. (collectively, the "**Publishers**"), Barnes & Noble Education, Inc., Barnes & Noble College Booksellers, LLC (collectively, "**Barnes & Noble**"), and Follett Higher Education Group, Inc. ("**Follett**") (Barnes & Noble and Follett are collectively referred to herein as the "**Defendant Retailers**"), and Educational Publishers Enforcement Group ("**EPEG**" or the "**Trade Association**") (the Publishers, the Defendant Retailers, and EPEG are collectively referred to herein as the "**Defendants**"), and respectfully allege the following:

## I.     NATURE OF THE ACTION AND SUMMARY OF THE ALLEGATIONS

1.     This antitrust case is about the Publishers and the Defendant Retailers lining their pockets at the expense of financially-vulnerable college students and the Plaintiff Retailers and Class members.  And, what's more, the Publishers and the Defendant Retailers eliminated from the marketplace those who could prevent them from doing so, including the Plaintiff Retailers and other Independent Collegiate Retailers like them.  Amidst trends of market-shifting and revenue decline in the higher education course materials industry, the Publishers and the Defendant Retailers conspired to protect their historical price increases and stranglehold on the market.  The Publishers collectively devised and agreed on a plan to force upon the market a new delivery mechanism for their product that forces *every single college student to purchase the Publishers' products anew every single semester*, and forces those purchases to be made from the Defendant Retailers (at their respective Universities), thereby eliminating both the ability to substitute

products and any competition among retailers, while also destroying the significant secondary market for course materials (in which Plaintiff Retailers and the Class members participate as both buyers and sellers).  The delivery mechanism at issue is ironically called "Inclusive Access" ("**Inclusive Access**" or "**Inclusive Access Materials**," for course materials made available exclusively through Inclusive Access).  In reality, it should be called "Exclusive Access" as there is nothing inclusive about it.  Inclusive Access Materials are not *themselves* fundamentally different from other electronic or physical textbook and ancillary products that could—but for the strictures of the Inclusive Access scheme—function as substitutes; what places these materials in a different market is their isolation from competition by their delivery mechanism, which was designed by collusion and agreement to artificially shift the market for only the Defendants' benefit.  The result is a product format that is *unwanted* by consumers and specifically *limits* access to higher education course materials and is exclusive to the conspiracy's members, resulting in the elimination of competition, higher prices, and the elimination of Plaintiff Retailers' access to materials, universities, and students, among other anticompetitive and market corruption effects.

2.      This case challenges the Defendants' conspiracy and their improper acquisition and use of monopoly power to irreparably harm the higher education course materials market by eliminating competition and thereby eliminating any consumer choice.  The Defendants attempt to disguise their anti-competitive actions as technological advancements, but that was not their true purpose or effect.  The Defendants' anticompetitive behavior has and will continue to destroy any competitive market for course materials in higher education.  The Defendants' anticompetitive behavior harms the entire market.  It results in a complete lack of choice for students, exponentially higher prices for students, and reduction in quality and variety of products and services offered to students.  It has stifled innovation in the marketplace.  It further has eliminated and otherwise

**SECOND AMENDED CLASS ACTION COMPLAINT**                                              **PAGE 2**

harmed through improper means both the Defendants' competitors, which include the Plaintiff Retailers and other Independent Collegiate Retailers, and the secondary product markets, including those of the Plaintiff Retailers and other Independent Collegiate Retailers.

3.      The broad conspiracy between and among the Defendants intends to and does artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the market for course materials at colleges and universities.  The conspiracy's end goal and result is eliminating competitors and raising prices.  The Defendants have accomplished the conspiracy through agreements in restraint of trade, concerted refusals to deal and group boycotts, exclusive dealing, targeted misinformation and coercion campaigns, and other exclusionary and anticompetitive conduct.  The Defendants also have separately and collectively acquired, enhanced, and maintained monopoly power through exclusionary and other anticompetitive conduct.

4.      The Defendants' illegal actions have and will ultimately result in a near-complete monopoly and foreclosure of the market for the sale of course materials at colleges and universities, as well as the elimination of any competition for the sale of course materials.  Under the Defendants' currently-enacted plan, each semester, every student enrolled at each college or university must purchase course materials in a single format—an electronic format delivered through Inclusive Access—from a single source—the Defendant Retailers—dictated by a single group—the Publishers (or, for colleges or universities without a Defendant Retailer, by the Publishers themselves or at another exclusive publisher partner as dictated by the Publisher).  The Defendants' plan eliminates consumer (student) choice for course material type or place of purchase at colleges and universities.  And for these course materials force-delivered through

Inclusive Access, prices will rise while quality, service, and innovation will decline, unchecked by any competitive market forces.

5.     With the Defendants' accomplished elimination of substitute products, retail competitors, and the secondary market, the students are deprived of all choice and competition on price, terms, quality, and innovation at each level of the market.  They are now given a take-it-or-leave-it product through a take-it-or-leave-it delivery mechanism at a take-it-or-leave-it price from a single take-it-or-leave-it retailer, and in many instances, "leave it" does not *just* mean choosing not to have the Course Materials—it means being unable to take a class or failing a class. Defendants' conspiracy has eliminated any meaningful opportunity to "opt out" of Inclusive Access. The Plaintiff Retailers and the Class members also suffer severely as a result of the Defendants' illegal actions, as they cannot compete where the Publishers (the creator of the content, itself) will not sell them the Inclusive Access Materials and the Defendants block students from purchasing any other Course Materials, including from the secondary market.

6.     This Inclusive Access scheme represents a "tectonic" shift in historical patterns for the publishing industry.[1]  The detrimental economic effects caused by this conspiracy are wide-ranging – students' costs have increased and non-Defendant retailers are being forced out of business, all while, not coincidentally, Defendant Publisher profits are rising for the first time in more than a decade and Defendant Retailers are now rewarded with virtually 100% market share and 100% sell-through—proportions that were unheard of before this conspiracy.

---

[1] Brian Barrett, The Radical Transformation of the Textbook, https://www.wired.com/store/digital-textbooks-radical-transformation.

\*      \*      \*

7.      The Plaintiff Retailers and members of the Class are retailers who sell and rent course materials to students at independent collegiate retail stores located around colleges and universities (the "**Universities**") throughout the United States and also online.  The Plaintiff Retailers' and the Class members' success and profitability depend on their ability to compete fairly for student purchases of course materials, which also helps ensure that students receive the lowest, most competitive prices and terms in the marketplace.

8.      Higher education course materials consist of traditional printed textbooks and other materials, as well as digital textbooks and e-textbooks, which have been used as an alternative to traditional, hard copy materials.  Students historically obtain e-textbooks by purchasing access codes (or unique serial numbers) that are used to unlock digital textbooks that sometimes also include homework, assignments, exams, quizzes, tests, and/or other learning software online (collectively, these higher education course materials are referred to as "**Course Materials**").

9.      The Publishers manufacture and sell and/or rent Course Materials, controlling at least 80%, and reportedly closer to 90%, of the market nationwide.  As more fully explained below, their individual dominance in relevant topic-specific and course-specific submarkets is far greater, as is their dominance in the market for Inclusive Access Materials (and relevant submarkets).  They have been the dominant firms in the market for the last 30 years.  The Association of American Publishers estimates the new Course Materials marketplace in the United States is over $3 billion.

10.      The market for Course Materials is captive; although students are the Course Materials' end consumers, the Universities select which Course Materials the students must purchase.  Thus, the Publishers market Course Materials to the Universities, not their students, and the Publishers generally do not market the Course Materials on price or other aspects important to

students.  In a properly functioning market, the Publishers would compete with each other to publish Course Materials for each University's classes and that competition would include the type, content, quality, and service of Course Materials.

11.     Before Inclusive Access, the Publishers have made widely available for sale and sold Course Materials to both Defendant Retailers and Plaintiff Retailers.  The Defendant Retailers contract with the Universities for an "on-campus" location that sells and rents Course Materials. The Plaintiff Retailers and Independent Collegiate Retailers, who are operators of physical and virtual retail bookstores and online sellers, compete with the Defendant Retailers to sell and rent Course Materials to students (including bids to become the "on-campus" location).

12.     For Universities that lease or subcontract their collegiate retail operations (rather than having them run by the institution itself), each such University has one lease-operated collegiate retailer, who operates the on-campus store.  The Defendant Retailers operate over 50% of the on-campus stores nationwide, accounting for nearly 2/3 of University student enrollments nationwide, and in the past, would normally compete with each other to operate each University's on-campus store.

13.     Historically, the higher education Course Materials market included full and open competition between retailers.  Universities selected Course Materials; publishers made available and sold such Course Materials to *all* retailers at the same price; and the students searched for competitive pricing and terms on those Course Materials—ultimately making purchases either from the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store) or from the Plaintiff Retailers or other Independent Collegiate Retailers (in physical locations and online).  Competition between retailers acted as at least some check on the captive Course Materials market—multiple opportunities existed for students to seek lower prices and preferred

**SECOND AMENDED CLASS ACTION COMPLAINT**                                    **PAGE 6**

sales terms, whether from alternative local retailers or from retailers with online platforms, such as Plaintiff Retailers, Amazon, or Chegg.  Actual performance data, as well as the statements of Defendants, confirm that retail competition—along with other factors—reduced the prices that Publishers and other Defendant Retailers could charge in the marketplace.  For a majority of students, the Plaintiff Retailers were a much-needed source of more affordable or accessible Course Materials, and for the others they at least functioned as a check on the prices Defendant Retailers could charge or the service terms Defendant Retailers could impose.

14.     The Plaintiff Retailers are sophisticated retailers of Course Materials offering the same or better technology, platform, and delivery options of Course Materials as the Defendant Retailers.  The Plaintiff Retailers have participated in the Course Materials market for over 20 years, during which time they served as at least some check on exorbitant Course Materials prices and relentless Course Materials price increases by offering lower-cost alternatives in formats and delivery methods to fit student demands.  The Plaintiff Retailers' participation has benefited consumers and competition through price competition, personalized service, and innovative programs, such as offering rentals and robust e-commerce solutions.  Throughout their decades of operation, the Plaintiff Retailers have grown with and adapted their business to the marketplace, including as e-textbooks and other digital offerings became available.  The Plaintiff Retailers were some of the first sellers on Amazon's Marketplace, a significant amount of their sales are online, and they have developed proprietary digital tools that enable them to thrive in the new technological environments.

*     *     *

15.     As the sale of Course Materials (over the Internet, by Amazon, and through rentals) increased competition and finally began lowering the price and increasing the availability of

Course Materials, the Publishers looked for ways to reduce or eliminate competition and increase their revenues.  As an example, the Publishers moved to custom packaging and/or custom delivery of Course Materials with one-time digital access codes, "custom books" (i.e., offering the same book with minimal alterations as an entirely new product), or other offerings that created a unique International Standard Book Number ("**ISBN**") and hindered or made it impossible to acquire the Course Materials in a used or second-hand format.  But even for these "new" Course Materials without a secondary market, the Plaintiff Retailers remained a much needed source of more affordable Course Materials for many students.  Because the Plaintiff Retailers could still obtain access to the Course Materials from the Publishers at the same cost as other retailers, they adapted and continued offering lower prices, preferred sales terms, or rental selections, remaining competitive and maintaining choices for students in the Course Materials market.

16.    This competitive market dramatically changed with Inclusive Access (sometimes also referred to as "Direct Access" or "Direct Bill").  For Inclusive Access, students are not purchasing any physical course materials and there is no choice of format or delivery method. Instead, students are automatically enrolled in and charged for time-limited access (usually one semester) to the Publishers' Inclusive Access Materials, which can be "turned on" for the student's account only directly by the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store).

17.    For Inclusive Access, the Publishers contractually deliver the Inclusive Access Materials *only* through the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store) by using either (a) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities and so-called license agreements (that operate as exclusive dealing arrangements) between the Publishers, the Universities, and the Defendant

Retailers, or (b) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities and, upon information and belief, master exclusivity agreements between the Defendant Retailers and the Publishers. The Publishers refuse to sell any Inclusive Access Materials to any other retailers, including the Plaintiff Retailers and the Class members, which is also an agreed change by Publishers in the terms and conditions of sale of Course Materials and Inclusive Access Materials. This agreement in restraint of trade and concerted refusal to deal and group boycott of the Independent Collegiate Retailers as to Inclusive Access Materials was agreed upon by the Publishers and also encouraged and agreed upon by the Defendant Retailers who compete with the Independent Collegiate Retailers.

18. Contrary to representations by the Publishers and the Defendant Retailers to justify or defend their anticompetitive actions, Inclusive Access Materials do not represent innovation or any technological advancement—as noted, they are just electronic course materials delivered through a means that prevents effective competition at any level. The Inclusive Access Materials provide students with the same Course Materials the Publishers were selling before and that were available in multiple formats from multiple retailers across the globe competing on price and other student considerations. Except now, the Defendants have limited the format of the content and added an access limitation element that eliminates competition in the market. Instead of selling students the product in the format they choose (and desire) or at least selling students (through any retailer) the access code or unique serial number to access the product (thereby at least permitting retail price and service competition), the Publishers and the Defendant Retailers have coordinated, conspired, and agreed that the students will only be sold Course Materials through Inclusive Access and will only be granted access to Inclusive Access Materials solely through the Defendant

Retailers.  This coordination artificially shifts the market to Inclusive Access Materials and eliminates by agreement output and supply of other Course Materials.

19.     Thus, Inclusive Access is an artificial construct like the digital access codes or "custom books" described above, except that the Publishers and the Defendant Retailers have coordinated, conspired, and agreed to prevent acquisition of Inclusive Access Materials by anyone except the Publishers and the Defendant Retailers—often through direct billing or automatic deductions from a student's account with the University and often without any mechanism for the student to opt out—thereby eliminating all student choice and price and term competition in the market.

20.     The Publishers and Defendant Retailers market Inclusive Access to Universities by claiming that it will lower student costs and be better for students.  But these claims are not only unsupported by the facts, as shown herein, the Publishers and Defendant Retailers know these statements are false.  If Inclusive Access is really cheaper and better for the students, the Publishers would allow the market to decide and students would line up to purchase it from wherever it was available.  There would be no need for automatic enrollment and charges, student quotas, and limitation of opt-outs.  In fact, students and faculty strongly disfavor Inclusive Access and would not choose it, and so the Defendants had to set up a system that presents no such choice. And while selling the Universities on the idea of Inclusive Access through misstatements, the Publishers and Defendant Retailers then use the Universities to bill or charge the students directly and use contract quotas and extensive durational terms to force more and larger courses into the use of Inclusive Access.

21.     Defendants claim that there are ways to "opt out" of Inclusive Access once it has been designated the material for a class.  But the Publishers and the Defendant Retailers have

purposefully blocked the "opt out" process by failing to provide or enable any such process, by making such processes practically impossible to use while staying enrolled in or able to pass classes, by holding student funds hostage, by making such processes difficult to discover and complicated to navigate, and even by engaging in disinformation or confusion campaigns designed to discourage—in some cases to *expressly* discourage—students from opting out in favor of a cheaper, better option available from Plaintiff Retailers and Class members.  In reality and as a practical matter, there is either no way or no meaningful way to "opt out" of Inclusive Access Materials once they have been designated the material for a class.  Upon enrollment in a class that is subject to Inclusive Access and these exclusive dealing arrangements, the students are automatically charged for Inclusive Access Materials by the Defendant Retailers.  The "opt out" process, when there is one at all, is opaque, confusing, and difficult if not impossible to execute at all or while still staying in or passing the class.  Students, including those who have specifically inquired about the "opt-out" options, receive misinformation, primarily from the Defendant Retailers, regarding the ability to opt out, whether the Inclusive Access Materials differ from other materials available, and how and what they are being charged for the Inclusive Access Materials. For example, students have been told there is no opt-out available, that they cannot take a class or will be de-enrolled from a class if they opt out and seek substitute materials, or that substitute materials available from other retailers like the Plaintiff Retailers are not sufficient or not allowed.

22.    The procedures students must follow are difficult or impossible to discover, navigate, or follow.  Therefore, even in cases where the Plaintiff Retailers have been able to obtain and sell Course Materials, such as access codes or e-textbooks, that provided the same substantive material as the Inclusive Access Materials (albeit with a different ISBN assigned by the Publishers, and for which the Publishers purposefully charge a higher price than they have set for the same

Inclusive Access Materials), they are still unable to compete because students are practically unable to opt out. This inability of students to opt out is a purposeful result of the Publishers' and the Defendant Retailers' behavior intended to capture 100% of the market.

23. This conduct is designed to (1) prevent materials that were functioning properly as price-competitive substitutes in the Course Materials market from continuing to be able to do so and (2) limit suppliers of the now-limited available Course Materials to avoid competition even on those remaining products. Rather than attempt to meaningfully differentiate their products from those they are (or should be, absent agreement) in competition with, or allow the marketplace to properly function as to any products, Defendants decided simply to use their market power to coerce the Universities into disallowing their students from making any choices at all, thereby shutting out all competition in the Course Materials market, including from Plaintiff Retailers and Class members.

24. If anything, Inclusive Access Materials are a step backwards in innovation and service to the consumer students. As noted by the Scholarly Publishing and Academic Resources Coalition in their published opposition to a proposed merger between two Publishers—Cengage and McGraw-Hill—digital subscriptions like Inclusive Access offer inferior quality and variety to the status quo. Examples of these inferiorities include requiring that all students access materials in the same way at the same price; applying expiration dates to access that prevent materials from being retained for future reference, shared with others, or resold; quality that depends substantially on access to technology and internet connections; technical issues requiring class time to explain or address; ignoring student preferences for print material over exclusively digital; and studies showing digital formats may not be better for students.

25.     Inclusive Access Materials also are not usually a better deal for students, even prior to the upward price effects that will result from the elimination of the competitive market for Course Materials.  To the extent that they appear to be a better deal in any instance, the "better deal" is an artificial image created by the Publishers, who have complete control over marketing and pricing for both the Inclusive Access Materials and the potential substitute Course Materials.

26.     The exclusive dealing agreements effectuating the conspiracy, concerted refusal to deal, group boycott, and anticompetitive monopolistic behavior have similar, and in some instances, the same language, as well as the same terms and conditions.  Upon information and belief, the master exclusivity agreements between the Publishers and the Defendant Retailers extend the same type of exclusivity as the combination of the exclusive dealing agreements and so-called license agreements described herein.

27.     The Plaintiff Retailers have discussed with the Publishers the ability to purchase the Inclusive Access materials from each of them, and each has refused while supplying the same pre-textual explanations, including that Inclusive Access Materials do not and cannot exist in a format available for sale to the Plaintiff Retailers, blaming the Universities and the Defendant Retailers.

28.     The exclusive dealing arrangements foreclose a substantial portion of the Course Materials market, due to the approximately 90% of the Course Materials market controlled by the Publishers and the over 50% of the lease-operated retail stores nationwide controlled by the Defendant Retailers.  Further, as to each University served by the Publishers and the Defendant Retailers, 100% of the Inclusive Access Materials market is foreclosed.  Because students are required to purchase the Inclusive Access Materials and the Defendants have limited that access to themselves, there is no other opportunity for the student-consumers to purchase the Inclusive

Access Materials elsewhere, either from the Plaintiff Retailers or anyone else.  As the Defendants clearly intended, there is no alternative distribution channel for the Plaintiff Retailers (or anyone else) to obtain or sell the Inclusive Access Materials, nor does the imposition of the Inclusive Access framework permit the existence of a meaningful alternative distribution channel for the Plaintiff Retailers (or anyone else) to sell other Course Materials that could substitute for the Inclusive Access Materials.

29.     By cooperatively engineering the market through the Inclusive Access scheme, the Publishers and Defendant Retailers have made it so that Plaintiff Retailers cannot compete.  Thus, the Publishers and Defendant Retailers eliminate the ability of Plaintiff Retailers to offer better prices, better terms, better service, and any other advantages that would benefit consumers, because that would also prevent the Publishers and Defendant Retailers from obtaining higher sales and profits.

30.     Despite not even representing a change in the fundamental product being sold, Inclusive Access represents an unprecedented and dramatic change in both the product format and the access offered by the Publishers for Course Materials, and this change was implemented at nearly identically the same time by multiple competing Publishers who had ample opportunities to, and did, conspire and collude on this issue.  This change followed failed individual attempts by the Publishers to introduce similar digital delivery systems, which were rejected by and performed poorly with Universities and student-consumers.  But after combining and agreeing to artificially shift the marketplace—to achieve together what they could not separately—the Publishers, in coordination with the Defendant Retailers, ramped up their efforts to convert all Universities with which they are associated to primarily use Inclusive Access, or at least to primarily use Inclusive Access for the core and lower-level classes that have the highest student enrollment, and therefore

have the largest economic impact on both the Publishers and the Defendant Retailers. Defendants do so in a coordinated fashion, including through creating or leveraging their exclusivity arrangements and through misleading and coercive marketing campaigns and other interactions. This is a complete change of marketing and selling philosophy by Defendants, who previously offered multiple styles of products for sale through multiple retailers.

31.     And the coordinated plan is working, destroying the marketplace with it. The exclusive dealing arrangements are multi-year, and many have annual quotas that guarantee additional classes and student enrollment each year required to use solely Inclusive Access, thus forcing the majority of University students into being automatically charged for Inclusive Access Materials. These quotas can take the form of enrollment minimums or percentage requirements. The quotas are enforced in multiple ways, including threats to cut off access to the Publishers and their materials for Universities that do not meet these requirements or significant price increases if the requirements are not met.

32.     Inclusive Access has not arisen from consumer demand, innovation, or other proper economic and competitive incentives. As described above and herein, Inclusive Access is the opposite of innovation and not what students want or need – indeed, the concept was rejected before when individual Publishers attempted to sell it. Instead, the implementation of Inclusive Access arose from the Defendants' conspiracy and improper use of monopoly power in reaction to reductions in Defendants' profitability attributable to competition. The Publishers collectively devised a product delivery system that forces *every single student* to purchase anew from the Publishers and Defendant Retailers *all their course materials each and every semester*, thereby eliminating all substitute products, including the significant secondary market for Course Materials.

**SECOND AMENDED CLASS ACTION COMPLAINT**                                    **PAGE 15**

33.     Among other ways, the Defendants have used the trade association EPEG to conspire and implement their anticompetitive behavior.  EPEG was formed in or around early 2016, and all the Publishers are members.  EPEG was formed ostensibly to engage in anti-counterfeiting efforts, but it has provided the Publishers with the opportunity, means, and motive to conspire, and has implemented standards designed to reduce supply and access to Course Materials (including for the Plaintiff Retailers and the Class members), eliminate the secondary market for Course Materials (in which Plaintiff Retailers and the Class members participate as both buyers and sellers), limit consumer choice, and raise prices for Course Materials (including for the Plaintiff Retailers and the Class members, when they were made available for sale).  The Publishers and the Defendant Retailers also had the opportunity to conspire at events for the National Association of Collegiate Stores and other trade associations, during coordinated activities in relation to rule-making for the Higher Education Opportunity Act, and during pre-merger discussions between at least McGraw-Hill and Cengage.

34.     The Publishers and the Defendant Retailers then collectively devised and agreed on a plan whereby the Defendant Retailers would assist the Publishers with the implementation of their collusive scheme and, in return, would be made the exclusive source of the Publishers' Course Materials through Inclusive Access, thereby eliminating all substitute sources (including the Independent Collegiate Retailers and the significant online market) and any potential competition on price, terms, service, or other benefits to the student-consumers.  In instances where any related materials are available to other retailers, the Publishers and the Defendant Retailers collectively agreed that the Defendant Retailers would receive favorable terms and conditions including price.

35.     The Publishers acknowledge that Course Materials have become so expensive that some students simply cannot afford them.  However, the Publishers are to blame for the fact that

Course Materials costs have significantly outpaced inflation; according to industry publications, Course Materials costs have risen 184% since 1998 and more than 1,000% since the 1970s. Indeed, these rates of increase—far outpacing inflation—are essentially impossible to explain but for the Publishers' immense market power, which while substantial in the Course Materials market generally, is at its greatest when the relevant submarkets—described below—are considered. The Publishers and the Defendant Retailers claim (and have in some cases convinced the Universities) that Inclusive Access will make Course Materials more affordable for all.  But in fact, Inclusive Access has and will continue to raise prices and limit supply and access.  The Defendants are actually implementing a collusive scheme to maintain their stranglehold on the industry while disguising it as reform.  If the Defendants are not stopped soon, there will be no players left in the industry to reverse the damage they have caused or stop them from causing even more.

*      *      *

36.     The Publishers win with Inclusive Access because they secure 100% of the business of "new" Course Materials each semester from each converted course, and ensure that students must purchase such "new" Course Materials each semester—resulting in more frequent, guaranteed purchases as well as increased prices (and no or less costs).  With all the Publishers artificially shifting the market to Inclusive Access Materials by refusing to offer competing products (that are actually better quality, better value, and more desirable and effective for student-consumers and University faculty), there will soon be no substitute to which the Universities can switch.  In a coordinated manner, the Defendants have instituted a stranglehold on Course Materials and artificially shifted the market to Inclusive Access Materials.

37.     Although it should not and has not mattered to the Publishers—under normal economic conditions and motives—who sells their Course Materials to students, the

Defendant Retailers also win with Inclusive Access.  Because the Publishers have agreed to sell Inclusive Access Materials at each University <u>only</u> to and through the Defendant Retailers, the Defendant Retailers now automatically receive 100% of sell-through to consumers on any course that is subject to Inclusive Access, in most cases through direct or automatic charges.  As Barnes & Noble noted in a December 2019 earnings call, "penetration is approaching 100% of adoptions" and "sell-through will increase from 35% to almost 100%."  Historically, the Defendant Retailers received only a 35-40% sell-through per course due to competition from Plaintiff Retailers and the Class members.

38.    "Sell-through" in this case means the number of students in a class that Defendant Retailers are able to capture, which used to be shared with Plaintiff Retailers and Class members, but now is artificially siphoned solely to Defendant Retailers.  This does not mean an increase in market-wide output or sales – Defendants have simply artificially and anticompetitively increased Defendant Retailers' own sales at the expense of all other retailers.  Indeed, market-wide output and sales is *decreased* by Defendants' conduct because they have decreased both the number and type of products available to consumers and the places where those products are available for sale.

39.    The losers in the Inclusive Access equation are the student-consumers and the Plaintiff Retailers and Class members.  With the elimination of substitute products (including the secondary market) and retail competitors, the students are deprived of all choice and competition on price, terms, quality, and innovation.  Defendants' conspiracy has eliminated any meaningful opportunity to "opt out" of Inclusive Access.  The Plaintiff Retailers and the Class members also suffer severely as a result of the Defendants' illegal actions, as they cannot compete where the Publishers (the creator of the content, itself) will not sell them the Inclusive Access Materials and

the Defendants block student opt-outs to purchase any other Course Materials, including from the secondary market.

40.     As shown below in detail, the Defendants have taken the following illegal and anticompetitive actions:

   a.   The Publishers entered into horizontal conspiracies to unreasonably restrain trade by raising prices, artificially limiting capacity and reducing supply, eliminating necessary access including through exclusive dealing arrangements, using the Defendant EPEG trade association to set pre-textual standards, and implementing concerted refusals to deal with and group boycotts of the Plaintiff Retailers and Class members;

   b.   The Defendant Retailers entered into horizontal conspiracies to unreasonably restrain trade by raising prices, artificially limiting capacity and reducing supply, and eliminating necessary access including through exclusive dealing arrangements;

   c.   The Publishers and the Defendant Retailers entered into a hub-and-spoke conspiracy to unreasonably restrain trade by raising prices, artificially limiting capacity and reducing supply, eliminating necessary access including through exclusive dealing arrangements, and concerted refusals to deal with and group boycotts of the Plaintiff Retailers and Class members;

   d.   The Publishers and the Defendant Retailers have acquired, enhanced, and maintained monopoly power through exclusionary conduct and other anticompetitive conduct, including combining, conspiring, or attempting to

monopolize the relevant market(s) set forth herein, including through Defendant EPEG; and

e. The Publishers and the Defendant Retailers unfairly and deceptively restrained competition in the relevant market(s) set forth herein, including through Defendant EPEG.

41.   The Plaintiff Retailers and the Class members seek a finding that the Defendants' actions violate federal and state antitrust and/or unfair competition laws; a permanent injunction preventing the Defendants from continuing their illegal conduct and rectifying ongoing anticompetitive effects caused by their illegal conduct; and damages on behalf of the Plaintiff Retailers and the Class members.

## II.   PARTIES

### A.   The Plaintiff Retailers

42.   Named Plaintiff (and Putative Class Representative) Campus Book Company, Inc. is a New Mexico corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  Campus Book Company, Inc. operates or operated Independent Collegiate Retailers serving students at University of Texas Arlington, University of New Mexico, and online.

43.   Named Plaintiff (and Putative Class Representative) BJJ Corporation is an Arkansas corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  BJJ Corporation operates or operated Independent Collegiate Retailers serving students at Middle Tennessee State University, Nashville State Community College, University of Houston, and Volunteer State Community College, and online.

44.     Named Plaintiff (and Putative Class Representative) CBSKY, Inc. is a Kentucky corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  CBSKY, Inc. operates an Independent Collegiate Retailer serving students at Eastern Kentucky University and online.

45.     Named Plaintiff (and Putative Class Representative) CBSNM, Inc. is a New Mexico corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  CBSNM, Inc. operates Independent Collegiate Retailers serving students at Dona Ana Community College and New Mexico State University, and online.

46.     Named Plaintiff (and Putative Class Representative) Renttext.com, Inc. is a Texas corporation, and may be served with pleadings and process in this proceeding through the undersigned counsel.  Renttext.com sells Course Materials online.

**B.     Defendants**

47.     Whenever this Complaint alleges that a Defendant has engaged in an act, deed, or transaction, the allegation means that the Defendant engaged in the act, deed, or transaction by or through the authorization, order, direction, and/or action of its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.  Various persons, firms, and corporations, who are known or unknown to Plaintiffs, and not named as defendants in this action, including senior executives of Defendants, have participated as co-conspirators in the violations alleged herein and have performed and made statements in furtherance of the conspiracy in violation of the laws asserted herein.

48.     The Defendants participated in and profited from their and their co-conspirators' efforts to eliminate and restrain competition in the Course Materials market by raising prices,

artificially limiting capacity and reducing supply, eliminating necessary access including through exclusive dealing arrangements, using trade associations to set pre-textual standards, concerted refusals to deal with and group boycotts of the Plaintiff Retailers and Class members, and eliminating secondary markets and competitors.  The Publishers have furthered the conspiracy by and through, among other things, concerted refusals to deal and group boycotts and acquiring, enhancing, and maintaining monopoly power through exclusionary conduct and other anticompetitive conduct.

49.     Defendants engaged in interstate commerce through the purchase and sale of Course Materials and Inclusive Access Materials and conducting business in this State.

### 1.  *The Publishers*

#### a.  <u>Cengage</u>

50.     Defendant Cengage Learning, Inc. ("**<u>Cengage</u>**") is a Delaware Corporation with its offices and principal place of business located in Boston, Massachusetts and has been served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent The Prentice Hall Corporation at 251 Little Falls Drive, Wilmington, Delaware 19808, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.  Cengage was served and has appeared in this suit.

51.     From January 1, 2015 through present (the "**<u>Class Period</u>**"), Cengage was a Publisher that participated in the Course Materials market and sold Inclusive Access Materials in the United States.

52.     Cengage is a member of EPEG.

### b. **McGraw-Hill**

53.     Defendant McGraw-Hill Global Education Holdings, LLC ("**McGraw-Hill**") is a Delaware Limited Liability Company with its offices and principal place of business located in New York, New York and has been served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent Cogency Global, Inc. at 850 New Burton Road, Suite 201, Dover, Delaware 19904, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.  McGraw-Hill was served and has appeared in this suit.

54.     During the Class Period, McGraw-Hill was a Publisher that participated in the Course Materials market and sold Inclusive Access Materials in the United States.

55.     McGraw-Hill is a member of EPEG.

### c. **Pearson**

56.     Defendant Pearson Education, Inc. ("**Pearson**") is a Delaware Corporation with its offices and principal place of business located in Upper Saddle River, New Jersey and has been served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, or pursuant to the Federal Rules of Civil Procedure wherever it may be found. Pearson was served and has appeared in this suit.

57.     During the Class Period, Pearson was a Publisher that participated in the Course Materials market and sold Inclusive Access Materials in the United States.

58.     Pearson is a member of EPEG.

## 2. *The Defendant Retailers*

### a. <u>Barnes & Noble</u>

59.    Defendant Barnes & Noble College Booksellers, LLC is a Delaware Limited Liability Company with its offices and principal place of business located in Basking Ridge, New Jersey and has been served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent Capitol Services, Inc. at 1675 S. State Street, Suite B, Dover, Delaware 19901, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.  Barnes & Noble Education, Inc. is the parent company of Barnes & Noble College Booksellers, LLC and is a Delaware Corporation with its offices and principal place of business located in Basking Ridge, New Jersey and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent Capitol Services, Inc. at 1675 S. State Street, Suite B, Dover, Delaware 19901, or pursuant to the Federal Rules of Civil Procedure wherever it may be found.  Barnes & Noble was served and has appeared in this suit.

60.    During the Class Period, Barnes & Noble was a Defendant Retailer that participated in the Course Materials market and sold Inclusive Access Materials in the United States.

### b. <u>Follett</u>

61.    Defendant Follett Higher Education Group, Inc. is an Illinois Corporation with its offices and principal place of business located in Westchester, Illinois and has been served with summons pursuant to Federal Rule of Civil Procedure 4 through its registered agent The Corporation Trust Company, Corporation Trust Center, 1290 Orange Street, Wilmington, Delaware 19801, or pursuant to the Federal Rules of Civil Procedure wherever it may be found. Follett was served and has appeared in this suit.

62.     During the Class Period, Follett was a Defendant Retailer that participated in the Course Materials market and sold Inclusive Access Materials in the United States.

63.     Defendant Follett purposefully availed itself of the Delaware forum through its contacts with the forum by operating on-campus bookstores in Delaware and participating in the sale and distribution of Inclusive Access in Delaware as part of the conspiracy with the Delaware-organized Defendants, causing injury to class members in Delaware and giving rise to this suit.

### 3.     *The Trade Association/EPEG*

64.     Defendant Educational Publishers Enforcement Group is an unincorporated association of the Publishers.  EPEG is an unincorporated association recognized as a legal entity under the law of Delaware and federal law.  Specifically, EPEG is a voluntary group formed by mutual consent of its publisher members.  EPEG is the common name regularly presented to the public as an entity acting as a collective whole.  EPEG has the capacity to be sued under Delaware law under its common name, *see* 10 Del. C. § 3904, and was served with suit in accordance with Delaware law by serving the Publishers, who are individuals comprising the group. *Furek v. Univ. of Delaware*, 594 A.2d 506, 513 (Del. 1991) ("Thus, a plaintiff faced with the prospect of filing suit against an unincorporated association has two options: the obvious, and usually more convenient, service upon the entity under its common name or service upon the individuals who comprise the group.").[2]  As an unincorporated association under the laws of the United States and states including Delaware, EPEG is a person under the Sherman Act, 15 U.S.C. § 7.

65.     During the Class Period, the Publishers formed EPEG, which has provided the Publishers with the opportunity, means, and motive to conspire.  As set forth herein, it publishes

---

[2] Although it is unclear whether the other current members of EPEG, Elsevier Inc. and Macmillan were part of the unincorporated association during the relevant time frame, they will be served with a copy of this complaint through their registered agents.

**SECOND AMENDED CLASS ACTION COMPLAINT**                                         **PAGE 25**

and maintains a shared website, promulgates and enforces certain guidelines, jointly prosecutes and publicizes lawsuits, and shares a common contact address.  These activities all prosecute the common and shared enterprise of purportedly putting a stop to counterfeit books, but actually going far beyond that with the intent and result of furthering the anticompetitive conspiracy of the Defendants. EPEG has developed, adopted, and implemented so-called Anti-Counterfeit Best Practices (the "**EPEG Guidelines**"), which the Publishers claim are for the purpose of eliminating counterfeit textbooks in the marketplace, but actually are pre-textual standards designed to allow the Publishers to control who can buy and sell Course Materials and further the conspiracy's goals to raise prices, reduce supply and access, limit consumer choice, and raise prices of Course Materials.  The Publishers in combination (1) developed the EPEG Guidelines, which advance their anticompetitive conspiracy, (2) coerce retailers to adopt and follow the EPEG Guidelines, (3) boycott any retailer, and coerce other essential suppliers to boycott any retailer, that does not adopt and follow the EPEG Guidelines, and (4) enforce the EPEG Guidelines.

### 4.   The Universities (currently not named as Parties)

66.     The market for Course Materials is captive.  Although the students are the ultimate consumers of the Course Materials, the Universities are responsible for selecting which Course Materials students are required to purchase.  Thus, the Publishers market Course Materials to the Universities, not the students.  The Publishers generally do not market the Course Materials on price or other aspects important to students.  In the words of Cengage CEO Michael Hansen, rather than competing for students' business, "the industry relied . . . on the notion that, 'if I can convince the professor, I don't need to worry about the student, and I can charge whatever I want.'"[3]

---

[3] Henry Kronk, Pushback against Cengage and McGraw-Hill Merger: What is at Stake and What Comes Next?, ELEARNING INSIDE (July 31, 2019).

67.     Publishers aim to sell Universities on Inclusive Access regardless of faculty choices.  And, given the coercive practices of the Publishers and Defendant Retailers related to Inclusive Access, Universities, Publishers, and/or Defendant Retailers are increasingly choosing materials *for* the faculty.  A 2019 study found that changes wrought by Inclusive Access "have altered the locus for decisions; others are increasingly making choices [about Course Materials] that were previously the prerogative of the faculty."  In that study, one faculty member said, "I used to use Open Source textbooks for this course but the University opted for Inclusive Access so I have to use it."  Indeed, the result of many of the Inclusive Access contracts is a requirement for certain curriculums, courses, or departments to use Inclusive Access Matters, or quota requirements that necessarily dictate at least all core classes use Inclusive Access Materials.  Publishers and Defendant Retailers also are unilaterally signing up classes for Inclusive Access in some instances without faculty request.  For instance, in an April 2020 email communication with a professor at Middle Tennessee State University, a Pearson representative asked about what courses a professor was teaching and told the professor about the Inclusive Access Materials.  The Pearson representative told the professor she would "make sure ECON 2420 and MBAE 6865 are added to the list for the First Day [Inclusive Access] program…," despite the professor being silent on whether he wanted to use Inclusive Access Materials.

68.     The Defendants' conspiracy was designed to manipulate the market and artificially shift the market to Inclusive Access Materials, including through coercion, manipulation, and constraint of the schools, as described herein, including with misleading marketing and other misstatements regarding the cost or other attributes of Inclusive Access.  The Defendants are able to do so because Defendant Publishers manufacture and control 80-90% of available Course Materials, and almost all of the most popular and desirable authors of Course Materials.  When

they operate in conjunction, they operate as a cartel and/or monopoly in the Course Materials market generally, and each is a monopolist itself in various relevant submarkets.

69.     Similarly, Defendant Retailers have used their position as the exclusive on-campus retailer to leverage and manipulate the Universities into Inclusive Access arrangements and to assist the Publishers with misleading marketing and other misstatements regarding the cost or other attributes of Inclusive Access.  In some cases, the Defendant Retailers have significant or essential control of the University's decision-making process with regarding to Course Materials.

70.     This coercive, manipulative, and constraining activity by the Defendants prevents the Universities from making any truly free choice between market alternatives, artificially shifts the market to Inclusive Access Materials, and discourages the choice of more appropriate products (and further, as described herein, another part of the Defendants' conspiracy was eliminating any alternative products).

71.     In some cases, and alternatively for all Universities, a University has joined the Defendants to become a co-conspirator, although not currently named as a party to this lawsuit. Defendants are offering the Universities financial rewards to play along with the Inclusive Access conspiracy.  As discussed herein, Universities have received large up-front payments from Defendant Retailers (and in some instances, payments from Publishers), and also receive increased commissions (by volume) from the sales of Inclusive Access Materials.  This is because Universities receive a commission on all sales from Defendant Retailers, while they receive no commissions from the sales from Plaintiff Retailers and Class members.  The Universities also do not directly suffer any of the anticompetitive effects of the Defendants' scheme, rendering the scheme and the anticompetitive effects harder to detect and control for those it does harm – Plaintiff Retailers, the Class members, and the students.

72.     The Defendants' control of the University and denial of access to the University to the Plaintiff Retailers and the Class members on any terms, let alone reasonable or fair terms (whether joined by the University as a co-conspirator or not), results in the Plaintiff Retailers and the Class members having no practical or reasonable opportunity to obtain or deliver Course Material products and no practical ability to otherwise compete.

### III.     JURISDICTION AND VENUE

73.     The Plaintiff Retailers bring this action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), Section 16 of the Clayton Act (15 U.S.C. § 26), and Section 2 of the Robinson-Patman Act (15 U.S.C. §§ 13(a) and (f)) for damages, including a request for treble damages and reasonable attorneys' fees and costs of this litigation.  The Plaintiff Retailers also bring this action pursuant to various state antitrust and consumer protection laws set forth herein, and the common law of unjust enrichment for damages, and, where available by law, punitive damages, and reasonable attorneys' fees and costs of this litigation.  The Plaintiff Retailers also request injunctive relief pursuant to the Clayton Act (15 U.S.C. § 26).

74.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

75.     All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

76.     This Court has supplemental subject matter jurisdiction over the pendant state antitrust and consumer protection law claims under 28 U.S.C. § 1367.

77.     The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because (a) there are more than 100 members of the Class; (b) citizenship of at

least one proposed Class member is different from that of any Defendant; and (c) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

78.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1407.  Prior to transfer of this action pursuant to 28 U.S.C. § 1407, venue was proper in the District of Delaware pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. §§ 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in the district.

79.     This Court can exercise jurisdiction over each Defendant in light of the transfer pursuant to 28 U.S.C. § 1407.[4]  Prior to transfer, the District of Delaware had personal jurisdiction over each Defendant because, *inter alia*, each Defendant:   (a) operates its principal place of business or is incorporated in the District of Delaware; (b) transacted business throughout the United States, including in the District of Delaware; (c) participated in the sale and distribution of Inclusive Access throughout the United States, including in the District of Delaware; (d) had substantial contacts with the United States, including in the District of Delaware; and/or (e) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in the District of Delaware.  Specifically, Defendants Barnes & Noble, Cengage, McGraw-Hill, and Pearson are all organized in Delaware.  Although Defendant Follett is not a Delaware corporation, it has purposefully availed itself of the Delaware forum through its contacts

---

[4] There are also independent grounds for this Court to exercise personal jurisdiction over Defendants, namely:   (1) Defendant McGraw Hill has its principal place of business in, and transacts substantial business in, New York, (2) Defendants Cengage, Pearson, Follett, Barnes & Noble, and EPEG all transact substantial business in New York, (3) Defendants Cengage, Pearson, Follett, and Barnes & Noble and EPEG all conspired with New York-based Defendant McGraw Hill, and (4) Defendants committed acts in furtherance of the conspiracy in New York, including establishing Inclusive Access programs at colleges and universities in New York.

with the forum by operating on-campus bookstores in Delaware and participating in the sale and distribution of Inclusive Access in Delaware as part of the conspiracy with the Delaware-organized Defendants, causing injury to class members in Delaware and giving rise to this suit.  Defendant EPEG has also purposefully availed itself of the Delaware forum through its contacts with the Delaware-organized Publisher Defendants, as part of the ongoing conspiracy, and causing injury to class members throughout the United States, including in Delaware.  Further jurisdictional contacts are alleged herein.

## IV.    FACTS

80.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the Nature of this Action and Summary of the Allegations of this Complaint.

### A.    Course Materials Industry

#### 1.  Course Materials Products and Players

81.    Higher education course materials consist of traditional printed textbooks and other materials, as well as digital textbooks and e-textbooks, which have been used as an alternative to traditional, hard copy materials.  Students obtain e-textbooks by purchasing access codes (or unique serial numbers) that are used to unlock digital textbooks.  E-textbooks generally are available in multiple formats from a variety of retailers to address multiple users' needs.  In addition, some e-textbooks or access codes also provide the student with access to homework, assignments, exams, quizzes, tests, and/or other learning software online.  The size of the marketplace for new Course Materials is estimated at over $3 billion by the Association of American Publishers.

82.     There also is a secondary market for used Course Materials.  Students who purchased Course Materials in the hard copy format have the option to re-sell those Course Materials, including to retailers.  Those used Course Materials are then sold by the retailers to other students, at reduced prices compared to the same Course Materials in new format.  Around 2008, Course Materials became widely available for rent, also contributing to the secondary market.  With Course Materials rental, the student would pay a lower price to rent the Course Materials until approximately the end of a semester.  Then, the student would return the Course Materials to the retailer, where the Course Materials could be rented again or sold. Plaintiff Retailers and the Class members participate as both buyers, sellers, and renters in the secondary market (in addition to participating in the primary Course Materials market as buyers, sellers, and renters).  As Pearson CEO John Joseph Fallon explained, textbook publishers' "biggest competitor" had become "the sale or rental of our [their] products on the secondary market."[5]

83.     Course Materials are identified and described in the marketplace by an assigned ISBN, a unique, numeric book identifier.  Retailers (generally direct purchasers of the Course Materials from the publishers) and consumers (generally students) use the ISBN to locate the Course Materials for purchase or sale.  Particularly since the early 2000s, when the sale of Course Materials online became more prevalent, students began using ISBNs to find Course Materials and locate the most competitive pricing.  Publishers purchase ISBNs from an affiliate of the International ISBN Agency and assign them to Course Materials.  Historically, a new ISBN is only assigned to each separate edition of a publication.  Thus, if a publication with a certain ISBN was previously released (i.e., is not a brand new publication), it can be identified and

---

[5] Pearson 2020 Q2 Earnings Call (July 24, 2020).

purchased, sold, or rented on the secondary market, without requiring a new purchase from a Publisher.

84.     Course Materials are produced and sold by publishers.  The Publishers produce Course Materials that they sell to retailers, among others.  Historically, the Publishers are competitors of each other.  The Publishers, who have been dominant firms in the market for the last 30 years, are the three largest Course Materials publishers and together make up over 80% (and reportedly closer to 90%) of the Course Materials market.[6]  The Publishers' market shares in the relevant topic-specific and course-specific submarkets are even more dominant.

85.     Further, in May 2019, Cengage and McGraw-Hill announced their intent to join forces in an all-stock merger, which would have merged the second- and third-largest publishers into a single giant with near-majority share of the market.  Following multiple objections to this merger, including those filed by industry groups, student groups, and legislators (some citing this lawsuit), as well as concerns raised by various competition agencies in the U.S. and abroad, Cengage and McGraw-Hill announced in May 2020 that the merger was being abandoned.  However, as set forth herein, in the one year prior to the merger being abandoned, Cengage and McGraw-Hill used the opportunity to further the conspiracy, including a number of joint statements evidencing the coordinated activity and anticompetitive conduct and motives of the Defendants with respect to the artificial shift of the market to Inclusive Access, which provides all Defendants with artificially-high sales and profit margins.

86.     The Plaintiff Retailers and the Class members are retailers of Course Materials who are both purchasers of the Course Materials from the Publishers and competitors of other retailers

---

[6] Pearson reports that its higher education market share is approximately 40% over the last five years.  Cengage is the second largest college textbook publisher with approximately 24% of the higher education market.  McGraw-Hill is the third-largest college textbook publisher with approximately 21% of the higher education market.

of Course Materials, including the Defendants.  The Plaintiff Retailers have been participants in the Course Materials market for over 20 years, and they are operators of physical and virtual retail bookstores and online sellers.  The Plaintiff Retailers have been market leaders in providing lower-cost alternatives, formats and delivery methods to meet student demands, personalized service, and innovative programs such as rentals and e-commerce.

87.     The Defendant Retailers are also retailers and are the two largest retailers in the Course Materials market.[7]  The Defendant Retailers contract with the Universities to have a location "on campus" that sells and rents Course Materials.  Unless the school runs its own bookstore,[8] each University has one lease-operated collegiate retailer, who generally pays something for the right to be the "on campus" bookstore.  In the past few years, the Defendant Retailers have significantly increased the amount they will pay to become the lease-operated collegiate retailer at a University, in some instances paying millions of dollars to secure just one "on campus" location.  These escalated amounts would not be economically feasible for any retailer, absent the knowledge of exponentially-increased sell-through compared to historical rates.  As operators of the "on campus" location, the Defendant Retailers are given access to operate on the Universities' computer systems which allows them to take federal financial aid and payment directly from students' accounts for Course Materials sold through the Defendant Retailers.

88.     The Defendant Retailers are competitors of each other (in normal market conditions) and competitors of the Plaintiff Retailers and the Class members.  Retailers are direct purchasers of Course Materials from publishers and are the largest customer group for the

---

[7] The Defendant Retailers control an estimated 57% of the lease-operated collegiate retailers at Universities (Follett at 30% and Barnes & Noble at 25%) and an estimated 64% of total student enrollment at Universities overall (Follett at 33% and Barnes & Noble at 31%).

[8] In some instances, a school maintains and operates its own "on campus" bookstore, which is referred to an institution-owned bookstore.  Defendant Retailers do not compete for the operation of these stores, since the school does not contract out the management of those stores.

Publishers.   Historically, the Publishers have sold Course Materials at the same prices to all retailers, including the Plaintiff Retailers, Class members, and the Defendant Retailers, who have then competed for sales to students.   Retailers are the primary Course Materials' distribution channel (through sale and rental) to the ultimate consumer – students.

89.     In the early days of higher education retail, there were only large retailers (including the Defendant Retailers) that were giant corporations operating physical locations with relatively captive student-consumers.   At that time, the Publishers dictated prices; in the words of Cengage CEO Michael Hansen, "Then the used book market developed, then rental. And the industry responded to this by continuing to raise prices — which we could, because the faculty, not the student, was actually the decider, and the faculty's decision was not price sensitive."[9]

90.     But as the industry developed, more retailers entered the market (including the Plaintiff Retailers) and students became savvier in shopping for Course Materials as to both price and service.   Especially after the introduction of online selling—of which the Plaintiff Retailers were at the forefront—the Course Materials market offered many retailer choices for students (*e.g.*, the Plaintiff Retailers, the Defendant Retailers, Amazon, Chegg, and others), and those retailers competed on price and service.

91.     The Publishers first individually attempted the elimination of competition and the secondary market with the inclusion of terms for e-textbooks and similar digital Course Materials. Pursuant to the Publishers' terms, consumers of e-textbooks and similar digital Course Materials cannot re-sell those particular Course Materials.   The Publishers created access codes that were "one-time-use" only.

---

[9] Andrew Albanese, Frankfurt Book Fair 2018: Cengage CEO Michael Hansen on the Company's Digital Switch, Publishers Weekly (Oct. 10, 2018) (statement of Cengage CEO Michael Hansen).

**SECOND AMENDED CLASS ACTION COMPLAINT**                                              **PAGE 35**

92.     The Publishers also impeded the secondary market of hard copy materials through manipulation of the ISBN system.  The Publishers created so-called "custom packages" that were a campus-specific offering with a unique ISBN.  For example, the Publishers would place two existing materials with existing ISBNs into a "package" and give it an entirely new ISBN.  Or the custom package would include a disk with additional materials or sometimes even just a blank sheet of paper that was "new," and this would be a "package" with an entirely new ISBN.

93.     The Publishers also created so-called "custom books" when an existing material with an existing ISBN would have minimal alterations performed—such as a special title page or elimination of a chapter(s)—and give it an entirely new ISBN.  Students would then be told to buy this new "custom" book, when they otherwise could have purchased the same book with additional chapters at a cheaper price.  The Publishers would often offer financial rewards to Universities, departments, or faculty for requiring and using a disposable custom book in class, all in an effort to drive sales higher.

94.     These "custom" books and packages hindered or made impossible the acquisition of the Course Materials in the secondary market—or even of competing new copies of materials with the prior ISBNs—because students could not identify the appropriate substitute materials through use of the ISBN, which of course was the Publishers' intent.  The Publishers ensured new sales while pitching these "custom" programs as a benefit to the schools and students.

95.     These actions show the genesis of the Publishers' individual efforts to exclude substitutes that would otherwise price-compete with their product offerings from the market through anticompetitive conduct without meaningfully improving their products.  These individual attempts failed, however, requiring the concerted efforts that reach their zenith with the Publishers' *coordinated* Inclusive Access scheme.

### 2.   The Retail Channel

96.     Before Inclusive Access, both Defendant Retailers and Plaintiff Retailers (and Class members) were the primary Course Materials' distribution channel to students.  Once the Course Materials are chosen and made known, the retailers would purchase the Course Materials for resale or rental—from the Publisher directly and also from the secondary market where available.  Retailers purchased both physical Course Materials and digital Course Materials from the Publishers.  Retailers paid a wholesale price for the Course Materials, which was a discounted amount from the list price.  The retailer then set its own price for re-sale of the Course Materials.

97.     The retail Course Materials business (prior to the market disruption resulting from the Inclusive Access scheme) was all about service and meeting customer demands.  Student-consumers are told which Course Materials they have to purchase, and therefore the retailer must be able to provide all of those Course Materials in order to compete.  Further, many student-consumers are looking for a one-stop-shop and do not want to purchase from multiple retail locations—especially for physical retail locations.  A retailer must be able to provide all necessary Course Materials for all classes offered at the Universities in order to effectively compete.  Therefore, when a retailer intends to compete either online or in a physical location at a particular University, access to the Course Materials products of the Publishers—who are providing 80-90% of the products the Universities require for the students—is critical.

98.     The Plaintiff Retailers' and Class members' success and profitability depend on their ability to compete fairly for student purchases of Course Materials, which also helps ensure that students receive the most competitive prices and terms in the marketplace.  The Plaintiff Retailers and Class members also have been essential to development and operation of the secondary market, including through the purchase and sale of used Course Materials and

renting Course Materials.  The secondary market acts as a market check, providing opportunities for students to seek lower prices and preferred sales terms.  As Plaintiff Retailers will show, it is precisely this type of price-competitive market check that Defendants are seeking to avoid—and admittedly so—with their anticompetitive conduct.

99.    Prior to the unlawful conspiracies, exclusive dealing, and monopolization detailed herein, the Plaintiff Retailers have always had access to the Course Materials products of the Publishers, including the digital materials and custom materials.  The Publishers offered all of the Course Materials for sale to the Plaintiff Retailers and generally on the same price and terms as the Defendant Retailers.  Many Course Materials also were part of the secondary market.

100.    Also prior to the unlawful conspiracy, exclusive dealing, and monopolization detailed herein, the Defendant Retailers obtained Course Materials in the same manner as the Plaintiff Retailers—following the adoption of Course Materials by the Universities, the Defendant Retailers would purchase the Course Materials for resale or rental from the Publishers and the secondary market.  But now the Defendant Retailers are involved in artificially shifting the market to the Publishers' Inclusive Access products at the Universities where the Defendant Retailers are located—products that, once adopted, result in 100% (or nearly 100%) of the student-consumers being forced to purchase these products from the Defendant Retailers.

101.    Thus, while Defendant Retailers and Plaintiff Retailers (and Class members) used to compete for all student sales, Defendant Retailers now do not have to compete for sales of Inclusive Access Materials because Defendant Retailers and Publishers have successfully prevented Plaintiff Retailers (and Class members) from having access to and any ability to sell Inclusive Access Materials or substitute Course Materials through the Inclusive Access Scheme.

### 3. Trade Associations

102.    Two major trade associations related to the Course Materials market play a role in the unlawful activities alleged herein.

103.    EPEG is an unincorporated trade association that has provided both opportunities for the Publishers to conspire and a method to restrain competition in the market.

104.    The Publishers formed EPEG sometime in or around early 2016.

105.    EPEG is an organization with a structure and purpose to act as a legal entity with the very specific common purpose of policing the textbook industry, including by promulgating and enforcing the EPEG Guidelines, purportedly to stop counterfeit textbooks.

106.    Since EPEG's formation, the Publishers have regularly coordinated and communicated, allegedly for activities related to EPEG, but on information and belief for a number of other purposes, including the conspiracies, exclusionary conduct, and monopolization alleged herein.

107.    Through EPEG, the Publishers have united in a common enterprise and have implemented certain methods to pursue their collective pursuit.  The stated purpose for EPEG's formation and activities was for the Publishers to collectively develop, implement, and enforce so-called Anti-Counterfeit Best Practices (the EPEG Guidelines), and, through EPEG, the Publishers did in fact collectively develop, implement, and enforce their stated common objective through the EPEG Guidelines.

108.    Although EPEG was ostensibly formed to engage in anti-counterfeiting efforts, it has implemented and enforced standards that were designed to reduce supply and access to Course Materials (including for the Plaintiff Retailers and the Class members), eliminate the secondary market for Course Materials (in which Plaintiff Retailers and the Class members participate as

both buyers and sellers), limit consumer choice, and raise prices for Course Materials (including for the Plaintiff Retailers and the Class members, when they were made available for sale). EPEG and the EPEG Guidelines have provided Defendants with the opportunity, means, and motive to conspire.

109. As part of the promulgation of the EPEG Guidelines, EPEG developed and publishes a website, http://stopcounterfeitbooks.com/. According to the website, EPEG promulgates anti-counterfeit "best practices" guidelines, maintains a list of all "best practice distributors," makes a list of best practice distributors publicly available, maintains a website where it makes its best practices available and will do so "for a period of time EPEG determines is appropriate," "will encourage other textbook distributors to adopt and implement the best practices in full, as set forth on the website," provides textbook distributors with list of recent releases, and can request and audit a textbook distributor's compliance with its best practices.[10] Further, EPEG's website promulgates surrender protocols, provides a form to be submitted electronically to the email address epeg_surrenders@oandzlaw.com,[11] jointly publicizes its litigation (coercion) efforts,[12] and indicates that the website itself is copyrighted and thus intellectual property held by some entity.[13]

110. EPEG presents itself to the public as a singular entity. In addition to its website and promulgation of the EPEG Guidelines, EPEG issues joint press releases describing the efforts of "[t]he Educational Publishers Enforcement Group (EPEG) publishers, consisting of Pearson, Cengage, Elsevier, Macmillan Learning, and McGraw Hill."

---

[10] *See* http://stopcounterfeitbooks.com/best-practices/

[11] *See* http://stopcounterfeitbooks.com/wp-content/uploads/EPEG-Surrender-Protocols-for-Textbook-Distributors.pdf.

[12] *See* http://stopcounterfeitbooks.com/news/.

[13] *See* http://stopcounterfeitbooks.com/.

111.    As a collective trade association, EPEG, through its website and shared email address, has established universal forms, protocols, and procedures to prosecute a common objective, but the collective actions of the Publishers through and in concert with EPEG goes beyond its pretextual anti-counterfeiting measures.

112.    Although the stated goal of the EPEG Guidelines and EPEG's other business, including its website, has been to eliminate counterfeit textbooks in the marketplace, in reality, the EPEG Guidelines were intended to and have the effect of the Publishers controlling who can buy and sell Course Materials products in the marketplace. The Publishers have coercively used the EPEG Guidelines against the Plaintiff Retailers and Class members to reduce supply and access to Course Materials, eliminate the secondary market for Course Materials, limit consumer choice, and raise prices of Course Materials, as discussed further herein.

113.    The National Association of Collegiate Stores ("**NACS**") is a professional trade association that previously had membership of all retail outlets, including the Plaintiff Retailers and the Defendant Retailers.  The Publishers are non-voting members of NACS and attend NACS events, including panels for which the Publishers coordinate and present together.

114.    The Defendant Retailers and the Publishers regularly coordinate and communicate allegedly for activities related to NACS, as well as communicating among themselves and with each other at NACS events.  NACS provided another opportunity for the Defendant Retailers to communicate and conspire.  In particular, each year, NACS host the CAMEX Campus Market Expo.  The Market Expo itself is attended by a variety of participants, but it is preceded by days of other, more limited events attended by Publishers and Defendant Retailers.  These events occurred around February 20-24, 2015, March 4-8, 2016, March 3-7, 2017, March 2-6, 2018,

February 22-26, 2019, and February 8-11, 2020. NACS also hosts other events throughout the year attended by Publishers and Defendant Retailers.

115. In September 2018, NACS announced a change in its bylaws that would remove from its membership bookstores that are not the institutions' or student/faculty owned (*i.e.* not "on campus"). The changes were approved and implemented on April 1, 2019, which effectuated the removal of the Plaintiff Retailers and Class members from NACS. This removal is harmful and furthers the unlawful activities alleged because it deprives all competitors but the Defendant Retailers of the information shared at NACS events, the advocacy efforts of the NACS, and direct interaction with senior campus administrators and leaders through NACS. This has allowed NACS to function in furtherance of Inclusive Access, rather than as a legitimate trade association representing the interests of all retailers.

116. The Publishers also formed an Inclusive Access Conference Consortium around 2016, which sponsored conferences in 2017 and 2019.[14] These conferences, as well as their planning, provided opportunities for the Defendants to collude regarding implementation of their conspiracy.

#### 4. Course Material Prices

117. While the cost of other books has steadily decreased, the costs of higher education Course Materials has significantly risen over the last decade.[15] A recent study reported that 90% of faculty at universities reported that textbook affordability is a concern for their institution.[16] When asked about the biggest drivers of high course material prices, faculty cited unnecessary

---

[14] RedShelf Press Release (Aug. 17, 2017).

[15] The Bureau of Labor Statistics reports that textbook costs increased 88% between 2006 and 2016.

[16] *See* FlatWorld Textbook Affordability Study (2019).

new editions, bundled courseware, bookstore price gouging, one-time-use digital codes, and monopoly control of the textbook publishing industry.

118.   According to the Bureau of Labor Statistics, since the 1970s, the price of new college textbooks has risen by more than 181 percent — more than three times the rate of inflation, and more than the rate of growth for almost any other category of consumer goods.



119.   Wholesale prices for textbooks have risen even more sharply. Since 1980, the prices retailers pay have increased 742 percent, almost six times the rate of inflation for all commodities.[17]   Such inflation-beating results demonstrate conclusively the massive market power of the Publishers.

---

[17] The annual average PPI for College Textbook Publishing (Series ID PCU511130511130F21) was 106 in 1980 and 892 in 2018, a 742 percent increase. The annual average PPI for All Commodities (Series ID WPU00000000) was 90 in 1980 and 202 in 2018, a 125 percent increase. This upward trend is backed up by the Consumer Price Index (CPI) which goes as far back as 2002. The annual average CPI for College Textbooks (Series ID CUUR0000SSEA011) was 104 in 2002 and 242 in 2018, a 124 percent increase. The annual average CPI for All Items (Series ID CUUS0000SA0) was 177 in 2002 and 251 in 2018, a 42 percent increase.



Producer Price Index by Industry: Book Publishers: College Textbook Publishing
January 1980 - September 2015

120.    By 2015, only about 25 percent of college students were purchasing new textbooks each term, with around twice as many (50 percent) buying used textbooks, and the rest (25 percent) resorting to other strategies such as borrowing, renting, sharing, or not using course materials.[18] Due in large part to the secondary market and the competition at the retail level provided by the Plaintiff Retailers and Class members, average student spending had been dropping in recent years.

121.    That reduced spending harmonizes with economics research showing that in industries based on durable goods — such as textbooks, cars, or video games — the presence of a secondary marketplace can reduce the profits of the goods' primary producers by 50 percent or

---

[18]  *See* Claudio Aspesi, et. al., Landscape Analysis: The Changing Academic Publishing Industry-Implications for Academic Institutions at 37, SPARC (Mar. 28, 2019).

more.[19]  Because publishers only realize revenue from the first sale of any textbook or e-book (the "new" sale), a decline in sales of new textbooks made their old model unable to achieve the high sales and profit margins that publishers desire.  Without being able to convince enough consumers to purchase new, over-priced textbooks, publisher profits were sinking. While the fortunes of the Publishers had been steadily declining for some time, in 2016 they experienced a particularly bad year. Cengage's revenues dropped by 15 percent, and Pearson and McGraw-Hill dropped 10 and 9 percent, respectively. The declining revenue made it clear that the industry could no longer compensate for lost volume by increasing unit prices and maintain the high sales and profit margins the Publishers desired. This establishes the motive for Defendants' present anticompetitive conduct.[20]

122.    Rather than competing and making their new Course Materials more attractive to consumers, the Publishers instead created the anticompetitive Inclusive Access scheme discussed further below, which included wholesale, coordinated changes to the marketing and selling practices of the Defendants.  The Defendants' goal was to destroy competition in the Course Materials market in order to (1) restore the Publishers to their prior position with a captive student-consumer audience who must always purchase new materials produced and sold by the Publishers; and (2) restore the Defendant Retailers to their prior position with a captive student-consumer audience who has no other retail choice.  The advantages for the Defendants to avoiding competition at every level were considerable—their sales would increase exponentially each term,

---

[19] *See*, *e.g.*, Reed Shiller, Digital Distribution and the Prohibition of Resale Markets for Information Goods, WORKING PAPER SERIES: BRANDEIS UNIV. (2013) (video games); J. Chen, et al., When do secondary markets harm firms?, AMER. ECON. REV., 2911-2934 (2013) (cars).

[20] Another factor for consideration is that, since 2014, both Cengage and McGraw-Hill have been controlled by private equity firms (KKR and Apax for Cengage, and Apollo Global Management for McGraw-Hill).  The private equity firms have saddled these companies with heavy debts. Cengage has $2.2 billion in debt and paid $175 million in interest in 2019. McGraw-Hill has $2.1 billion in debt and paid $188 million in interest in 2019.

and, further, sales that feed the secondary marketplace and discipline the price of new Course Materials would be eliminated.  Defendants want a return to the state of affairs when the prices they extracted for Course Materials could rise every year, far faster than inflation, due to their monopoly power, and where students had no available alternatives in the form of substitute Course Materials or substitute channels such as the Plaintiff Retailers and Class members.

**B.    Inclusive Access**

**1.    The Inclusive Access Scheme**

123.    The result of the Defendants' anticompetitive schemes, Inclusive Access and the Inclusive Access Materials, was a so-called "new" and "better" product that is neither new nor better.  The scheme is just a re-hash of the "custom book" scam with some new twists—limited access, forced sales, and planned, coordinated conduct by the Publishers.  The Publishers—in coordination with the Defendant Retailers—use artificial technological constructs and claims of "technological advancement" to claim that the same material previously offered through other Course Materials is an entirely separate product that can only be provided "new."  Further, the material now must be purchased every semester with only limited-use privileges and can only be obtained from the "on campus" bookstore (in most cases, operated by the Defendant Retailers).

124.    The Publishers have artificially shifted the market to these "Inclusive Access" products (sometimes also called "Direct Access" or "Direct Bill").  This shifting and corruption of the market has not occurred naturally, but only through coordinated activity of the Publishers.  This is illustrated first by the timeline of the market shift to Inclusive Access and Inclusive Access Materials, with events that are discussed more fully below.

125.    The Publishers first began to attempt to introduce an Inclusive-Access-style product to the market in 2014 and 2015, through pilot programs – both collectively and separately – at

various Universities.  The product was not well-received.  As explained herein, a variety of studies showed the products did <u>not</u> evidence improvement in areas such as affordability, quality, or learning outcomes, and further showed that the students (and in many cases, the faculty) did not like the products.  There were no significant movements of the market to Inclusive-Access-style products at that time.  Not coincidentally, also at that time, the Publishers still were offering and selling all of their Course Materials products for sale to all retailers.  Nor had Publishers begun to institute their coercive exclusivity arrangements or their full-court press of misleading marketing to Universities.

126.    Then, around the end of 2015 and the beginning of 2016, a new trade association – the Educational Publishers Enforcement Group – was formed by the Publishers and began taking action in the market to control supply and demand of Course Materials on the secondary market through coercive "Best Practices" that retailers could comply with or be essentially cut-off from the collective Publishers' supply of Course Materials, as well as from other suppliers beholden to the Publishers that the Publishers demanded also require compliance with the Best Practices.

127.    Then later in 2016, "Inclusive Access" in its current form came to market – again – but this time from all of the Publishers practically simultaneously.  And this time it also came with announcements from the Publishers that they would be restricting and eventually discontinuing their production of *all Course Materials other than Inclusive Access Materials* and misleading marketing claiming that Inclusive Access Materials were cheaper and better for students.  Nothing had changed about the Inclusive Access product to address the market's prior concerns, but now all Publishers were pushing the Inclusive Access product, and it was made clear that other products – the preferred products – were <u>all</u> on the way out, as to <u>all</u> Publishers.

**SECOND AMENDED CLASS ACTION COMPLAINT**                                      **PAGE 47**

128.     Therefore, nothing changed regarding the product or the market conditions that previously rejected this Inclusive Access product.  What changed was the Publishers' planned, coordinated activities to corrupt and artificially shift the market to Inclusive Access solely for the benefit of the Publishers and their bottom line.

129.     Part of the Publishers' coordinated activities when they began working together in 2016 was to, as Peter Cohen, then-CEO of McGraw Hill explained, "evangelize"[21] Inclusive Access.  As a result of this coordination and evangelism, Inclusive Access has spread rapidly. McGraw Hill boasted in 2016 that it was making great progress in signing institutions up to its Inclusive Access program.[22] Cengage's earliest known contracts with Universities for Inclusive Access programs also date to 2016.  Pearson launched its Inclusive Access program in 2016. Tim Peyton, VP Strategic Partnerships at Pearson, stated that between July 2016 and November 2017 alone, Pearson signed Inclusive Access agreements with over 200 institutions.[23]

130.     The Defendant Retailers then joined the Publishers in coordinated activities to shift the market to Inclusive Access. And, because the Publishers – again, all of the Publishers – coordinated in cutting off all other retailers from the supply of what was shifting to be the only product of the Publishers, the Defendant Retailers benefitted greatly from the elimination of their retail competitors – the Plaintiff Retailers and the Class members.

131.     Because of the nature of the market in which Course Materials and Inclusive Access Materials are sold, this effort did not happen overnight or on the same day for every Publisher at every University.   That would be impossible, because different Universities have different

---

[21] Carl Straumsheim, Is 'Inclusive Access' the Future for Publishers? (Jan. 31, 2017).

[22] "McGraw-Hill Tackles Three of the Biggest Challenges Facing Colleges: Student Preparation, Retention and Career Readiness," McGraw Hill Press Release (Oct. 25, 2016).

[23] Lindsay McKenzie, 'Inclusive Access' Takes Off, INSIDE HIGHER ED (Nov. 7, 2017).

mechanisms and timeline for approval of any such program or adoption of Course Materials.  But the adoption of Inclusive Access at Universities across the country has been exceptionally fast given how dramatically the marketplace had to be shifted, and especially in light of the prior failure of similar separate programs attempted by the Publishers.  And regardless of when each different program goes into effect, its genesis is the same; it is the result of continued coordinated conduct by the Publishers, joined by the Defendant Retailers, with the goal of having Inclusive Access exclusively adopted at each of these Universities while the Publishers refuse to sell other Course Materials products by other means.

132.    The *coordinated* effort by the Publishers, joined by the Defendant Retailers, accomplished what the prior effort did not – having the consumer-rejected Inclusive Access Materials adopted at major Universities, growing in number every semester.  And through used of the same methodologies – exclusivity, a form of student quota, and enforcement mechanisms – Inclusive Access has permeated the Universities from 2016 through today, despite all of its well-documented shortcomings compared to previously-existing products.

## 2.    Defendants Artificially Shift the Market to Inclusive Access

133.    The Publishers describe Inclusive Access as a "partnership between an institution, bookstore and publisher to deliver digital course materials to students."[24]  Each semester, through their coordinated actions, the Publishers have exponentially increased the number of Universities and classes affected by Inclusive Access.  The Publishers also have indicated their plans to move all Universities and classes to 100% Inclusive Access-type materials.

134.    Documents obtained from Northwest Arkansas Community College, for example, show that after a brief pilot in Spring 2018 involving just 6 Inclusive Access classes, the fall

---

[24] https://www.mheducation.com/highered/inclusive-access.html.

semester of 2018 had 76 required Inclusive Access courses.  Spring 2019 had 94 such classes.  Fall 2019 had 111 Inclusive Access classes.  At Volunteer State Community College, the same pattern occurred, with an initial 6 classes in 2018 multiplying to 61 in 2020.  Patterns like those at NWACC and Volunteer State are common across many Universities.

135.    The force with which Defendants are collectively pushing and artificially shifting the market to Inclusive Access, thereby corrupting the previously-competitive Course Materials market, is undeniable.  Such programs were initially rejected by Universities after they were determined to be more expensive, not useful, and more burdensome on University staff, and then the programs have inexplicably been re-adopted without any substantial change and without any benefit to consumers.

136.    An example of this is the experience of the Tennessee Board of Regents.  Findings from a TBR study of a pilot program for Inclusive Access at multiple institutions showed that neither cost savings nor improved learning outcomes actually materialized, resulting in the program being dropped or scaled back at various campuses.  Yet TBR has now resuscitated the program, and now the programs are entrenched, to the benefit of Defendants Pearson and Follett.

137.    Another example demonstrates that, following the initial pilot, Northwest Arkansas Community College faculty did "not recommend implementing digital access [because] it is too much of a manual process with the workload falling to NWACC."  Also, Northwest Arkansas Community College indicated other complaints such as pressure from its Barnes & Noble on-campus bookstore to increase Inclusive Access, student and parent complaints about added charges, "difficulty of reading the materials on [students'] cell phones," and the "costs for materials provided by Pearson is not the final costs. You must also include B&N's markup and sale[s] tax. For example, a book priced at $100 by Pearson may increase to $130 once B&N's markup and taxes are added."

138.    Despite these significant issues, and because of the full-court press put on by Defendants, including (as more fully described herein) signing bonuses and false statements regarding cost and quality, Inclusive Access is and will be widespread, impacting every University across the United States.  As the examples herein show, it is spreading quickly.  This is made even worse by the fact that the Universities, either being bullied or tricked into adopting Inclusive Access or willingly becoming co-conspirators with the Defendants to adopt Inclusive Access and reap their own financial rewards, do not directly suffer any of the anticompetitive effects of the Defendants' scheme, rendering the scheme and the anticompetitive effects harder to detect and control for those it does harm – Plaintiff Retailers, the Class members, and the students.

139.    These efforts have borne fruit, as the Publishers themselves report.  For instance, in its November 24, 2020 Investor Update, Defendant McGraw-Hill states that the number of campuses participating in Inclusive Access is now more than 1,300, and billings for Inclusive Access are up 48% from the previous year (an annualized rate of growth of 60% is expected in the fourth quarter of the fiscal year).  Digital sales now account for 80% of McGraw-Hill's Higher Education sales, and the "inflection point"—where growth in digital billing exceeded declines in print billing—is now in the rearview mirror for McGraw-Hill.

140.    The Inclusive Access scheme is metastasizing at an alarming and accelerating rate across the higher education market. If nothing is done, the injuries will only become more widespread and the relevant markets more distorted, to the detriment of competition and harming all competitors – the Plaintiff Retailers and Class members – and student consumers. For  Inclusive Access, students are not purchasing physical Course Materials, and there is no choice of format or delivery method.  There is no longer any access code offered or unique serial number sold alone or in conjunction with physical or digital materials—although there could be; it is solely the result of

the concerted choice and design of the Publishers that the delivery method and format are artificially restricted as described herein.  Defendants attempt to describe this as a "service" model of materials publishing, but in reality, it is simply a way of re-selling the same material again and again while eliminating competition of any potential substitute products (other Course Materials) or substitute sources of products (Plaintiff Retailers and the Class members and including through the secondary market).

141.    So instead, through Inclusive Access, students are provided time-limited access (usually one semester) to the Inclusive Access Materials, which can be "turned on" for the student's account only directly by the Defendant Retailers.  Under Inclusive Access, any student enrolled in a participating class is required, usually through a so-called "course fee" automatically added to the student's tuition bill, to purchase the Inclusive Access Materials from a specific Publisher through the Defendant Retailer for that University.  Inclusive Access Materials are offered through no other outlet.  Inclusive Access Materials sometimes provides students with some type of software component, including homework or lab assignments, but in most cases, Inclusive Access Materials are simply the same Course Materials that students would receive in physical copy or digital format (if they still had that choice, which they do not).  Further, previously, these ancillary materials for homework, exams, quizzes, test, and lab assignments were given to faculty to be used with students free of charge without any charge for "Inclusive Access."

142.    The Publishers have admitted that the content offered through Inclusive Access is the same content.  Thus, with Inclusive Access, students are receiving the same Course Materials content as before but have had (or will have) their costs increased, their quality decreased, and their choices eliminated—all for the privilege of turning in their homework.

143.    Even stranger, despite the essentially zero additional cost (and actually a reduced cost due to reduced materials and labor) of providing the same material to additional students in a digital format, and despite students only having access for one semester, in cases the Plaintiff Retailers have investigated, Inclusive Access materials *actually cost more* than buying a physical book or a permanent e-book from one of the Plaintiff Retailers or another Class member. Examples of these inexplicable price differentials are set forth below.

144.    Indeed, while the product at issue is ironically called "Inclusive Access," in fact it should be called "Exclusive Access"—it is a product designed by collusion and agreement among competitors with monopoly power specifically to *limit* access to Course Materials and make it exclusive to members of the conspiracy to sell and to make it exclusively the only product and delivery method that students can purchase.  Inclusive Access does not improve the quality of education received by students or save them any money; instead, Inclusive Access eliminates the ability to have substitutes in the market for Course Materials, eliminating any vector for any party to compete with the monopoly provider, on price or otherwise.

145.    Each semester, every student enrolled at a University is forced to purchase course materials in this single format – Inclusive Access – from a single source – the Defendant Retailers, as dictated by the Publishers (or, for Universities without a Defendant Retailer, at another exclusive Publisher partner, as dictated by the Publisher).  The result of this exclusive access is to eliminate retail competitors (like the Plaintiff Retailers and Class members), the secondary market for Course Materials (in which Plaintiff Retailers and the Class members participate as both buyers and sellers), and any student choice in the Course Materials market including any basis for price competition (which was enhanced by participation of Plaintiff Retailers and the Class members in the market).

### 3.   Defendants' Use of Exclusivity Agreements

146.    This "Exclusive Access" is accomplished through a series of exclusive dealing arrangements between the Publishers, Defendant Retailers, and/or Universities—arrangements that are identical or strikingly similar amongst the Publishers and the Defendant Retailers.  The vast majority of the arrangements contain four key provisions: (1) net pricing rates, (2) minimum usage requirements (i.e., quotas), (3) restrictions on print upgrades, and (4) restrictions on publicity.  The presence of functionally equivalent overlapping terms — and, in some cases, of identical language — in agreements between different parties demonstrates concerted action by the Defendants in furtherance of their scheme.

147.    The Publishers contractually deliver Inclusive Access *only* through the Defendant Retailers (or, if not lease-operated, the institution's own on-campus store) by using either (a) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities and so-called license agreements (that operate as exclusive dealing arrangements) between the Publishers, the Universities, and the Defendant Retailers; or (b) a combination of exclusive dealing arrangements between the Defendant Retailers and the Universities, and, upon information and belief, master exclusivity agreements between the Defendant Retailers and the Publishers.  There is no practical option for Universities to contract with Publishers and Defendant Retailers without these exclusive dealing arrangements, as presented by the Publishers and Defendant Retailers.

148.    In most cases, as shown by some of the examples above, Inclusive Access begins with a pilot program impacting a few large introductory courses at a University and thereafter grows each semester to the largest courses impacting the greatest number of students and a significant portion of the Course Materials market.

149.    The exclusive dealing arrangements are multi-year, and many have annual quotas that guarantee additional classes and student enrollment each year required to use solely Inclusive Access Materials, and they force the majority of University students into Inclusive Access. These can take the form of enrollment minimums or percentage requirements. The quotas are enforced in multiple ways, including threats to cut off access to the Publishers and their materials for Universities that do not meet these requirements or significant price increases if the requirements are not met.

150.    By the third year of most arrangements, a large percentage of the University's enrollments are forced into Inclusive Access.

151.    For example, the agreement between University of Florida and Pearson set "minimum usage rates" of 10,400 enrollments in 2017, which jumped to 47,000 in 2018. The agreement between Eastern Kentucky University and Pearson started with a minimum 4,730 enrollments for Fall semester 2018, increased to 10,505 in 2019, and progressively up to 20,335 in 2023. In Cengage's contract with University of New Mexico, there are penalties for failing to achieve at least 85% enrollment in classes using Inclusive Access. Pearson has used a minimum sell-through rate of 90% in its contracts, such as with Central Michigan University. Although Plaintiffs have requested this information from a number of Universities, the minimum usage rates (or equivalent) are often redacted from public documents, when the documents are made available.

152.    Part of these exclusivity agreements governing Inclusive Access include limiting the purchase of "print upgrades" to students who have been charged for Inclusive Access Materials, as well as a restriction on the number of "print upgrades" available for purchase by students. So-called print upgrades provide students, at an additional price, the ability to have a hard copy textbook from which to work if they so choose. The fact that providing a print textbook

is considered an "upgrade," when historically it was the main business model, firmly demonstrates the non-innovative nature of Inclusive Access.

153.    The Publishers have severely restricted "print upgrades" as part of a two-pronged strategy to (1) disable the utility of course materials in circulation on the secondary marketplace (by adding exams, quizzes, and homework assignments that students now cannot get elsewhere to Inclusive Access Materials), and (2) dry up the future supply of products that feed the secondary marketplace and discipline the price of new textbooks, by not selling physical textbooks anymore. As Pearson CEO John Fallon stated,

> The first year of our digital-first product strategy, with frequent releases of content, features and updates no longer tied to an edition cycle, with print only available through our own rental program, is working. In the first half of this year, we increased total unit sales whilst shipping 700,000 fewer print products into the channel, diminishing future secondary supply.[25]

154.    McGraw Hill executives, during discussions of their proposed merger with Cengage, admitted to employing the same two-pronged strategy. In 2019, then-CEO Nana Bannerjee predicted that by restricting print output, the Defendants would eliminate the secondary marketplace within "four to six" years.[26]

155.    Absent the anticompetitive scheme, restricting print output in this way would go against each Publisher Defendants' independent economic self-interest. After all, they would make more money selling print editions, alongside digital editions. The only reason the Publisher Defendants would terminate this previously-profitable course of conduct (i.e., the unrestricted sale of physical textbooks as part of a range of format offerings) was to further their exclusionary

---

[25] 2020 Q2 Earnings Call (July 24, 2020).

[26] Cengage/McGraw-Hill Joint Merger Call (May 1, 2019).

conduct, eliminate competition (including the secondary marketplace), and monopolize the market through Inclusive Access.

156.    The exclusivity is enforced by the Defendants.  The Publishers have refused to sell Inclusive Access Materials to the Plaintiff Retailers and other Class members, including at:  the University of New Mexico, Eastern Kentucky University, New Mexico State University, Dona Ana Community College, and the University of Texas Arlington, and the University of North Texas in 2019.    The Plaintiff Retailers approached each of the Publishers regarding why they would not sell Inclusive Access Materials to them, and each of the Publishers responded with the same pretextual explanations, including that it was due to exclusivity requirements with the Defendant Retailers (or school-operated on-campus stores) either directly or through the Universities and that the Inclusive Access Materials do not or cannot exist in a format available for sale to the Plaintiff Retailers.

157.    For example, when the Plaintiff Retailers attempted to purchased Inclusive Access Materials from Defendant McGraw-Hill, the order was cancelled, and the Plaintiff Retailers were notified by Defendant McGraw-Hill that "this is an inclusive access item and there are strict contracts to follow.  Follett is the only vendor authorized to purchase these types of items for this school."  In addition, when the Plaintiff Retailers attempted to purchase Inclusive Access Materials from Defendant Pearson, the order was also cancelled, and the Plaintiff Retailers were notified that there was a "contractual agreement exclusively with Barnes & Noble for the course fee materials."

158.    As further episodes of this kind, more fully detailed below, will demonstrate, these representations that the *Universities* require exclusive use of a particular retailer are sometimes not even true—although Defendants are usually successful at securing the exclusivity they seek, they are not always.  But the fact that Publishers, like McGraw-Hill, assume that this rule is in place in

every instance shows both the nature of the intended scheme and the coordination regarding this scheme with the Defendant Retailers.

159.     In very few instances, the Publishers have offered to sell the Plaintiff Retailers an access code or similar product that is arguably a substitute for the Inclusive Access Materials.  But the Publishers have not offered that product at the same cost as that product or the Inclusive Access Materials are offered to the Defendant Retailers.  Moreover, the Publishers only did so after legal intervention by the Plaintiff Retailers.  Further, as discussed below, the Publishers and the Defendant Retailers also have taken other steps to block students from being able to "opt out" of the direct and automatic charges for Inclusive Access Materials, such that students have no opportunity to purchase, and Plaintiff Retailers have no opportunity to sell, these so-called substitute products.

### 4.   Inclusive Access Is an Inferior and Unwanted Product

160.     Contrary to representations by the Defendants, Inclusive Access Materials do not represent any innovation, technological advancement, or cost savings to students.

161.     The Inclusive Access Materials only provide students with the same Course Materials available previously in multiple formats from multiple retailers.  The only difference is a limitation on access, which does not add anything.  The access limitation actually subtracts from the student's experience and rights to the materials—they now have *only* digital materials available *only* in one specific format *only* for a very limited period of time.  A student also can obtain the materials *only* through one retailer and payment method, which is often direct billing or automatic deductions from a student's account with the University.  The access limitation also subtracts from competition in the marketplace, as other retailers such as the Plaintiff Retailers have no ability to obtain or sell the Inclusive Access Materials and there is no viable substitute.

162.     The Defendants publicly cite technology as the driver for the move to Inclusive Access, but the development of the Inclusive Access Materials was not driven by the market or consumers.  Any conceivable technological advance represented by Inclusive Access could have been delivered in far a less restrictive way and would not have required the countless coercive measures undertaken by the Defendants to force students to use and pay for Inclusive Access. The Defendants engaged in collusion and coercion because Inclusive Access could not have simply "competed on the merits" given students' preference for Course Materials available in a variety of formats, and for cheaper prices, from the competitive market.

163.     Consumer (that is, student, since it is the student and not the University that ultimately pays for these materials) preference does not support Inclusive Access.  Studies and other evidence show that in some instances over 90% of students indicate a preference for a physical book as opposed to purely digital materials for reasons including finding print textbooks to be a helpful resource, distractions that are present with computers, and headaches and eye strain that can result from staring at a screen.[27]  Indeed, the sale of digital Course Materials prior to the collusive artificial shifting of the market to Inclusive Access has been abysmal.  Given a full marketplace of options, a digital textbook is usually a student's last choice.

164.     Defendants are well aware that student preference—that is, the preference of Defendants *end consumers*—goes against Inclusive Access, but they don't care. Cengage's CEO, Michael Hansen, specifically said so: "whether somebody learns and likes to read something on a

---

[27] *See* March 1, 2018 Study at University of Central Arkansas ("80% of responding students indicated a preference for a physical book, as opposed to an e-book."); Naomi S. Baron, *Word Onscreen:  The Fate of Reading in a Digital World*; Michael Schaub, *92% of college students prefer print books to e-books, study finds*, Feb. 8, 2016, www.latimes.com; Letter from the Scholarly Publishing and Academic Resources Coalition ("SPARC"), to Honorable Makan Delrahim, Assistant Attorney General, United States Department of Justice Antitrust Division (Aug. 14, 2019) (concluding that "[a]bout half of students prefer some kind of print material over exclusively digital" and finding that "digital format may not, in fact, be better for students").

printed paper isn't really as relevant"[28] as the Publishers' business considerations. A survey of students participating in one of the earlier pilot programs of Inclusive Access by the Publishers showed that more than half of the participants preferred print over Inclusive Access.[29] And that has not changed, showing further that the Defendants' collective and coercive artificial shift of the market to Inclusive Access is actually the opposite of what consumers want. For example, a Barnes & Noble presentation to New Mexico State University in 2018 showed that, when it was not mandatory (as it is with Inclusive Access), only 8.6% of students got digital texts and commented that it must be because the students don't want them. Barnes & Noble's CEO acknowledged on an earnings call in December 2019 that "evidence persists that there is still a strong appetite to learn using the physical book" and that 96% of the more than 100,000 students responding to Barnes & Noble's annual student survey said they "find print textbooks to be a helpful resource."

165.    Product features and quality do not support Inclusive Access. Industry opinion is that digital subscriptions offer inferior quality and inferior variety to the status quo of Course Materials. Examples of these inferiorities include: requiring that all students access materials in the same way at the same price; applying expiration dates to access that prevent materials from being retained for future reference, shared with others, or resold; and quality that depends substantially on access to technology and internet connections.

166.    Students also believe the Inclusive Access products are inferior. For example, students have made comments regarding Cengage products like: "Cengage has the entire

---

[28] CNBC Interview (May 1, 2019) (statement of Michael Hansen, CEO of Cengage).

[29] The Inclusive Access Model, Jason Lorgan, Director of UC Davis Stores, https://www.slideshare.net/bisg/jason-lorgans-presentation-20150318, (May 1, 2015) (surveying more than 5,000 students who participated in a pilot program of Inclusive Access by Cengage, McGraw-Hill, and Pearson where 55% of students preferred print over Inclusive Access).

accounting program at my community college locked down….The products aren't even good, they're shoddy, hard to use and make the content of the course unnecessarily complicated."

167.    Learning outcomes do not support Inclusive Access.  Studies and other evidence have shown that physical books are more effective for education than digital materials.[30]  So-called "first day readiness" also is not enhanced by Inclusive Access.  With prior Course Materials, over 80% of students already had all their class materials before the first or second day of class.  With Inclusive Access, technical orientation and other technical issues actually require class time to explain or address, which does not result in first-day readiness and also decreases class time spent on substantive matters and delays the onset of course study.  Further, a comparison at one University disproves the claim that Inclusive Access improves student engagement and grades—the majority of courses where adoption of Inclusive Access occurred experienced a decrease in the percent of students with a grade of "C" or better.[31]

### 5.  Inclusive Access Is Not More Affordable

168.    Affordability does not support Inclusive Access.  The Publishers have claimed to Universities that there is a lower cost in order to coerce the Universities to adopt Inclusive Access.  For example, Defendant Pearson has claimed that with Inclusive Access "all students are paying a lower and equitable price," and Defendant McGraw-Hill claims that Inclusive Access provides the "lower-cost option for individual courses, with prices of up to 70% off the cost of traditional bound textbooks."   These are misrepresentations by the Defendants to further their anticompetitive schemes.

---

[30] *See* 2017 Study by Patricia Alexander, literacy scholar at the University of Maryland, in *Review of Educational Research* (determining that if a person is reading something more than 500 words, that person's comprehension will likely take a hit if the person is using a digital device).

[31] *See* Tennessee Board of Regents, Comparison of Grade Distributions: Fall 2014 to Fall 2015.

169.    Inclusive Access Materials are not usually a better deal for students than the substantively-comparable Course Materials.  For example, a comparison of textbook course fees at Volunteer State Community College reveals that the lowest cost was offered by the Independent Collegiate Retailer and that the cost of Inclusive Access was significantly higher (often double or triple the cost):

| Volunteer State Community College | Business Law (Custom) for BUSN 2370 | Network + Guide to Networks (Custom) for CITC 1302 | Conceptual Physical Science (Custom) for PSCI 1030 |
|---|---|---|---|
| Inclusive Access | $79.70 | $70.35 | $87.50 |
| Amazon | $29.49 | $24.86 | $29.97 |
| Chegg | $29.49 | $23.99 | $30.99 |
| Plaintiff Retailer | $29.99 | $29.99 | $29.99 |

170.    There are numerous other examples of significantly higher prices for mandatory Inclusive Access materials as compared to identical materials purchased through other means such as the Plaintiff Retailers and Class members:

> a.    At Arkansas State in August 2018, Pearson sold MyStatLab, through the Follett on-campus bookstore's Inclusive Access program IncludeEd at a price of $113.87.  But a student—if allowed—could have gotten the same MyStatLab materials from an off-campus retailer for $99 and from online platforms for $87-99.  When asked about these lower-cost products, Pearson tried to justify the difference by referencing the unique ISBN for the Inclusive Access product, and eventually refused to explain in writing its rationale for any use of an "affordability" message with students. The following table shows additional examples of Inclusive Access materials being more expensive than the Independent Collegiate Retailer alternative at Arkansas State during the 2018 timeframe:

| Class | ISBN | IncludED Student Price | Open Market (Independent Collegiate Retailer) | % Above Market |
|---|---|---|---|---|
| MKTG 3013 | 9781260699609 | $108.50 | $99.95 | 8% |
| BIOL 1003 | 9780135274101 | $104.11 | $99.95 | 4% |
| STAT 3233 | 9780135294505 | $113.87 | $68.50 | 66% |

b. At UCLA, the Inclusive Access price of N. Gregory Mankiw's Principles of Economics is $108.98. The same textbook can be rented for $34.51 on Amazon or Chegg. Mankiw is estimated to have made $42 million in royalties from his textbook, illustrating the profitability of a best-selling textbook title such as many of those being offered now solely in a mandatory Inclusive Access format.

c. At Ohio State University, the course CHEM 1250 General Chemistry for Engineers required the text The Central Science (14th ed.) (ISBN 978-0134414232). The Inclusive Access price was $41.62, but if the students had been permitted to buy hard copies of the textbook outside of the Inclusive Access regimen, the price was lower: $24.99 for a used copy and $14.00 to rent a copy. Similarly, the Ohio State business course BUSFIN 3300 required the Inclusive Access purchase of Principles of Risk Management and Insurance (ISBN 978-0134082578) for $53.99. Had students been able to shop through other means they could have acquired this same material for $47.61 for a used copy.

d. At New Mexico State University, the textbook for business course BUSA 111 for fall of 2018 could be obtained in print for permanent purchase from a

Plaintiff Retailer for $20 *less* than the automatically applied Inclusive Access charges, which only permit the students to access the digital copy during the semester.  The physical copy could be rented for even less.  The ISBN number for the texts was the same for the Inclusive Access version and the print version, so the material content was identical.  For a student to genuinely choose to Inclusive Access product, as opposed to being forced to accept it or not even being made aware there was a choice, would require that the student make a conscious decision to *pay more* to rent a digital copy than the permanently own (and have the capacity to re-sell) a physical one.  That a student would not otherwise make the irrational choice to pay a premium for the Inclusive Access product is the reason that Defendants have used exclusivity, automatic opt-in, and direct billing (i.e., automatic charges) as part of their contracts to lock in Universities and students.  It is also the reason that Defendants have made opting out impossible, or at least exceedingly difficult to successfully execute.

e.   At the University of North Texas, during the Fall 2019 semester, the following higher prices for Inclusive Access products have been observed, when compared with off-campus Voertman's Bookstore in Denton, Texas:

   i.   ART 1300 (889 Students Enrolled)
        Product: Lazzari's Exploring Art - MindTap 1 Term Access Code
        Publisher: Cengage
        National ISBN: 9781337281744
        IA Price Charged to UNT Students: $60.89
        Voertman's Price to Students: $55.95

   ii.  BLAW 3430 (828 Students Enrolled)
        Product: Mann's Business Law - MindTap 1 Term Access Code
        Publisher: Cengage
        National ISBN: 9780357042564
        IA Price Charged to UNT Students: $86.26

Voertman's Price to Students: $78.95

   iii.  KINE / SOCI 2050 (236 Students Enrolled)
Product: Coakley's Sports in Society 1 Term Connect Access Code
Publisher: McGraw Hill
National ISBN: 9781259844959
IA Price Charged to UNT Students: $69.28
Voertman's Price to Students: $59.91

   iv.  COMM 2020 (140 Students Enrolled)
Product: Floyd's Interpersonal Communication (delivered as an ebook
only to IA students - no Connect Access capabilities)
Publisher: McGraw Hill
National Physical Textbook ISBN: 9780073523903
IA Price Charged to UNT Students: $47.36
Voertman's Price to Students: $37.25

   v.  BIOL 1082 (130 Students Enrolled)
Product: Mader's Essentials of Biology (delivered as an ebook only to
IA students - no Connect Access capabilities)
Publisher: McGraw Hill
National Physical Textbook ISBN: 9781259660269
IA Price Charged to UNT Students: $47.36
Voertman's Price to Students: $33.75

   vi.  HMGT 1450 (209 Students Enrolled)
Product: Schiff's Nutrition Essentials - 1 Term Connect Access Code
Publisher: McGraw Hill
National ISBN: 9781260081916
IA Price Charged to UNT Students: $77.94
Voertman's Price to Students: $71.95

171.   To the extent that they appear to be a better deal in any instance, such appearance
is an artificial image created by the Publishers, who have complete control over pricing for both the
Inclusive Access Materials and the Course Materials.  When the Publishers have compared costs to
show Universities, they use their own prices as the baseline rather than market pricing.  For
example, in materials provided by a Publisher to a University the school reported the following:

| Class | Number | Book Title | Inclusive Access Pricing | New Book Pricing | New Book with Code Pricing | Used Book Pricing | Used Rental Pricing | Access Code Pricing | Inclusive Access Loose Leaf |
|-------|--------|-----------|--------------------------|------------------|----------------------------|-------------------|---------------------|---------------------|-----------------------------|
| BIOL | 11700 | Biology in Focus | $113.14 | $161.00 | $187.00 | $120.75 | $80.50 | $136.00 | *Included in Fee* |

The Publisher did not report the price at the Plaintiff Retailers or the Amazon price.  Amazon listed the textbook for rental at $34.96, used at $49.97, and in paperback new at $59.97.  The Plaintiff Retailers would have rented the textbook for the market price—$29.95.  Purportedly providing such information to the University in "case study" form misrepresents the price and cost savings. Moreover, the "case study" does not provide the ISBN for the University to independently confirm the cost of the book.  This is yet another reason why the Universities are going along with the Inclusive Access scheme – not only are the Universities being captured by large up-front payments and increased commissions from the Defendant Retailers, but Defendants are also lying to the Universities about the reality of the Course Materials market and the alleged benefits presented by Inclusive Access.

172.    In addition to this misleading information, the pricing terms contained in contracts between the Publishers and the Universities allow any supposed discounts to disappear if there are significant opt-outs or quotas missed, and also allow for annual (and sometimes twice-yearly) price increases on Inclusive Access Materials.  For example, Pearson's contract with Central Michigan University for Inclusive Access Materials states, "If such Minimum Usage Rates [90%] are not met for the applicable academic year…the Non-Discounted Prices set forth below shall apply…. Pearson reserves the right to annually adjust the Inclusive Access Prices (and Maximum Resale Prices) under this Agreement" up to "four percent (4%) annually."  And in many instances, the Publishers (and Defendant Retailers) refuse to provide public information on their pricing, claiming that information is a trade secret and therefore frustrating attempts to determine what the Inclusive

Access pricing actually is. Although Plaintiffs have requested this information from a number of Universities, all pricing terms often are redacted from the contracts.

173.    Based on their investigation of these and other similar examples at Universities throughout the country, the Plaintiff Retailers allege, on information and belief, that these substantial premiums for participation in Inclusive Access and the practice of Defendants' misrepresenting the cost of Inclusive Access Materials relative to alternatives are the norm, rather than the exception, across the Course Materials market.

174.    Further, there are other costs to be taken into consideration.  At least one University requested an increase in the student fees to cover the increased costs to the University associated with Inclusive Access.  As another example, at Eastern Kentucky University, where Plaintiff CBSKY, Inc. operates a retail location that competes with Defendant Barnes & Noble's retail location, the cost of Pearson MyMathLab materials was converted to a mandatory fee charged to registered students.  Those same MyMathLab materials were previously sold by CBSKY at a lower cost than the mandatory fee now charged to students for those materials.  At UC Davis, students are required to pay a large per-quarter fee regardless of whether they only need one course material. At UC Davis, students also are automatically billed this per-quarter fee prior to school starting.

175.    Another example at UC Davis is where two professors representing the academic senate sent a letter to university administration in April 2020 stating that the academic senate could not support the Equitable Access (a new marketing name the Publishers are using for Inclusive Access) pilot program in its current iteration, noting that there was no evidence showing that Equitable Access would reduce collective student costs or benefit the campus as a whole but instead expressing concern that it would only benefit the Publishers.  The letter noted that the Inclusive Access program was more expensive than the national average for the cost of Course Materials and

that there were logistical problems with the purported opt-out procedure because the cost of the Inclusive Access program had to be paid when tuition was due, which was before classes started and while students were still adding and dropping courses.  Senate members also expressed concern that stated "success" for the pilot is how many students are enrolled each quarter, rather than how it has impacted faculty, pedagogical quality, and student learning outcomes.

176.    That the Inclusive Access Materials are not a better deal for students is a reality that will only get worse due to the upward price effects that will result from the elimination of the competitive and secondary markets for Course Materials.

177.    The elimination of retail competitors such as Plaintiff Retailers and Class members – and therefore available options on where to purchase Course Materials – is also of concern and against the preferences of consumers.  A March 2018 survey of students at University of Central Arkansas found that "[t]extbook vendor choice continues to be an important issue for students, who are looking for price but also honest and sincere service.  Over 70% of the respondents indicated that the choice of textbook vendor was a 'very important' or 'somewhat important' issue."  And Defendant Retailers were not the student choice – that is why prior to Inclusive Access the Defendant Retailers had only a 35-40% student capture rate for sales; a number that has now gone up to almost 100% due entirely to the Inclusive Access conspiracy.

### 6.  Defendants' Inclusive Access Scheme Harms Competition

178.    These facts show that *only as a result of the described anticompetitive conduct and monopoly power* are Defendants able to obtain extortionate premiums for Inclusive Access Materials that cannot be meaningfully differentiated from identical Course Materials (both new and used) available for purchase from Plaintiff Retailers and Class members.  The historical evidence shows that the introduction of Inclusive Access, and contemporaneous cutting off of Plaintiff

Retailers and Class members by all the Publishers, was specifically timed to defeat the pro-competitive effects of available alternate sources for Course Materials, including the secondary market, Plaintiff Retailers, and Class members.

179.    As revealed by communications directly from Publishers, the driver and purpose of Inclusive Access was never to reduce costs or provide any other benefits to students. The sole driver and purpose was to eliminate competition – that is, to "de-substitutize" the market, not through product and service differentiation, but through elimination of products offered by Defendants and through contractual requirements that bind the Universities, and therefore the students who attend them.  For example, in February 2015, a Senior Consultant for Defendant Cengage communicated about a "course fee model" that the Defendant Retailers were "banking on" and stated that:

> "**The goal is to cut out online student shopping (aka Amazon) and guarantee 100% sell-through.**"

Similarly, in a May 2018 update to investors, Cengage represented that "digital adoptions provide 2x more net sales than print" and that digital "does not feed secondary market."  Pearson CEO John Fallon also explained in 2019 that Inclusive Access is a business model in which publishers "build direct relationships with…learners, who pay us directly to use our products, thus over time, eliminating the currently large secondary market."[32]

180.    In light of such communications, the coordination between Publishers (like Cengage) and Defendant Retailers (like Follett, who the above-quoted email specifically references) is manifest.  Barnes & Noble has publicly stated in March 2020 that it is collaborating more closely with major publishing partners (claiming it is at the behest of the Universities).  And

---

[32] Pearson 2019 Q4 Earnings Call (Jan. 20, 2020).

on that same investor call, Barnes & Noble reported an anticipated 4-5x growth in its Inclusive Access programs in fiscal year 2021 and a multiple growth rate of that model in fiscal year 2022.

181.    The benefits to the Publishers are obvious as well, in terms of elimination of price-competing products, as reflected by Michael Hansen, CEO of Cengage, and Nana Banerjee, CEO & President of McGraw-Hill, agreeing with a reporter that, through digital products like Inclusive Access, "**you're also able to rid yourself, hopefully long term, of the used book market**" which is a "huge component of this"—"capturing . . .the used piece" of the market."[33]  Similarly, Pearson CEO John Fallon reported earlier this year that Pearson's digital sales are up, an "early indication of secondary [market] recapture."[34]  He concluded "**[O]ur digital-first product strategy**, with frequent releases of content, features and updates no longer tied to an edition cycle, **with print only available through our own rental program, is working**."[35]

182.    Inclusive Access has allowed the Publishers to arrest the decline in profits that stemmed from stagnant new textbook prices, reduced market penetration, increased competition, consumer reliance on the secondary market, and reduced student spending on textbooks.  A recent study confirmed that if the Publishers can destroy the secondary market, they may enjoy profits 42.6% higher than under current conditions.[36]

183.    Despite all of these reasons that Inclusive Access should not be a viable product in a competitive market, one Publisher, Defendant Pearson, has now signed Inclusive Access agreements with over 900 institutions.

---

[33]  *See* CNBC Interview of Michael E. Hansen, CEO of Defendant Cengage, and Nana Banerjee, President of Defendant McGraw-Hill (May 1, 2019).

[34]  2020 Q2 Earnings Call (July 24, 2020).

[35]  2020 Q2 Earnings Call (July 24, 2020).

[36]  *See* Matt Schmitt and Tongtong Shi of Analysis Group, *Working Paper*, UCLA Anderson (2019).

184.    Likewise, Defendant McGraw-Hill estimates that the number of campuses participating in its Inclusive Access program now exceeds 1,100, with an "opt-out" rate below 2 percent (although as detailed below, that opt-out rate is artificially low due to Defendants' actions). According to the company's April 2020 investor update, 71 percent of its higher education revenues are now digital, with an "Inclusive Access model" that is "highly accretive, growing substantially (+43 Y/Y in Fiscal Q1) with a course enrollment capture rate of nearly 100%."[37]

185.    As of 2019, Defendant Cengage reported having "somewhere between 400 to 500 institutional deals" with Universities for subscription services like Inclusive Access.[38]

### 7.  Defendants Have Blocked Student Opt-Outs

186.    Defendants claim that there is a way for students to "opt out" of Inclusive Access. But in reality and as a practical matter, there is either no way or no meaningful way to opt out of Inclusive Access.

187.    Upon enrollment in a class that is subject to Inclusive Access and the exclusive dealing arrangements described above, the students are automatically charged for Inclusive Access Materials by the Defendant Retailers.  Students and faculty at Colorado Mesa University, for instance, have complained about the automatic opt-in.  Materials obtained from Nashville State Community College also show Inclusive Access fees were automatically applied in 2019.  At University of Nevada, Reno, students are charged for Inclusive Access before they can opt out, and those fees are withheld from their financial aid.  Therefore, even students who want to opt out cannot do so in time, and if they do so, their financial aid is not made available to them.

---

[37] McGraw Hill Fiscal 2021 Q1 Investor Update, Aug. 28, 2020.

[38] Cengage Earnings Call (Nov. 15, 2019).

188.    In many instances, there is no opt-out process at all.  Pursuant to the contractual arrangements and the direct enrollment/billing process, any opt-out process must be facilitated by the Defendants.  In many instances, the Defendants have purposefully failed to provide or enable any opt-out process.  For example, students have been told by Defendant Barnes & Noble there is no opt-out available for Inclusive Access materials at New Mexico State University:



In this instance, had students been able to opt out, Plaintiff CBSNM, Inc., which operates a bookstore location at New Mexico State University, had print copies available of these digital materials for purchase at approximately $20 less than the cost of Inclusive Access Materials, and it had rentals available for even less.  But students had no ability to make such purchases because the Inclusive Access platform gave them no option of opting out.

189.    Similarly, Course Information Descriptions at Nashville State refer to Inclusive Access as the "required text" and inform the student that "associated fees are automatically applied to [the student's] account."  At University of New Mexico, a handout titled "Inclusive Access Program Description for Faculty" says that the supposed discount offered for Inclusive Access Materials is premised on the "expected enrollment for the course" and "based on the assumption of 95% sell-through."  That same handout encourages faculty to tailor their courses to Inclusive Access

in a way that would limit students' choice to opt out: "ideally, [the instructor] utilized the content in such a way as to require the student to access and use the content in order to pass the class….[U]se it in a way where not having it would hurt [the student]."  University of New Mexico also requires faculty to tell students that "[o]pting out…could impact their learning experience and grade."  Similarly, comments have been made at NACS events that "[s]ometimes opting out requires the instructor to fail that student."

190.    Even where there is a supposed opt-out process, it is opaque, confusing, and difficult if not impossible to execute.  The Defendants have purposefully made it so and have implemented barriers to opting-out and deterred students from opting-out.  The procedures students must follow are difficult to discover, navigate, or follow.  For example, even when the fact of an opt-out is communicated to students, there is no option provided to students to opt-out at any time in the purchasing or direct bill process.  Defendant Barnes & Noble included the following for the below course at Northwest Arkansas Community College:



While providing no viable opportunity to opt out, Defendant Barnes & Noble charges $104.95 for a product that was on Amazon for rental for $23.  In addition, the language referencing the opt-out often emphasizes that materials are not obtainable elsewhere—saying, for example, "please be aware that in some cases, opting out will make passing your course impossible," or requiring the student to say, for example, "I want to opt out of access to all required materials for this course."

Further, opt-out procedures are often presented only on a University-wide basis and not a course-by-course basis, designed to further discourage students from even attempting to opt out.

191.    Plaintiff Retailers have obtained a guide provided by Defendant McGraw-Hill to students to assist them with registering for Inclusive Access programs.  The guide shows how to register and buy materials in a step-by-step fashion, displaying each screen.  No screen displays any button or text enabling students to opt out or even explaining that opting out is an option.

192.    In most cases where an opt-out exists, the opt-out requires the student to go through the Defendant Retailers, such as going through a Defendant Retailer online portal or having to go in-person to the Defendant Retailer location.  And the Defendant Retailers in particular have engaged in disinformation and coercion campaigns to discourage or prevent students from "opting out."

193.    An example of direct discouragement is one "opt-out" prompt from Eastern Kentucky University, which states "[o]pting out of the fee…IS NOT recommended."  The capital emphasis is original to the prompt.  Interestingly, in February 2017 email correspondence with officials at EKU about Inclusive Access programs, Pearson represented that, in implementing an Inclusive Access program, the University and the Defendant Retailer would *not* be forcing the student to pay for any content and that the students would be able to purchase the content elsewhere. That proved to be false on all accounts.

194.    Examples of deceptive statements designed to prevent opting out include the false statements that the Inclusive Access Materials differ in content from other materials available, that the method of charging for the Inclusive Access Materials is favorable, that students are being charged less for the Inclusive Access Materials than what they would pay if they opted out, and/or

that there will be negative consequences of a student choosing not to purchase the Inclusive Access Materials from the Defendant Retailers.

195.    For example, students (and in some cases Universities and their faculty) have been told by the Publishers and the Defendant Retailers that substitute materials available from other retailers such as the Plaintiff Retailers are not sufficient or not allowed.  Students also have been told that they cannot take a class or will be de-enrolled from a class if they do not purchase the Inclusive Access Materials.  Students have reported that the opt-out process was too difficult or uncertain to do with confidence, even when available.  At Arizona State University, for example, students were not provided any confirmation when they opted out, thus making it uncertain whether they would receive a refund on the Inclusive Access Materials and discouraging them from opting out.

196.    Faculty have reported not being told about the opt-out option, being effectively told not to allow opt-outs, or given incomplete and inaccurate information about the opt-out process. For example, also at Arizona State University, one professor indicated that faculty was not provided information on opting out until the day before the deadline for students to opt out. Defendant Retailers also have made derogatory remarks about other retailers to the faculty, including telling them to treat information and requests from other retailers regarding course materials as spam.

197.    In one specific example, Defendant Barnes & Noble, on its customer care website, presents says as follows in response to a FAQ question titled "How do I Opt Out of the Courseware Material in the Inclusive Access Program?":

> Please be advised it is NOT recommended that you Opt-Out, as these materials are required by your professor to complete the course. Should you choose to Opt-Out, you will then be responsible for purchasing your course materials at the Opt-Out Price and may have to work outside of the e-learning platform.
>
> It is not recommended that you Opt-Out, but to do so, click the 'Want to opt-out?' button, select your reason why and click Opt Out. If you Opt Out, you will be responsible for purchasing these materials on your own.

This answer takes the time to repeat, two times in three sentences, that opting out is not recommended. Moreover, immediately before this portion of the answer, Defendant Barnes & Noble implies that the materials will be cheaper if purchased through Inclusive Access:

> To enhance your learning experience and provide affordable access to the right resources for your class, your course is part of an inclusive access program. You can easily access these resources for the discounted price, and benefit from single sign-on access with no codes required.

198.    Defendants also advise faculty to discourage students from exercising any opt-out mechanisms that might be available. This example is from a September 2018 "First Day External Faculty Guide" prepared by Defendant Barnes & Noble for faculty at Northwest Arkansas Community College:

> **Is every student required to participate in First Day?**
> Yes, every student will have the opportunity to Opt-Out of your First Day content and then be given the option to purchase the same content at the national retail price. In addition to negotiating huge discounts, {Insert Bookstore Name} coordinates with the publishers to deliver materials through First Day, so they are available the first day of class. Opting out of the materials change, and the automatic delivery of your electronic book and courseware, IS NOT RECOMMENDED. If a student chooses to opt-out, they will be responsible for purchasing access at the national retail price and any delay will hinder their success in your class.

199.    Upon information and belief, and as strongly suggested by the above excerpt's use of "Insert Bookstore Name," this guide is a form used by Defendant Barnes & Noble with faculty at all schools at which it operates an on-campus bookstore – a guide that includes the deceptive implication that these materials will be cheaper if purchased through Inclusive Access than if purchased from a Plaintiff Retailer or Class member after opting out.

**SECOND AMENDED CLASS ACTION COMPLAINT**                                 **PAGE 76**

200.     Further, in most cases there is no alternative means to purchase Inclusive Access Materials or any substitute Course Materials, so the opt-out procedure is meaningless even if technically provided.  For example, at UC Davis, if a student opts out, they only receive a "credit" that cannot be used to buy Course Materials from other sources.

201.     Thus, even in the very few cases where the Plaintiff Retailers have been able to obtain and sell Course Materials, such as access codes or e-textbooks, that provided the same substantive content as the Inclusive Access Materials, they are still unable to compete because students are practically unable to opt out.  Further, these substitute materials have been assigned a different IBSN by the Publishers, and the Publishers purposefully charge a higher price than that set for the same content, just called Inclusive Access Materials instead, which further prevents competition.

202.     As a result of these coercive practices, opt-out rates are consistently below five percent and often as low as 1 percent.  The requirement for students to purchase Inclusive Access Materials sold by the Publishers and distributed by the Defendant Retailers—and the inability of students to opt out to buy other Course Materials instead—is a purposeful result of the anticompetitive schemes undertaken by the Defendants in this case to destroy competition in the Course Materials market, force a captive student audience to purchase new materials for every course from the Publishers, and obtain those materials only from the Defendant Retailers.

## C.     Relevant Markets

### 1.  Product Markets

203.     The relevant product market is Course Materials, for which there also are no substitutes or widely used substitutes, and no other product significantly constrains the prices of Course Materials.

204.     Relevant product submarkets, or alternative relevant product markets, are:  (1) Topic-specific submarkets, including but not limited to Economics Course Materials, History Course Materials, Mathematics Course Materials, English Course Materials, and Science Course Materials (collectively, the "Topics Markets"), and (2) Course-specific submarkets, which are markets for materials for individual courses common across many universities (and are thus too numerous to set out individually) within each of the Topic Markets (collectively, the "Individual Course Markets").  These submarkets are proper because there are no substitutes or widely-used substitutes, and no other product significantly constrains the prices of Course Materials in each Topic Market, or in each Individual Course Market.

205.     In particular, the Course Materials Market, Topic Markets, and Individual Course Markets are relevant to the Plaintiff Retailers' allegations regarding the imposition of Inclusive Access generally, and Publishers' efforts (in conjunction with the Defendant Retailers) to strong-arm schools into adopting Inclusive Access, so that they can de-substitutize the Course Materials Market, Topic Markets, and Individual Course Markets and eliminate any competition within those markets from the secondary market. These are the markets impacted by Inclusive Access as a general, market-constraining phenomenon. These markets are additionally impacted by the Exclusive Dealing Arrangements (which also impact the IA Course Materials Market, IA Topic Markets, and IA Individual Course Markets as discussed below).

206.     Another relevant product submarket, or an alternative relevant product market, is Inclusive Access Materials and its Topic Markets and Individual Course Markets.  As discussed above, there are either no substitutes or no widely used substitutes for Inclusive Access Materials, even though, absent Defendants' market-constraining conduct, print and digital Course Materials would be substitutes for Inclusive Access Materials.  Because of Defendants' conduct, no other

product significantly constrains the prices of Inclusive Access Materials as a whole or in each Topic Market or Individual Course Market.  By design, there is no secondary market for Inclusive Access Materials.

207.     In particular, the Inclusive Access Materials Market, the IA Topic Markets, and the IA Individual Course Markets are relevant to the Plaintiff Retailers' claims regarding the Exclusive Dealing Arrangements in the retail markets, as well as the group boycott and concerted refusal to deal. The anticompetitive effects of Inclusive Access generally are felt outside of the market Inclusive Access itself creates, but within these IA markets it should still be possible for retailers to compete with one another in service, price, etc. for student customers. That avenue of competition is the *only type of competition possible* within the Inclusive Access Materials Market, the IA Topic Markets, and the IA Individual Course Markets, and these markets are therefore particularly distorted by the exclusive dealing and group boycott conduct.

208.     Therefore, Course Materials (either generally, or through the Topic Markets or Individual Course Markets) and Inclusive Access Materials (either generally, or through the Topic Markets or Individual Course Markets) constitute an economically appropriate market (and/or sub-market) for the purposes of antitrust analysis.

209.     The Topic Markets, Individual Course Markets, IA Topic Markets, and IA Individual Course Markets are proper submarkets of Course Materials and Inclusive Access Materials for antitrust analysis because no product sold in any one of these submarkets is a substitute for any product sold in another market.  For instance, Science Course Materials cannot be purchased and used as a substitute for Economics Course Materials if the price of Economics Course Materials increases. Similarly, at the Individual Course Market level, United States History course materials are not an adequate substitute for European History course materials. Nor are

materials in each Topic Market or Individual Course Market complements for materials in other Topic Markets or Individual Course Markets; for instance, the purchase of Math Course Materials does not increase the demand for History Course Materials, and the purchase of calculus course materials does not increase the demand for topology course materials. Each University's need for textbooks in each Topic Market and Individual Course Market is entirely independent of its need for textbooks in other Topic Markets and Individual Course Markets. Consequently, the cross-elasticity of demand for materials in each Topic Market or Individual Course Market is neither positive nor negative, but is zero or nearly zero.

## 2.  Geographic Markets

210.    The relevant geographic market for Course Materials—other than Inclusive Access Materials—is the United States.

211.    The relevant geographic market for Inclusive Access Materials is each individual University.  Inclusive Access is marketed, sold, and implemented at the University level by the Publishers, aided by the Defendant Retailers.  The Universities are the principal markets for the sale of Inclusive Access Materials, and also for the sale of Course Materials.  The sale of Inclusive Access Materials occurs on a campus-by-campus basis, and students at one University cannot obtain Inclusive Access Materials through other Universities or other online options.  Thus, no geographic market other than each individual University is a viable substitute or in any way constrains prices, and this is an economically appropriate market for the purposes of antitrust analysis.  Alternatively, the relevant geographic market for Inclusive Access Materials is also the United States.

### 3.  Market Conditions

212.    The Publishers are competitors of each other (ostensibly) in the market to sell Course Materials and Inclusive Access Materials.

213.    The Defendant Retailers are competitors of each other (ostensibly) and competitors of the Plaintiff Retailers and Class members in the market to sell Course Materials and Inclusive Access Materials (if there was not a group boycott and conspiracy to restrict access to Inclusive Access Materials).

214.    The Plaintiff Retailers and Class members, as both purchasers and sellers of Course Materials and Inclusive Access Materials (if there was not a group boycott and conspiracy to restrict access to Inclusive Access Materials), are actual and/or potential competitors and/or direct purchaser consumers in the relevant markets affected by the allegations in this case.

215.    The relevant market(s) are particularly conducive to collusion.  The markets are highly concentrated with extremely high barriers to entry.  These conditions also favor and give greater power to the sellers—the Defendants—compared to the buyers in the relevant market(s). At the student level, demand is highly inelastic; students have no choice but to purchase the products their courses require and, due to Defendants' conduct in this case of eliminating suppliers such as Plaintiff Retailers and the Class members, very little choice but to purchase them on the terms those products are offered from Defendants.  These factors exist at all levels of the market, filtering down from the power of the Publishers to the Defendant Retailers, because the Publishers' market power enables them to choose winners and bestow retail market power on those retailers who will agree to cooperate with their anticompetitive schemes.

216.    The Course Materials market is highly concentrated.  At least 80%, and reportedly closer to 90%, of the sales of new Course Materials across any geographic market are made by the

three Publishers.  Specifically, Pearson has approximately 40%, Cengage has approximately 25%, McGraw-Hill has approximately 21%, of the Course Materials market.  There is a secondary market for some Course Materials, which should not be included in determining the Publishers' market or monopoly power.

217.    The Topic Markets are even more concentrated.  This is by design.  As is widely known in the industry, the Publishers generally avoid competing with each other within Topic Markets.[39]  Consequently, Pearson is a dominant presence in the Math Course Materials submarket and the Science Course Materials submarket, on information and belief controlling more than 50% of each of these markets, while Cengage is dominant in the Economics Course Materials submarket, on information and belief having a greater than 50% control of that market. McGraw Hill and Pearson appear to share the English Course Materials submarket, on information and belief controlling all or nearly all of that market. Cengage and McGraw Hill dominate the History Course Materials submarket, on information and belief controlling all or nearly all of that market.

218.    As the scale of analysis tightens, Publisher market control becomes even more dominant. On information and belief, a significant number (if not all) of the Individual Course Markets are monopolistic, with each Publisher having specific monopoly control over a subset of these markets. Again, this is by design, and it is well-known.

219.    The concentration of these markets has not gone unnoticed. The merger of Publishers Cengage and McGraw-Hill was called off following the investigation of the United

---

[39] Foundation for Economic Education, *Student Frustration with the Flawed Textbook Market is Justified*, August 11, 2019 ("Major textbook publishers avoid direct competition with one another by not publishing in subjects where one company has found success."); Ari Kotler, *It is time to take back the textbook market*, THE VERMONT CYNIC, September 12, 2020 ("Together, these companies have total control of the textbook market, avoiding competition by allowing each other to dominate textbook publishing in specific subject areas."); David Annand & Tilly Jensen, *Incentivizing the Production and Use of Open Educational Resources in Higher Education Institutions*, INT'L REV. RES. OPEN & DISTRIBUTED LEARNING, June 2017, Vol. 18, No. 4 (explaining that the US higher education market has become an oligopoly in which "[r]ival firms avoid competing against popular textbooks in certain subject areas.").

States Department of Justice Antitrust Division ("DOJ") and intervention by several members of Congress. The U.S. antitrust authorities were calling for stringent requirements that the companies divest educational assets prior to merging to avoid further concentration. However, the DOJ's materials regarding market and other analyses that led Cengage and McGraw-Hill to call off the proposed merger have not been made public. Congressional concerns about the merger focus on the "highly consolidated nature of the textbook industry," "[t]extbook publishers' practice of frequently releasing new textbook editions even when updates are either minor or merely cosmetic forces students to purchase the cost-prohibitive, newest version of a textbook, and depresses the value of older editions for purposes of resale," and concern that "digitized textbooks—which are increasingly automatically billed to students through 'inclusive access' programs—would eliminate that choice, further straining the competitiveness of the textbook market."[40]

220.    Publishers' well-known propensity to avoid competing with one another can be hidden to some extent at the Course Materials market and even the Topic Market level, but it is obvious when common courses are considered. Publishers' shared interest in protecting their mutually-policed monopolies and near monopolies further motivates the anticompetitive conduct alleged herein. What can already be inferred from information available to the public will be demonstrated with clarity after discovery.

221.    In addition, the Inclusive Access market is highly concentrated. Upon information and belief, more than 90% of the sales of Inclusive Access Materials across any geographic market are made by the three Publishers. There is no secondary market for sales of Inclusive Access Materials, which is by design. Similarly, in the Inclusive Access market, the Topic Markets and

---

[40] Senators Richard Blumenthal, Richard Durbin, Dianne Feinstein, Tina Smith, Cory A. Booker, and Mazie K. Hirono, Letter to The Honorable Makan Delrahim, Assistant Attorney General, Antitrust Division, Department of Justice (Apr. 24, 2020).

Individual Course Markets are even more highly concentrated.  On information and belief, the Inclusive Access Topic Market shares are as or more monopolistic than the Course Material Topic Market shares, and the Inclusive Access Individual Course Market shares are even more monopolistic than that, which is ensured by (1) the limited and exclusive nature of Inclusive Access Materials and (2) the cooperation and coordination of the Publishers.

222.    Whether considered in the general Course Materials Market, the Inclusive Access Market, the Topic Markets, or the Individual Course Markets and whether or not the secondary market is included, the Publishers each have market and monopoly power across any geographic market.

223.    At the retailer level, the Defendant Retailers each have market and monopoly power in the Inclusive Access market because, as described above, they have 100% of the sales of Inclusive Access Materials at each University where they are the lease-operator.  Indeed, the effect of the combined exclusive dealings between the Defendant Publishers, Defendant Retailers, and Universities, whereby the corresponding Publisher and Defendant Retailer to each University operate as exclusive providers of Inclusive Access (and therefore of Course Materials), is to generate geographical monopolies at each University – certainly for the Defendant Retailers and in most instances also for the Publishers.  In the University Inclusive Access Market, each Publisher and Defendant Retailer has the power to control prices and exclude competition in that market.  The Publishers are the primary providers of Inclusive Access (as described herein), and at each University, their shares are generally in excess of 70%.

224.    In addition to the percentage market shares, the monopoly power of each Defendant is demonstrated by each of their ability to exclude competitors, to control prices (including driving prices at supracompetitive levels), to control the secondary market, and to impose unwanted

distribution policies on the Universities and consumers, all discussed further herein.  Ultimately, the ability of Defendants to extract the prices they can, for products that are not meaningfully differentiated from products that, but for Defendants' anticompetitive conduct, would be perfect or near-perfect substitutes, is direct evidence of market power.

225.    In addition to the direct evidence, the Publishers' market shares evidence their monopoly power. The Publishers have a combined market share of 80-90% of the Course Materials market nationwide, with Pearson having more than 40%, and Cengage and McGraw-Hill each having more than 20%.  Pearson's majority dominance in the Math Course Materials and Science Course Materials market, Cengage's majority dominance in the Economics Course Materials market, and the extreme concentration of the History Course Materials and English Course Materials market, alleged above, shows each Publishers' monopoly and market power in the various Topic Markets.  When their forced shift of the market to Inclusive Access is complete, the Publishers will increase sell-through and eliminate competitors and competition, thereby further increasing each of their market shares in the Course Materials Market, the Inclusive Access Market, and the Topic Markets.  These effects will be felt even more deeply in the Individual Course Markets, which are held at nearly 100%, with each Defendant having a subset of these markets.

226.    Such a high concentration of the relevant market(s) enhances the Defendants' ability and incentive to collude.  In particular, the Publishers are joined in their desire to eliminate competition with substitutes to their products.  Defendant Retailers share that desire because it leads to increased sales and profits as well as their monopolization of the retail market.  The concentration of the market makes colluding towards these shared goals easy and effective.

227.    The Defendants have the power to control prices as evidenced by the textbook industry's relentless trend of annual price increases between 1980 and 2016, *vastly* outpacing inflation.  Each of the Defendants have consistently raised prices above the competitive level for significant periods of time.

228.    Further evidence of this power to extract monopoly prices is demonstrated by the examples above which show that the prices of Inclusive Access Materials dramatically exceed the costs of nearly-identical or actually identical products when such products are able to be purchased from Plaintiff Retailers or Class members, despite Inclusive Access Materials offering only temporary "rental"-type possession.

229.    The Defendants also have the power to exclude competition in the relevant market—either Course Materials or Inclusive Access—which has been facilitated by their past use of unique ISBNs, custom books, current refusal to sell Inclusive Access, and use of EPEG to create and enforce the EPEG Guidelines.

230.    The Defendants are also significantly restricting output by eliminating substitute products such as traditional print textbooks and by restricting access to Inclusive Access Materials such that they can only be obtained through the Defendant Retailers.

231.    Defendants' monopoly power was and is protected by substantial barriers to effective entry and expansion.  The history of the Course Materials market is devoid of successful entries (with the same three firms dominating the market for more than thirty years), evidencing the notoriously high barriers to entry.  Entry into the relevant market(s) takes time, a substantial cash investment, a knowledge of the marketplace, relationships and approved accounts with suppliers and consumers, and access to content and the Universities.  Related to content, the Publishers monopsonize the relatively small group of textbook authors, keeping them on contract,

and rendering them unavailable for other potential market entrants to contract with. The result of this is that, in order to enter the market, a competitor would have to either persuade many such authors to leave their presently-lucrative contracts or develop an entirely new group of textbook authors.

232.    For retailers, there is often a request for proposal process to be a lease operator that requires the bidder to already operate numerous on-campus stores such that the Defendant Retailers are among the few, and sometimes only ones, that can submit an RFP response. Further, Defendant Retailers' recent escalations of financial incentives also have made this process less competitive. And for both on- and off-campus retailers, there is a significant outlay of capital involved not only at the beginning but also each semester, as well as necessary relationships with suppliers and student populations, many of which must be built over time. Thus, there are significant barriers to entry into the relevant markets. This was true even before Defendant Publishers' anticompetitive actions related to Inclusive Access. But now, denial of access to the content and to the Universities—especially as it relates to Inclusive Access Materials—severely debilitates or completely prevents a competitor from competing in the retail market. Once Inclusive Access Materials are designated as mandatory at a University, the barrier to any retailer other than Defendant Retailers selling materials for that course is near perfect. The end consumer, the student who actually pays the price, is not among the parties making these market-constraining decisions. Thus, while there were immense barriers to entry into the relevant markets even prior to Defendants' anticompetitive conduct, Defendants' conspiratorial, unfair, and exclusionary methods of competition described herein have raised additional, near-insurmountable barriers to effective entry, expansion, or indeed even continued existence within the relevant market(s).

233.    In addition, there is a history of unsuccessful attempts to enter the relevant markets – and ultimate exits – by other companies.  At one point there were up to two dozen players in the Course Materials publishing market, and now substantial industry consolidation has left the Publishers with dominant market share and weak competitors.  Similarly, significant players have exited the retail market or been consolidated with Defendant Retailers.

234.    If a given change in price triggers a smaller proportionate change in the quantity demands, then the demand for the good or service is said to be inelastic.  That quantity demanded of Inclusive Access Materials or Course Materials is price inelastic.  When the relative importance of price differences between products is low (as in the case of college textbooks), the "price elasticity of demand" — the extent to which sales go down with the price goes up — will also be low or inelastic.  Price inelasticity gives textbooks publishers the ability to raise or maintain prices above competitive levels without losing sales.

235.    Students – the end consumer – are assigned which particular Inclusive Access Materials or Course Materials they are required to buy by each University (coerced or at least influenced by the Defendants), and this requirement is in no way dependent on or constrained by price.  Thus, as described above, students are a captive market whose demand for Inclusive Access Materials or Course Materials does not fluctuate with price.  Further, the lack of viable substitutes for the Inclusive Access Materials or Course Materials required by each University, including in the Topic Markets or Individual Course Markets, contributes to the price inelasticity.  The Course Materials also carry no official list price, allowing for price changes at any time.

236.    This creates a highly exploitable market for Defendants, who can design and sell materials without regard to the preferences, need, or financial constraints or distress of the ultimate student-consumers, and who can hinder or eliminate competition in the sale of those materials

through denial of access.  The Defendants' control of the University and denial of access to the University to the Plaintiff Retailers and the Class members on any terms, let alone reasonable or fair terms, results in the Plaintiff Retailers and the Class members having no practical or reasonable opportunity to obtain or deliver products and no practical ability to otherwise compete.  Such control and denial are contrary to the Publishers' independent business interests and lacks a valid business justification, ultimately increasing the Defendant Retailers' monopoly in the market.

237.    The captive and highly distorted nature of these markets is not entirely new, and Defendants did not only just begin to collude, but their collusion regarding Inclusive Access is new and its effects on the market have already been devastating, and will only get worse.  It is the market forcing of Inclusive Access, combined with Defendant Publishers' refusal to permit competition even in the retailing of Inclusive Access Materials, that is calculated to eliminate what little competition the market previously had.  In fact, Defendants steps are a reaction to procompetitive trends in recent years that have tended to lessen Defendants' market dominance.

238.    There simply is no explanation for the extractive power that Defendant Publishers have had for years – the power to charge nearly any amount they like for new editions of substantially the same textbooks – except for monopoly power.  But in the past, extortionate pricing drove an expanding secondary market and adoption of other ways of saving on Course Materials and this, coupled with the rise of lower cost alternative retailers and retailers offering online platforms, like Plaintiff Retailers, Amazon, and Chegg, briefly drove a decline in the amount students spent on course materials between 2013 and 2019.  This trend has been broadly covered in news media.  As recorded in an article summarizing a podcast interview for Vox in August of 2019, Defendant Pearson's CEO admitted that its problem was that, thanks in part to price competition from certain retailers who would either buy books wholesale and rent them, or

sell used books on the secondary market, "the $300 textbook is dead."[41]   It is not a coincidence that Defendants began their move towards Inclusive Access and towards exclusive dealing arrangements and a group boycott in response to this effective price competition from Plaintiff Retailers and Class members.   In its 2019 Annual Report, Defendant McGraw-Hill admitted that reductions in market share and prices had resulted from "competition" including from "relatively inexpensive education products" and the "[g]rowth of the used and rental book markets."   On that last point, this Publisher complained that "[t]he sale of used books and rental of books provides a lower priced option for consumers."

239.   Inclusive Access will erase (and is erasing) the complained-of substitutes from the competitive landscape.   These substitutes show that the market is not naturally anticompetitive; in the absence of Defendants' anticompetitive conduct, extractive prices are not inevitable.   This evidence of prior effective price competition shows the lie in Defendants' statements that their recent success and the rise of Inclusive Access is due to the innovative nature and market desire for their new products and services.   The only "innovations" here are not targeted at improving Course Materials, but only at improving Defendants' own financial situation by evading the price competition that had begun eating into Defendants' bottom lines.

240.   Defendants' efforts to prevent students from even having the opportunity to choose these price-competitive substitutes, or to buy Course Materials (or even Inclusive Access Materials) from the retailer of their choice are the result of Defendants briefly having experienced price competition and finding that it was not to their liking.   It is evident that Defendants' efforts to counteract price competition, as described in this Complaint, are beginning to work.   In the same Vox article in which Defendant Pearson's CEO declared the $300 textbook dead, he touted

---

[41] *See* Eric Johnson, *"The $300 textbook is dead," says the CEO of textbook maker Pearson*, Aug. 2, 2010, www.vox.com.

"services-type offerings" like Inclusive Access as "the fastest area of growth" for Pearson's Course Materials business. Pearson's CEO also described in earnings calls the plan of "eliminating the currently large secondary market." McGraw Hill's Annual Report, dated December 31, 2019, admits "Growth of the used and rental book markets could adversely affect our revenue…. The sale of used books and rental of books provides a lower prices option for customers…. Recent technological and market developments have result in an increase in the size of used and rental markets…. Further expansion of the used and rental markets in which we do not participate could adversely affect our revenue." Defendant Cengage's investor update for Fiscal Year 2020 shows continued increase in "recurring units," which are "Rental, Core Digital & eBooks" including Inclusive Access-type materials). Cengage's update further explains that "[r]ecurring units do not feed secondary market[,]" demonstrating clearly the goal of moving in this direction.

## D.    Anticompetitive Agreements and Behavior

### 1.    The Conspiracy

241.    The Defendants entered into conspiracies and contracts in restraint of trade and abused their market power for the purpose of forcing the entire Course Materials market into a single product delivery system – Inclusive Access – that would restrict sale and distribution to only be available from the Defendants. With Inclusive Access, the Defendants committed — in concerted fashion, almost overnight — to completely abandoning traditional print textbooks, dealing exclusively with the Retailer Defendants (and concertedly refusing to deal with Plaintiff Retailers and Class members), and offering digital-only, time-limited, non-shareable, non-resalable, and effectively mandatory courseware enrollments. The mechanics of the Inclusive Access scheme were detailed above in Section B.

242.    The goal and result of this anticompetitive conduct is narrowing the Course Materials Market to be only the Inclusive Access Market, eliminating competition from the secondary market altogether, and driving the Plaintiff Retailers and Class members out of business as retail competitors, with the end result of controlling supply and raising prices.

243.    The Publishers entered into one or more agreements to (1) eliminate products from the relevant market(s); (2) conduct a group boycott of and concerted refusal to deal with the Plaintiff Retailers and Class members to squash retail competition; and (3) monopolize the relevant market(s).  The Publishers also conspired with the Defendant Retailers and entered into one or more agreements to (1) eliminate products from the relevant market(s); (2) conduct a group boycott of and concerted refusal to deal with the Plaintiff Retailers and Class members to squash retail competition; and (3) monopolize the relevant market(s).

244.    Concerted action was critical to the Publishers' rapid expansion of Inclusive Access.  One Publisher moving, on its own, to an exclusive, delivery-service model like Inclusive Access would have been perceived as experimental, restrictive, or otherwise undesirable (as, indeed, it was in the 2014-2015 timeframe when the Publishers made their individual efforts). Such a move may even have caused a Publisher to lose market share to competitors willing to sell print, e-books, and other formats.  While businesses sometimes gain an advantage by the being the initial occupant of a market segment, no "first-mover advantage" exists in the textbook market where decisions regarding which textbooks to assign or purchase must be made by numerous stakeholders resistant to change. One Publisher introducing Inclusive Access likely would have been risky.  However, with all three of the Publishers, who indisputably control almost 90 percent of the market, agreeing to artificially shift the market to Inclusive Access, the risk was substantially lower.  Together, the Publishers could create a scenario where Universities understood they had

no choice, while the Publishers collectively publicly stated that these digital materials are the "wave of the future," which the Publishers emphasized by making it the only product offered while also all touting the same supposed (and false) benefits of the system.

245.     Cooperation from the Defendant Retailers was required for the scheme to work—the Defendant Retailers provided the mechanism for distributing the materials, and for sharing the revenues and further incentivizing the Universities to require Inclusive Access.

246.     By agreeing to artificially shift the market to only selling Inclusive Access Materials to Universities, the Defendants manipulated and corrupted the market to eliminate competitors and competition and acquired or enhanced their monopoly power in the relevant market(s).  Then, by refusing to sell Inclusive Access Materials to the Plaintiff Retailers and Class members and preventing the Plaintiff Retailers and Class members from obtaining and selling Inclusive Access Materials or potential substitutes by other means, the Defendants prevented the Plaintiff Retailers and Class members from competing with Defendant Retailers and remaining in the market to sell Inclusive Access Materials or Course Materials, even under these artificial conditions.

247.     This result was the common purpose for which Defendants worked together to increase their own profits at the expense of the market, competition, and consumers.  The Publishers have made it plain that their intent is to shift the market to Inclusive Access, and to the extent print or other formats will be available at all, it will be in the form of rentals that cannot be resold.  On a May 1, 2019 joint investor call for the merger of Defendants Cengage and McGraw-Hill, Dr. Banerjee of McGraw-Hill stated plans to "[take] out this used secondary market book enterprise that has really been a disruptor for us."  He specified a four to six year timeline, and projected that they would be "more than half way through" within two and a half years.  According

to Cengage's 2019 annual report, the point of Inclusive Acces is to give the Defendants "access to a greater number of students in any given classroom" by locking them into digital subscriptions that, "[i]n contrast to print publications . . . cannot be resold or transferred" on the secondary market.[42]  To be clear, these are open admissions that the Publishers' main problem has been price competition with the same products or adequate substitute products, and they are solving it together.

248.    The Defendants' anticompetitive actions have created an almost 100% sell-through requirement in this captive market where all students have to buy all new Inclusive Access Materials from the Publishers through the Defendant Retailers (or the Universities, when a Defendant Retailer was not present).  All of this conduct was knowing and intentional.  The Defendants have already achieved many of their goals and harmed the market and competition at Universities across the country.  Once they have fully eliminated competition, the Defendants will continue to raise prices and reduce quality, service, and innovation, unchecked by any competitive market forces.

249.    The powerful Publishers all desired to eliminate the secondary market and choices for student-consumers in Course Materials and move the market to solely Inclusive Access Materials for which the Publishers would receive 100% of sales to students in every class, every semester at the Universities, at whatever price the Publishers choose to set.  Inclusive Access Materials in their current form represent an unprecedented change in both the format of products offered by the Publishers and the access controlled by the Publishers.  As discussed in Section B, Inclusive Access is not what students want or need and is, in reality, the opposite of innovation.

---

[42] Cengage, Cengage Learning Holdings II, Inc.: Annual Report for Fiscal Year Ended March 31, 2019.

250.    The Publishers then began to artificially shift the market to Inclusive Access (and only Inclusive Access) – with the same mechanics – to the Universities to whom they market, especially for the core and lower-level classes that have the highest student enrollment, and therefore the largest economic impact on the Publishers.  The Publishers did not independently arrive at this across-the-market decision to create a standardized and "new" product, and to offer virtually only that product and in only that way.

251.    In fact, if the Publishers had not coordinated this conduct, Universities would have been more likely to deal with the Publishers offering more choices and avenues for sale, especially choices that coincide with market preferences and other issues.  The initial failed attempts at introducing Inclusive Access to the market and converting Universities to the Inclusive Access model shows that if any one Publisher had made Inclusive Access its only product, that would likely not have gained traction.  It would have further been a significant risk to any given Publisher that Universities would have chosen other products, and therefore other Publishers, with whom to deal.  However, with coordination among the Defendant Publishers controlling around 90% of the market artificially shifting the market to *all* only offer Inclusive Access, that risk was greatly reduced, and the Universities were left with no choice.  No one can refuse to buy what is essentially the only product on the market, despite its many negative aspects for students, disfavor with faculty, and limited availability from one retailer.

252.    Senior executives of the Defendants frequently and privately communicated with one another regarding various topics in furtherance of the conspiracy, including the mechanics of the Inclusive Access scheme, elimination of the secondary market, monopolization of the relevant markets, and the group boycott and concerted refusal to deal with the Plaintiff Retailers and Class members.  The Defendants had multiple opportunities to conspire, including at activities related to

EPEG, NACS, and the Inclusive Access Conference Consortium, coordinated activities in relation to rule-making for the Higher Education Opportunity Act, and merger discussions between the Defendants.  In fact, EPEG itself, through both its formation and actions, provided a pretextual platform for the conspiracy to play out in plain sight.

253.    It is known that the Publishers communicated with one another and had meetings regarding Inclusive Access (and related agreements and exclusionary activities) in at least the following instances:  coordination of efforts related to U.S. Department of Education rulemaking that could affect the delivery and price of Inclusive Access Materials, and meetings and other activities of NACS and the Inclusive Access Conference Consortium.  It is known that the Publishers communicated with one another in the following instances, and upon information and belief, regarding Inclusive Access (and related agreements and exclusionary activities):  meetings and other activities of the EPEG trade association and activities related to the proposed merger of Defendants Cengage and McGraw-Hill.  The Publishers had many other opportunities to communicate and conspire through these and other activities.

254.    The Publishers arranged and agreed upon a system by which they would all accomplish development and conversion of the market to exclusively Inclusive Access Materials (and other new Course Materials in some instances), restricting retailer access to the Inclusive Access Materials (and other new Course Materials), and the monopolization of the relevant markets.

255.    The system included coordination of efforts related to U.S. Department of Education rulemaking that could affect the delivery and price of Inclusive Access Materials.

256.    And, as described above, the system included the use of trade associations. Specifically, the Publishers formed EPEG in or around early 2016.  The stated purpose of EPEG

was for the Publishers to collectively develop, implement, and enforce the EPEG Guidelines, which had the stated goal of eliminating counterfeit textbooks in the marketplace.  In reality, the EPEG Guidelines were intended to and have the effect of the Publishers controlling who can buy and sell the products in the marketplace, and the Publishers have coercively used the EPEG Guidelines against the Plaintiff Retailers and Class members to reduce supply and access, limit consumer choice, and raise prices of Course Materials.  The EPEG Guidelines limit from whom the Plaintiff Retailers can buy books, which hinders the secondary market.  Further, the EPEG website publicly identified an "allowed list" of those companies who were following the EPEG Guidelines, and the Publishers (collectively, through EPEG) require and/or coerce other essential suppliers (who themselves need to be able to purchase from Publishers for their own businesses) not to buy from or sell to anyone who was not on the "allowed list," thereby creating a "disallowed list."  Essential industry suppliers will not sell or purchase to anyone not agreeing to the EPEG Guidelines or on the Publishers' collective (through EPEG) "allowed list."  In essence, the EPEG Guidelines constrain retailers' use of Amazon and similar online platforms to purchase books in order to continue to do business with the Publishers and other essential suppliers.

257.    The Publishers also formed an Inclusive Access Conference Consortium around 2016, which sponsored conferences in 2017 and 2019.  These conferences, as well as their planning, provided opportunities for the Defendants to collude regarding implementation of their conspiracy.

258.    The NACS trade association also was utilized by the Publishers and the Defendant Retailers to advance the Inclusive Access conspiracy, culminating in the exclusion of competing retailers from the organization altogether in 2019.

259.    For the conversion of the market to Inclusive Access Materials to be most effective and to move more quickly and more easily, the Publishers recognized the Defendant Retailers must be on board.  The Defendant Retailers could assist in moving the market to Inclusive Access Materials, and the agreements between the Defendant Retailers and the Universities for operation of the retail locations could be leveraged and manipulated to create the necessary and desirable exclusivity between the Publishers and the Defendant Retailers.  Similarly, the Defendant Retailers recognized the opportunity to join the Publishers in moving the market to Inclusive Access Materials and to secure themselves as the exclusive providers in this artificial "new" market.

260.    In furtherance of the conspiracy, the Defendant Retailers encouraged the Publishers, provided the Publishers their full cooperation, coordinated with the Publishers regarding terms for Inclusive Access, and participated in all aspects of the conspiracy, including implementing the Inclusive Access scheme at the Universities to artificially shift the market to only Inclusive Access Materials.  The Defendant Retailers desired to eliminate retail competitors as well as the secondary market and choices for student-consumers in Course Materials.  Prior to the Inclusive Access scheme, the Defendant Retailers had an average capture rate of 35-40% of the student purchases of Course Materials at a University.  Through their agreements with the Publishers whereby the Publishers agreed not to sell the Inclusive Access Materials to the Plaintiff Retailers or Class members or directly to the student-consumers, the Defendant Retailers are the exclusive source of Inclusive Access Materials at their respective Universities, and receive 100% of sales to students for every class, every semester and therefore 100% of the profits at those Universities.  This arrangement eliminates all substitute sources for the Inclusive Access Materials (including the Plaintiff Retailers) and any potential competition on price, terms, or other benefits to the student-consumers.

261.   This is, of course, the intended effect of the conspiracy, which benefits both Publishers and Defendant Retailers and is touted to the Universities as a benefit.  For example, Pearson represented to Eastern Kentucky University that Inclusive Access programs would increase the student capture rate of the on-campus bookstore operated by Barnes & Noble from 25% to close to 90%.

262.   Since the time of the Inclusive Access conspiracy, the Defendant Retailers have significantly increased the incentives to the Universities to be certain that the Defendant Retailers become or remain the lease-operator of the University bookstore locations.  For example, the Defendant Retailers are providing high-dollar payments to the Universities in order to secure their status as lease-operator.  These payments by the Defendant Retailers, while not unheard of in lower amounts prior to Inclusive Access, have now increased substantially to amounts that are far beyond a payment that would be justified by the Defendant Retailers' typical profitability of a University location.  These payments not economically justifiable and are not in the Defendant Retailers' economic self-interest, but for expectations of the reduced competition and nearly 100% sell-through promised by Publishers and Defendant Retailers' coordinated efforts to push Inclusive Access.

263.   In some instances, the Defendant Retailers are now paying the Universities an up-front sum of millions to be the lease-operator of the University bookstore location.  For example, at Eastern Kentucky University, Barnes & Noble paid a staggering $3.3 million signing bonus for their on-campus bookstore contract in 2017.   For comparison, the prior contract from 2007 contained a signing bonus of only $200,000.  Barnes & Noble paid $1.25 million, plus a $250,000 signing bonus to the University of South Alabama for a 2018 contract. Barnes & Noble also paid $1 million to the University of North Carolina for a 2016 contract.  The TBR – who, as discussed

**SECOND AMENDED CLASS ACTION COMPLAINT**                                    **PAGE 99**

previously, recently adopted Inclusive Access despite a prior failed pilot program and earlier decision not to adopt Inclusive Access – received an $800,000 payment from Follett for a 2018 contract.  The University of South Florida received a $1.2 million "transition payment" from Follett for a 2018 contract and will receive an additional $1.25 million "renewal bonus."  These increased amounts, of course, only make sense in light of the near 100% Inclusive Access sell-through the Defendant Retailers can now obtain through the exclusivity agreements between the Publishers, Defendant Retailers, and Universities and the group boycott by the Publishers of the Plaintiff Retailers and Class members.

264.    "On campus" bookstores also traditionally return a percentage of sales at the University bookstore locations (in addition to the other payments discussed herein) to the University.  According to documents obtained through FOIA requests, on sales of most products, the Defendant Retailers are providing the University payments ranging from 9.5 to 14% of gross sales.  But for sales of Inclusive Access Materials, Defendant Retailers are providing the University lower payments—in many instances, only 5-8% of gross sales.  This further shows the motives of Defendant Retailers to entice Universities with millions of dollars up front.  Not only is their sell-through nearly 100% for Inclusive Access Materials, but they keep a greater proportion of the revenue from that guaranteed sell-through.  A December 2019 earnings call by Barnes & Noble stated specifically, "As we move to digital course materials sold through the First Day program, bookstore margins will slightly decrease, but…the sell-through will increase from approximately 35% to almost 100%.  The commissions we paid to the schools will also decrease."

265.    These increased upfront payments are not investments under competitive circumstances because Defendant Retailers would not be able to recoup these enormous payments if they were forced to compete.  Instead, these large upfront payments to the Universities prevent

Plaintiff Retailers from effectively competing with Defendant Retailers to operate on-campus bookstores, and, once Defendant Retailers are operating those on-campus outlets, the exclusivity agreements and concerted refusal to deal orchestrated by the Publishers also prevent Plaintiff Retailers from competing in the selling of Course Materials as an off-campus or online bookstore. These substantially larger payments are economically possible only because the Publishers have already conspired with Defendant Retailers to be the exclusive sellers of the exclusive Inclusive Access Materials, and, therefore, Defendant Retailers have advance understanding that they will receive nearly all sales from each University campus bookstore they secure.

266.    These same facts establish Defendant Retailers' involvement in and knowledge of that conspiracy.  The Defendant Retailers' increased up-front payments to the Universities make economic sense only if the Defendant Retailers know that the University will be forced to use Inclusive Access—regardless of which Publishers are chosen by the University—and that the students will be forced to purchase that Inclusive Access from the Defendant Retailers, thereby significantly increasing the Defendant Retailers sell-through numbers and gross profit.

267.    Further, the Defendant Retailers' contracts with the Universities offer a separate commission for Inclusive Access Materials than for other Course Materials.  This commission is generally around 7% of all Inclusive Access Materials sold, which is lower than commissions on other Course Materials.   That lower percentage amount provided to Universities on sales of Inclusive Access Materials is premised on exclusivity and on the anticipation that students will be required to purchase Inclusive Access Materials, rather than being allowed to choose the format of Course Materials they prefer.  Such incentives indicate that Defendant Retailers know they will retain a much higher percentage of sales than for non-Inclusive Access materials, and Defendant

Retailers are capitalizing on their knowledge of and involvement in the conspiracy with the Publishers.

268.    Another indicator of Defendant Retailers' knowledge of and involvement in this conspiracy are direct communications with Publishers and Universities regarding the Inclusive Access contracts with Universities.  For instance, in one series of emails from November 2017 about an Inclusive Access pilot at Northwest Arkansas Community College, the school administration raised concerns about a pass-through fee on materials for the school's "Leased Operator," Barnes & Noble, which the school was concerned that it could not enforce.  Barnes & Noble's legal department "reached out to Pearson to change the language addressing the B&N area and nothing else."  Thus, Barnes & Noble's legal department and Pearson's legal department worked together to alter the contract between Pearson and Northwest Arkansas Community College, rather than having Barnes & Noble as a signatory.

269.    The Defendant Retailers further assist the conspiracy by their misconduct in blocking any potential opt-out or workaround for Inclusive Access (as discussed above in Section B) and through misinformation campaigns and other unfair and anticompetitive actions meant specifically to exclude and harm their competitor retailers—the Plaintiff Retailers and Class members (as discussed further below).

270.    The Defendants responded to competition – including from the Plaintiff Retailers – with a concerted refusal to deal and by adopting restrictive and exclusive distribution policies that were intended to, expected to, and actually did block the ability of the Plaintiff Retailers to be in the Inclusive Access Materials market and the ability of any other competitors to enter or expand in the market.  These policies further were intended to, expected to, and actually did block or at a least severely impede the ability of the Plaintiff Retailers to be in the Course Materials market and

the ability of any other competitors to enter or expand in the market.  The policies further allowed the Defendants to acquire, maintain, or enhance their monopoly power.

### 2. Exclusive Dealing

271.    At the Publisher level, Inclusive Access destroys inter-brand and secondary market competition; at the retail level, the institution of a group boycott of non-Defendant Retailers and coordinated exclusive dealing arrangements destroys the only remaining vector for price or service competition: competition among retailers. That makes the exclusive dealing arrangements and group boycott separate and additional violations of state and federal antitrust laws.

272.    To be a lease-operator of a University bookstore location, the Defendant Retailers enter into agreements with the Universities.  Those agreements contained an exclusivity provision for the purpose of ensuring that the University would have only one "official" location—the one operated by the Defendant Retailer.  Historically, this did not prevent the Publishers from selling to other retailers, and it did not prevent students from making purchases from other retailers.  It did not affect who could purchase or sell Course Materials or where they could be purchased or sold.

273.    For example, a typical exclusivity provision in a University-Defendant Retailer agreement would state:  "The Bookstore shall be [the University's] exclusive on campus buyer and seller of all required, recommended or suggested course materials and supplies. . . ."  Another might provide in addition that the retailer was "[e]xclusive agent to accept all campus debit card and financial aid transactions for Bookstore merchandise typically sold in college bookstores," thereby making it even harder for competitors (or potential competitors) because they cannot accept some of the resources students have budgeted to acquire their textbooks, such as their college debit card or their financial aid.  Both Defendant Retailers require terms that indicate they

are exclusive providers even with respect to e-commerce sources.  As explained above, these arrangements are all very similar.

274.    Using these agreements between the Defendant Retailers and the Universities as a base, the Defendants executed additional agreements (including the "So-Called License Agreements" and "Master Exclusivity Agreements" defined and discussed below) – both between themselves and with the Universities – to create an exclusive dealing system that dictates who can sell what to the students and where.  These agreements are collectively referred to as the "**Exclusive Dealing Agreements**."  The Defendant Retailer from the University location, and no one else from any other location, exclusively can sell Inclusive Access Materials to the students.

275.    The Publishers all entered into agreements with the Universities and the Defendant Retailers to "license" the Inclusive Access on an exclusive basis to the Defendant Retailers to sell to students at the University (the "**So-Called License Agreements**"). The Exclusive Dealing Agreements have similar, and in some instances, the same language, as well as the same terms and conditions.  For example, the So-Called License Agreements would provide that:

> Without in any way limiting or amending the terms of the agreements by and between [the Defendant Retailer] and [University], Publisher shall work only with [the Defendant Retailer] to provide [University] the Licensed Program and Licensed Program Materials.

276.    Upon information and belief, the Publishers also entered into master exclusivity agreements (the "**Master Exclusivity Agreements**") with the Defendant Retailers, which results in the same exclusivity for the Defendant Retailers to sell Inclusive Access Materials as the So-Called License Agreements, to be used in the case where there is not a University agreement to accomplish this purpose.  The Master Exclusivity Agreements eliminate the need for the Publishers to enter into the So-Called License Agreements with the Universities to accomplish the exclusivity

and permit faster growth of the Inclusive Access Program with the multiple Publishers throughout the country.  Referring to these agreements, and their role in the broader Inclusive Access Scheme, Barnes & Noble CEO Mike Huseby has stated,

> Our recently announced important agreements with McGraw-Hill Education and Pearson allow us to offer their content through inclusive access models . . . at our campus stores nationwide. The ability to offer their content throughout proprietary systems further strengthens our position at the center of content education distribution for the students, faculties and institutions we serve.[43]

277.    Upon information and belief, these Master Exclusivity Agreements, along with the agreements between the Universities and the Defendant Retailers provide that only Defendant Retailers may sell Inclusive Access materials to a University's students, thus cutting out Plaintiff Retailers from the competitive fray.

278.    The Defendants entered into these agreements and acted in concert with the specific intent to maintain and share in monopoly profits by eliminating competition (including amongst themselves) and excluding rival retailers.  As to the Plaintiff Retailers and Class members, the Defendants effectuated a concerted refusal to deal and group boycott, often using these exclusivity arrangements as a pretextual excuse.

279.    The coordination of Defendants' conduct is evidence of this intent, but even more evidence is provided by the fact that the scheme could not be successful without all of the major Publishers, and the Defendant Retailers, coordinating their.  The Inclusive Access scheme would only work if all of the Publishers participated in artificially shifting the market by a coordinated effort not to offer competing products and to lock in a critical mass of students and classes at the Universities to Inclusive Access.  Therefore, the Publishers collectively agreed to limit (and eventually eliminate) offerings of products other than Inclusive Access and further established the

---

[43] BNED Q3 2018 Earnings Call (March 1, 2018).

mechanics of agreements to be used for Inclusive Access that locked in the core and lower-level classes, which are the largest University classes with the highest student enrollments and therefore have the largest economic impact.  The Publishers also used agreements that required guarantees of classes and/or student numbers and an increase in those numbers over time with a punishment mechanism if those guarantees were not met.  The Publishers agreed-upon plan is eventually to convert every class to Inclusive Access.  And, once converted, the Defendants have agreed to do everything within their power to make sure that all alternatives to Inclusive Access Materials that might compete on price or otherwise with the Inclusive Access Materials are disallowed and that any means for students to "opt out" of Inclusive Access are either impossible to execute or simply nonexistent.

280.    The mechanics and timing of the rollout of Inclusive Access has been the same for all the Publishers, and the exclusivity discussed herein is with both the Defendant Retailers.

281.    The Defendant Retailers were only interested in the Inclusive Access scheme if it also resulted in exclusivity for the Defendant Retailers in sales of Inclusive Access Materials (and any other new Course Materials) to students at the Universities.  The Defendant Retailers' involvement was beneficial to the Publishers' scheme as set forth above, and exclusivity for the Defendant Retailers was also beneficial in its removal of the disruptive market force of the Plaintiff Retailers and Class members, which all the Defendants desired to squash.

282.    The purpose and effect of these exclusive dealing policies, no matter which Exclusive Dealing Agreements are utilized, has been and is to compel Universities and students to deal with the Defendants on an exclusive or nearly exclusive basis for the Inclusive Access Materials and/or Course Materials.  The Plaintiff Retailers have discussed this with each of the Publishers in an attempt to gain access to the ability to purchase the Inclusive Access Materials,

and all have similarly refused to deal with the Plaintiff Retailers while supplying the same pre-textual explanations discussed previously in Section B.

283.    Prior to the Defendants' anticompetitive actions and exclusive dealing policies, the Plaintiff Retailers had excellent relationships with the Universities and students.  On average, Plaintiffs' physical stores captured 25-50% of the student market at its University, and the Plaintiff Retailers' online stores did over $20 million in business each semester.  Students are interested in purchasing from the Plaintiff Retailers (and other Class members), but they were and are unable to do so due to the Defendants' concerted refusals to deal and exclusive dealing policies, which have forced students instead to exclusively purchase from the Defendant Retailers and forces charges for Inclusive Access Materials, contrary to their preferences.  For example, thousands of students at the University of North Texas signed a petition calling for the school to end Inclusive Access.

284.    The Exclusive Dealing Arrangements generally last for an extended period of time. Many of the agreements obtained by Plaintiff Retailers are in the three-year range, such as between Cengage and University of New Mexico, and the five-year range, such as between Pearson and multiple Universities.  Some are even longer, such as the Barnes & Noble agreement with Eastern Kentucky University, which is a 15-year agreement, the Barnes & Noble agreement with Northwest Arkansas Community College, which is an 11-year agreement, and Follett's contract with the Tennessee Board of Regents covering 15 separate colleges and universities, which is a 7-year agreement.  Plaintiffs have been unable to obtain copies of the Master Exclusivity Agreements, and therefore do not know the length of time covered by such exclusivity agreements, but the extensive length of the Retailer Defendant agreements with the Universities suggests that these Master Exclusivity Agreements also extend well past just a few years.

285.    The Defendants' exclusive dealing policies have foreclosed the Plaintiff Retailers and Class members from a substantial volume of sales opportunities in the market, and, by doing so, have minimized, impeded, and prevented the Plaintiff Retailers' ability to compete effectively in the market.   The exclusive dealing arrangements foreclose 100% of the Inclusive Access Materials market and a substantial portion of the Course Materials market, due to the approximately 90% of the Course Materials market controlled by the Publishers, and the approximately 60% of the lease-operated retail stores and University student population controlled by the Defendant Retailers.  As discussed in Section B, there is no alternative distribution channel, and there are no meaningful substitute products.  And, as discussed in Section A, retail stores must offer all products needed by students in order to compete.

### 3.   Price Discrimination

286.    While the restrictive and artificial Inclusive Access construct is anticompetitive in effect and borne of the anticompetitive scheme described herein, Defendants' reliance on their exclusive agreements, group boycott, and discriminatory price behavior further causes anticompetitive harm even just considering the Inclusive Access Materials themselves. If Publishers would offer to sell Inclusive Access Materials to and through Plaintiff Retailers (and Class members), it could at least afford some competition, especially as to prices and sales terms, and allow students some choices in purchasing materials.

287.    As set forth above, in almost every case where the Plaintiff Retailers have encountered Inclusive Access Materials, the Publishers refused to sell the Inclusive Access Materials to the Plaintiff Retailers in any format and under any terms.  In the very few instances where the Publishers agreed to sell Inclusive Access Materials or a substitute product to the Plaintiff Retailers – after heavy communications by the Plaintiff Retailers with the Publishers and

Universities – the Publishers only offered to sell to the Plaintiff Retailers at a higher price compared to that offered to the Defendant Retailers operating at the same Universities and against whom the Plaintiff Retailers are directly competing for the same student customers, and the Publishers have not offered the same discounts and terms and conditions of sale.  This is completely contrary to the way the Publishers have dealt with the Plaintiff Retailers for decades and shows the Publishers are willing to forsake short-term profits for anticompetitive ends.

288.    For example, at the University of Texas at Arlington, Plaintiff Campus Book Company, Inc. operated a retail location and ecommerce site that competed with Defendant Follett's on-campus retail location and ecommerce site.  For courses at the University, Defendant Pearson originally refused to sell any Inclusive Access Materials to Plaintiff Campus Book Company, Inc., giving a pre-textual explanation that the University required exclusivity, thereby preventing Defendant Pearson from providing Inclusive Access Materials through any retailer other than Defendant Follett, who is the lease-operator of that University's on-campus bookstore. The University denied requiring any such exclusivity, and eventually Pearson agreed to allow Plaintiff Campus Book Company, Inc. to sell access to Inclusive Access Materials to students. However, Pearson then sold this product to Plaintiff Campus Book Company, Inc. at prices that were substantially higher than those for sales to Defendant Follett (approximately $95-$125 per product when, upon information and belief, the Defendant Retailer was charged approximately $45-$85 for the Inclusive Access Materials per student – for the exact same products) around the same time.  Also, Pearson imposed onerous and unreasonable additional terms, such as requiring Plaintiff Campus Book Company, Inc. to send students to Defendant Follett's retail location to "confirm" the product purchased from Plaintiff.  Due to these discriminatory prices and terms, Plaintiff Campus Book Company, Inc. was effectively unable to sell the product and unable to

compete with Defendant Follett for sales to students.  Plaintiff Campus Book Company, Inc. was forced to close its doors in October 2019.

289.    One interpretation of this chain of events is that Pearson simply made a "mistake" in favor of one of its favored retailers by assuming that Follett was the exclusive Inclusive Access retailer to UTA.  Under this view, Pearson then decided to engage in market-distorting price discrimination and bullying tactics to support its favored retailer Follett once the "mistake" was revealed.  But the "mistake" example does not make much sense – why would Pearson think that Follett had the exclusive rights when they didn't?  This question is answered by the existence of the conspiracy.  Pearson was coordinating with Follett about the deals that Pearson and Follett were both to make with Universities. Pearson and Follett agreed and conspired either (1) to attempt to secure such exclusivity, or (2) to misrepresent their arrangements with Universities when questioned in order to improperly obtain greater market share.  In this, as in other examples, Defendants' actions are best explained by coordination and conspiracy, rather than by arm's-length market behavior or mistaken exclusivity.

290.    Another example of price discrimination involves Eastern Kentucky University, where Plaintiff CBSKY, Inc. operates a retail location and ecommerce site that competes with Defendant Barnes & Noble's on-campus retail location and ecommerce site.  Pearson offered a supplement print product for Inclusive Access courses used where the student chooses to buy a print book to go along with their auto-billed Inclusive Access Materials.  The supplement print product is available for purchase by Plaintiff CBSKY, Inc.  However, Pearson charged Plaintiff CBSKY, Inc. a significantly higher price for the workable substitute than Pearson charged to Defendant Retailer Barnes & Noble (which paid EKU $3.3 million to operate the on-campus bookstore), as shown in the following examples:

| Class | Number | Book Title | Defendant Retailer Barnes & Noble's *List Price (New)* of Book to Student | *Cost* to Plaintiff Retailer for Book |
|-------|--------|-----------|-------------------------------------------------------------------------|----------------------------------------|
| ACC | 201 | Horngren's Financial Accounting Loose-leaf | $57.15 | $119.99 |
| ACC | 202 | Managerial Accounting Loose-leaf | $57.15 | $164.99 |
| ACC | 327, 527, 727 | Horngren's Cost Accounting | $57.15 | $164.99 |
| ART | 200 | World of Art | $21.45 | $122.66 |
| BIO | 101 | Biology: Today + Tomorrow | $46.65 | $101.25 |
| MATH | 105 | Using + Understanding Math Loose-leaf | $57.15 | $109.99 |
| MATH | 112A | College Algebra in Context | $57.15 | $119.99 |
| PHY | 101 | Conceptual Physics Loose-leaf | $57.15 | $119.99 |
| STA | 215 | Statistics: Art + Science of Learning | $57.15 | $114.99 |

291.    The case of Inclusive Access Materials and related supplemental print products is the first time the Publishers refused to sell the same Course Materials to the Plaintiff Retailers at the same price as the Defendant Retailers at the relevant University location.  Without the broader pattern of coordination on multiple levels alleged herein, this conduct on the part of the Publishers makes little sense.  Publishers' profit margin should not be altered significantly by *who* is retailing its products, but only by how many products it is selling.

292.    The nature of Plaintiff Retailers' business is buying each product in bulk to then sell to student consumers.  Therefore, in each instance of Plaintiff Retailer purchases from the Publishers, Plaintiff Retailers purchased multiple copies of the products at issue.

293.    In these few instances where the Plaintiff Retailers were sold any product related to Inclusive Access Materials (including the supplemental print products) by the Publishers, the Defendant Retailers knew from the Publishers that they were receiving a lower price than the Plaintiff Retailers.  Further, the Defendant Retailers knowingly induced and received the lower price from the Publishers for the Inclusive Access Materials (including the supplemental print

products) pursuant to the continuing conspiracy, whereby the Publishers agreed with the Defendant Retailers that Inclusive Access Materials (including the supplemental print products) would only be sold to and through the Defendant Retailers for any University at which the Defendant Retailers operated.

### 4. Additional Anticompetitive Conduct

294.    The Defendant Retailers have also commonly engaged in competition-reducing practices that have continued through the time of and in addition to their participation in the conspiracy to implement the exclusive Inclusive Access.  Timely access to information regarding University adoption of Course Materials is necessary for retailers to have correct materials available for students timely and at competitive prices—i.e., it is necessary to compete (and disclosure of such information is required pursuant to federal regulations).  Universities route this information to their "on campus" stores who are supposed to, and traditionally have, made this information publicly available and/or shared this information timely with all other retailers, including the Plaintiff Retailers.  However, in the last few years, contemporaneously with the conspiracy alleged herein, the Defendant Retailers (who are the keepers of this information as lease-operators of the "on campus" stores) have purposefully impeded any other retailers, including the Plaintiff Retailers, from obtaining this information necessary to compete.

295.    For example, the Defendant Retailers have (1) purposefully provided the Plaintiff Retailers with incorrect or outdated Course Materials adoption information, when the Defendant Retailers had the correct information available; (2) refused to provide the Plaintiff Retailers with Course Materials adoption information, either ever or in a timely manner so that orders could be made, when the Defendant Retailers had the information available; and (3) failed to timely post or update the public listing of Course Materials adoption information, when the

Defendant Retailers had the information available. Further, the Defendant Retailers had this competition-reducing behavior included as part of the conspiracy and the Exclusive Dealing Agreements—pursuant to the Exclusive Dealing Agreements, the Defendant Retailers are claiming that Course Materials adoption information from the Universities is "proprietary information" and cannot be accessed by anyone other than the Defendant Retailers.

296.    The Defendant Retailers also have blocked the efforts of the Plaintiff Retailers to obtain Course Materials adoption information through other means. In the past, the Plaintiff Retailers also have sought and gathered this information directly from the University (and its faculty). But now the Defendant Retailers are attempting to prevent direct communications between any other retailers and the faculty by means such as disseminating or orchestrating "official" communications to faculty, providing that Course Materials adoption information should be submitted *only* to the Defendant Retailers and stating that other retailer communications are "spam" or otherwise illegitimate.

## 5. Continuing Conspiracy and Fraudulent Concealment

297.    As detailed above, the Defendants have engaged in an ongoing and continuing conspiracy to restrain trade, including by eliminating competition, reducing capacity, artificially shifting and corrupting the market, monopolizing the market, raising prices, and eliminating substitute products through repeated and overt acts in furtherance of such conspiracy. Each semester, each University, campus, or course that adopts Inclusive Access at the insistence or urging of the Defendants is an overt act in furtherance of the illegal conspiracy and results in continuing competitive harm. The Defendants' behavior continues and does result each semester in further conversions. This ongoing anticompetitive conduct by Defendants has caused and continues to cause the Plaintiff Retailers ongoing harm.

298.    And indeed, such a conspiracy—including a full horizontal agreement among Publishers—is necessary for the scheme to operate at all. As the above factual allegations show, both faculty and students *do not want this product*. Both find Inclusive Access to be constraining and unnecessarily expensive and difficult to use. The pedagogical inferiority of the sub-par options available through Inclusive Access turns off the faculty, and the high cost and low benefits of this "innovation" gives the ultimate consumers—students—every reason to look for any other option. As also already explained, there is *indisputably* high present demand for Publishers' products on the very secondary market that Publishers are now seeking to destroy. And there has been demand among students for decades for alternative retail sources for the books they buy, even for new books, where retailers still compete on price and terms of service. These facts are the very reason for these conspiratorial efforts: to eliminate meaningful substitutes, to destroy the secondary market, and to end retail competition. The weakness of these products in light of obvious consumer and faculty preference for what Defendants have conspired to take away renders a conspiracy of *all* the Publishers necessary for any one of the Publishers to achieve its goal of eliminating competition, including from the secondary market.

299.    The horizontal agreement the Publishers have reached and each of the Exclusive Dealing Agreements – many of which were executed between 2016 and 2019 and which upon information and belief continue to be executed – is a separate overt act that advances the illegal conspiracy and results in competitive harm, and further, each time the Exclusive Dealing Agreements are relied upon to refuse retailers, including the Plaintiff Retailers, the ability to obtain Inclusive Access Materials also advances the illegal conspiracy and results in competitive harm and injury to the Plaintiff Retailers.  As a result, each of the Exclusive Dealing Agreements and each time such agreements are relied upon to refuse access to retailers, including the Plaintiff

Retailers, to Inclusive Access Materials constitutes an overt act in furtherance of the Defendants' ongoing and continuing conspiracy.

300.    The Defendants have further continued to engage in communications and other activities related to furthering the scheme, as evidenced by the formation of EPEG in 2016 and its continued operation, the formation of the Inclusive Access Conference Consortium in 2016, and the continued participation in NACS, including the 2019 bylaw change that resulted in exclusion of the Plaintiff Retailers and Class members from NACS going forward.  These communications and other activities also constitute overt acts by the Defendants in furtherance of their ongoing conspiracy.

301.    The totality of the Defendants' continued and repeated anticompetitive conduct has caused and continues to cause ongoing injury to the Plaintiff Retailers in, among other ways, lost sales, and has excluded the Plaintiff Retailers and Class members from the market and eliminated competition.

302.    The Defendants' concerted actions were naturally concealed and the Defendants also took affirmative acts to mask and conceal their illegal conspiracy.  The Defendants engaged in an active misinformation campaign, designed to trick the market – including students, Universities, and competitors – into believing that Inclusive Access was the result of consumer demand and technological advances (which was not true, as detailed in Section B), when in reality it was the result of Defendants' conspiracy.   Further, the Publishers concealed their conspiracy by communicating to the Plaintiff Retailers that the exclusivity was a requirement of the Universities when in reality, the Defendants made that decision in furtherance of their conspiracy.

303.    Because of the Defendants' efforts to obscure and mask their conspiracy, the Plaintiff Retailers did not learn, and could not have learned, of the complex conspiracy crafted by

the Defendants until at least the time Inclusive Access was adopted on multiple campuses at which the Plaintiff Retailers had a store location and until the Plaintiff Retailers were denied the ability to purchase Inclusive Access Materials.   The first time the Plaintiff Retailers heard of Inclusive Access at multiple locations from multiple Publishers was in late 2015 and early 2016. And it was not until 2016 that the Plaintiff Retailers were first able to attempt to gain access to Inclusive Access Materials and were denied such access.  Following multiple denied attempts with similar responses from multiple Publishers, the Plaintiff Retailers exercised diligence in seeking and uncovering more information.   The Plaintiff Retailers have actively sought information regarding Inclusive Access through open records requests and communications with the Publishers.  The Exclusive Dealing Agreements of which the Plaintiff Retailers are aware, based on these open records requests, were executed or amended between 2016 and 2019.  The trade association activities providing further information to the Plaintiff Retailers also did not occur until 2016 for EPEG and the Inclusive Access Conference Consortium, and 2019 for NACS.

### 6. Anticompetitive Effects

304.   The anticompetitive actions of the Defendants have had the effect of restraining, suppressing, and eliminating competition in the sale of Inclusive Access Materials and Course Materials.  The Defendants' conduct adversely affected competition, the Plaintiff Retailers and Class members, and consumers by (i) reducing or eliminating the output of and access to Inclusive Access and Course Materials; (ii) eliminating or significantly reducing price competition for Inclusive Access and Course Materials; (iii) impeding or blocking the ability of actual or potential competitors to enter or expand sales in the relevant market(s); (iv) significantly raising barriers to entry for rivals; (v) reducing consumer choice among products and competing retailers;

(vi) reducing quality and stifling innovation for Course Materials; and (vii) artificially inflating the price of Course Materials and Inclusive Access Materials above competitive levels.

305.    The Defendants' anticompetitive actions have had the effect of creating and/or enhancing a monopoly in the sale of Inclusive Access Materials and Course Materials in the relevant market(s) for both the Publishers as suppliers and the Defendant Retailers as retailers. These monopolies completely, or at least substantially, foreclose competition at the Universities where the Publishers and the Defendant Retailers operate and function to eliminate the secondary market, competition (on price or terms or otherwise), and competitors.

306.    Absent the Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, the Defendants would have faced additional competition, including from the Plaintiff Retailers.

307.    There are no legitimate pro-competitive efficiencies that justify the Defendants' conduct or that outweigh the substantial anticompetitive effects of that conduct.

308.    The Plaintiff Retailers and the Class members have suffered antitrust harm because their loss of business, profits, and ability to compete are directly and predictably related to the Defendants' conduct, their conspiracy, and exclusionary activities—in fact, it is the result intended by the anticompetitive activities.  Damages for total or partial exclusion of a competitor from the market, for reduction of supply and limiting access, and interference with market pricing (including by actual/attempted monopolization) each reflect injury for which the antitrust laws were intended to provide redress.

309.    As of the filing of this Complaint, some of the Plaintiff Retailers' stores have closed.  Moreover, the Plaintiff Retailers' units in online sales through marketplaces such as Amazon to students across the country have also been significantly impacted due to Inclusive

Access at Universities across the country.  Due to the conspiracy, group boycott, and exclusionary activities, they did not have necessary access to purchase and sell the Course Materials that would allow them to compete in the market that was artificially shifted to the exclusive Inclusive Access Materials.  Other stores, while still operating, have seen drastic decreases in gross sales.  It is only a matter of time until all the Plaintiff Retailers' stores will have to close due to the Defendants' anticompetitive efforts.  And at that time, the Defendants will be the only remaining market participants and further will monopolize both production and distribution of Course Materials, with highly detrimental effects on the market and student-consumers.

310.    Prior to the Defendants' conspiracy and exclusionary activities, the Plaintiff Retailers' revenues and profits were growing year-over-year.  Thereafter, where the Inclusive Access conspiracy was implemented, the Plaintiff Retailers' revenues and profits have plummeted. In some cases, the Plaintiff Retailers have been so drastically impacted by the Defendants' exclusionary and anticompetitive activities that they have been forced to close.  Moreover, the Plaintiff Retailers' units in web sales have also significantly been impacted by Inclusive Access.

311.    The full amount of damages to the Plaintiff Retailers and Class members is presently unknown and will be calculated after discovery for proof at trial.

## V.    INTERSTATE TRADE AND COMMERCE

312.    During the Class Period, the Defendants produced, manufactured, distributed, marketed, and/or sold Course Materials, including Inclusive Access Materials, through the means of interstate commerce in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including into, through, and within this District and the District of Delaware.  The Defendants' actions, including their conspiracies and monopolization, had a direct and substantial effect on interstate trade and commerce, including through raising the

price of Course Materials (to the Plaintiff Retailers, Class members, and ultimate student-consumers), artificially limiting capacity and reducing supply (including of Course Materials available to the Plaintiff Retailers, Class members, and ultimate student-consumers), and eliminating secondary markets and competitors (including the Plaintiff Retailers and Class members) in the market for Course Materials.

313.    The Defendants have used instrumentalities of interstate commerce to produce, market, distribute, and/or sell Course Materials, including Inclusive Access Materials, and to accomplish their anticompetitive conduct.

## VI.    CLASS ALLEGATIONS

314.    The Plaintiff Retailers bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) for damages sought and (b)(1) and (b)(2) for injunctive and declaratory relief sought, on their own behalf and as representatives of the following class of persons and entities (the "**Class**"):

> All persons or entities in the United States who were in the business of selling Course Materials at off-campus retail outlets serving students at the Universities or online during the Class Period.

315.    Excluded from the Class are the Defendants and their parents, subsidiaries, and affiliates, whether or not named as a Defendant in this Complaint, federal government entities, and instrumentalities of the federal government.

316.    The Plaintiff Retailers reserve the right to amend the definition of the Class upon further investigation, including at the time when the Plaintiff Retailers move for class certification.

317.    The Plaintiff Retailers do not know the exact size of the Class at the present time, but upon information and belief, the Class includes over 100 members.  Therefore, the Class is so numerous that joinder of all members in this action is impracticable.

318.    The Plaintiff Retailers' claims are typical of the claims of the Class, and the Plaintiff Retailers will fairly and adequately protect the interests of the Class.    The Plaintiff Retailers' interests are coincident with, and not antagonistic to, those of the Class members.   The Plaintiff Retailers have retained competent counsel experienced in complex antitrust and consumer protection class action litigation.

319.    Class treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged in this Complaint.  Class treatment will permit the large number of Class members to prosecute their claims based on common legal and factual issues in a single forum and proceeding and thus to pursue such claims simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender for the parties and the courts.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternatives exist for the fair and efficient adjudication of this controversy.

320.    There are questions of law and fact common to all members of the Class, and that predominate over any questions affecting solely individual members of the Class.    The Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to the Plaintiff Retailers and the other members of the Class. These common questions include, but are not limited to:

      a.  Whether the Publishers engaged in a combination and conspiracy among themselves to unreasonably restrain trade by artificially limiting capacity and reducing supply, eliminating necessary access, using trade associations to set pre-textual standards, and implementing concerted refusals to deal with the Plaintiff Retailers and Class members;

b. Whether the Defendant Retailers engaged in a combination and conspiracy among themselves to unreasonably restrain trade by artificially limiting capacity and reducing supply, eliminating necessary access, using trade associations to set pre-textual standards, and concerted refusals to deal with the Plaintiff Retailers and Class members;

c. Whether the Defendants engaged in a combination and conspiracy among themselves to unreasonably restrain trade by artificially limiting capacity and reducing supply, eliminating necessary access, using trade associations to set pre-textual standards, and concerted refusals to deal with the Plaintiff Retailers and Class members and eliminating competition for Course Materials through exclusive dealing arrangements;

d. Whether each Publisher and Defendant Retailer had the power to control prices and exclude competition in the relevant markets alleged herein;

e. Whether the Defendants effectuated a concerted refusal to deal and group boycott of Plaintiff Retailers and Class members;

f. Whether the Defendants engaged in exclusive dealings, and other restrictive, exclusionary, unfair, and anticompetitive conduct;

g. Whether the Defendants were in a combination and conspiracy to monopolize the relevant market(s) alleged herein;

h. The duration and extent of the conspiracies alleged herein;

i. Whether these alleged conspiracies violated Sections 1 and 2 of the Sherman Act;

j. Whether the Defendants each illegally monopolized the relevant market(s) set forth herein in violation of Section 2 of the Sherman Act;

k. Whether the Defendants participated in a discriminatory pricing scheme for Course Materials, including Inclusive Access Materials;

l. Whether the Defendants unfairly and deceptively restrained competition in the relevant market(s) set forth herein;

m. Whether the Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of the Plaintiff Retailers and the Class members;

n. The effect of the alleged conspiracies and monopolization on the capacity, supply, and access in the relevant market(s) alleged herein;

o. The appropriate measure of damages; and

p. The appropriate injunctive relief.

321. The Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.  Prosecuting separate actions by and against individual Class members also would create a risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants or (2) adjudications that, as a practical matter, would be dispositive of the interests of other Class members.

## VII.   CLAIMS FOR RELIEF

### COUNT 1:  RESTRAINT OF TRADE (15 U.S.C. § 1) –CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST PUBLISHERS AND EPEG

322. The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

323.    The Publishers and EPEG and unnamed conspirators entered into and engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) to artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the markets identified in this Complaint, with the end goal and result of raising prices and reducing and eliminating competition. As set forth in this Complaint, the Publishers agreed together in violation of Section 1 to do so through (1) understandings and agreements to or with the effect to fix, raise, maintain, and stabilize prices or terms and conditions of the sale of Course Materials and Inclusive Access Materials, including through agreements that restrict capacity, supply, and access to Course Materials and Inclusive Access Materials (behavior collectively referred to as the "**Horizontal Price Fixing**"), (2) concerted refusals to deal with and group boycotts of Plaintiff Retailers and other Class members (behavior collectively referred to as the "**Horizontal Group Boycott**"), and (3) utilization of EPEG to agree upon and implement standardized conduct (including the Horizontal Price Fixing) through concerted action and setting pre-textual standards to restrain trade (behavior collectively referred to as the "**Trade Association Violations**").

324.    In engaging in the Horizontal Price Fixing, the Horizontal Group Boycott, and the Trade Association Violations, the Publishers engaged in the same or similar conduct at or near the same time using standardized and agreed-upon materials, contracts, and behavior.  Many of the Publishers' actions related to the sale of Course Materials and Inclusive Access Materials were against each of their independent economic self-interest, including their risky behavior in shifting their business models solely to a previously-unsuccessful delivery system and their refusal to sell to other willing customers such as the Plaintiff Retailers.  EPEG acted for the Publishers, and the Publishers each acted through EPEG.  The Publishers have had multiple opportunities for collusion

as set forth in this Complaint, including through their involvement in EPEG, events for the NACS and Inclusive Access Conference Consortium, coordinated activities in relation to rule-making for the Higher Education Opportunity Act, and merger discussions between Defendants McGraw-Hill and Cengage.

325.    The Publishers possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

326.    Each act in the Horizontal Price Fixing, Horizontal Group Boycott, and Trade Association Violations constitutes a *per se* violation of Section 1 of the Sherman Act.

327.    In the alternative, the Horizontal Price Fixing, the Horizontal Group Boycott, and the Trade Association Violations caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist, and under a rule of reason analysis, the Horizontal Price Fixing, the Horizontal Group Boycott, and the Trade Association Violations violate Section 1 of the Sherman Act.

328.    The Publishers' and EPEG's anticompetitive actions have harmed competition and caused unreasonable restraints of trade.  As a result of the Publishers' and EPEG's unlawful conduct, the price of Course Materials and Inclusive Access Materials was raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint, the capacity, supply, and access of Course Materials and Inclusive Access Materials has been restricted, limited, reduced, and/or eliminated, and competition has been reduced and/or eliminated for Course Materials and Inclusive Access Materials.

329.    The Publishers produced, manufactured, distributed, and sold Course Materials and Inclusive Access Materials through the means of interstate commerce in a continuous and

uninterrupted flow to customers located in states other than the states in which the Publishers market and sell such products.  The Publishers and EPEG also have accomplished their horizontal scheme through interstate commerce.  The Publishers' and EPEG's anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

330.    For purposes of formulating and effectuating their contract, combination or conspiracy, the Publishers and EPEG did those things they combined or conspired to do, including the Horizontal Price Fixing, the Horizontal Group Boycott, the Trade Association Violations, and the acts, practices, and course of conduct set forth in this Complaint.

331.    As a result of the Publishers' and EPEG's unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the sale of Inclusive Access Materials, have had competition and their participation as competitors in the marketplace for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition, and their participation in the same, including elimination of the secondary market for Course Materials.

332.    As a direct and proximate result of the Publishers' and EPEG's scheme, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

**COUNT 2:  RESTRAINT OF TRADE (15 U.S.C. § 1) –CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST DEFENDANT RETAILERS**

333.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

334.    The Defendant Retailers and unnamed conspirators entered into and engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) to artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the markets identified in this Complaint, with the end goal and result of eliminating competitors, raising prices, and reducing and eliminating competition.  As set forth in this Complaint, the Defendant Retailers agreed together in violation of Section 1 to the Horizontal Price Fixing and the Horizontal Group Boycott.

335.    In engaging in the Horizontal Price Fixing and the Horizontal Group Boycott, the Defendant Retailers engaged in the same or similar conduct at or near the same time using standardized and agreed-upon materials, contracts, and behavior.  Many of the Defendant Retailers' actions related to the sale of Course Materials and Inclusive Access Materials were against each of their independent economic self-interest, including their large payments to Universities to acquire lease-operator status at Universities, absent knowledge of the conspiracy and its intended effects.  The Defendant Retailers have had multiple opportunities for collusion as set forth in this Complaint, including through their involvement in NACS.

336.    The Defendant Retailers possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

337.    Each act in the Horizontal Price Fixing and the Horizontal Group Boycott constitutes a *per se* violation of Section 1 of the Sherman Act.

338.    In the alternative, the Horizontal Price Fixing and the Horizontal Group Boycott caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist, and under a rule of reason analysis, the Horizontal Price Fixing and the Horizontal Group Boycott violate Section 1 of the Sherman Act.

339.    The Defendant Retailers' anticompetitive actions have harmed competition and caused unreasonable restraints of trade.  As a result of the Defendant Retailers' unlawful conduct, the price of Course Materials and Inclusive Access Materials was raised, fixed, maintained and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint, the capacity, supply, and access of Course Materials and Inclusive Access Materials has been restricted, limited, reduced, and/or eliminated, and competition has been reduced and/or eliminated for Course Materials and Inclusive Access Materials, including the elimination of the Plaintiff Retailers and Class members who are the direct competitors of the Defendant Retailers.

340.    The Defendant Retailers have accomplished their horizontal scheme through interstate commerce.  The Defendant Retailers' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

341.    For purposes of formulating and effectuating their contract, combination, or conspiracy, the Defendant Retailers did those things they combined or conspired to do, including the Horizontal Price Fixing, the Horizontal Group Boycott, and the acts, practices, and course of conduct set forth in this Complaint.

342.    As a result of the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more

for Course Materials than they otherwise would have paid in the absence of the Defendant Retailers' unlawful conduct, have been excluded from the sale of Inclusive Access Materials, have had competition and their participation as competitors in the marketplace for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition, and their participation in the same, including elimination of the secondary market for Course Materials.

343.    As a direct and proximate result of the Defendant Retailers' scheme, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

**COUNT 3:  RESTRAINT OF TRADE (15 U.S.C. § 1) – CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AGAINST ALL DEFENDANTS**

344.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

345.    All Defendants and unnamed conspirators entered into and engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) to artificially limit capacity and reduce supply, eliminate access, and eliminate secondary markets and competitors in the markets identified in this Complaint, with the end goal and result of raising prices, eliminating competitors, and reducing and eliminating competition.  As set forth in this Complaint, the Defendants agreed together in violation of Section 1 to so through the Horizontal Price Fixing, the Horizontal Group Boycott, and the exclusive dealing arrangements and/or exclusive distributorships for the Defendant Retailers with the Publishers (the "**Exclusive Dealing**").  The Defendants entered into one or more of the following

understandings or agreements:  (1) the Publishers, through a series of vertical agreements with the Defendant Retailers, created and accomplished a horizontal conspiracy of the Publishers; (2) the Defendant Retailers, through a series of vertical agreements with the Publishers, created and accomplished a horizontal conspiracy of the Defendant Retailers; or (3) vertical agreements between one or more Publishers or EPEG and one or more Defendant Retailers to restrict distribution of Inclusive Access to the Defendant Retailer(s).

346.    The Exclusive Dealing is memorialized and effectuated by, at a minimum, the So-Called License Agreements, the Exclusive Dealing Agreements, the Master Exclusivity Agreements, and the other understandings and agreements among the Publishers and the Defendant Retailers described in this Complaint.  As described in this Complaint, the Exclusive Dealing forecloses all or a substantial portion of the market by eliminating distribution of Inclusive Access Materials and certain other Course Materials through any channels other than the Defendant Retailers, which previously was not the case.

347.    In engaging in the Horizontal Price Fixing, the Horizontal Group Boycott, and the Exclusive Dealing, the Defendants engaged in the same or similar conduct at or near the same time using standardized and agreed-upon materials, contracts, and behavior, and have taken at least some actions against each of their independent economic self-interest and have had multiple opportunities to collude.

348.    The result of the Exclusive Dealing is that retail competitors—the Plaintiff Retailers and the Class members—have no supply to the product from any of the Defendants—the Inclusive Access Materials, the product to which the Defendants have artificially shifted the entirety of the marketplace.  The Plaintiff Retailers have no ability to obtain Inclusive Access Materials, or competitive products, elsewhere.

349.    The Defendants possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

350.    For a horizontal conspiracy of either the Publishers or the Defendant Retailers accomplished through a series of vertical agreements, this is a *per se* violation of Section 1 of the Sherman Act.

351.    In the alternative, and also for any solely vertical agreements, the agreement between and among the Defendants caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist, and under a rule of reason analysis, the agreements violate of Section 1 of the Sherman Act.

352.    The Defendants' anticompetitive actions have harmed competition and caused unreasonable restraints of trade.  As a result of the Defendants' unlawful conduct, the price of Course Materials and Inclusive Access Materials was raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint, the capacity, supply, and access of Course Materials and Inclusive Access Materials has been restricted, limited, reduced, and/or eliminated, and competition has been reduced and/or eliminated for Course Materials and Inclusive Access Materials, including the elimination of the Plaintiff Retailers and Class members who are the direct competitors of the Defendant Retailers.

353.    The Defendants have accomplished their scheme through interstate commerce.  The Publishers produced, manufactured, and distributed and the Defendant Retailers sold Inclusive Access through the means of interstate commerce in a continuous and uninterrupted flow to customers located in states other than the states in which the Publishers market and sell such

products.  The Defendants' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

354.    For purposes of formulating and effectuating their contract, combination or conspiracy, the Defendants did those things they combined or conspired to do, including the Horizontal Price Fixing, the Horizontal Group Boycott, the Exclusive Dealing, and the acts, practices, and course of conduct set forth in this Complaint.

355.    As a result of the Defendants' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' and the Defendant Retailers' unlawful conduct, have been excluded from the sale of Inclusive Access Materials, have had competition and their participation as competitors in the marketplace for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition, and their participation in the same, including elimination of the secondary market for Course Materials.

356.    As a direct and proximate result of the Defendants' scheme, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property in amounts that are presently undetermined.  Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## COUNT 4:  MONOPOLIZATION (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS

357.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

358.    The Publishers and the Defendant Retailers have monopolized or combined or conspired to monopolize the markets described in this Complaint, including (a) the sale of Course Materials nationwide (the "**Nationwide Course Materials Market**"), (b) the sale of Inclusive Access at each specific, single University where a Defendant Retailer operates (the "**University Inclusive Access Market**"), and (c) the alternative markets and/or submarkets by subject matter topics (the "**Topic Markets**" and "**IA Topic Markets**") or individual courses (the "**Individual Course Markets**" and "**IA Individual Course Markets**").  The Nationwide Course Materials Market, the University Inclusive Access Market, the Topic Markets, the IA Topic Markets, the Individual Course Markets, and the IA Individual Course Markets are each valid antitrust markets.

359.    The Publishers and the Defendant Retailers possess and exercise market power in the relevant product and geographic markets identified in this Complaint.

360.    In the Nationwide Course Materials Market, the Publishers each have the power to control prices and exclude competition and have done so including but not limited to with respect to the exclusion of the Independent Collegiate Retailers. The Publishers working in concert have even greater power, nearing total control of the Course Materials Market.

361.    In the Topic Markets, the IA Topic Markets, the Individual Course Markets, and the IA Individual Course Markets, the Publishers enjoy dominant market shares as a result of their collusion and mutual avoidance.  In each of these markets, one Publisher has (or in rare cases of certain Topic Markets and IA Topic Markets, two Publishers have) a dominant market share, in most instances over 50% and in many instances nearing 100%, as described herein. The competitive conditions are more fully described in Section IV.C.3. *supra*.

362.    In the University Inclusive Access Market, each Publisher and Defendant Retailer has the power to control prices and exclude competition in that market.  The Publishers are the

primary providers of Inclusive Access (as described herein), and at each University, their shares are generally in excess of 70%. The Defendant Retailers are the only providers of Inclusive Access through the lease-operated stores at each University at which they operate (as described in this Complaint) and thus each have a market share of 100% (and the same is true in considering the IA Topic Markets and the IA Individual Course Markets).

363.    In the defined markets, the barriers to entry are substantial as described in this Complaint.

364.    The Publishers and the Defendant Retailers engaged in anticompetitive exclusionary conduct, as set forth in this Complaint that was intended to and had the effect of illegally acquiring, maintaining, and enhancing the monopoly of the Publishers and the Defendant Retailers in the relevant markets in violation of Section 2 of the Sherman Act. The Publishers' and the Defendant Retailers' exclusionary acts include, *inter alia*, the exclusion of and limitation of the Plaintiff Retailers and the Class members from competing through the Exclusive Dealing, denying access to Universities, and further deceptive and coercive conduct set forth in this Complaint, including in Section D and Count 3.

365.    The Publishers and the Defendant Retailers have effectively excluded competition from a significant and substantial portion of the relevant markets, unlawfully acquired, maintained, and enhanced their dominant market share in the relevant markets, and profited from their anticompetitive conduct by the price of Course Materials and Inclusive Access Materials being raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint, the capacity, supply, and access of Course Materials and Inclusive Access Materials being restricted, limited, reduced, and/or eliminated, and competition has been reduced and/or eliminated in the relevant markets,

including the elimination of direct competitors of the Defendant Retailers. This conduct has no legitimate business purpose or pro-competitive effect, and even if any such purpose or effect existed, the pro-competitive effects could have been obtained by less restrictive means and/or the anticompetitive effects far outweigh the pro-competitive effects.

366. The Publishers and the Defendant Retailers have accomplished their anticompetitive conduct through interstate commerce, and it has had a substantial effect on interstate commerce. The Publishers' and the Defendant Retailers' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

367. As a result of the Publishers' and the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the Universities and the sale of Inclusive Access Materials, have had competition and their participation as competitors in the marketplace for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition, and their participation in the same, including elimination of the secondary market for Course Materials. This injury is of the type that the federal antitrust laws were intended to prevent and flows from that which makes the Publishers' and the Defendant Retailers' conduct unlawful.

368. As a direct and proximate result of the Publishers' and the Defendant Retailers' anticompetitive conduct, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined. Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class

members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## COUNT 5:  CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS

369.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

370.    The Publishers and the Defendant Retailers have combined or conspired to monopolize the Nationwide Course Materials Market, the University Inclusive Access Market, the Topic Markets, the IA Topic Markets, the Individual Course Markets, and the IA Individual Course Markets.

371.    The Publishers and the Defendant Retailers entered into and participated in a continuing agreement to monopolize the relevant markets through the exclusionary and anticompetitive conduct set forth in this Complaint and in Counts 3 and 4 in violation of Section 2 of the Sherman Act.  The conduct of the Publishers and the Defendant Retailers facilitated the Publishers' creation, maintenance, or enhancement of monopolies in the Nationwide Course Materials Market, the University Inclusive Access Market, the Topic Markets, the IA Topic Markets, the Individual Course Markets, and the IA Individual Course Markets and the anticompetitive effects thereof and the Defendant Retailers' creation, maintenance, or enhancement of a monopoly in the University Inclusive Access Market (and the IA Topic Markets and the IA Individual Course Markets) and the anticompetitive effects thereof (see Count 4). The nature of these monopolies, and the competitive conditions under which they arise, are described in Count 4 and in Section IV.C.3 *supra*.

372.    The Publishers and the Defendant Retailers each possess and exercise market power in the relevant product and geographic markets identified in this Complaint including as described in Count 4.

373.    The Publishers and the Defendant Retailers did those things they agreed and conspired to do with the specific intent of monopolizing the relevant markets.

374.    As a result of the conspiracy, the Publishers and the Defendant Retailers have effectively excluded competition from a significant and substantial portion of the relevant markets, unlawfully acquired, maintained, and enhanced their dominant market share in the relevant markets, and profited from their anticompetitive conduct by the price of Course Materials and Inclusive Access Materials being raised, fixed, maintained, and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this Complaint, the capacity, supply, and access of Course Materials and Inclusive Access Materials being restricted, limited, reduced, and/or eliminated, and competition has been reduced and/or eliminated for Course Materials and Inclusive Access Materials, including the elimination of direct competitors of the Defendant Retailers.  This conduct has no legitimate business purpose or pro-competitive effect, and even if any such purpose or effect existed, the pro-competitive effects could have been obtained by less restrictive means and/or the anticompetitive effects far outweigh the pro-competitive effects.

375.    The Publishers and the Defendant Retailers have accomplished their horizontal anticompetitive conduct through interstate commerce, and it has had a substantial effect on interstate commerce.  The Publishers' and the Defendant Retailers' anticompetitive actions were intentionally directed at the markets identified in this Complaint and had a substantial and foreseeable effect on interstate commerce.

376.     As a result of the Publishers' and the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the Universities and the sale of Inclusive Access Materials, have had competition and their participation as competitors in the marketplace for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition, and their participation in same, including elimination of the secondary market for Course Materials.  This injury is of the type that the federal antitrust laws were intended to prevent and flows from that which makes the Publishers' and the Defendant Retailers' conduct unlawful.

377.     As a direct and proximate result of the Publishers' and the Defendant Retailers' anticompetitive conduct, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.   Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 6:  ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) – AGAINST THE PUBLISHERS AND THE DEFENDANT RETAILERS

378.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

379.     The Publishers and the Defendant Retailers each have attempted to monopolize the markets described in this Complaint, including the Nationwide Course Materials Market, the University Inclusive Access Market, the Topic Markets, the IA Topic Markets, the Individual Course Markets, and the IA Individual Course Markets.

380.    The Publishers and the Defendant Retailers each possess and exercise market power in the relevant product and geographic markets identified in this Complaint including as described in Count 4.

381.    The Publishers and the Defendant Retailers each attempted to monopolize the relevant markets through the exclusionary and anticompetitive conduct set forth in this Complaint and in Counts 3, 4, and 5 in violation of Section 2 of the Sherman Act. The conduct of each of the Publishers and the Defendant Retailers was specifically intended to facilitate the Publishers' creation, maintenance, and enhancement of a monopoly in the Nationwide Course Materials Market, the University Inclusive Access Market, the Topic Markets, the IA Topic Markets, the Individual Course Markets, and the IA Individual Course Markets and the anticompetitive effects thereof and also the Defendant Retailers' creation, maintenance, and enhancement of a monopoly in the University Inclusive Access Market (including the IA Topic Markets and the IA Individual Course Markets) and the anticompetitive effects thereof (see Count 4).  This conduct has no legitimate business purpose or pro-competitive effect, and even if any such purpose or effect could exist, any possible pro-competitive effects could be obtained by less restrictive means and/or the anticompetitive effects far outweigh any possible pro-competitive effects.

382.    There is a dangerous probability that the Publishers and the Defendant Retailers each would succeed in achieving monopoly power if they continue to engage in the anticompetitive conduct.  Defendants' power was and is protected by substantial barriers to effective entry and expansion set forth in this Complaint, and the market(s) are highly-exploitable for Defendants.

383.    The Publishers and the Defendant Retailers have taken actions in furtherance of this attempt through interstate commerce, and these actions were intentionally directed at the

markets identified in this Complaint with a substantial and foreseeable effect on interstate commerce.

384.    As a result of the Publishers' and the Defendant Retailers' unlawful conduct, the Plaintiff Retailers and the Class members have been injured in their businesses and property in that they have paid more for Course Materials than they otherwise would have paid in the absence of the Publishers' unlawful conduct, have been excluded from the Universities and the sale of Inclusive Access Materials, have had competition and their participation as competitors in the marketplace for Course Materials and Inclusive Access Materials restrained, suppressed, or eliminated, and have been deprived of the benefits of free and open competition, and their participation in same, including elimination of the secondary market for Course Materials.  This injury is of the type that the federal antitrust laws were intended to prevent and flows from that which makes the Publishers' and the Defendant Retailers' conduct unlawful.

385.    As a direct and proximate result of the Publishers' and the Defendant Retailers' anticompetitive conduct, the Plaintiff Retailers and the Class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.   Accordingly, the Plaintiff Retailers, on behalf of themselves and the Class members, seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

### COUNT 7:  PRICE DISCRIMINATION (15 U.S.C. § 13(a)) – AGAINST THE PUBLISHERS

386.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

387.    The Publishers were, and continue to be, persons engaged in interstate commerce, as defined by the Robinson-Patman Act.

388.    The Publishers have manufactured and sold commodity Course Materials in interstate commerce to numerous Defendant Retailers at the Universities, who are in direct competition with the Plaintiff Retailers, for resale to students of the Universities.

389.    The Plaintiff Retailers have purchased commodity Course Materials from the Publishers in interstate commerce for resale to students of the Universities.

390.    The Publishers, in the course of commerce, knowingly sold, and are continuing to sell, the same Course Materials to the Defendant Retailers at discriminatory prices in violation of Section 13(a) of the Robinson-Patman Act, which prices were, and remain, substantially less than the Publishers charged, and presently charge, the Plaintiff Retailers for the identical and contemporaneously-purchased Course Materials of like grade and quality, including as set forth in this Complaint.  There was a reasonable probability that this discriminatory pricing may harm competition and in fact it has and will continue to harm competition.

391.    The Publishers' discriminatory pricing and related illegal discriminatory and anticompetitive practices were not, and are not, justified based upon any differences in the cost of manufacture, sale of delivery resulting from any differing methods or quantities in which the Course Materials were, or are, sold or delivered to the Plaintiff Retailers, as compared to the Defendant Retailers or upon changing conditions affecting the market for, or the marketability of, the Course Materials.

392.    As a direct and proximate result of the illegal discriminatory and anticompetitive practices being engaged in by the Publishers, the Plaintiff Retailers' ability to compete with the Defendant Retailers for sales of Course Materials for which there was discriminatory pricing has been substantially diminished or eliminated.

393.    This price discrimination has caused economic injury to the Plaintiff Retailers, including but not limited to damage to their business, reputation, customer goodwill, lost sales, and lost profits, and has caused and will continue to cause substantial injury to competition generally.  Accordingly, the Plaintiff Retailers seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## COUNT 8:  PRICE DISCRIMINATION (15 U.S.C. § 13(f)) – AGAINST THE DEFENDANT RETAILERS

394.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

395.    The Defendant Retailers in the course of interstate commerce knowingly induced and continue to induce and/or knowingly received and continue to receive discriminatory pricing of Course Materials by and/or from the Publishers as set forth in Count 7, in violation of Section 13(f) of the Robinson Patman Act.

396.    The effect of the Defendant Retailers' illegal and anticompetitive actions and unfair business conduct has been that the Defendant Retailers received substantially lower prices than the Plaintiff Retailers on contemporaneous sales of commodities of like grade and quality to be sold to students in direct competition with the Plaintiff Retailers.

397.    This price discrimination has caused economic injury to the Plaintiff Retailers, including but not limited to damage to their business, reputation, customer goodwill, lost sales, and lost profits, and has caused and will continue to cause substantial injury to competition generally.  Accordingly, the Plaintiff Retailers seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

**COUNT 9:  INJUNCTIVE RELIEF (15 U.S.C. § 26) – AGAINST ALL DEFENDANTS PURSUANT TO SECTION 16 OF THE CLAYTON ACT**

398.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

399.     Pursuant to Section 16 of the Clayton Act, the Plaintiff Retailers and the Class members seek the issuance of an injunction against Defendants preventing and restraining the antitrust violations alleged herein.

400.     The Plaintiff Retailers and the Class members qualify as "persons" under Section 1 of the Clayton Act.

401.     The Plaintiff Retailers and the Class members are entitled to an injunctive remedy based upon the above Counts 1-8 under the Sherman Act, the Clayton Act, and the Robinson-Patman Act due to the loss and future injury caused by Defendants' antitrust violations.

402.     The Plaintiff Retailers and the Class members request an injunctive remedy that is as broad as necessary to terminate illegal conduct, prevent or eliminate its consequences, and ensure that violations do not recur.

**COUNT 10:  CLAIMS UNDER ARKANSAS LAW
(VIOLATIONS OF ARK. CODE ANN. §§ 4-75-201, *et seq.* and UNJUST ENRICHMENT)**

403.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

**A.      The Arkansas Unfair Practices Act (Against the Publishers and Defendant Retailers)**

404.     The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of

Course Materials in Arkansas, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the Arkansas Unfair Practices Act (the "**AUPA**").

405.    By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the AUPA, Arkansas Code Annotated §§ 4-75-201, *et seq.*

406.    The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the Act.

407.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Course Materials and Inclusive Access in Arkansas constitutes "economic activity" within the meaning of the AUPA.

408.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the price discrimination set forth in this Complaint and alleged in Counts 1-8 have substantially affected trade and commerce throughout Arkansas.  The acts and practices engaged in by the Publishers and Defendant Retailers and described herein constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented within the state of Arkansas, in violation of the AUPA.

409.    In addition, the Publishers and the Defendant Retailers charge students for access to their financial aid funds, in violation of Department of Education ("**DOE**") regulations, including 34 C.F.R. 668.164(c)(2), because Inclusive Access Materials are not offered at "lower than the competitive market rate" and students are not provided with an "opt out."  Under 34 C.F.R. 668.164(c)(2), entities are only permitted to credit a student's ledger account with Title IV funds to pay for books and supplies as a part of tuition charges without the student's or parent's authorization if:  (1) the books are offered at costs that are lower than the competitive market rate, and (2) policy allows a student or parent to decline or opt out of using the school provided means

to obtain the books. The public policy of the United States makes clear that students are to have a clear and fair choice on how to receive their financial aid funds. The Publishers and the Defendant Retailers violate this regulation and act contrary to the public policy of the United States because they do not offer Inclusive Access Materials at lower than competitive market rates and do not provide students with an opt-out of Inclusive Access Materials in violation of Section 668. The Publishers and the Defendant Retailers act contrary to the public policy of the United States because they unfairly, deceptively, or improperly obtain Title IV funds to pay for books in violation of the DOE regulations (the "**DOE Violations**").

410. As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices and intrastate price discrimination, the Plaintiff Retailers and the Class members have been injured in their business and/or property. The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by Publishers' and Defendant Retailers' unlawful acts. The Plaintiff Retailers and the Class members are thus entitled to all relief available under the AUPA.

**B.     Unjust Enrichment (Against the Publishers and Defendant Retailers)**

411. By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access Materials that were sold in Arkansas than would have been possible absent the illegal conduct. In so doing, the Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

412.     As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

413.     The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

414.     The enrichment of the Publishers and Defendant Retailers that occurred because of their illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in Arkansas, the Publishers and Defendant Retailers should be ordered to make restitution.

## COUNT 11:  CLAIMS UNDER KENTUCKY LAW
## (VIOLATIONS OF KY. REV. STAT. ANN. §§ 365.020, *et seq.* and UNJUST ENRICHMENT)

415.     The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

**A.     The Kentucky Unfair Trade Practices Act (Against the Publishers and Defendant Retailers)**

416.     The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in Kentucky, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the Kentucky Unfair Trade Practices Act (the "**KUTPA**").

417.     By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the KUTPA, Ky. Rev. Stat. Ann. §§ 365.020, *et seq.*

418.     The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the KUTPA.

419.     During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Course Materials and Inclusive Access Materials in Kentucky constitutes a trade practice within the meaning of the Act.

420.     The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout Kentucky.  The acts and practices engaged in by the Publishers and Defendant Retailers and described herein constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the KUTPA.

421.     As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the KUTPA.

## B.     Unjust Enrichment (Against the Publishers)

422.     By engaging in the wrongful conduct described herein, the Publishers received higher prices from Plaintiff Retailers and the Class members for Course Materials and Inclusive Access Materials that were sold in Kentucky than would have been possible absent the illegal

conduct.  In so doing, the Publishers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

423.    As a result of the Publishers' wrongful conduct as alleged herein, the Publishers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

424.    The Publishers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

425.    The enrichment of the Publishers that occurred because of their illegal activities was without legally cognizable justification.  Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' illegal profits from their sales in Kentucky, the Publishers should be ordered to make restitution.

## COUNT 12:  CLAIMS UNDER NEW MEXICO LAW
### (VIOLATIONS OF N.M.S.A. 1978 §§ 57-12-1, *et seq.*, and §§ 57-14-1, *et seq.* and UNJUST ENRICHMENT)

426.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

**A.    The New Mexico Unfair Practices Act (Against the Publishers)**

427.    The Publishers agreed to, and did in fact, act in restraint of trade or commerce by unfair and deceptive trade practices in the sale of Course Materials in New Mexico, constituting unfair deceptive acts or practices within the meaning of the New Mexico Unfair Practices Act (the "**NMUPA**").

428.    By reason of the foregoing, the Publishers have acted in violation of the NMUPA, N.M.S.A. 1978 §§ 57-12-1, *et seq.*

429.    The Publishers are corporations and thus are "person[s]" for purposes of the NMUPA.

430.    During the Class period, the Publishers' manufacture, distribution, and sale of Inclusive Access in New Mexico constitutes "commerce" within the meaning of NMUPA.

431.    During the Class period, the Plaintiff Retailers and the Class members purchased Course Materials from the Publishers and thus are "consumer[s]" for purposes of the NMUPA.

432.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout New Mexico.  All of the acts and practices engaged in by the Publishers and described herein, constitute unfair and discriminatory trade practices in violation of the NMUPA, including but not limited to making false or misleading statements of fact concerning the price of goods or the reasons for, existence of, or amounts of price reduction.

433.    As a direct and proximate result of the Publishers' unlawful practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the NMUPA.

**B.    The New Mexico Price Discrimination Act (Against the Publishers and Defendant Retailers)**

434.    The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in New Mexico, constituting an unfair method of competition and/or unfair

deceptive acts or practices within the meaning of the New Mexico Price Discrimination Act (the "**NMPDA**").

435.    By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the NMPDA §§ 57-14-1, *et seq.*

436.    The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the NMPDA.

437.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Inclusive Access Materials in New Mexico constitutes "commerce" within the meaning of the NMPDA.

438.    The price discrimination practices set forth in this Complaint and alleged in Counts 7 and 8 has substantially affected trade and commerce throughout New Mexico and violate the NMPDA.

439.    As a direct and proximate result of the Publishers' and Defendant Retailers' price discrimination practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the NMPDA.

**C.    Unjust Enrichment (Against the Publishers and Defendant Retailers)**

440.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access Materials that were sold in New Mexico than would have been possible absent the illegal conduct.  In so

doing, the Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

441.    As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

442.    The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

443.    The enrichment of the Publishers and Defendant Retailers that occurred because of their illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in New Mexico, the Publishers and Defendant Retailers should be ordered to make restitution.

### COUNT 13:  CLAIMS UNDER TENNESSEE LAW (UNJUST ENRICHMENT AGAINST PUBLISHERS)

444.    The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

445.    By engaging in the wrongful conduct described herein, the Publishers received higher prices from the Plaintiff Retailers and the Class members for Course Materials and Inclusive Access Materials that were sold in Tennessee than would have been possible absent the illegal conduct.  In so doing, the Publishers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

446. As a result of the Publishers' wrongful conduct as alleged herein, the Publishers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

447. The Publishers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

448. The enrichment of the Publishers that occurred because of their illegal activities was without legally cognizable justification. Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' illegal profits from their sales in Tennessee, the Publishers should be ordered to make restitution.

## COUNT 14: CLAIMS UNDER TEXAS LAW (VIOLATIONS OF TEX. BUS. & COM. CODE §§ 15.01, *et seq.* and UNJUST ENRICHMENT)

449. The Plaintiff Retailers incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this Complaint.

## A. The Texas Free Enterprise and Antitrust Act of 1983 (Against the Publishers and Defendant Retailers)

450. The Publishers and Defendant Retailers agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively restraining competition in the marketplace of Course Materials in Texas, constituting an unfair method of competition and/or unfair deceptive acts or practices within the meaning of the Texas Free Enterprise and Antitrust Act of 1983 (the "**TX Antitrust Act**").

451. By reason of the foregoing, the Publishers and Defendant Retailers have acted in violation of the TX Antitrust Act, Tex. Bus. & Com. Code §§ 15.01, *et seq*.

452.    The Publishers and Defendant Retailers are corporations and thus are "person[s]" for purposes of the TX Antitrust Act.

453.    During the Class period, the Publishers' and Defendant Retailers' manufacture, distribution, and sale of Inclusive Access Materials in Texas constitutes "trade" and "commerce" within the meaning of the TX Antitrust Act.

454.    The Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the monopolization and price discrimination set forth in this Complaint and alleged in Counts 1-8, as well as the DOE Violations alleged herein, have substantially affected trade and commerce throughout Texas.  The acts and practices engaged in by the Publishers and Defendant Retailers and described herein constitute unfair and discriminatory practices by which fair and honest competition is destroyed or prevented in violation of the Act.

455.    As a direct and proximate result of the Publishers' and Defendant Retailers' unlawful and anticompetitive practices, including the employment of these unfair and deceptive acts and practices, the Plaintiff Retailers and the Class members have been injured in their business and/or property.  The Plaintiff Retailers and the Class members have suffered an ascertainable loss and have been damaged by the Publishers' and Defendant Retailers' unlawful acts.  The Plaintiff Retailers and the Class members are thus entitled to all relief available under the TX Antitrust Act.

**B.      Unjust Enrichment (Against the Publishers and Defendant Retailers)**

456.    By engaging in the wrongful conduct described herein, the Publishers and Defendant Retailers received higher prices for Course Materials and Inclusive Access Materials that were sold in Texas than would have been possible absent the illegal conduct.  In so doing, the

Publishers and Defendant Retailers acted with conscious disregard for the rights of the Plaintiff Retailers and the Class members.

457.     As a result of the Publishers' and Defendant Retailers' wrongful conduct as alleged herein, the Publishers and Defendant Retailers have been unjustly enriched at the expense of, and to the detriment of, the Plaintiff Retailers and the Class members.

458.     The Publishers' and Defendant Retailers' unjust enrichment is traceable to, and resulted directly and proximately from, the wrongful conduct alleged herein.

459.     The enrichment of the Publishers and Defendant Retailers that occurred because of the Publishers' and Defendant Retailers' illegal activities was without legally cognizable justification.   Under the common law doctrine of unjust enrichment, it is inequitable for the Publishers and Defendant Retailers to be permitted to retain the benefits they received, and to the extent legal remedies do not sufficiently accomplish disgorgement of the Publishers' and Defendant Retailers' illegal profits from their sales in Texas, the Publishers and Defendant Retailers should be ordered to make restitution.

## VIII.   JURY DEMAND

460.     The Plaintiff Retailers demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues triable as of right by jury.

## IX.     PUNITIVE AND TREBLE DAMAGES

461.     All of the acts committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and said acts meet the standards required for the imposition of punitive damages.

462.     The Plaintiff Retailers are entitled to recover treble damages under Section 4c of the Clayton Act (15 U.S.C. § 15(a)) and applicable state laws.

## X.        ATTORNEYS' FEES

463.    The Plaintiff Retailers are entitled to recover their reasonable and necessary attorneys' fees and costs for their claims against the Defendants.

## XI.       CONCLUSION AND PRAYER FOR RELIEF

464.    The Plaintiff Retailers request that the Court:

    a.    Determine that the claims herein under the Sherman Act, the Robinson-Patman Act, the Clayton Act, the state antitrust laws, and the state consumer protection and/or unfair competition laws may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

    b.    Adjudge and decree that the unlawful conduct alleged herein constitutes:

        i.    A violation of the Sherman Act, 15 U.S.C. § 1, as alleged in Counts 1, 2, and 3;

        ii.    A violation of the Sherman Act, 15 U.S.C. § 2, as alleged in Count 4, 5, and 6;

        iii.    A violation of the Robinson-Patman Act (15 U.S.C. §§ 13(a) and 13(f)), as alleged in Counts 7 and 8; and

        iv.    A violation of the state antitrust, consumer protection, and unfair competition laws, as alleged in Counts 10 – 14.

    c.    Adjudge preliminary and permanent injunctive relief under the Clayton Act (15 U.S.C. § 26) requiring the Defendants to cease and desist from restraining competition in the marketplace of college Course Materials and Inclusive Access Materials, as alleged in Count 9;

    d.    Adjudge compensatory damages;

e.   Award treble damages and punitive damages for injury including under Section 4 of the Clayton Act and applicable state laws;

f.   Award costs and attorneys' fees;

g.   Award pre-judgment interest and post-judgment interest to the full extent allowed under the law; and

h.   Award such other and further relief against Defendants as may be necessary and appropriate.

DATED:  December 18, 2020

Respectfully submitted,

By:      */s/ Bruce W. Steckler*

**STECKLER WAYNE COCHRAN PLLC**
Bruce Steckler
Stuart Cochran (*admitted pro hac vice*)
L. Kirstine Rogers (*admitted pro hac vice*)
**Steckler Wayne Cochran PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone:  972/387.4040
Facsimile:  972/387.4041
bruce@sgc.law
stuart@sgc.law
krogers@sgc.law

**THOMPSON COBURN LLP**
Nicole L. Williams (*admitted pro hac vice*)
Jasmine S. Wynton
1919 McKinney Ave., Suite 100
Dallas, Texas 75201
Telephone:  972/629-7100
Facsimile:  972/629-7171
NWilliams@thompsoncoburn.com
JWynton@thompsoncoburn.com

Christine Couvillon (*admitted pro hac vice*)
1909 K Street N.W., Suite 600
Washington, D.C.  20006
Telephone:  202/585-6900
Facsimile:  202/585-6969
CCouvillon@thompsoncoburn.com

**ATTORNEYS FOR PLAINTIFFS AND
CO-LEAD COUNSEL FOR
INDEPENDENT COLLEGIATE
RETAILER PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Civil Rule 5.2 on December 18, 2020.  As such, this document was served on all counsel who are deemed to have consented to electronic service.

*/s/ Bruce W. Steckler*
Bruce W. Steckler