**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE INCLUSIVE ACCESS COURSE MATERIALS ANTITRUST LITIGATION | MASTER FILE NO. 20 MDL No. 2946 (DLC) |
| This Document relates to: 20cv6314 | **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** **JURY TRIAL WAIVED** |

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION .................................................................................................. 1

II.    PARTIES ............................................................................................................. 18

III.   NON-NAMED CO-CONSPIRATORS ................................................................ 20

IV.    JURISDICTION AND VENUE .......................................................................... 21

V.     PLAINTIFFS' FACTUAL ALLEGATIONS ....................................................... 23

       A.     Industry Background .............................................................................. 23

              1.     Characteristics of the University Textbook Marketplace. ...................... 23

              2.     Consolidation of the University Textbook Publishing Industry. ............. 25

              3.     Textbooks Prices and the Student Debt Crisis. ........................................ 28

       B.     The Secondary Marketplace Disrupts the Textbook Publishing Industry. ........... 31

       C.     The Defendants Share a Common Motive to Eliminate the Secondary
              Marketplace ....................................................................................... 32

       D.     The Defendants Devise the Inclusive Access Scheme to Eliminate the Secondary
              Marketplace ....................................................................................... 35

       E.     Inclusive Access Marks a "Tectonic" Shift in Historical Patterns for the
              Publishing Industry. ............................................................................ 39

       F.     The Defendants Roll Out Inclusive Access in Concerted Fashion. ..................... 41

       G.     The Defendants Have Opportunities to Collude, Including at Meetings of the
              Trade Associations EPEG and NACS. .................................................... 44

       H.     The Defendants Effectuate the Inclusive Access Scheme Through a Series of
              Agreements in Restraint of Trade. ......................................................... 45

              1.     The University Agreements ................................................................. 46

              2.     The Bookstore Operating Agreements ................................................. 54

              3.     The Licensing Agreements .................................................................. 58

              4.     The Master Exclusivity Agreements .................................................... 60

              5.     The Overall Effect of the Scheme Agreements ..................................... 61

       I.     Universities Work with the Defendants to Coerce Students
              to Purchase Inclusive Access Materials. ................................................. 62

       J.     The Publisher Defendants Artificially Limit the Supply of Print Textbooks in
              Furtherance of the Inclusive Access Scheme. .......................................... 66

       K.     The Defendants' Anticompetitive Scheme Harms Students. .............................. 68

              1.     Students Prefer Print Textbooks to Digital Subscriptions. ..................... 68

i

|  |  | 2. | Inclusive Access Materials Are Supra-Competitively Priced. | 70 |
|  |  | 3. | Inclusive Access Does Not Represent a Technological Innovation and in Fact Degrades Traditional Textbooks. | 74 |
|  |  | 4. | Any Supposed Procompetitive Justification for Inclusive Access Can Be Achieved through Less Restrictive Alternatives. | 76 |
|  | L. |  | The Inclusive Access Scheme is Successful in Excluding Competition from the Secondary Marketplace. | 76 |
| VI. |  |  | RELEVANT MARKETS | 80 |
| VII. |  |  | ANTITRUST INJURY | 84 |
| VIII. |  |  | FRAUDULENT CONCEALMENT | 84 |
| IX. |  |  | NATIONWIDE FEDERAL DIRECT PURCHASER CLASS ACTION ALLEGATIONS | 85 |
|  | A. |  | Plaintiffs Are Direct Purchasers | 85 |
|  | B. |  | Direct Purchaser Class Action Allegations | 90 |
| X. |  |  | INDIRECT PURCHASER CLASS ACTION ALLEGATIONS | 92 |
| XI. |  |  | CAUSES OF ACTION | 93 |

## GLOSSARY OF TERMS

"**Ancillary Required Course Materials**" refers to required assignments, homework problems, exams, and quizzes.

"**Bookstore Operating Agreement**" refers to an agreement between a University and a Retailer Defendant vesting the retailer with exclusive rights to distribute Inclusive Access Materials on the University's campus

"**Inclusive Access**" refers to a system of providing time-limited access to digital course content that requires University students to obtain their textbooks only in an online format and only from their official on-campus bookstore (or from publishers themselves) and not from any other source.

"**Inclusive Access Materials**" refers to textbooks and Ancillary Required Course Materials assigned through the Inclusive Access system.

"**Inclusive Access Scheme**" refers to a conspiracy by the Defendants and co-conspirator Universities to rid the textbook industry of the used book market by implementing the Inclusive Access system.

"**Licensing Agreement**" refers to an agreement between a Publisher Defendant and a University naming a Retailer Defendant as the exclusive distributor of Inclusive Access materials on the University's campus.

"**Master Exclusivity Agreement**" refers to an agreement between a Publisher Defendant and a Retailer Defendant providing the retailer with exclusive rights to distribute the publishers' Inclusive Access Materials on one or more University campuses.

"**Scheme Agreement**" refers to any agreement between Defendants or between Defendants and Universities implementing the Inclusive Access Scheme.

"**Textbooks**" and "**textbooks**" includes all texts assigned for an undergraduate or graduate higher education course, whether in print, electronic, or online format.

"**University**" means any institution of undergraduate or graduate higher education, including any college of higher education.

"**University Agreement**" refers to an agreement between a Publisher Defendant and a University regarding the assignment, use, and /or pricing of Inclusive Access Materials on the University's campus.

The Representative Student Purchaser Plaintiffs ("Plaintiffs"), by and through their attorneys, bring this action ("Action") on behalf of themselves and all others similarly situated against the three dominant publishers of college and graduate school textbooks, Cengage Learning, Inc. ("Cengage"), McGraw Hill LLC ("McGraw Hill"), and Pearson Education, Inc. ("Pearson," collectively, the "Publisher Defendants"), and against the two dominant operators of official on-campus college and university bookstores, Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc. (collectively, "Barnes & Noble" or "B&N"), and Follett Higher Education Group, Inc. ("Follett," and, collectively with B&N, the "Retailer Defendants") (collectively, the "Publisher Defendants" and the "Retailer Defendants" are referred to as the "Defendants"). Based on their individual experiences, the investigation of counsel, and information and belief, the Plaintiffs allege here as follows:

## I.      **INTRODUCTION**

1.      For decades, publishers of educational texts have exploited college and graduate school students as captive purchasers who must purchase their products, charging exorbitant prices for textbooks that faculty members assign but that "the student has to pay for."[1] In the words of Cengage CEO Michael Hansen, rather than competing for students, "the industry relied . . . on the notion that, 'if I can convince the professor, I don't need to worry about the student, and I can charge whatever I want.'"[2]

---

[1] Abigail Hess, *4 tricks for saving money on college textbooks*, CNBC Make It (Aug. 20, 2019), https://www.cnbc.com/2018/08/20/4-tricks-for-saving-money-on-textbooks.html (statement of Cengage CEO Michael Hansen).

[2] Henry Kronk, *Pushback against Cengage and McGraw-Hill Merger: What is at Stake and What Comes Next?*, eLearning Inside (July 31, 2019), https://news.elearninginside.com/pushback-against-cengage-and-mcgraw-hill-merger-what-is-at-stake-and-what-comes-next.

2.      In the early to mid-2000s, publishers' ability to pull this "magical price lever"[3] was impaired by the rise of a robust, online secondary marketplace for textbooks. Because of advancements in internet technology and logistics, what had long been a localized and fragmented marketplace for used textbooks became a national or international one, with sophisticated search capabilities and fast delivery options. On e-commerce websites like Chegg, eBay, and Amazon (and at independent bookstores), students could buy, sell, and rent used copies of textbooks at dramatically discounted prices. In just a few years' time, the secondary marketplace was significantly reducing the "volumes of textbooks publishers were selling."[4]

3.      Initially, the Publisher Defendants responded to this new form of competition by inflating prices to make up for lost volume.[5] Taking advantage of a captive marketplace, "the industry" would "just ratchet[] up the prices—sometimes 10 percent, twice a year" to make up for shortfalls in unit sales.[6] For a time, the Publisher Defendants' "revenue[s] looked relatively stable."[7] But by 2016, it had become clear that the industry could no longer compensate for lost volume by increasing unit prices. That year, Cengage, Pearson, and McGraw Hill—which together control a combined 80 to 90 percent of the marketplace for new textbooks—reported record losses.

---

[3] Brian Barrett, *The Radical Transformation of the Textbook*, Wired (Aug. 4, 2019), https://www.wired.com/story/digital-textbooks-radical-transformation/amp (statement of Cengage CEO Michael Hansen).

[4] *Id.*

[5] Andrew Albanese, *Frankfurt Book Fair 2018: Cengage CEO Michael Hansen on the Company's Digital Switch*, Publishers Weekly (Oct. 10, 2018) (statement of Cengage CEO Michael Hansen: "Then the used book market developed, then rental. And the industry responded to this by continuing to raise prices — which we could, because the faculty, not the student, was actually the decider, and the faculty's decision was not price sensitive."), https://www.publishersweekly.com/pw/by-topic/international/Frankfurt-Book-Fair/article/78276-frankfurt-book-fair-2018-cengage-ceo-michael-hansen-on-the-company-s-digital-switch.html

[6] Hess, *4 tricks for saving money on college textbooks*, CNBC Make It (Aug. 20, 2019) (statement of Cengage CEO Michael Hansen).

[7] Barrett, *The Radical Transformation of the Textbook*, Wired (Aug. 4, 2019).

Cengage's revenues dropped by 15 percent, Pearson's by 10 percent, and McGraw Hill's by 9 percent.

4.      In the minds of the Publisher Defendants, it had become imperative to, as former McGraw Hill CEO Nana Banerjee put it, "[take] out [the] used secondary market book enterprise that has really been a disruptor for us."[8] The secondary marketplace for textbooks had ballooned into a nearly billion-dollar industry,[9] significantly reducing publishers' sales, classroom penetration rates, and profits. As Pearson CEO John Fallon explained, textbook publishers' "***biggest competitor***" had become "***the sale or rental of our products on the secondary market***."[10]

5.      The Publisher Defendants' incentive to block competition from the secondary marketplace (and return to the days of unrestrained pricing power) was enormous. According to one independent economic analysis, elimination of the secondary marketplace for textbooks would increase publishers' overall profits by nearly 43 percent.[11]

6.      The Publisher Defendants were not the only ones that stood to gain from the elimination of the secondary marketplace: so too did retailers that operate on-campus bookstores. As students purchased more textbooks on the secondary marketplace, they purchased fewer new textbooks at official on-campus bookstores. And though on-campus bookstores sold used textbooks, they could not match the prices offered by vendors like Chegg or Amazon (or even

---

[8] Cengage/McGraw Hill Joint Merger Call (May 1, 2019).

[9] SPARC Letter to Assistant Atty. Gen. Makan Delrahim Opposing the Merger Between Cengage and McGraw-Hill Education at 21 (Aug. 14, 2019) ("The secondary market for college textbooks is estimated at $954 million.") (citing Simba Information, State of College Course Materials 2017-2018, at 36 (Dec. 5, 2018)), https://sparcopen.org/news/2019/sparc-urges-department-of-justice-to-block-merger-between-cengage-and-mcgraw-hill.

[10] Pearson 2020 Q2 Earnings Call (July 24, 2020).

[11] Matt Schmitt & Tongtong Shi, *Secondary Markets and Firm Profits: Evidence from College Textbooks*, UCLA ANDERSON REV. at 2 (Sept. 10, 2018), https://www.anderson.ucla.edu/Documents/areas/fac/policy/SchmittShi_SecondaryMarkets_09102018.pdf ("[W]e find that publishers would substantially benefit from closing the secondary market. . . . Overall, we estimate that publisher profits would increase by 42.6 percent.").

smaller independent booksellers that purchased inventory online). While some on-campus bookstores in the United States are still run by colleges and universities ("Universities") themselves, the majority are now operated by just two corporate retailers: Defendants Follett and Barnes & Noble, which manage on-campus bookstores at over 700 Universities.

7.       The Publisher and Retailer Defendants thus shared a common interest in conspiring to eliminate competition from the secondary marketplace. They knew that eliminating the secondary marketplace would require a coordinated, industry-wide shift from a long-standing business model based on the sale of print textbooks through a variety of on- and off-campus retailers (brick-and-mortar and online) to one based on mandatory, time-limited, digital-only subscriptions sold exclusively through on-campus bookstores (or by the publishers themselves). While this shift would require buy-in from Universities across the country, the advantages for the Defendants were considerable: print textbook sales that feed the secondary marketplace (and discipline the price of new textbooks) would be eliminated and students could be charged higher, supra-competitive prices for digital textbook subscriptions.

8.       But the Defendants knew that no single firm, acting alone, could shift the marketplace in this way. In fact, when some of the Defendants tried individually in 2014 and 2015 to do so, they failed and were unable to convert the marketplace. In the absence of similar behavior by rivals, it was not in the independent economic self-interest of any individual firm to abandon the traditional print textbook model and shift to a restrictive, digital-only model.

9.       Thus, in 2015 and early 2016, the Defendants collectively devised and agreed upon a scheme known as "Inclusive Access" to "rid" themselves of the "used book market"[12] (the

---

[12] CNBC Interview (May 1, 2019), https://www.cnbc.com/video/2019/05/01/mcgraw-hill-and-cengage-team-up-to-make-a-netflix-for-textbooks.html (hereinafter "CNBC Interview") (statements of Michael Hansen, CEO of Cengage, and Nana Banerjee, CEO & President of McGraw Hill, agreeing with reporter that, through digital

"Inclusive Access Scheme" or "Scheme"). Inclusive Access is a system in which students must purchase an access code to subscribe to required textbooks[13] and other course materials, such as assignments, homework, quizzes, and exams ("Ancillary Required Course Materials," collectively with textbooks, "Inclusive Access Materials"), when they register for classes. Inclusive Access Materials are made available almost exclusively in digital format and only at prices that have been set by the Defendants.[14] Subscriptions generally last only the length of the course, so that students no longer have access to materials after the course ends. Students must purchase the subscriptions only through official on-campus bookstores (or from the Publisher Defendants).

10.     In 2015 and 2016, the Defendants began working together to, as Peter Cohen, then-CEO of McGraw Hill explained, "evangelize" Inclusive Access,[15] promoting the program at Universities and to the public as a technological innovation that delivered more affordable textbooks and better learning outcomes for students. The Publisher Defendants also formed a new trade association called the Educational Publishers Enforcement Group ("EPEG"). While the stated purpose of EPEG was to work against textbook counterfeiting, EPEG's true purpose was to facilitate collusion among the Publisher Defendants to gain University and faculty buy-in for Inclusive Access, and thereby to impose it on a captive market of student textbook purchasers.

products like Inclusive Access, "you're also able to rid yourself, hopefully long term, of the used book market" which  is a "huge component of this"—"capturing . . .the used piece").

[13] "Textbooks" as used in this complaint includes all texts assigned for an undergraduate or graduate higher education course whether in print, electronic, or online format.

[14] Other monikers for Inclusive Access include Direct Access, IncludED, "ALL-Inclusive and Digital Direct Access," "All Students Acquire," "AutoAccess," "Immediate Access," "First Day Access," and "day-one access." All of these programs shared the same central goal: to replace print textbooks with digital subscription plans in order to eliminate competition from the secondary market. For purposes of this Action, all such programs are referred to as "Inclusive Access."

[15] Carl Straumsheim, *Is 'Inclusive Access' the Future for Publishers?*, Inside Higher Ed (Jan. 31, 2017) (statement of Peter Cohen, president of McGraw Hill Education's U.S. education group), https://www.insidehighered.com/news/2017/01/31/textbook-publishers-contemplate-inclusive-access-business-model-future.

Other trade associations, meetings, and conferences (including a 2017 conference dedicated entirely to Inclusive Access) also provided opportunities for the Publisher and Retailer Defendants to conspire and enact the Scheme.

11.     In furtherance of the Scheme, the Defendants have entered into hundreds (if not thousands) of unlawful Inclusive Access agreements among themselves and with Universities (the "Scheme Agreements"). The intent and effect of each of these agreements is to eliminate competition from the secondary marketplace and raise the prices students pay for textbooks. Pursuant to agreements between the Publisher Defendants and Universities (the "University Agreements"), Universities agree to so-called "discount" prices for Inclusive Access Materials. These prices, however, are conditioned on a school's ability to hit certain "minimum usage" levels. Under the "minimum usage" provisions, if too few students purchase Inclusive Access subscriptions and contractual quotas are not met, the "discount" rate disappears and a higher rate prevails. Not only do these contracts incentivize Universities to maximize (and indeed mandate) Inclusive Access subscriptions, they also establish the prices students pay for Inclusive Access Materials. While the Publisher Defendants deceptively claim these prices are "discounted," they are in fact supra-competitive and much higher than the net prices students used to pay for interchangeable products when they could avail themselves of the secondary marketplace.

12.     Students are coerced into purchasing Inclusive Access Materials (rather than purchasing cheaper substitutes on the secondary market) by the Defendants' practice of tying textbooks to Ancillary Required Course Materials such as assignments, exams, and quizzes (which students need to pass their courses) and then selling students a "package" of Inclusive Access Materials. Previously, these ancillary materials had been given to faculty to be used with students free of charge, or faculty drafted their own ancillary materials that they provided to students. Under

the Scheme, only Inclusive Access subscribers have access to these Ancillary Required Course

Materials, which cannot be obtained from any other source. The purpose of tying digital textbooks

(which can be purchased on the secondary marketplace) to other course materials like assignments

and quizzes (which cannot be purchased elsewhere) is not to improve student outcomes, but to

force students to purchase Inclusive Access subscriptions—or else suffer academically. Indeed,

multiple University bookstores include the following identical warning on their websites:

> [We] have worked with publishers to get your course
> materials at the lowest available cost. These
> materials are required by your instructor. If you
> decide that you do not want to participate, you will
> need to OPT-OUT of the program by the drop date
> and be sure that you're obtaining the material on your
> own. ***Some courses may not have any codes to
> purchase from third-party vendors (Amazon,
> Chegg, B&N, etc.) so please be aware that in some
> cases, opting out will make passing your course
> impossible.***[16]

The Defendants are also open about the fact that failure to purchase Inclusive Access packages

will make it virtually impossible for many students to pass their courses under the Scheme. As

Cengage CEO Michael Hansen has explained,

> With the inclusive access model you typically the
> sales force typically [sic] go to the institution or
> department, say the accounting department or the
> business department in a given institution. And it is
> essentially negotiating an inclusive deal meaning
> every student essentially has to buy the individual
> product . . . ***[I]t is mandated essentially from the top
> of the institution or the department that every
> student has to buy that set of materials.***[17]

---

[16] *See, e.g.*, NEO Bookstore, https://bookstore.neo.edu/inclusive-access-course (emphasis added); NOC Bookstore, https://www.nocbookstore.com/site_inclusive_access.asp; Victoria College Bookstore, https://www.victoriacollege.edu/Explore/Students/Bookstore/EBookCourseFee.

[17] Cengage Q4 2018 Earnings Call (May 17, 2018).

Because purchasing Inclusive Access products is essentially compulsory, opt-out rates are consistently below 5 percent and, in many instances, are as low as 1 percent.

13.     Universities are financially induced to mandate Inclusive Access on their campuses through agreements with the Retailer Defendants regarding the management of on-campus bookstores (the "Bookstore Operating Agreements"). Under these agreements, Universities receive commissions from the sale of course materials (including Inclusive Access Materials),[18] as well as, in many cases, large upfront signing bonuses from the Retailer Defendants. The payment of high six- and seven-figure signing bonuses by retailers to operate on-campus bookstores was virtually unheard of prior to Inclusive Access and, but for the Scheme, would be economically irrational, as typical revenues from on-campus bookstores do not justify such payments. But under the Scheme, the Retailer Defendants are willing to make large upfront payments to win access to on-campus bookstores because they know that once a University adopts Inclusive Access, virtually all students in courses subject to Inclusive Access will be coerced into purchasing their textbooks from their on-campus bookstore—and not the secondary marketplace. Whereas prior to Inclusive Access, only about 35 percent of students purchased their textbooks through the Retailer Defendants, under the Scheme (and as a result of the coercion it entails) that rate has gone up to almost 100 percent. Universities know that to obtain lucrative agreements with prospective on-campus bookstore operators, they must mandate Inclusive Access, guaranteeing these returns for the Retailer Defendants even to the detriment of students.

14.     Following their financial incentives and in furtherance of the Scheme, Universities have conspired with the Publisher and Retailer Defendants to coerce students to purchase Inclusive

---

[18] Universities that run their own bookstores retain 100 percent of profits from the sale of Inclusive Access materials on their campuses.

Access Materials. Many students are "automatically subscribed" to Inclusive Access materials when they enroll in courses and receive automatic charges on their tuition bills. While students technically must have the right to "opt out" of Inclusive Access,[19] the Defendants have worked with Universities to ensure that this right is effectively illusory. Processes for opting out are cumbersome and opaque, with students being given insufficient time and information about pricing to determine the true costs of Inclusive Access.

15.     In furtherance of the Scheme, the Publisher Defendants have also taken steps to artificially reduce the supply of print textbooks for the purpose of limiting the volume of sales that feed the secondary marketplace. For example, each edition of a textbook has a unique serial number, known as an ISBN. The Publisher Defendants assign unique ISBNs to digital-only Inclusive Access editions of textbooks to make it difficult for students to identify items on the secondary marketplace (such as hard copy textbooks or other identical or nearly identical e-textbooks available for rent) that would be functionally interchangeable alternatives to specific Inclusive Access textbooks. Similarly, to obtain print copies of these Inclusive Access textbooks, students must either rent them from the Publisher Defendants or purchase "print upgrades" for significant sums over and above the cost of their Inclusive Access subscriptions. These print copies are typically "loose-leaf versions of . . . textbooks," instead of more durable bound textbooks, "to limit secondary market exposure."[20] Publishers also cap the number of students in any given course who may purchase print upgrades. As Pearson CEO John Fallon stated earlier this year, publishers restrict their output of print textbooks to eliminate competition from the secondary marketplace:

---

[19] Federal rules governing automatic billing for textbooks provide that "[a]n institution may include the costs of books and supplies as part of tuition and fees . . . [only] if [t]he institution [h]as a policy under which the student may opt out of the way the institution provides for the student to obtain books and supplies. . . ." 34 C.F.R. § 668.164(c).

[20] McGrawHill Education, Inc., Annual Report ending Dec. 31, 2018 (Mar 29, 2019).

> The first year of our digital-first product strategy, with frequent releases of content, features and updates no longer tied to an edition cycle, with print only available through our own rental program, is working. In the first half of this year, we increased total unit sales *whilst shipping 700,000 fewer print products into the channel, diminishing future secondary supply.*[21]

The same strategy for "aging out" print textbooks was articulated in 2019 by then-serving McGraw Hill CEO Nana Banerjee, who predicted that by restricting print output, the Publisher Defendants would eliminate the secondary marketplace within a "four to six-year window":

> [W]e do expect at some point, as we have more and more digitized products coming in [to make used books less of a disruptor]. . . . [T]here is a half-life that is associated with kind of taking out this used secondary market book enterprise that really has been a disruptor for us. We would expect that to [occur in] a four to six-year window. *Every new frontlist that becomes a backlist and as we stick to our rental program is helping us kind of age out . . . the books that are now in circulation* but kind of becoming less and less relevant from the prior vintages. *So I think [a] four to six-year year window seems appropriate.*[22]

Artificially reducing the output of print textbooks would contravene the independent economic self-interest of any individual Publisher Defendant in the absence of similar behavior by its rivals. Indeed, absent the Scheme, each publisher would ordinarily profit from selling as many textbooks as possible (in whatever format consumers prefer) to outcompete rivals. However, the Publisher Defendants know that by acting in concert to restrict the supply of goods to the secondary marketplace, they will all benefit from the exclusion of competition and the supra-competitive prices they can charge for Inclusive Access Materials as a result. It was and is in no Publisher

---

[21] Pearson Q2 2020 Earnings Call (July 24, 2020) (statement of Pearson CEO John Joseph Fallon).

[22] Cengage/McGraw Hill Joint Merger Call (May 1, 2019).

Defendant's individual economic self-interest to reduce print output absent the Inclusive Access Scheme and the coordination among horizontal competitors it entails.

16.     Inclusive Access represents a "tectonic" shift in historical patterns for the publishing industry.[23] As Pearson CEO John Fallon has explained, prior to Inclusive Access, the industry's "product development . . . and the revision cycle[s] were still driven by essentially the way the world ha[d] been the last 40 years."[24] Publishers sold print textbooks to retailers (whether on-campus or independent) at wholesale prices, and retailers resold those textbooks to students. With Inclusive Access, the industry committed—in rapid, concerted fashion—to abandoning traditional print textbooks, dealing exclusively with on-campus retailers, and offering digital-only, time-limited, non-shareable, non-resalable, and effectively mandatory courseware subscriptions.

17.     The purpose and effect of this sudden, industry-wide shift was not to enhance consumer welfare (as the Defendants claim in promotional materials), but to eliminate the secondary marketplace. The Publisher Defendants have all admitted as much in public statements to investors:

- According to Cengage's 2019 annual report, the point of Inclusive Access is to give the Defendants "access to a greater number of students in any given classroom" by locking nearly 100 percent of students into digital subscriptions, which, "[i]n contrast to print publications. . . cannot be resold or transferred" on the secondary marketplace.[25]

---

[23] Barrett, *The Radical Transformation of the Textbook*, Wired (August 4, 2019), https://www.wired.com/story/digital-textbooks-radical-transformation ("For several decades, textbook publishers followed the same basic model: Pitch a hefty tome of knowledge to faculty for inclusion in lesson plans; charge students an equally hefty sum; revise and update its content as needed every few years. Repeat. But the last several years have seen a shift at colleges and universities—one that has more recently turned tectonic.").

[24] *Id*.

[25] Cengage Learning Holdings II, Inc., Annual Report for Fiscal Year Ended March 31, 2019 (May 30, 2019).

- In a 2019 earnings call, Pearson CEO John Fallon stated that the Inclusive Access "digital-first" strategy "means . . . eliminating the currently large secondary market."[26]

- McGraw Hill executives have likewise confirmed that the purpose of digital strategies like Inclusive Access is for publishers "to rid [themselves] of the used bookstore market."[27]

18.     Cooperation among the Publisher Defendants was critical to the expansion of Inclusive Access. The Publisher Defendants knew that instituting Inclusive Access at Universities would require a sea change in the way University and academic departments—institutional stakeholders that are notoriously resistant to change—assign course materials. If an individual Publisher Defendant moved on its own to introduce a digital-only subscription model like Inclusive Access, it would have been perceived as offering an experimental, overly restrictive, and higher priced product and would have lost sales to competitors willing to sell textbooks in a variety of formats, including e-books and print, which students prefer. (Indeed, the Publisher Defendants' first individual attempts at launching digital-only subscription services were flops.) In the unlikely event that the first mover was successful, any upside would have been limited by the fact that competitors would have rushed to the marketplace with their own digital-only subscription plans the following year, as the technology underpinning Inclusive Access is not novel. Being the first mover, in other words, was high risk with limited potential reward, making it contrary to any one Publisher Defendant's economic self-interest to pursue Inclusive Access alone. Cooperation, by contrast, had many advantages. By rolling out their Inclusive Access programs together, the Publisher Defendants—which control nearly 90 percent of the University textbook marketplace—

---

[26] Pearson 2019 Q4 Earnings Call (Jan. 20, 2020) (statement of John Joseph Fallon, CEO).

[27] CNBC Interview (May 1, 2019).

were able to convey to Universities that digital-only subscription programs were not experimental, but rather the inevitable future of the textbook industry, and increasingly, the only product on offer.

19.    The Inclusive Access Scheme also required the involvement and cooperation of the Retailer Defendants and Universities. Each of these players were (and are) critical to the maintenance of the Scheme—and directly benefit from the monopoly rents the Scheme extracts from students. Prior to Inclusive Access, Universities and their on-campus bookstores profited from the sale of print textbooks. The Publisher Defendants knew that Universities would not assign Inclusive Access Materials if they could only be purchased from the Publisher Defendants, as this would mean giving up traditional revenue streams and undermining the financial wellbeing of on-campus bookstores. To overcome this, under the Scheme, the Publisher Defendants share a portion of the monopoly profits they receive from the sale of Inclusive Access Materials with Universities and the Retailer Defendants. First, the Publisher Defendants make on-campus bookstores, the majority of which are run by the Retailer Defendants, the exclusive distributors of the Inclusive Access Materials, allowing them to charge supra-competitive prices for Inclusive Access Materials without the threat of competition from the secondary marketplace. Universities, in turn, receive a percentage of all revenues from the sale of course materials at their on-campus bookstores as well as, in many cases, large upfront payments from the Retailer Defendants. In this way, the Scheme funnels to each of its members a share of the monopoly profits generated from the sale of Inclusive Access Materials at supra-competitive prices.

20.    While Inclusive Access is a win for the Publisher and Retailer Defendants (and the Universities with whom they conspire), it has no advantages for students, who lose the ability to find lower-cost textbooks on the secondary marketplace in the formats they prefer. Even in today's

digital age, the vast majority of students prefer print textbooks,[28] which the Defendants admit publicly. In the words of former Barnes & Noble CEO Max Roberts, "**printed textbooks are still the format of choice for most students.**"[29] According to the company's current CEO, "[w]hile digital coursework delivery is increasing, evidence persists that there is still a strong appetite to learn using the physical book."[30]

21.    Student preference for print textbooks is rooted in sound judgment. Studies show that increasing screen time has deleterious health effects[31] and that students have superior learning outcomes when they engage with course materials in physical form.[32] Still, the Defendants ignore student preference for print and coerce them into purchasing digital-only Inclusive Access Materials. To the Defendants, "**whether somebody learns and likes to read something on a printed paper isn't really as relevant**"[33] as other business considerations.

---

[28] *See generally*, Naomi Baron, *Words Onscreen: The Fate of Reading in a Digital World* (2015) (finding 92 percent of university students, in the United States, Germany, and Japan, prefer physical textbook to e-books); *see also* University of Central Arkansas Study (March 1, 2018) (finding 80 percent of students prefer physical books over e-books); Michael S. Rosenwald, *Why digital natives prefer reading in print. Yes, you read that right.*, Washington Post (Feb. 22, 2015), https://www.washingtonpost.com/local/why-digital-natives-prefer-reading-in-print-yes-you-read-that-right/2015/02/22 ("Textbook makers, bookstore owners and college student surveys all say millennials still strongly prefer print for pleasure and learning, a bias that surprises reading experts given the same group's proclivity to consume most other content digitally. A University of Washington pilot study of digital textbooks found that a quarter of students still bought print versions of e-textbooks that they were given for free.").

[29] BNED Q4 2016 Earnings Call (June 28, 2016) (statement of Max Roberts, BNED CEO).

[30] BNED Q2 2020 Earnings Call (Dec. 4, 2019) (statement of Mike Huseby, BNED CEO).

[31] *See, e.g.*, Alice Robb, *92 Percent of College Students Prefer Reading Print Books to E-Readers*, THE NEW REPUBLIC (Jan. 14, 2015), https://newrepublic.com/article/120765/naomi-barons-words-onscreen-fate-reading-digital-world (describing research finding that "young people" — even those "accustomed to doing most things on screens" — were "resistant to e-books" because "they say they get distracted, pulled away to other things" and had "eye strain and headaches and physical discomfort").

[32] Lauren Singer & Patricia Alexander, *Reading on paper and digitally: What the past decades of empirical research reveal*, Rev. of Educ. Research (July 2017) (finding use of digital devices reduced reading comprehension for respondents consuming content of more than 500 words); Tenn. Bd. of Regents, Comparison of Grade Distributions: Fall 2014 to Fall 2015 (observing overall decrease in percentage of students with grade of "C" or better after digital Inclusive Access program adopted).

[33] CNBC Interview (May 1, 2019) (statement of Michael Hansen, CEO of Cengage).

22.     The Defendants market Inclusive Access as delivering steep discounts to students, ranging from 50 to 80 percent.[34] These claims are deceptive and false for a variety of reasons. Such "discounts" are not calculated against "competitive market rates," as, for example, is required by federal rules governing automatic billing for textbooks;[35] rather, they are calculated by comparing the cost of Inclusive Access subscriptions to the monopolistic prices set by the Publisher Defendants themselves for new print textbooks. Inclusive Access textbooks are, in fact, *more expensive* than interchangeable products available on the secondary marketplace—including e-book rentals, which also provide students with access to digital copies of textbooks for the duration of a course but at a fraction of the Inclusive Access price. In some cases, Inclusive Access textbooks are more expensive even than the price listed for the corresponding textbook on the Publisher Defendants' own websites. Inclusive Access "discounts," moreover, do not account for the fact that physical textbooks, as durable goods, have significant long-term use and resale value, while time-limited digital subscriptions do not. Inclusive Access eliminates students' ability to keep course materials after the course ends (for example, as resources to refer to in future classes or as additions to a personal library) or to recapture some of their out-of-pocket costs by selling them on the secondary marketplace at a later date.

23.     McGraw Hill's popular textbook, *Economics* (21st edition) (ISBN10-1264224338), by Campbell McConnel, Stanley Brue, and Sean Flynn, illustrates the deceptiveness of the Defendants' discount claims. On McGraw Hill's website, *Economics* can be purchased as a print

---

[34] *See, e.g.*, McGraw Hill, https://www.mheducation.com/highered/inclusive-access.html ("50% – 80% Lower Cost"); https://www.pearson.com/us/higher-education/products-services-institutions/inclusive-access/for-administrators.html ("Digital course materials cost up to 70% less than traditional print products. . . .").

[35] *See* 34 C.F.R. Sec. 668.164(c)) ("An institution may include the costs of books and supplies as part of tuition and fees . . . if [*inter alia*] [t]he institution has an arrangement with a book publisher or other entity that enables it to make those books or supplies available to students below *competitive market rates* . . . .") (emphasis added)

version for $262 (loose leaf pages in a binder) or rented as an e-textbook for 180 days for $55.[36] McGraw Hill claims that, relative to new print textbooks, Inclusive Access Materials are "50-80% lower cost."[37] But even if the Inclusive Access subscription for *Economics* were priced at a 70 percent discount relative to print, putting it at $80, that would still be more than the $55 website price for the same e-book rental. Students, in other words, are paying more through Inclusive Access than they would renting the e-textbook directly from the publisher. And on the secondary marketplace, students can obtain the same textbook in any format for even less money:

| *Economics, 21st edition*<br>ISBN-10: 1264224338 | Amazon Prices[38] | Discount Off Estimated Inclusive Access Price ($80) |
|---|---|---|
| One-semester rental (hardcover) | $13.48 | 83% |
| Used purchase (hardcover) | $44.55 to $75.00 | 44% to 6% |
| E-book purchase | $52.71 | 34% |
| Six-month e-book rental | $47.44 | 41% |
| One-semester print rental (loose leaf) | $27.99 | 65% |
| New print purchase (loose leaf) | $59.99 | 25% |
| Used print purchase (loose leaf) | $39.73 | 50% |

24.     In the long run, if the Defendants succeed in eliminating the secondary marketplace for textbooks, there will be no competitive mechanism to constrain pricing and prevent the Defendants from obtaining supra-competitive prices for textbooks. The Defendants, through their Scheme, are seeking to monopolize the marketplace for University textbooks by excluding one of the only effective forces (the secondary marketplace) that disciplines the price of textbooks.

25.     The Defendants also tout Inclusive Access as a technological "innovation" that solves the textbook affordability crisis (a crisis of their own making, of course). This claim, too, is misleading and false. Inclusive Access represents virtually no technological innovation or

---

[36] McGraw Hill, https://www.mheducation.com/highered/product/economics-mcconnell-brue/M9781259723223.html.

[37] McGraw Hill, https://www.mheducation.com/highered/inclusive-access.html ("50% – 80% Lower Cost").

[38] Amazon, https://www.amazon.com/Economics-Irwin-Campbell-McConnell-ebook-dp-B06XD4WTV9/dp/B06XD4WTV9/ref=mt_other?_encoding=UTF8&me=&qid=.

advantages for students. It simply offers the same textbooks and course materials that were available before but in a restricted electronic-only format and with time-limited access.

26.     Inclusive Access is, in fact, an instance of *product degradation, not innovation*. Through the Inclusive Access Scheme, the Defendants are effectively "aging out" traditional textbooks—durable goods with lasting use value that societies have protected from suppression for generations—and replacing them with ephemeral educational "experiences" that last only as long as a particular corporation sees fit.

27.     Beneath all the Defendants' spurious marketing claims, Inclusive Access is simply another attempt by the Defendants to extract monopoly rents from students for the use of textbooks. The only thing innovative about it is the extent to which it hinders consumer choice, reduces output, and blocks competition from the secondary marketplace and independent retailers.

28.     In addition to this rent seeking, there are other dangers lurking behind the Defendants' glib claims about technological innovation. Once students are forced to transition to digital course subscriptions, the Defendants can collect vast amounts of data on them, including their physical locations, study habits, learning profiles, and grades. Such data collection poses privacy concerns for students and creates barriers to entry that will hinder future competition.

29.     The Defendants have been successful in implementing the Inclusive Access Scheme, which has allowed them to achieve penetration rates of close to 100 percent in courses where Inclusive Access Materials are assigned and to arrest the decline in profits resulting from secondary marketplace competition. As Pearson CEO John Fallon reported earlier this year, the companies' digital sales were up, which was "an early indication of secondary [market] recapture."[39] He concluded, ***our digital-first product strategy***, with frequent releases of content,

---

[39] Pearson 2020 Q2 Earnings Call (July 24, 2020) (statement of Pearson CEO John Joseph Fallon).

features and updates no longer tied to an edition cycle, with print only available through our own rental program, ***is working.***"[40]

30.     As a direct result of the anticompetitive conduct described by Fallon and others, the Defendants have unlawfully monopolized and are unlawfully monopolizing the marketplace for University textbooks, and students have paid and are paying supra-competitive prices for Inclusive Access Materials, without justification. The Student Purchaser Plaintiffs bring claims under federal antitrust laws to enjoin this ongoing illegal conduct and to obtain overcharge damages.

## II.     **PARTIES**

31.     Plaintiff Martha Barabas is a resident of Hunterdon County, New Jersey. During the relevant time period (and while enrolled at the College of New Jersey between 2015 and 2018), she was required to and did purchase subscriptions to Inclusive Access Materials through the on-campus bookstore run by Defendant Barnes & Noble.

32.     Plaintiff Julio Lopez is a resident of Dade County, Florida. During the relevant time period (and while enrolled at Miami-Dade College-Virtual College between 2019 and 2020), he was required to and did purchase subscriptions to Inclusive Access Materials through the on-campus bookstore run by Defendant Follett.

33.     Plaintiff Kira Cloonan is a resident of Kane County, Illinois. During the relevant time period (and while enrolled at North Central College between 2018 and 2019), she was required to and did purchase subscriptions to Inclusive Access Materials from Defendant Pearson.

34.     Plaintiff Cliff Urban (collectively with Barabas, Lopez, and Cloonan, the "Representative Student Purchaser Plaintiffs") is a resident of Lake County, Indiana. During the

---

[40] Pearson 2020 Q2 Earnings Call (July 24, 2020) (statement of Pearson CEO John Joseph Fallon).

relevant time period (and while enrolled at Ivy Tech Community College of Indiana in 2015, Indiana University in 2015 and 2016, and Purdue University Northwest between 2016 and 2018), he was required to and did purchase subscriptions to Inclusive Access Materials through the on-campus bookstores run by Defendants Barnes & Noble and Follett.

35.     Defendant Barnes & Noble Education, Inc. is a Delaware corporation based in Basking Ridge, New Jersey that was spun off from Barnes & Noble, Inc. in 2015. It is the parent company of Barnes & Noble College Booksellers, LLC.

36.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware LLC based in Basking Ridge, New Jersey that operates Barnes & Noble's campus bookstores nationwide and that sells Inclusive Access Materials through those bookstores.

37.     Defendant Follett Higher Education Group is an Illinois corporation based in Westchester, Illinois that operates Follett's campus bookstores nationwide and that sells Inclusive Access Materials through those bookstores.

38.     Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, Massachusetts that publishes University textbooks and course materials, including through Inclusive Access.

39.     Defendant McGraw Hill LLC is a Delaware LLC based in New York, New York that publishes University textbooks and course materials, including through Inclusive Access.

40.     Defendant Pearson Education, Inc. is a Delaware corporation based in New York, New York that publishes University textbooks and course materials, including through Inclusive Access.

### III.   NON-NAMED CO-CONSPIRATORS

41.     All Universities that conspired with the Defendants as part of the Inclusive Access Scheme and/or entered into agreements with the Defendants in furtherance of the Inclusive Access Scheme are non-named co-conspirators in this Action.

42.     "Inclusive Access is a partnership between an institution, bookstore, and publisher to deliver digital course materials to students."[41]

43.     Universities actively supported the illegal restrictions at the heart of the Scheme through participation in their formulation and encouragement of their continuation. Universities entered into agreements with Publishers and Retailers to mandate the use of Inclusive Access on campuses, marketed Inclusive Access, coerced students into purchasing Inclusive Access products, and facilitated purchases of Inclusive Access subscriptions, in some cases automatically billing students for Inclusive Access as an add-on to their tuition bill.

44.     Universities suffer no injury from the Inclusive Access Scheme. The Defendants acknowledged as much in related proceedings in the District of Delaware, when they averred that any alleged damages resulting from Inclusive Access—namely, "high prices," "reduced quality" course materials, and the constriction of "consumer choice"—were injuries that "***would be borne by students.***" *See Campus Book Co., Inc., et al. v. McGraw-Hill Global Educ. Holdings, LLC, et al.*, No. 20-102 (D. Del. 2020), Defendants' Reply Br. (ECF 46), at 7-8 (contesting antitrust standing of independent retailer plaintiffs).

45.     Universities in fact benefit from the Scheme, receiving a split of the Defendants' monopoly profits through commissions from the sale of Inclusive Access Materials to their

---

[41] https://www.mheducation.com/highered/inclusive-access.html.

students as well as direct upfront payments from the Retailer Defendants in connection with the Scheme.

46.     Universities' voluntary and complete involvement in the monopolistic Scheme alleged herein precludes them from recovering against any party in connection with the Scheme.

47.     Universities have not brought, and will not bring or seek to bring, any action for damages or other relief in connection with the Scheme. Under each Inclusive Access agreement between a Publisher Defendant and a University, the parties release each other from all liability for damages arising in connection with the Scheme. For example, a May 2017 Inclusive Access agreement between Pearson and the University of Florida Board of Trustees provides as follows:

> LIMITATION OF LIABILITY. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHATSOEVER, SUFFERED BY THE OTHER PARTY, INCLUDING WITHOUT LIMITATION LOST DATA, LOST PROFITS AND COSTS FOR PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, GOODWILL, BUSINESS INTERRUPTIONS OR OTHER ECONOMIC LOSS ARISING OUT OF OR RELATED TO THE AGREEMENT. . . .[42]

## IV.   JURISDICTION AND VENUE

48.     The Student Purchaser Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15; injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26; and, in the alternative, damages, to the maximum extent allowed,

---

[42] Ewalt Decl., Ex. B at 6, ECF 69.

and injunctive relief under applicable state laws. This Court has subject matter jurisdiction over the Student Purchaser Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a), as that this Action arises under the federal antitrust laws. The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

49.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims herein occurred in this District, and in the alternative, under 28 U.S.C. § 1391(b)(3), as this Court would have personal jurisdiction over McGraw Hill LLC and Pearson, which are inhabitants of, and transact business in, this District.

50.     This Court has personal jurisdiction over each Defendant on several grounds: (1) Defendants McGraw Hill and Pearson have their principal places of business in, and transact substantial business in, New York, (2) Defendants Cengage, Pearson, Follett, and Barnes & Noble all transact substantial business in New York, (3) Defendants Cengage, Pearson, Follett, and Barnes & Noble all conspired with New York-based Defendants McGraw Hill and Pearson, and (4) the Defendants committed acts in furtherance of the conspiracy in New York, including establishing Inclusive Access programs at Universities in New York.

51.     The Defendants' actions have had a significant effect on interstate commerce in the University textbook field.

52.     Barnes & Noble has on-campus University bookstores in 43 states.  On information and belief, Barnes & Noble sells Inclusive Access to students in all 43 of those states.

53.     Follett has on-campus University bookstores in 48 states. On information and belief, Follett sells Inclusive Access to students in all 48 of those states.

54.     Cengage, McGraw Hill, and Pearson sell University textbooks and course materials through Inclusive Access to students in all 50 states.

55.     The Scheme described in this Action has had a substantial effect on the national marketplace for University textbooks, including the national markets for each textbook (or other course material) assigned in courses subject to Inclusive Access programs.

## V.     PLAINTIFFS' FACTUAL ALLEGATIONS

### A.  Industry Background

*1.  Characteristics of the University Textbook Marketplace.*

56.     In a normal, well-functioning market, a consumer who wants to purchase a product has options from a variety of competing brands. For example, a student who wants to purchase lunch can purchase from a variety of different restaurants. These consumers have knowledge of or can readily learn about the comparative quality, attributes, and prices of competing products and brands. They decide whether it is worth buying one product over another (or buying any product at all) and are responsible for paying the cost. When consumers have both the payment obligation and the choice of products, price typically plays a predominant role in their product choices. And where price plays a predominant role in consumer choice, sellers typically have a strong incentive to lower prices to attract customers and maintain profitability.

57.     The college textbook marketplace lacks the price/quality trade-off present in other industries. Students are "captive" in the sense that they are required to purchase the materials they have been assigned regardless of their quality or cost. If a student chooses not to purchase the assigned materials (because she cannot afford the materials assigned or believes the prices are excessive or unfair), she will be at an academic disadvantage relative to classmates who purchased the material. The Inclusive Access Scheme takes this to a new level, as a student will fail her course if she does not purchase the assigned Inclusive Access Materials, which likely include Ancillary Required Course Materials like homework assignments and quizzes.

58.     In courses where physical textbooks have been assigned, a student must purchase, rent, or borrow either a new print textbook or a functionally interchangeable used or digital version of the assigned textbook to successfully participate in the class. While students have the obligation to acquire the assigned course materials, Universities and their personnel choose which products to require. The fact that one entity selects the product while someone else pays for it introduces a "disconnect" in the market.

59.     Seizing on this disconnect, the Publisher Defendants have traditionally marketed course materials directly to Universities—not students. Publishers employ sales representatives to visit Universities to persuade them to assign the Publisher Defendants' course materials to students. Publishers compete for University business not on price, but on features and benefits. In fact, the Publisher Defendants and their sales representatives intentionally obscure price information, making it difficult even for well-intentioned institutions to consider the financial impact of their decisions on students. Publishers can enact price changes at any time, including after a professor has made the decision to assign a particular textbook but before their students have purchased the materials. According to one economist,

> Professors never know how expensive the textbooks they are getting are. It's like when doctors prescribe drugs, though most people have insurance to cover pharmaceutical costs. Students don't have insurance to cover textbooks.[43]

60.     Even when University personnel are aware of the relative costs, they are insensitive to price differences because they do not pay for the products themselves. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

61.     When the relative importance of price differences between products is low (as in the case of Inclusive Access Materials), the "price elasticity of demand"—the extent to which sales go down when price goes up—will, by definition, also be low. Low price elasticity of demand gives textbook publishers the ability to raise or maintain prices substantially above competitive levels without losing sales. The ability to raise price above competitive levels without losing sales is referred to by economists and antitrust courts as "market power."

62.     The price disconnect inherent in the University textbook industry has given publishers a blank check to raise textbook prices at rates far exceeding inflation and to develop expensive materials that appeal to professors based on features and benefits (not price), without regard to the preferences or financial circumstances of students. And, as alleged in this Action, this disconnect has enabled the Defendants to implement a "hard switch" from print textbooks to mandatory, time-limited digital subscriptions (despite students' continuing preference for print materials) and to sell those subscriptions at supra-competitive prices.

## 2.  *Consolidation of the University Textbook Publishing Industry.*

63.     In the 1980s, there were roughly two dozen major players in the textbook publishing industry. Today, there are just three: Cengage, McGraw Hill, and Pearson. These publishers control virtually the entire University textbook industry, with weak competitors and a combined market share approaching 90 percent.

64.     The oligopolistic structure of the publishing industry is the product of several mergers, some of which are illustrated in the following chart:



65.    The current levels of consolidation within the industry have already created conditions that are ripe for collusion and anticompetitive conduct, such as price fixing and market allocation. Despite this fact, the industry has very recently attempted to consolidate further. In May 2019, Cengage (which has been substantially owned by the private equity firms KKR and Apax since it emerged from bankruptcy in 2014) and McGraw Hill (which was purchased by Apollo Management in 2013) announced their intention to join forces in an all-stock merger, which would have combined the second- and third-largest textbook publishers into a single giant. Cengage and McGraw Hill justified the planned merger as a means to expand digital platforms like Inclusive Access.

66.    Objectors rushed to protect students from the anticompetitive effects of the proposed merger. Multiple objections to the proposed merger were filed in August 2019, including by industry and student groups that argued that the merger would exacerbate coordinated and anticompetitive behavior in the industry, leading to reduced incentives for innovation, lower quality experiences for students, and, ultimately, higher prices. According to the Scholarly

Publishing and Academic Resources Coalition (SPARC), an alliance of more than 200 academic and research libraries, coordinated conduct in the industry would be "especially likely" after a Cengage-McGraw Hill merger given the growth of digital subscriptions programs like Inclusive Access. As SPARC wrote in its letter to the Department of Justice opposing the merger,

> If as we suspect, the post-merger firm launches a combined all-access [digital subscription] plan and Pearson follows suit, the market will become a pure duopoly. While it is possible that the two firms might compete for institutions, it is also possible *they might find it more profitable to first lock institutions into subscriptions to both plans, then resume their historical rate of coordinated price increases once introductory discounts expire.*[44]

67.    Members of Congress also voiced concern with the proposed merger. According to a letter authored by several U.S. Senators, the merger was problematic because of, among other things, the "highly consolidated nature of the textbook industry," "[t]extbook publishers' practice of frequently releasing new textbook editions even when updates are either minor or merely cosmetic forces students to purchase the cost-prohibitive, newest version of a textbook, and depresses the value of older editions for purposes of resale," and the concern that "digitized textbooks—which are increasingly automatically billed to students through 'inclusive access' programs—would eliminate that choice, further straining the competitiveness of the textbook market."[45]

---

[44] SPARC Letter to Assistant Atty. Gen. Makan Delrahim Opposing the Merger Between Cengage and McGraw-Hill Education at 33 (Aug. 14, 2019) https://sparcopen.org/news/2019/sparc-urges-department-of-justice-to-block-merger-between-cengage-and-mcgraw-hill.

[45] Senators Richard Blumenthal, Richard Durbin, Dianne Feinstein, Tina Smith, Cory A. Booker, and Mazie K. Hirono, Letter to The Honorable Makan Delrahim, Assistant Attorney General, Antitrust Division, Department of Justice (Apr. 24, 2020).

68.     The attempted merger was ultimately abandoned in May 2020 after a protracted DOJ investigation, which resulted in a call for stringent requirements that the companies divest educational assets prior to merging to avoid concentration.

### 3.   Textbooks Prices and the Student Debt Crisis.

69.     The history of textbook prices illustrates what can happen when an oligopoly controls a captive market: collusion, extreme annual price increases, and a textbook affordability crisis so severe that, in one study, 43 percent of college students surveyed reported making personal sacrifices—*including skipping meals*—in order to purchase textbooks.[46]

70.     According to the Bureau of Labor Statistics, since 1998, the price of new college textbooks has risen by more than 181 percent—more than three times the rate of inflation, and more than the rate of growth for almost any other category of consumer goods.[47] The component of the Consumer Price Index (CPI) that tracks new college textbooks was *the sixth-fastest growing component from January 2008 to January 2015 out of more than 350 different components*.[48]

---

[46] Emma Whitford, *Textbook Trade-offs,* Inside Higher Ed (July 26, 2018),
https://www.insidehighered.com/news/2018/07/26/students-sacrifice-meals-and-trips-home-pay-textbooks.

[47] Mark Perry, *Chart of the day . . . or century?* AEIdeas (Jan. 11, 2019), https://www.aei.org/carpe-diem/chart-of-the-day-or-century.

[48] Schmitt & Shi, *Secondary Markets and Firm Profits*, at 29.



71.     Wholesale prices for textbooks have risen even more precipitously. Since 1980, the prices paid by retailers to textbook producers have increased 742 percent, almost six times the rate of inflation for all commodities.[49] These rates of increase, which outpace inflation, illustrate the Publishers' immense market power.

---

[49] The annual average Producer Price Index (PPI) for College Textbook Publishing was 106 in 1980 and 892 in 2018, a 742 percent increase. The annual average PPI for All Commodities was 90 in 1980 and 202 in 2018, a 125 percent increase.



Producer Price Index by Industry: Book Publishers: College Textbook Publishing
January 1980 - September 2015

72.    The exploding cost of textbooks has significantly contributed to the student debt crisis. Total student loan debt is now over $1.56 trillion dollars, exceeding the total debt owed for auto loans or credit cards. Over forty-five million Americans have outstanding student debts, with borrowers owing $37,172 on average. Student loan debt is the second largest class of consumer debt, behind only mortgage debt.

73.    These student debt figures include debt resulting from the purchase of course materials. According to the College Board, the average college student now spends roughly $1,300 per year on textbooks. For students attending four-year colleges, course materials account for 15 percent of tuition and fees; for those attending community colleges, that number is 39 percent.[50]

---

[50] The College Board, Trends in College Pricing 2019 (2019), https://research.collegeboard.org/pdf/trends-college-pricing-2019-full-report.pdf.

**B.  The Secondary Marketplace Disrupts the Textbook Publishing Industry.**

74.     In the early to mid-2000s, e-commerce websites like Chegg, eBay, and Amazon began selling used textbooks at a fraction of the price of new textbooks sold by on-campus bookstores. Unlike the used textbook business generated by brick-and-mortar booksellers— which, at the time, typically serviced only their local campus communities—this new, online, global "secondary market book enterprise" would prove to be, in the words of McGraw Hill's former CEO Nana Banerjee, a massive "disruptor" for the industry.[51]

75.     The impact of the secondary marketplace on publishers was stark. According to Cengage CEO Michael Hansen, within a few years, competition from the likes of Chegg and Amazon was dramatically reducing both the "volumes of textbooks [the dominant publishers] were selling,"[52] and their profitability. By 2015, only about 25 percent of college students were purchasing new textbooks, with around twice as many buying used textbooks; the remaining 25 percent resorted to other strategies—such as borrowing, sharing, renting, or not using any course material—which did not represent significant financial transactions for publishers or retailers.[53]

---

[51] Cengage/McGraw Hill Joint Merger Call (May 1, 2019).

[52] Andrew Albanese, *Frankfurt Book Fair 2018: Cengage CEO Michael Hansen on the* Company's *Digital Switch*, Publishers Weekly (Oct. 10, 2018) (Cengage CEO Michael Hansen noting that the secondary marketplace significantly reduced the number of textbooks sold), https://www.publishersweekly.com/pw/by-topic/international/Frankfurt-Book-Fair/article/78276-frankfurt-book-fair-2018-cengage-ceo-michael-hansen-on-the-company-s-digital-switch.html

[53] *See* Claudio Aspesi, et. al., *Landscape Analysis: The Changing Academic Publishing Industry-Implications for Academic Institutions* at 37, SPARC (Mar. 28, 2019), https://osf.io/preprints/lissa/58yhb/download/.



Student Textbook Purchasing Habits
(circa 2015)

76.     As McGraw Hill would later explain in its 2019 Annual Report, the Publisher Defendants' reduced market share resulted from "competition" from the "grow[ing] . . . used and rental book markets" that provided "lower priced option[s] for consumers."[54]

**C.  The Defendants Share a Common Motive to Eliminate the Secondary Marketplace.**

77.     The Publisher Defendants initially responded to the threat posed by the online secondary marketplace not by lowering the prices of new textbooks, but by raising them more. On an industry-wide basis, the Publishers would "ratchet up" prices "sometimes 10 percent, twice a year" to make up for lost sales.[55] This strategy of price inflation gave the appearance of stable revenues for a time but was ultimately unsustainable.

---

[54] McGraw-Hill Education, Inc. Annual Report as of December 31, 2019 (March 10, 2020).

[55] Henry Kronk, Pushback against Cengage and McGraw-Hill Merger: What is at Stake and What Comes Next?, eLearning Inside (July 31, 2019), https://news.elearninginside.com/pushback-against-cengage-and-mcgraw-hill-merger-what-is-at-stake-and-what-comes-next (statement of Cengage CEO Michael Hansen).

78.    While the fortunes of the Publisher Defendants had been declining for years, in 2016 they experienced a particularly bad year. Cengage's revenues dropped by 15 percent; Pearson's and McGraw Hill's dropped 10 and 9 percent, respectively. The average price of new print textbooks dropped relative to the prior year, the first time in decades this had occurred.[56]

79.    To the Publisher Defendants, the secondary marketplace, which had ballooned into an almost billion-dollar industry due to online sales,[57] had become a grave threat that had to be eradicated. As Pearson CEO John Joseph Fallon has stated, the industry's **"*biggest competitor***," had become "***the sale or rental of our own products on the secondary market.***"[58]

80.    Fallon's comments are consistent with economic analyses showing that in industries based on durable goods—such as textbooks, cars, or video games—the presence of a secondary marketplace (where consumers can obtain functionally interchangeable goods) can reduce the profits of the primary producers by 50 percent or more.[59] A 2018 study by economists Matt Schmitt and Tongtong Shi estimates that in the college textbook marketplace, publisher profits would increase by 42.6% if the secondary marketplace were eliminated:

> [W]e find that publishers would substantially benefit from closing the secondary market. New book prices fall (since publishers can no longer charge for resale value), but publishers sell more books and spend less on revisions. Overall, we estimate that publisher profits would increase by 42.6 percent. In short, from the perspective of publisher profits, it appears that

---

[56] *See* Aspesi, *Landscape Analysis*, at 34-35.

[57] SPARC Letter to Assistant Atty. Gen. Makan Delrahim Opposing the Merger Between Cengage and McGraw-Hill Education at 21 (Aug. 14, 2019) ("The secondary market for college textbooks is estimated at $954 million.") (citing Simba Information, State of College Course Materials 2017-2018, at 36 (Dec. 5, 2018)), https://sparcopen.org/news/2019/sparc-urges-department-of-justice-to-block-merger-between-cengage-and-mcgraw-hill.

[58] Pearson 2020 Q2 Earnings Call (July 24, 2020).

[59] *See, e.g.*, Reed Shiller, *Digital Distribution and the Prohibition of Resale Markets for Information Goods*, Working Paper Series: Brandeis Univ. (2013) (video games); J. Chen, et al., *When do secondary markets harm firms?*, AMER. ECON. REV., 2911-2934 (2013) (cars).

> competition with used books dominates any benefits
> provided by resale value. This result is consistent
> with textbook publisher claims that the used textbook
> market harms profits as well as the recent
> development of E-Textbooks for which publishers
> can more effectively prevent resale. [60]

The Publisher Defendants' incentive to destroy the secondary marketplace was therefore enormous.

81.     The Retailer Defendants also had a strong incentive to eliminate the secondary marketplace for textbooks (as well as competition from independent booksellers of new and used textbooks). The Retailer Defendants manage more than half of all on-campus bookstores in the United States, at over 700 Universities attended by some two-thirds of all college students. As students increasingly sought cheaper alternatives to new textbooks on the secondary marketplace, sales at on-campus bookstores diminished, along with their profits. Nor could on-campus bookstores compete with the secondary marketplace by selling used textbooks, as their contractual arrangements with publishers bar them from selling used books for less than 75 percent of the price of the new editions. [61] By contrast, used books on sites like Amazon can sell for any price and, on average, are sold for roughly 50 to 55 percent of the price of the new textbooks.

82.     Universities, too, were negatively impacted by the secondary marketplace and stood to gain significantly from its destruction. Universities that outsource the operation of their bookstores to the Retailer Defendants typically receive a share of revenues from the sale of course

---

[60] Schmitt & Shi, *Secondary Markets and Firm Profits: Evidence from College Textbooks*, UCLA Anderson Rev. at 2, 22 (Sept. 10, 2018) (noting the "large increase in [publishers'] profits . . . comes from . . . a higher quantity sold and . . . less revision spending").

[61] *Id.* at 25 ("[W]e have good reason to suspect that used prices for the period of our data were determined mechanically as roughly 75 percent of new prices. The market frictions that led to this price setting mechanism were clearly substantially lessened by the growth of online intermediaries like Amazon.com. With Amazon and firms like it, used prices are perhaps better modeled as being determined by market clearing: *i.e.*, the used price that prevails is the price that equates the demand and supply of used books.").

materials, ranging from 5 to 15 percent. This revenue stream is diminished when students buy textbooks on the secondary marketplace. (The same impact exists for Universities who manage their own bookstores, only in more direct form.)

**D. The Defendants Devise the Inclusive Access Scheme to Eliminate the Secondary Marketplace.**

83.     By 2016, the Publisher Defendants and Retailer Defendants knew that eliminating the secondary marketplace could not be accomplished by individual action alone. Prior to that year, individual publishers had experimented with rentals, e-textbooks, and even selling textbooks together with quizzes and homework assignments in shrink-wrapped "bundles." They attempted to hinder students' ability to find used alternatives on the secondary marketplace by frequently and aggressively re-versioning print textbooks (*i.e.*, making trivial changes to a prior version of the textbook and releasing it as a new version) and reissuing them with unique ISBNs, a costly process.[62] Some even launched pilot digital subscription programs, which failed when undertaken individually, highlighting the need for coordinated action. None of these individual efforts proved effective at shifting away from print textbooks or stemming the tide of the secondary marketplace.

84.     Eliminating competition from the secondary marketplace could only be achieved through an industry-wide shift from a business model based on the sale of print textbooks (at wholesale prices to a variety of retailers) to one based on digital subscriptions sold exclusively through on-campus bookstores, or directly by publishers. Such a shift would require significant cooperation between the Publisher Defendants, the Retailer Defendants, and Universities—with the Publishers operating as the hub of the conspiracy; however, the advantages were considerable:

---

[62] Economists estimate that the over 50% of the increased profits that would flow to publishers from the closing of the secondary marketplace would come from reduced revision spending, which publishers would no longer need to undertake so regularly if they were not competing against secondary marketplace vendors. *See* Schmitt & Shi, *Secondary Markets and Firm Profits* at 22 ("The decrease in revision spending accounts for . . . 51 percent of the increase in profits . . . .").

used textbook sales that feed the secondary marketplace (and discipline the price of textbooks) could be eliminated.

85.     Accordingly, in 2015 and 2016, the Defendants collectively devised and agreed upon a scheme to "rid" the industry of the "used book market."[63] That scheme is known as Inclusive Access. "***Inclusive Access is a partnership between an institution, bookstore, and publisher to deliver digital course materials to students.***"[64] Under Inclusive Access, students must subscribe, typically on an "opt-out" basis, to required digital course materials when they enroll in their courses and at prices set by the Defendants. Charges for those materials are often included on students' tuition bills. Students can purchase Inclusive Access subscriptions only from their official on-campus bookstores, the majority of which are run by the Retailer Defendants, or from the Publisher Defendants. As Pearson CEO John Joseph Fallon explained in 2019, Inclusive Access is a business model in which publishers "build direct relationships with . . . learners, ***who pay us directly to use our products***, thus over time, ***eliminating the currently large secondary market***.[65]

86.     The Publisher Defendants refuse to sell Inclusive Access Materials to any retailers other than official on-campus bookstores. When retailers other than the Retailer Defendants or on-campus bookstores run by Universities approach the Publisher Defendants and ask to purchase Inclusive Access Materials to sell to students, they are refused. The Publisher Defendants either state that they have an exclusive arrangement with one of the Retailer Defendants (or with a

---

[63] CNBC Interview (May 1, 2019) (Michael Hansen, CEO of Cengage, and Nana Banerjee, then-CEO of McGraw-Hill, agreeing with reporter that, through digital products like Inclusive Access, "***you're also able to rid yourself, hopefully long term, of the used book market***", which is a "huge component of this" digital shift, "***capturing . . .the used piece***").

[64] "What Is Inclusive Access?", McGraw Hill, https://www.mheducation.com/highered/inclusive-access.html.

[65] Pearson 2019 Q4 Earnings Call (Jan. 20, 2020).

University-run on-campus bookstore) or that Inclusive Access Materials cannot be made available in a format that would allow off-campus or online retailers to resell them.

87.     Absent the Scheme and similar behavior by rivals, any individual Publisher Defendant's refusal to sell Inclusive Access Materials to independent retailers (while other publishers did) would have been contrary to its economic self-interest in selling course materials to as many retailers at possible, as they had sought to do for decades. However, the Publisher Defendants knew that only if they acted in concerted fashion to boycott and refuse to deal with independent and online retailers, could they eliminate competition from the secondary marketplace, monopolize the markets for their textbooks, and charge supra-competitive prices for their products.

88.     Cooperation among the Publisher Defendants was critical to the Scheme. While businesses sometimes gain an advantage by being the initial occupant of a market segment, no such "first-mover advantage" exists in the textbook publishing industry. Decisions regarding which textbooks to assign or purchase must be made by numerous University stakeholders (including academic departments and administrators) all of which are resistant to change. In 2016, if any individual publisher had moved, on its own, to introduce a digital-only subscription model like Inclusive Access, that publisher would have been perceived as offering a product that was experimental, overly restrictive, more expensive, and undesirable to students; and, it would have risked losing sales to competitors willing to sell textbooks in multiple formats, including the student-preferred print format. If the publisher were somehow successful in introducing Inclusive Access on its own, any upside associated with being the first mover would have been limited by the fact that competitors would have, the following term, introduced their own digital subscription plans, as the technology underlying Inclusive Access is neither new nor complicated, and is

accessible to all major industry participants. Moving first, in other words, would have entailed significant risks while offering little to no upside; to implement Inclusive Access alone, absent similar conduct by rivals, therefore, would have been contrary to any single Defendant's independent economic self-interest.

89.     By contrast, cooperation had numerous advantages. By rolling out their digital-only subscription programs in concert under the shared umbrella of "Inclusive Access," the Publisher Defendants—the three biggest textbook publishers, which control nearly 90 percent of the market—could draft off each other's marketing efforts and convey to Universities that digital-only subscription programs were not experiments, but rather the inevitable future of the textbook industry (and, increasingly, the only available option). The Defendants knew that only in response to such a show of unity would University stakeholders, which are notoriously resistant to change, be willing to take a chance on adopting Inclusive Access. Such coordination, moreover, enabled the Publisher Defendants to fix the prices of Inclusive Access Materials at supra-competitive levels. The Defendants' cooperation and coordination in implementing Inclusive Access allowed them to achieve conversion of the marketplace and begin the destruction of the secondary marketplace—a goal that had eluded the Defendants when they tried to accomplish it individually just a few years earlier.

90.     The Inclusive Access Scheme also required the involvement and cooperation of the Retailer Defendants and Universities. Each of these entities plays an indispensable role in furthering the Scheme, and each also benefits from the Scheme. Prior to Inclusive Access, Universities and their on-campus bookstores received a share of the profits from the sale of print textbooks. The Defendants knew that Universities would not mandate Inclusive Access for

students if subscriptions could only be purchased directly from the Publisher Defendants, as this would mean giving up significant sums of money from their on-campus bookstores.

91.    To solve this problem, the Publisher Defendants share a portion of the monopoly profits they receive from the sale of Inclusive Access Materials with Universities and their on-campus bookstores, the majority of which are run by the Retailer Defendants. This occurs through the Scheme generally as laid out below:

92.    First, the Scheme makes on-campus bookstores (the majority of which are run by the Retailer Defendants) the exclusive retailers of the Inclusive Access Materials. These bookstores can mark up the price of Inclusive Access Materials considerably and need not compete against any other retailers. Second, the Scheme ensures that Universities receive a percentage of all revenues from the sale of Inclusive Access Materials as well as, in many cases, large upfront payments from the Retailer Defendants in exchange for being named on-campus bookstore operators. Since the implementation of the Inclusive Access Scheme, these upfront payments have ballooned to six and seven figures, far exceeding what would be justified by a retailer's typical revenues from the operation an on-campus bookstore in the absence of Inclusive Access. Retailers are willing to make these large payments (which would otherwise be economically irrational and contrary to their economic self-interest) because they know Universities will mandate Inclusive Access, guaranteeing higher sales for their on-campus bookstores. And Universities know they must mandate Inclusive Access to obtain these large payments. This arrangement—implemented through a variety of Scheme Agreements discussed further below—in turn benefits the Publisher Defendants: because Universities and the Retailer Defendants have skin in the game, they are incentivized to maximize Inclusive Access subscription rates.

**E.  Inclusive Access Marks a "Tectonic" Shift in Historical Patterns for the Publishing Industry.**

93.     In the pre-Inclusive Access world, all major University textbook publishers, including the Publisher Defendants, employed the same basic business model. Publishers marketed textbooks to schools and professors for inclusion in lesson plans. Those textbooks were sold to retailers (including on- and off-campus bookstores, both online and brick-and-mortar) at wholesale prices. Retailers, in turn, sold those textbooks to students, typically with significant mark-ups. Students could then purchase textbooks either from their official, on-campus bookstore or from any number of independent retailers. Competition between retailers provided a check on the price of textbooks. Every few years, publishers would undertake expensive revisions and publish new editions with unique ISBNs, forcing students to buy new textbooks.

94.     The Inclusive Access Scheme represented a "tectonic" shift in these historical patterns.[66] With Inclusive Access, the industry committed in a short period of time to abandoning traditional print textbooks sold via the wholesale model, and implementing a "hard switch" to digital, time-limited, and virtually mandatory course material subscriptions sold exclusively via on-campus bookstores. The purpose and effect of this dramatic shift was to eliminate competition from the secondary marketplace, monopolize the markets for textbooks, and charge supra-competitive prices. As set forth in Cengage's 2019 annual report, Inclusive Access gives the Defendants "access to a greater number of students in any given classroom" by locking nearly 100 percent of students into digital subscriptions, which, "[i]n contrast to print publications . . . cannot be resold or transferred" on the secondary market.[67]

---

[66] Barrett, *The Radical Transformation of the Textbook*, Wired (Aug. 4, 2019), https://www.wired.com/story/digital-textbooks-radical-transformation.

[67] Cengage, Cengage Learning Holdings II, Inc.: Annual Report for Fiscal Year Ended March 31, 2019.

**F.  The Defendants Roll Out Inclusive Access in Concerted Fashion.**

95.     In accordance with the Scheme, the Publisher and Retailer Defendants began working together in 2015 and 2016 to promote a new, all-digital subscription model known as "Inclusive Access."[68]

96.     As Barnes & Noble CEO Mike Huseby has stated, Inclusive Access required "***a lot more cooperation between us [retailers] and the publishers***" than traditional print textbooks.[69]

97.     As a result of this coordination, Inclusive Access spread rapidly. McGraw Hill—which had launched a precursor "Connect Your Way" program in 2015 that was intended to "disintermediate[] used and rental" textbooks[70] but did not get much traction on its own—boasted in 2016 that it was making great progress in signing institutions up to its "Inclusive Access" program.[71]

98.     Cengage's earliest known contracts with Universities for Inclusive Access programs date back to early 2016.

99.     Pearson launched its Inclusive Access program in 2016. Tim Peyton, VP Strategic Partnerships at Pearson, has stated that between July 2016 and November 2017 alone, Pearson signed Inclusive Access agreements with over 200 institutions.[72]

---

[68] Carl Straumsheim, *Is 'Inclusive Access' the Future for Publishers?,* Inside Higher Ed (Jan. 31, 2017), (statement of Peter Cohen, president of McGraw-Hill Education's U.S. education group), https://www.insidehighered.com/news/2017/01/31/textbook-publishers-contemplate-inclusive-access-business-model-future.

[69] BNED Q3 2018 Earnings Call (March 1, 2018); *see also* BNED Q3 2018 Earnings Call (March 1, 2018) (statement of CEO Mike Huseby: "We remain well positioned to capture new market share and collaborate with an increasing number of schools and strategic partners, both within and outside of our store footprint. *Our . . . newly expanded relationships with leading publishers, are key accomplishments* . . . .") (emphasis added).

[70] McGraw-Hill Global Education Holdings Q2-2015 Investor Update (Aug. 13, 2015).

[71] "McGraw-Hill Tackles Three of the Biggest Challenges Facing Colleges: Student Preparation, Retention and Career Readiness," McGraw Hill Press Release (Oct. 25, 2016), https://www.mheducation.com/news-insights.

[72] Lindsay McKenzie, *'Inclusive Access' Takes Off*, Inside Higher Ed (Nov. 7, 2017), https://www.insidehighered.com/news/2017/11/07/inclusive-access-takes-model-college-textbook-sales.

100.     All of the Defendants entered into Scheme Agreements among themselves and with Universities. As discussed further below, these agreements share a number of key terms and characteristics that function to further the Scheme, including: revenue-sharing provisions, upfront payments, net or discount pricing provisions, minimum usage rates, restrictions on print output, and restrictions on publicity. The presence of these parallel terms in agreements between different parties illustrates concerted action by the Defendants in furtherance of the Scheme.

101.     In late 2015 or early 2016, the Publisher Defendants also created a new trade association, the Educational Publishers Enforcement Group or "EPEG," the purpose of which was to provide opportunities for collusion, as well as to foster and implement the Scheme.

102.     The Publisher Defendants would also participate as non-voting members in meetings of the National Association of Collegiate Stores ("NACS"), a trade association for textbook retailers, further enabling their collusion with the Retailer Defendants.

103.     The three Publisher Defendants also formed an Inclusive Access Conference Consortium around 2016, which sponsored conferences in 2017 and 2019.[73] These conferences, as well as their planning, provided opportunities for the Defendants to collude regarding implementation of the Inclusive Access Scheme.

104.     A timeline of events related to the Defendants' Inclusive Access Scheme is included below:

---

[73] Press Release, RedShelf and indiCo to C-Host the 2017 Inclusive Access Conference, (Aug. 17, 2017) (noting Inclusive Access Conference on November 9-10, 2017), https://www.businesswire.com/news/home/20170817005841/en/RedShelf-indiCo-Co-host-2017-Inclusive-Access-Conference.

## TIMELINE OF EVENTS
## DEFENDANTS' INCLUSIVE ACCESS SCHEME



105.    While the Defendants continue to join new Universities to the Scheme, the nationwide adoption of Inclusive Access has been exceptionally fast given how dramatically the marketplace has shifted. Nor could the Scheme have been effectuated in a matter of days. Given the semester system in place at most Universities, textbook assignment decisions are made only a few times a year, at most. Universities, moreover, have different systems and timelines for adopting new course materials and implementing new programs. Regardless of when any given school ultimately adopts Inclusive Access, the genesis of that decision is the same—the anticompetitive agreement and Scheme to destroy the secondary marketplace.

### G. The Defendants Have Opportunities to Collude, Including at Meetings of the Trade Associations EPEG and NACS.

106.    In late 2015 or early 2016, the Publisher Defendants formed EPEG, a new trade association to further the Inclusive Access Scheme. Though EPEG's publicly announced goal was to fight textbook counterfeiting, its true purpose was to facilitate collusion among the Publisher Defendants, to gain University buy-in for Inclusive Access, and thereby to impose it on captive student textbook purchasers. All three Publisher Defendants are members of EPEG and have been involved in the organization since EPEG's founding.

107.    In 2016, EPEG created so-called anti-counterfeiting practices known as the EPEG Guidelines. These guidelines in fact functioned to limit which retailers could sell textbooks in order to limit supply and enable the Publisher Defendants to charge supra-competitive prices. EPEG created a "white list" of acceptable retailers and encouraged its members to refuse to sell to anyone not on the white list as a means of reducing competition from off-campus and online sellers.  The vast majority of those non-white-list sellers were selling used textbooks and were not engaged in counterfeiting.

108.    The Defendants also had opportunities to collude through NACS, a trade association representing college bookstores. The Publisher Defendants participated in NACS events as non-voting members, providing further opportunities for collusion with the Retailer Defendants.

109.    On April 1, 2019, NACS voted to exclude all textbook retailers that do not operate on-campus stores, removing retailers other than the Retailer Defendants and University-operated bookstores. This has allowed NACS to function in furtherance of the Scheme rather than as a legitimate trade association representing the interests of all textbook retailers.

110.    On information and belief, the Publisher Defendants and the Retailer Defendants also had the opportunity to conspire during other coordinated activities, including merger discussions between at least McGraw Hill and Cengage and during conferences hosted by the Inclusive Access Conference Consortium in 2017 and 2019.

## H.  The Defendants Effectuate the Inclusive Access Scheme Through a Series of Agreements in Restraint of Trade.

111.    To effectuate the Inclusive Access Scheme, with the Publisher Defendants acting as the hub, the Defendants have executed (and continue to execute) hundreds (and perhaps thousands) of agreements between themselves and Universities (the "Scheme Agreements"). There are four types of Scheme Agreements: (1) University Agreements between Universities and the Publisher Defendants, (2) Bookstore Operating Agreements between the Retailer Defendants and Universities, (3) Master Exclusivity Agreements between the Retailer Defendants and the Publisher Defendants, (4) and Licensing Agreements between the Publisher Defendants, Universities, and, in some cases, the Retailer Defendants.

112.    As detailed below, these agreements are the mechanisms by which the Scheme (1) induces Universities to mandate Inclusive Access and (2) creates exclusive dealing relationships

45

between the Publisher Defendants and on-campus bookstores, including those run by the Retailer Defendants. Each of these contracts has the purpose and effect of destroying the Defendants' major source of competition (the secondary marketplace for textbooks) and represents an unlawful restraint of trade actionable under the federal antitrust laws.

113.    Moreover, the presence of functionally equivalent terms—and, in some cases, identical language—in agreements between different parties demonstrates concerted action by the Defendants in furtherance of the Scheme.

### 1.  The University Agreements

114.    As part of the Inclusive Access Scheme, the Publisher Defendants enter into contracts with Universities that induce those Universities to assign Inclusive Access Materials and maximize subscription rates, including through coercion. These agreements (the "University Agreements") typically contain four key provisions: (1) net pricing rates, (2) minimum usage requirements, (3) restrictions on print upgrades, and (4) restrictions on publicity.

115.    "Net" or "discount" pricing provisions: As part of a typical University Agreement, a Publisher Defendant agrees to provide a University with Inclusive Access Materials at "net" or "discounted" prices, which are to be passed down to students (after being marked up by the on-campus bookstores). These net prices are often not included on the face of the agreement and can be found only in non-public Inclusive Access price catalogues to eliminate price transparency for students and other observers. In some contracts, the net prices offered are subject to confidentiality provisions, as discussed below. Three exemplar University Agreements referring to net or discount Inclusive Access prices are excerpted below.

o   University Agreement between Pearson and UNC Chapel Hill, dated
October 19, 2018



AGREEMENT FOR ACCESS AND USE OF PEARSON PRODUCTS

(B&N Institutional Customer)

**Parties**: This Agreement ("*Agreement*") is made as of October 19, 2018 (the "*Effective Date*") between:

| Customer (Institution) | Pearson |
|---|---|
| The University of North Carolina at Chapel Hill | Pearson Education, Inc. |
| 214 East Cameron Avenue | 221 River Street |
| Chapel Hill, NC 27599 | Hoboken, NJ 07030 |

**Approved Distributor: Barnes & Noble College Booksellers, LLC ("B&N")**
Barnes & Noble College Booksellers, LLC has been designated by Customer as its Approved Distributor to perform the following functions under this Agreement:

* provide Usage and Pricing Reports to Pearson
* remit payments to Pearson
* manage the Pearson Inclusive Access Program and provide customer service
* pay Fulfillment Fees for eBooks purchased by Customer as set forth below

Net Prices:
* eBooks (delivered via an Approved Fulfillment Agent) will be sold at the then-current Inclusive Access Price per Enrollment.
* Revel products will be sold at a Net Price per Enrollment of twenty percent (20%) off the then-current Online Purchase Price for the corresponding nationally available Revel product.
* Digital Packages will be sold at the following Net Prices:
    o   A Net Price per Enrollment of twenty percent (20%) off the then-current Online Purchase Price for the corresponding nationally available MyLab or Mastering product with incorporated eText

o   University Agreement between Cengage and Ohio State University,
dated June 20, 2018.



**TEXTBOOK SERVICES AGREEMENT**

THIS TEXTBOOK SERVICES AGREEMENT (this "Agreement") is made, as of June 20, 2018 (the "Effective Date"), by and between The Ohio State University an instrumentality of the State of Ohio ("OSU"), as fiscal agent for the Ohio Library and Information Network ("OhioLINK"), a publicly funded consortium of educational institutions authorized by the Ohio Board of Regents, whose primary business address is 1224 Kinnear Rd, Columbus Ohio 43212, and Cengage Learning, Inc. ("Cengage"), whose primary business address is 20 Channel Center Street, Boston, MA 02210 (each a "Party" or collectively "the Parties").

2)   PRICING.
   a)   Cengage shall make its publications and content available to Member Institutions at the following pricing:

For eBook Titles, Member Institutions shall pay Cengage for each student enrolled, as of the add/drop date, in each course using the eBook Titles, twenty-five percent (25%) off of Cengage's then current digital list price for the Titles.

o   University Agreement between McGraw Hill and San Diego State
    University, dated March 27, 2019



Exhibit A
to Subscription and Product Purchase Agreement between MHE and' Aztec Shops, Ltd., an Auxiliary of San
Diego State University

**Platform Provider:** Red Shelf, Inc.

**Section A: Specific MHE Subscribed Materials/MHE Services Access Purchase:**
MHE will provide Subscriber supercodes for access to the MHE Services up to the number Subscriber Registered Student
enrollments in the corresponding Courses listed below.

Subscriber will provide MHE a census that identifies the number of Registered Students enrolled in each Courses listed below
at the end of each Course add/drop period, and MHE will invoice Subscriber directly the Discounted Fee for each Registered
Student based upon the Registered Student enrollment data in the census.  The supercodes will be invalidated after the
applicable add/drop period.

| Course Description | MHE Subscribed Materials/MHE Service | Discounted Fees (per Registered Student) | Subscription Term |
|---|---|---|---|
| P_H 353 | Connect: Yarber, Human Sexuality: Diversity Contemporary America, 9th Ed. | $63.00 | 1 year |
| Chemistry 100 | Connect: Denniston, General Organic & Biochemistry, 8th Ed. | $40.00 | 1 year |
| Comm 103 | Connect: Floyd, Communications Matters, 3rd Ed. | $54.75 | 1 year |

The following Discounted Fees apply for the MHE Subscribed Materials and MHE Services listed that MHE may make
available and Subscriber may order other than those in Section A specified above:

**Section B: MHE Connect Access Purchase:**

| Course Description | MHE Subscribed Materials/MHE Service | Discounted Fees (per Registered Student) | Subscription Term |
|---|---|---|---|
| Courses for which Connect is available from MHE | Connect | 36% off the then current MHE National Connect List Price | MHE national subscription term for the specific Connect service |

**Section C: MHE eBook Access Purchase:**

| Course Description | MHE Subscribed Materials/MHE Service | Discounted Fees (per Registered Student) | Subscription Term |
|---|---|---|---|
| Courses for which an eBook Title is available from MHE | eBook versions of the following:<br>• McGraw-Hill Technology Education (Discount Code CI, and CG),<br>• McGraw-Hill Higher Education College special products (Discount Code CI), and<br>• McGraw-Hill Higher Education Study Guides (Discount Code SG)<br>MH Professional eBooks are not included | $35.00 | 1 year |

116.   <u>Minimum usage requirements</u>: To secure net or discounted prices, the University

must typically hit certain minimum usage requirements. Some of these minimum usage

requirements make it nearly impossible for Universities to allow for students to opt out of Inclusive

Access. The University of Florida, for example, a large public university with a student body of

approximately 50,000, agreed to a minimum usage requirement of 47,000 enrollments for calendar

year 2018. Three exemplar University Agreements containing minimum usage requirements are

excerpted below.

o  University Agreement between Pearson and the University of Florida,
   dated May 1, 2017

AGREEMENT FOR ACCESS AND USE OF PEARSON PRODUCTS

(Institutional)

**Parties:** This Agreement is made as of May 1, 2017 (the "*Effective Date*") between:

| Customer | Pearson |
|---|---|
| The University of Florida Board of Trustees | Pearson Education, Inc. |
| 235 Tigert Hall | 221 River Street |
| Gainesville, FL  32611 | Hoboken, NJ  07030 |

**Minimum Usage Rate:** Customer agrees that for all Courses in which a Pearson Product has been adopted as of May 1, 2017 and a digital version of such adopted Pearson Product is available, Customer will utilize the digital Pearson Product in such Courses at the terms, prices and conditions set forth in this Ordering Document by Customer's Spring 2018 academic term. Subject to the automatic renewal provision set forth in the "*Purchase Period*" Section of this Ordering Document, Customer agrees it will achieve the following Minimum Usage Rates:

- **10,400 Enrollments from May 1, 2017 through December 31, 2017;**
- **47,000 Enrollments during the 2018 calendar year; and**
- **The number of Enrollments for the 2019 and each subsequent calendar year during the Purchase Period shall be determined by the Parties pursuant to the annual review described below.**

The Parties agree to perform an annual review, every summer during the Purchase Period, to determine the number of Enrollments in Courses utilizing a Pearson Product hereunder satisfied by Customer during the immediately preceding 12-month period. The Minimum Usage Rate for the 2019 calendar year and each subsequent calendar year will reflect 67% of the number of Enrollments satisfied by Customer during the immediately preceding 12-month period, in addition to any future adoption changes for the following academic year, as determined by such annual review.  The eBook, Revel and Package Net Prices offered hereunder are conditioned upon Customer achieving the Minimum Usage Rates (including the Minimum Usage Rates to be determined for the 2019 and subsequent calendar years during the Purchase Period).  Should Customer fail to achieve the Minimum Usage Rate in a calendar year, Pearson will have the right to increase the Net Prices to the Non-Discounted Rates set forth below for the following calendar year.  Pearson may resume the discounted Net Prices once Customer achieves the Minimum Usage Rate for the subsequent calendar year.  The remedy for Customer's failure to achieve the Minimum Usage Rate is as set forth in this Section and the Parties acknowledge that Pearson will not invoice Customer any additional fees should Customer fail to achieve the Minimum Usage Rate in a calendar year.

o  University Agreement between Cengage and Central Washington
   University, dated March 21, 2017

INCLUSIVE ACCESS
MASTER AGREEMENT
FOR EBOOKS AND DIGITAL HOMEWORK SOLUTIONS

This Agreement is made, effective as of **March 21, 2017** (the "Effective Date"), by and between **Central Washington University, 400 E. University Way, Ellensburg, WA 98926** ("INSTITUTION"), and Cengage Learning, Inc., with an office located at 5 Maxwell Drive, Clifton Park, NY 12065 ("Cengage").

c.  Cengage shall have the right to terminate this Agreement, in the event that INSTITUTION's purchases hereunder fail to achieve purchases for at least eighty-five percent (85%) of the students enrolled in courses using the Titles during the term of this Agreement.

     o   University Agreement Between Pearson and UNC Chapel Hill, dated
        October 19, 2018



117.   <u>Restrictions on "print upgrades"</u>: As part of their Scheme to eliminate competition

from the secondary marketplace, the Defendants seek to limit the number of print copies that can

be later sold into the secondary marketplace. To that end, virtually all University Agreements

restrict the ability of students to obtain print copies of Inclusive Access textbooks. Print copies of

Inclusive Access textbooks are made available only to students who have purchased digital

subscriptions; they are not standalone products. Students may "upgrade" their subscriptions to

obtain supplemental print copies as well, but for a steep price. Even this costly option is limited to

loose-leaf copies in binders (rather than more durable, bound hardcovers) to avoid secondary

marketplace exposure. Moreover, only a certain percentage of students in any course (usually no more than 15 percent) may avail themselves of a print upgrade. Without purchasing a "print upgrade," the number of pages a student can print from the Inclusive Access platform is strictly limited (typically to 10 pages). Absent the Scheme and similar behavior by rivals, restricting sales of print textbooks in this way would be contrary to the Publisher Defendants' independent economic self-interest in selling as many units as possible in whatever format consumers prefer, as they had sought to do prior to Inclusive Access. Three exemplar University Agreements containing print restrictions are excerpted below.

> o University Agreement Between Pearson and UNC Chapel Hill, dated
> October 19, 2018

---

**AGREEMENT FOR ACCESS AND USE OF PEARSON PRODUCTS**

**(B&N Institutional Customer)**

**Parties**:  This Agreement ("*Agreement*") is made as of <u>October 19, 2018</u> (the "*Effective Date*") between:

| Customer (Institution) | Pearson |
|---|---|
| The University of North Carolina at Chapel Hill | Pearson Education, Inc. |
| 214 East Cameron Avenue | 221 River Street |
| Chapel Hill, NC  27599 | Hoboken, NJ  07030 |

---

**H.     Print Upgrade Purchases:**

<u>Eligible Titles; Limitations</u>:
Provided that a Pearson Title is not a "*Print Rental Only*" title available through Pearson's Print Rental Program, or a "*Digital Only*" Revel product, Customer (or its Approved Distributor on Customer's behalf) may purchase, for use in Courses, Print Upgrades at the prices set forth below.  Pearson shall have the right to limit the number of Print Upgrades ordered to no more than fifteen percent (15%) of the total number of Authorized Student Users registered in the Course utilizing such Pearson Product.

<u>Pricing</u>:  Unless otherwise agreed to in writing by the Parties prior to any Print Upgrade orders being submitted to Pearson, Customer (or its Approved Distributor, as applicable) will be invoiced forty dollars ($40) per unit, plus shipping costs, for a Print Upgrade of an eText incorporated into a MyLab or Mastering product, and seventeen dollars ($17) per unit, plus shipping costs, for a Print Upgrade of an eText incorporated into a Revel product.  Pearson reserves the right, no more than once annually, to adjust Print Upgrade pricing which shall be communicated to Customer and its Approved Distributor in February and take effect the following fall academic semester.  Prices are exclusive of all sales and use taxes applicable to all transactions covered by this Agreement, for which Customer (or its Approved Distributor, on its behalf) is responsible.

<u>Restrictions on Distribution and Sales</u>:  The right to purchase and distribute Print Upgrades is subject to the following conditions:  (i) the distribution and sale of Print Upgrades are limited to one Print Upgrade per Authorized Student User enrolled in a Course in which the corresponding eText is incorporated into a Digital Learning Application adopted for such Course; (ii) Print Upgrades may only be resold (or charged as a materials fee) to Authorized Student Users at a resale price (or materials fee) that incorporates no more than a twenty-five percent (25%) margin above the price paid for such Print Upgrade; (iii) Authorized Student Users wishing to purchase Print Upgrades shall be required to present verification of their enrollment in a Course in which the corresponding eText is incorporated into a Pearson Product adopted for such Course; (iv) upon Pearson's request, Customer (or its Approved Distributor, as applicable) will provide Pearson with sufficient documentation to evidence compliance with the foregoing restrictions; and (v) Pearson's standard return policies for printed textbooks shall apply to the return of Print Upgrades.

---

o   University Agreement Between Cengage and Central Washington
    University, dated March 21, 2017



o   University Agreement Between McGraw Hill and San Diego State,
    dated March 27, 2019



118.   <u>Restrictions on Publicity</u>: Many of these agreements provide that Universities may

not share details—including prices—regarding their Inclusive Access arrangements with third

parties. These provisions, among others, prevent students and other observers from evaluating

Inclusive Access discount claims. The Cengage and Pearson contracts excerpted below contain identical publicity clauses:

- o  University Agreement between Cengage and Central Washington University, dated March 21, 2017



- o  University Agreement between Pearson and the University of Utah, dated April 25, 2016

## 2.   *The Bookstore Operating Agreements*

119.    Bookstore Operating Agreements between the Retailer Defendants and Universities govern the operation and management of on-campus bookstores. These contracts further the Scheme in two ways: first, they induce Universities to maximize Inclusive Access subscriptions and second, they create exclusive arrangements between the Publisher Defendants and the Retailer Defendants.

120.    Under these agreements, Universities receive a percentage (typically between 5 and 15 percent) of all revenues from the sale of course materials (including Inclusive Access Materials) at their on-campus bookstores. Such revenue sharing arrangements provide strong incentives for Universities to maximize Inclusive Access subscriptions. Two representative revenue-sharing provisions are shown below.

    o   Bookstore Operating Agreement between Follett and Warren County Community College, dated June 30, 3017

**BOOKSTORE OPERATING AGREEMENT BETWEEN
WARREN COUNTY COMMUNITY COLLEGE
AND FOLLETT HIGHER EDUCATION GROUP, INC.**

This Bookstore Operating Agreement ("Agreement") is made as of June 30, 2017 between Warren County Community College ("School") and Follett Higher Education Group, Inc. ("Follett").

*10.*   *Commission.*

10.1    Follett shall pay commission to the School in an annual amount equal to the sum of:

10.6% of all Commissionable Sales up to **$1,000,000**; plus
11.6% of any part of Commissionable Sales over **$1,000,000**.

Follett will pay 7% of all Commissionable Sales of digital course materials.

Commissionable Sales is defined as all collected sales made at the Store or the Store website, including Follett's agency fee when Follett sells digital content as agent, textbook rental fees, includED program fees and the income earned from regalia, class rings and graduation items less voids, refunds, sales tax, discounted sales to authorized School faculty, staff departments and others as may be mutually agreed to under this Agreement, Follett-funded scholarships, handling fees associated with non-return of rental textbooks, pass-through income and merchandise sales at less than an inherent 20% margin (i.e., computer hardware and software).

    o  Bookstore Operating Agreement between Barnes & Noble and UNC Chapel Hill, dated June 25, 2016



121.   Bookstore Operating Agreements also incentivize Universities to mandate Inclusive Access through large, upfront payments from the Retailer Defendants. The Tennessee Board of Regents (TBR), for example—which did not adopt Inclusive Access after running a failed pilot in 2014 and 2015[74]—resuscitated the program after receiving a large upfront payment from Follett in 2018.

    a.  Bookstore Operating Agreement between Follett and the Tennessee Board of Regents, dated April 2, 2018



---

[74] Inclusive Access was rolled back at a number of institutions after a study showed that, in a majority of classes where an Inclusive Access pilot program was launched, the percentage of students with a grade of "C" or better declined. *See* Tennessee Board of Regents, Comparison of Grade Distributions: Fall 2014 to Fall 2015.

122.    Such large upfront payments, which have risen to high six- and seven-figure amounts, were virtually unheard of prior to Inclusive Access. For example, Eastern Kentucky University received a $3.3 million signing bonus as part of its Bookstore Operating Agreement with Barnes & Noble dated July 1, 2017. The prior signing bonus that the school received in 2007 was $200,000. Likewise, the University of Southern Florida received a $1.2 million "transition payment" and a $1.25 million "renewal bonus" as part of its Bookstore Operating Agreement with Barnes & Noble dated July 1, 2018, excerpted below. The prior contract included no bonus.

   o  Bookstore Operating Agreement between Barnes & Noble and the
      University of Southern Florida, dated July 1, 2018

> **UNIVERSITY OF SOUTH FLORIDA**
> **BOOKSTORE MANAGEMENT AND RETAIL SERVICES**
> **AGREEMENT**
>
> This Bookstore Management and Retail Services Agreement ("Agreement") is made this (29th) day of June 2018 ("Effective Date") by and between the University of South Florida Board of Trustees, a public body corporate, (hereinafter, referred to as "USF" or the "University") and Follett Higher Education Group, Inc., 3 Westbrook Corporate Center, Suite 200, Westchester, IL 60154, (hereinafter, referred to as "Follett").
>
> 3.5   Transition Payment. Follett shall provide a Transition Payment of One Million Two Hundred Thousand Dollars ($1,200,000) to USF (hereinafter, referred to as the "Transition Payment"). The Transition Payment shall be paid by Follett within thirty (30) days of Agreement commencement (July 30, 2018). The Transition Payment shall be amortized on a straight-line basis beginning with the date of the Transition Payment and ending June 30, 2023. USF shall not have a payback obligation for any unamortized portion of the Transition Payment beyond June 30, 2023.

123.    These payments are far beyond what would be justified by the typical profits associated with operating an on-campus bookstore absent the Scheme (and the increase in sales it guarantees), and would make no economic sense absent the Scheme. The Retailer Defendants have become willing to pay more for access to on-campus stores because they know that pursuant to the Scheme, on-campus bookstores are the exclusive distributors of Inclusive Access Materials and, moreover, that Universities are incentivized to mandate that students purchase Inclusive Access subscriptions. Universities also know that they will not receive these large bonuses unless they

adopt Inclusive Access Materials and mandate their use by students. Through these direct payments, some of the monopoly profits of the Publisher Defendants are, in essence, passed from the Retailer Defendants to non-named co-conspirator Universities.[75]

124. Bookstore Operating Agreements typically name one of the Retailer Defendants as the "exclusive distributor" of course materials on campus, or as the "exclusive provider" of bookstore management services. Pursuant to the Inclusive Access Scheme, the Defendants point to these provisions as vesting the Retailer Defendants with exclusive rights to distribute Inclusive Access Materials on University campuses.[76] Two exemplar exclusivity provisions are shown below.

- Bookstore Operating Agreement between Warren County Community College and Follett, dated June 3, 2017

**BOOKSTORE OPERATING AGREEMENT BETWEEN WARREN COUNTY COMMUNITY COLLEGE AND FOLLETT HIGHER EDUCATION GROUP, INC.**

This Bookstore Operating Agreement ("Agreement") is made as of June 30, 2017 between Warren County Community College ("School") and Follett Higher Education Group, Inc. ("Follett").

Follett shall have the exclusive right, free from any alternate source endorsed, licensed or otherwise approved or supported by School (whether on campus, by catalog or through electronic commerce, including hyperlinks to alternate sources) to buy, sell, rent and distribute (including the right to select vendors) merchandise and services traditionally offered in college and university bookstores, including but not limited to, all required course materials (print and digital), class and alumni rings and jewelry, clothing (whether or not emblematic), school supplies, desk and dorm accessories, gifts, souvenirs, graduation regalia (sale and rental) and announcements, course-adopted software and paper and electronic custom anthologies, and textbook buybacks. Follett shall also have right of first refusal to fulfill any distance learning instructional and ancillary materials required by School during the term of this Agreement. This Section 6.3 does not prohibit occasional sales by student groups or student government organizations that do not materially impact Store sales.

[75] On information and belief, the Publisher Defendants also make direct payments to Universities in furtherance of the Scheme.

[76] BNED Q2 2018 Earnings Call (Dec. 5, 2017) (statement of BNED CEO Mike Huseby: "[W]e are continuing to recourse our contractual exclusivity with our school partners by enforcing our rights as a sole provider of course materials on those campuses that have such contractual rights, approximately 90% of our contracts provide for such an exclusivity right.").

○ Bookstore Operating Agreement between the University of North Carolina (UNC) at Chapel Hill and Barnes & Noble, dated June 25, 2016

> **UNC STUDENT STORES MANAGEMENT SERVICES AGREEMENT BETWEEN BARNES & NOBLE COLLEGE BOOKSELLERS, LLC AND THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL**
>
> This UNC Student Stores Management Services Agreement ("Agreement"), dated as of June 25, 2016, is by and between The University of North Carolina at Chapel Hill (the "University") and Barnes & Noble College Booksellers, LLC ("Barnes & Noble").
>
> **ARTICLE I - SCOPE OF SERVICES/PERFORMANCE**
>
> 1.1    Scope of Services.   The University hereby enters into this Agreement with Barnes & Noble for purposes of providing exclusive bookstore management services for its Student Stores. Barnes & Noble agrees to provide the University the services described in this Agreement and on **Exhibits A, B, C, D, E, F and G** attached hereto, each of which is incorporated by reference as if fully set forth herein.

### 3. The Licensing Agreements

125.    Some University Agreements between the Publisher Defendants and Universities name one of the Retailer Defendants as the preferred or exclusive distributors of Inclusive Access Materials on University campuses. These contracts are referred to herein as "Licensing Agreements."[77] Licensing Agreements also create exclusive dealing arrangements between the Publisher Defendants and the Retailer Defendants.[78] Three exemplar Licensing Agreements are excerpted below:

---

[77] On campuses where the official on-campus bookstore is run by the University itself, Inclusive Access is an exclusive arrangement between the Publisher Defendants and the University.

[78] BNED Q2 2018 Earnings Call (Dec. 5, 2017) (statement of BNED CEO Mike Huseby: "[W]e are continuing to recourse our contractual exclusivity with our school partners by enforcing our rights as a sole provider of course materials on those campuses that have such contractual rights, approximately 90% of our contracts provide for such an exclusivity right.").

o Licensing Agreement between Cengage and Warren Community
College naming Follett as Contracted Intermediary, dated July 16,
2018

> ### INSTITUTION CENGAGE UNLIMITED PURCHASE AGREEMENT
>
> This Agreement is made, as of July 16, 2018 (the "Effective Date"), by and between Cengage Learning, Inc.
> 5 Maxwell Drive, Clifton Park, NY 12065 ("Cengage"), and Warren County Community College, with an
> office located at 475 Route 57 West, Washington, New Jersey 07882 ("Institution") (collectively "the
> Parties").
>
> The Parties hereto agree as follows:
>
> 1.      The term of this Agreement shall commence as of the Effective Date and shall continue for a
> period ending December 31, 2021.
>
> 2.      Cengage Unlimited is a program where students are provided access to Cengage learning
> materials as defined in Exhibit A attached hereto and made a part hereof (the "Materials").
>
> 3.      During the term of this Agreement, Cengage shall provide, and Institution shall order, purchase,
> and pay Cengage for, instant access codes ("IACs"), which will allow Institution's students to access
> Cengage Unlimited, as provided in Exhibit A. The parties agree to work with Follett as Institution's
> contracted intermediary.

o Licensing Agreement Between Pearson and UNC Chapel Hill naming
B&N as "Approved Distributor," dated October 19, 2018

> ### AGREEMENT FOR ACCESS AND USE OF PEARSON PRODUCTS
> #### (B&N Institutional Customer)
>
> **Parties**: This Agreement ("*Agreement*") is made as of <u>October 19, 2018</u> (the "*Effective Date*") between:
>
> | Customer (Institution) | Pearson |
> |---|---|
> | The University of North Carolina at Chapel Hill | Pearson Education, Inc. |
> | 214 East Cameron Avenue | 221 River Street |
> | Chapel Hill, NC 27599 | Hoboken, NJ 07030 |
>
> Approved Distributor: Barnes & Noble College Booksellers, LLC ("*BCN*")
>
> <u>Barnes & Noble College Booksellers, LLC</u> has been designated by Customer as its Approved Distributor to perform
> the following functions under this Agreement:
> - provide Usage and Pricing Reports to Pearson
> - remit payments to Pearson
> - manage the Pearson Inclusive Access Program and provide customer service
> - pay Fulfillment Fees for eBooks purchased by Customer as set forth below

o Licensing Agreement Between McGraw Hill, Johnston Community College, and Barnes & Noble, naming Barnes & Noble as "Transaction Manager," dated August 12, 2015



*4. The Master Exclusivity Agreements*

126.    On information and belief, each of the Publisher Defendants has also entered into agreements with each of the Retailer Defendants, which provide the Retailer Defendants with exclusive rights to distribute Inclusive Access Materials (the "Master Exclusivity Agreements") on University campuses.

127.    The Master Exclusivity Agreements eliminate the need for the Publisher Defendants to enter into Licensing Agreements with Universities to accomplish exclusivity and permit faster growth of Inclusive Access programs. Referring to these agreements, and their role in the broader Inclusive Access Scheme, Barnes & Noble CEO Mike Huseby has stated,

> ***Our recently announced important agreements
> with McGraw-Hill Education and Pearson allow us
> to offer their content through inclusive access
> models . . . at our campus stores nationwide.*** The
> ability to offer their content throughout proprietary
> systems further strengthens our position at the center
> of content education distribution for the students,
> faculties and institutions we serve.[79]

### 5. The Overall Effect of the Scheme Agreements

128. The four types of Scheme Agreements effectuate the Scheme by vesting on-campus bookstores with exclusive rights to distribute Inclusive Access Materials, inducing Universities to mandate the purchase of Inclusive Access Materials, and sharing the Publisher Defendants' monopoly profits from the sale of Inclusive Access textbooks at supra-competitive prices with both the Retailer Defendants and the Universities, as illustrated in the diagram below.



---

[79] BNED Q3 2018 Earnings Call (March 1, 2018) (emphasis added).

**I.   Universities Work with the Defendants to Coerce Students to Purchase Inclusive Access Materials.**

129.   In accordance with their financial incentives, Universities work with the Defendants to coerce students to purchase Inclusive Access subscriptions. This occurs in several ways. At many Universities that participate in Inclusive Access, students are "automatically subscribed" to Inclusive Access textbooks and materials (rather than given the opportunity to "opt in") when they enroll in a course. Charges for Inclusive Access Materials may then appear on students' tuition bills.[80]

130.   While students must technically have the right to "opt out" of Inclusive Access, Universities work with the Defendants to ensure that this right is illusory. In many cases, students are effectively required to purchase Inclusive Access Materials to pass their courses, as the required assignments, homework problems, exams, and quizzes ("Ancillary Required Course Materials") are tied into Inclusive Access "packages." Because these ancillary materials are typically available through no other source than bundled as part of an Inclusive Access package, many University bookstores explicitly warn students that "*in some cases, opting out [of Inclusive Access] will make passing your course impossible.*"[81]

131.   Ancillary Required Course Materials for each University course constitute distinct antitrust markets. Prior to Inclusive Access, Ancillary Required Course Materials were either drafted by faculty members or other University employees or were given to faculty by textbook publishers.  Students paid for these materials with their tuition fees.

---

[80] Federal rules governing automatic billing for textbooks provide that "[a]n institution may include the costs of books and supplies as part of tuition and fees . . . [only] if [t]he institution [h]as a policy under which the student may opt out of the way the institution provides for the student to obtain books and supplies. . . ." 34 C.F.R. § 668.164(c)).

[81] *See, e.g.*, NEO Bookstore, https://bookstore.neo.edu/inclusive-access-course (emphasis added); NOC Bookstore, https://www.nocbookstore.com/site_inclusive_access.asp; Victoria College Bookstore, https://www.victoriacollege.edu/Explore/Students/Bookstore/EBookCourseFee.

132.    Ancillary Required Course Materials for a specific course are unique because a student cannot pass that course without both completing and submitting the assignments and exams assigned specifically for that course. Thus, there are no reasonable substitutes for Ancillary Required Course Materials. Other exams, assignments, or homework materials are not reasonably interchangeable with Ancillary Required Course Materials because they would not allow a student to pass the course in which they are enrolled. The Defendants, including the University co-conspirators, have monopoly power in the Ancillary Required Course Materials markets. There are significant barriers to entering the market for Ancillary Required Course Materials, in that only the Universities, Retailers Defendants, or Publisher Defendants can assign or provide access to the materials assigned for a particular course.

133.    Defendants used their monopoly in the Ancillary Required Course Materials markets to establish a monopoly in the separate Inclusive Access market by, among other anticompetitive activities, tying Inclusive Access e-textbooks to Ancillary Required Course Materials. This tying arrangement coerces students into purchasing the Inclusive Access package when what they really need and want is the Ancillary Required Course Materials necessary to pass their course. The e-textbook could be purchased on the secondary market, but the Ancillary Required Course Materials cannot.

134.    While previously, a student could pass his or her class even without purchasing an assigned textbook in any format—for example, by reading it in the reserve room or sharing with a friend—Inclusive Access destroyed that option and forced students to buy the (digital) book in order to pass the class. Before Inclusive Access, a student could alternatively purchase a used textbook and obtain access to ancillary course materials separately for an overall lower price. By tying the textbooks to the Ancillary Required Course Materials in the Inclusive Access Scheme,

students are deprived of the opportunity to obtain the best possible deal for the textbook in a free and open marketplace.

135.     Contracts between Universities and the Publisher Defendants acknowledge that Ancillary Required Course Materials are not in the same market as Inclusive Access textbooks or e-textbooks. For example, an agreement between Pearson and the University of Florida Board of Trustees states that "Neither the Customer nor Approved Distributor shall have the right to unbundle any Package and sell the components individually." The contract then states the components of the package and relevant discounts as follows:

- eBooks (delivered via a Pearson Fulfillment Partner, such as Vital Source) will be sold at a Net Price per Enrollment of twenty-five percent (25%) off the then-current Online Purchase Price (or OLP) for the corresponding nationally available eBook.
- Revel will be sold at a Net Price per Enrollment of twenty percent (20%) off the then-current List Price for the corresponding nationally available Revel product.
- Packages (utilized in one Course over one academic term) will be sold at a Net Price per Enrollment of twenty percent (20%) off the then-current List Price for the corresponding nationally available MyLab or Mastering product with embedded eBook.
- Packages (utilized in sequenced Courses over multiple academic terms) will be sold at a Net Price of $62.67 per Enrollment (per student per academic term) in each sequenced Course.
- Non-Discounted Rate for eBooks: eBooks will be sold at a Net Price per Enrollment of twenty-five percent (25%) off the then-current List Price for the corresponding nationally available Print Text version.
- Non-Discounted Rate for Revel: Revel products will be sold at the then-current List Price for the corresponding nationally available Revel product per Enrollment.
- Non-Discounted Rate for MyLabs and Mastering: MyLab and Mastering products will be sold at the then-current List Price for the corresponding nationally available MyLab or Mastering product per Enrollment.

("Revel" is the tradename for Pearson's Ancillary Required Course Materials.)[82]

136.     The purpose of tying Inclusive Access e-textbooks (which can be purchased on the secondary market) to Ancillary Required Course Materials (which cannot) and coercing students to purchase these Inclusive Access "packages" is two-fold: (1) to gain substantial additional profits from the sale of new digital textbooks that most students would ordinarily not purchase (or would purchase at lower prices from other vendors in the secondary marketplace) , and (2) to make opting out impossible (a fact some Universities explicitly communicate to their students) to establish a

---

[82] Ewalt Decl., Ex. B at 8, ECF 69.

monopoly in the separate market for Inclusive Access textbooks. For example, multiple University bookstores use the following identical language—which would be highly unlikely absent the Defendants' coordination and Scheme—on their websites:

> [We] have worked with publishers to get your course materials at the lowest available cost. These materials are required by your instructor. If you decide that you do not want to participate, you will need to OPT-OUT of the program by the drop date and be sure that you're obtaining the material on your own. ***Some courses may not have any codes to purchase from third-party vendors (Amazon, Chegg, B&N, etc.) so please be aware that in some cases, opting out will make passing your course impossible.***[83]

137.    Under the Scheme, faculty members are also coerced into assigning Inclusive Access Materials and discouraging students from opting out. Under the Scheme, Universities, Publishers, and/or Defendant Retailers are increasingly choosing materials for the faculty. A 2019 study found that changes wrought by Inclusive Access "have altered the locus for decisions; others are increasingly making choices [about course materials] that were previously the prerogative of the faculty." According to one faculty member quoted in the study, "I used to use Open Source textbooks for this course but the University opted for Inclusive Access so I have to use it."[84]

138.    At the University of New Mexico, a handout entitled "Inclusive Access Program Description for Faculty" encourages faculty to tailor their courses to Inclusive Access in such a way as to limit students' ability to opt out:

> [I]deally, [the instructor] utilize[s] the content in such a way as to require the student to access and use

---

[83] *See, e.g.*, NEO Bookstore, https://bookstore.neo.edu/inclusive-access-course (emphasis added); NOC Bookstore, https://www.nocbookstore.com/site_inclusive_access.asp; Victoria College Bookstore, https://www.victoriacollege.edu/Explore/Students/Bookstore/EBookCourseFee.

[84] Julia Seaman and Jess Seaman, *Inflection Point: Educational Resources in U.S. Higher Education* at 6, 14 (2019), https://www.onlinelearningsurvey.com/reports/2019inflectionpoint.pdf.

the content in order to pass the class . . . . *[U]se it in a way where not having it would hurt [the student]*."

The University of New Mexico also requires faculty to tell students that "[o]pting out . . . *could impact their learning experience and grade*."

139.    Opting out processes are also designed to be difficult (if not impossible) to understand, navigate, and complete. Instructions are not well publicized, so students are often not aware they can opt out. Even when the possibility of opting out is communicated, there are many impediments to doing so. Students are not given an option to opt out at any time in the purchasing or direct billing process. Students must opt-out of all courses subject to Inclusive Access at a particular University, rather than being able to do so on a class-by-class basis. Students who opt out must show proof of purchasing the materials from another source (which is often not possible). And students are not given sufficient time or information about pricing and alleged discounts to determine whether they financially benefit from purchasing Inclusive Access Materials.

140.    As a result, opt-out rates are consistently below 5 percent under the Scheme, and often much lower. Purchasing Inclusive Access subscriptions is essentially mandatory. In the words of Cengage CEO Michael Hansen, "[with the inclusive access model . . . *every student essentially has to buy the individual product . . . [I]t is mandated essentially from the top of the institution or the department that every student has to buy that set of materials*."[85]

**J.   The Publisher Defendants Artificially Limit the Supply of Print Textbooks in Furtherance of the Inclusive Access Scheme.**

141.    Pursuant to the Scheme, the Publisher Defendants have severely restricted print output as part of a two-pronged strategy to (1) disable the utility of print textbooks currently in circulation (and available for affordable prices on the secondary marketplace) and (2) dry up the

---

[85] Cengage Q4 2018 Earnings Call (May 17, 2018).

future supply of products that feed the secondary marketplace by not selling physical textbooks anymore.

142.    The Publisher Defendants have begun updating Inclusive Access textbooks and releasing them with unique ISBNs. These digital edition updates—which are designed to make print products currently in circulation not substitutable for Inclusive Access textbooks—are not part of the regular edition cycle and are not tied to traditional print runs.

143.    Students can only obtain print copies of Inclusive Access textbooks if they are digital subscribers who pay for "print upgrades," or if they rent those materials directly from the Publisher Defendants. Print textbooks, in many cases, are no longer standalone products that can be purchased by ordinary consumers. Those print copies that are made available for purchase now consist of loose-leafed pages in binders, which degrade far more quickly than bound soft or hardcover copies, so they cannot be resold on the secondary marketplace after use.[86]

144.    The purpose of restricting print output in this way is to choke off the supply of goods that feed the secondary marketplace and to coerce students to purchase Inclusive Access subscriptions. Describing Pearson's strategy for restricting print output, CEO John Fallon has stated,

> The first year of our digital-first product strategy, with frequent releases of content, features and *updates no longer tied to an edition cycle, with print only available through our own rental program*, is working. In the first half of this year, we increased total unit sales *whilst shipping 700,000 fewer print products into the channel, diminishing future secondary supply*.[87]

---

[86] *See* McGraw-Hill Education, Inc., Annual Report ending December 31, 2018 (Mar 29, 2019).

[87] Pearson 2020 Q2 Earnings Call (July 24, 2020) (statement of Pearson CEO John Joseph Fallon).

145.    McGraw Hill executives, during discussions of their proposed merger with Cengage, admitted to employing the same two-pronged strategy. In 2019, then-CEO Nana Banerjee predicted that by restricting print output, the Defendants would eliminate the secondary marketplace within "four to six" years. As he explained, "*every new frontlist that becomes a backlist and as we stick to our rental program is helping us kind of age out . . . the books that are now in circulation* but kind of *becoming less and less relevant from the prior vintages*.[88]

146.    Cengage has likewise explained its reason for reducing print output and switching to recurring, digital subscription plans: "*Recurring units do not feed secondary market*."[89]

147.    The only reason the Publisher Defendants are refusing to sell print textbooks alongside digital subscriptions, as they have done profitably in the past, is to eliminate the secondary marketplace and monopolize the marketplace for textbooks via the Inclusive Access Scheme. Absent the Scheme and similar conduct by rivals, restricting print output in this way would be contrary to the economic self-interest of each individual Publisher Defendant

**K.  The Defendants' Anticompetitive Scheme Harms Students.**

148.    While Inclusive Access is a boon to the Defendants, it has no advantages for students, who lose the ability to find lower-cost course materials on the secondary marketplace in a variety of formats.

*1.  Students Prefer Print Textbooks to Digital Subscriptions.*

149.    Despite being digital natives, the vast majority of students today still prefer print textbooks. Independent studies show that around 90 percent of students prefer reading print

---

[88] Cengage/McGraw Hill Joint Merger Call (May 1, 2019).

[89] Cengage Investor Update, Fiscal Year 2020.

textbooks over digital materials.[90] Among other reasons, students report experiencing distractions that are present with computers, as well as headaches and eye strain that can result from staring at a screen.[91] Students also experience better learning outcomes with print than digital materials. One study found that for most courses observed, there was a *decrease* in the percentage of students who obtained a grade of "C" or better after Inclusive Access was adopted.[92]

150.   On numerous occasions, the Defendants have admitted to this fact. In 2016, then-serving CEO of Barnes & Noble Max Roberts stated that "printed textbooks are still the format of choice for most students."[93] In 2019, the company's current CEO Mike Huseby reported that B&N's "annual student pulse survey"—which "received response[s] from more than 100,000 students"—showed that "[w]hile digital coursework delivery [was] increasing, evidence persists that there is *still a strong appetite to learn using the physical book*."[94]

151.   The Defendants ignore student preference for print textbooks. As Cengage CEO Michael Hansen has made clear, "*whether somebody learns and likes to read something on a*

---

[90] *See* March 1, 2018 Study at University of Central Arkansas ("80% of responding students indicated a preference for a physical book, as opposed to an e-book."); Naomi S. Baron, *Word Onscreen: The Fate of Reading in a Digital World*; Michael Schaub, *92% of college students prefer print books to e-books, study finds*, L.A. TIMES (Feb. 8, 2016), https://www.latimes.com/books/jacketcopy/la-et-jc-92-percent-college-students-prefer-paper-over-pixels-20160208-story.html (citing a study finding that 92% of students preferred a physical textbook). Even the Defendants' own survey data show that a majority of students prefer reading print textbooks over digital Inclusive Access materials. *See* Jason Lorgan (Dir. of U.C. Davis Stores, *The Inclusive Access Model* (May 1, 2015) https://www.slideshare.net/bisg/jason-lorgans-presentation-20150318 (surveying more than 5,000 students who participated in a pilot program of Inclusive Access by Cengage, McGraw-Hill, and Pearson where 55% of students preferred print over Inclusive Access).

[91] *See* Alice Robb, *92 Percent of College Students Prefer Reading Print Books to E-Readers*, THE NEW REPUBLIC (Jan. 14, 2015), https://newrepublic.com/article/120765/naomi-barons-words-onscreen-fate-reading-digital-world ("Alice Robb: Why are young people—who are accustomed to doing most things on screens—resistant to e-books? Naomi Baron: There are two big issues. The first was they say they get distracted, pulled away to other things. The second had to do with eye strain and headaches and physical discomfort.").

[92] Tennessee Board of Regents, Comparison of Grade Distributions: Fall 2014 to Fall 2015. Another study showed that participants' reading comprehension dropped relative to print when they used digital devices to read passages of more than 500 words. *See* Lauren Singer & Patricia Alexander, *Reading on paper and digitally: What the past decades of empirical research reveal*, Review of Educational Research (July 2017).

[93] BNED Q4 2016 Earnings Call (June 28, 2016) (statement of Max Roberts, BNED CEO).

[94] BNED Q2 2020 Earnings Call (Dec. 4, 2019).

***printed paper isn't really as relevant***" to the Publisher Defendants "[as] adapt[ing] . . . content to the individual learner."[95] Students purchase Inclusive Access Materials not because they prefer digital content, but because they are coerced to do so through the Scheme.

### 2. Inclusive Access Materials Are Supra-Competitively Priced.

152.    The Defendants promote Inclusive Access as delivering steep discounts to students of 50 to 80 percent.[96] Such assertions are deceptive and false. Proclaimed "discounts" are not calculated against competitive market rates, but by comparing the prices of Inclusive Access subscriptions (which the Defendants set) to the prices of new print textbooks (which the Defendants also set). Inclusive Access textbooks are, in fact, more expensive than products available on the secondary marketplace (including virtually identical e-book rentals). Prior to the introduction of Inclusive Access, these products were interchangeable with new textbooks, but Inclusive Access has the intent and effect of degrading these products and rendering them non-interchangeable.

153.    Inclusive Access "discounts" also fail to take into account the fact that when students purchase physical textbooks, they can use them for an unlimited time period (keeping them as resources to refer to in later courses or as part of a personal library) or sell them on the secondary marketplace for significant sums and thereby reclaim their residual value. Inclusive Access subscriptions have no long-term use value or resale value (which is factored into the prices of new textbooks), meaning their ***effective prices*** are higher:

> When the secondary market is closed, the publisher
> can no longer charge students for resale value, which
> puts downward pressure on the new price. The new

---

[95] CNBC Interview (May 1, 2019) (statement of Michael Hansen, CEO of Cengage).

[96] McGraw Hill, https://www.mheducation.com/highered/inclusive-access.html (stating Inclusive Access is "50% – 80% Lower Cost"); Pearson, https://www.pearson.com/us/higher-education/products-services-institutions/inclusive-access/for-administrators.html ("Digital course materials cost up to 70% less than traditional print products. . . .").

> effective price, on the other hand, rises considerably. Without resale, many students face much higher effective prices because they are no longer able to recoup some of the purchase price via resale. . . . [T]he detrimental effect from used book competition on publisher profits far exceeds any benefits that are generated by resale value.[97]

154.    Additionally, these alleged "discounts" do not reflect the reality that production costs are far lower for digital versions of books than for physical versions. For publishers, gross margins for digital products are 80 percent as compared to 25 percent for print textbooks. McGraw Hill, for example, states in its 2015 annual report that "[d]igital products are highly profitable due to the low variable cost nature of these products, with gross margins of approximately 90%."[98] With open competition, the price of electronic versions of textbooks would be far lower than they are under Inclusive Access.

155.    The appendix provided below illustrates the harm students suffer as a result of the Defendants' Scheme. Appendix A compiles price information for a representative sample of over 30 best-selling textbooks assigned in introductory courses subject to Inclusive Access.[99] By comparing Inclusive Access prices[100] for these textbooks to the digital and physical rental prices available on Amazon.com, Appendix A shows that Inclusive Access does not result in savings for

---

[97] Schmitt & Shi, *Secondary Markets and Firm Profits,* at 21-22.

[98] McGraw Hill Education 2015 Annual Report.

[99] This sample is representative of the market as a whole given that, according to one study, the top one percent of textbooks sold account for 52 percent of all textbook revenues. *See* Schmitt & Shi, *Secondary Markets and Firm Profits* at 6.

[100] Inclusive Access prices were collected by reviewing college bookstore websites and identifying textbooks sold under Inclusive Access, in which digital rental fees were directly added to student tuition.  For example, Inclusive Access textbooks from Volunteer State Community College were denoted as DEI ("Digital Engagement Initiative") textbooks, which were listed with the following note on the bookstore website: "Above item is part of a program where course materials are included in a course charge or tuition. Contact your campus store for more information." The bookstore also presents DEI items with notes such as "Required digital MyLab & etextbook are provided with enrollment in this course."  In the cases of UC Davis, Skyline College, Cape Fear Community College. Trident Technical College, and San Diego State University, the words "Inclusive Access" explicitly appear either in the product name or description.

students. For instance, the Inclusive Access price of *Engineering Mechanics: Statics* (14th Edition) by Russell Hibbeler is $100, while Amazon's digital rental price is $45 and its hard cover rental is $17.

# APPENDIX A

| Textbook | Publisher | Inclusive Access (A) | Amazon Digital Rental (B) | Amazon Hardcover Rental (C) | Amazon Paperback Rental (D) | Amazon Loose-Leaf Rental (E) |
|---|---|---|---|---|---|---|
| Ethical Obligations and Decision-Making in Accounting: Text and Cases, Mintz, 5th Edition | McGraw-Hill | $ 89.00 | $ 36.90 | $ 69.59 | | $ 49.99 |
| Discovering Computers ©2018: Digital Technology, Data, and Devices, 001 Edition, Vermaat | Cengage | $ 69.00 | $ 36.26 | | $ 16.70 | |
| Abnormal Psychology: Clinical Perspectives on Psychological Disorders, Whitbourne, 8th Edition | McGraw-Hill | $ 70.00 | $ 37.62 | | $ 52.85 | |
| Auto Engine Diagnosis, Gilles, 8th Edition | Cengage | $ 69.00 | $ 33.20 | | $ 40.99 | |
| Inside Reporting, Harrower, 3rd Edition | McGraw-Hill | $ 50.00 | $ 52.50 | | $ 23.48 | |
| Principles of Microeconomics (MindTap Course List) 009 Edition, Mankiw | Cengage | $ 79.00 | $ 69.91 | | $ 75.79 | |
| Brief Principles of Macroeconomics (MindTap Course List) 009 Edition, Mankiw | Cengage | $ 79.00 | $ 69.91 | | $ 38.36 | |
| Introduction to Mass Communication: Media Literacy and Culture 10th Edition, Baran | McGraw-Hill | $ 85.00 | $ 29.70 | | | |
| Mosaicos: Spanish as a World Language, 6th Edition, Castells | Pearson | $ 59.00 | $ 54.98 | | | |
| Algebra & Trigonometry, Stewart, 4th Edition | Cengage | $ 95.00 | $ 33.20 | $ 21.96 | | |
| Elementary Statistics, 13th Edition, Triola | Pearson | $ 75.50 | $ 44.98 | $ 14.99 | | $ 60.33 |
| Thomas' Calculus, 14th Edition, Hass | Pearson | $ 99.00 | $ 54.98 | $ 25.79 | | |
| Organic Chemistry, 8th Edition, Bruice | Pearson | $ 66.00 | $ 64.99 | | | |
| Horngren's Accounting, Miller-Nobles, 12th Edition | Pearson | $ 113.00 | $ 59.98 | $ 88.39 | | |
| Calculus: Early Transcendentals 8th Edition, Stewart | Cengage | $ 119.25 | $ 37.58 | $ 36.52 | | $ 54.95 |
| Music: An Appreciation, Brief Edition 9th Edition, Kamien | McGraw-Hill | $ 77.00 | $ 42.54 | | | |
| Chemistry, Chang, 13th Edition | McGraw-Hill | $ 68.25 | $ 36.90 | $ 24.72 | $ 54.33 | |
| Living Religions, 10th Edition, Fisher | Pearson | $ 65.00 | $ 39.99 | | $ 31.27 | |
| The Big Questions: A Short Introduction to Philosophy, 10th edition, Solomon | Cengage | $ 50.50 | $ 26.21 | | $ 22.90 | |
| A Concise Introduction to Logic, 13th edition, Hurley | Cengage | $ 78.00 | $ 33.20 | $ 27.77 | | $ 49.95 |
| Retailing Management, 10th Edition, Levy | McGraw-Hill | $ 80.00 | $ 36.90 | $ 29.16 | $ 41.99 | $ 59.81 |
| General, Organic, and Biochemistry, 10th Edition, Denniston | McGraw-Hill | $ 75.50 | $ 36.90 | $ 68.20 | | |
| Criminal Law (Justice Series), 2nd Edition, Moore | Pearson | $ 75.50 | $ 44.98 | | $ 24.84 | |
| Marketing Management, 3rd edition, Marshall | McGraw-Hill | $ 80.00 | $ 36.90 | | $ 47.32 | |
| Organizational Behavior, 4th Edition, McShane | McGraw-Hill | $ 60.80 | $ 22.50 | | $ 24.33 | $ 52.23 |
| Financial Accounting, by J. David Spiceland, 5th Edition | McGraw-Hill | $ 100.00 | $ 36.90 | $ 19.05 | | $ 42.72 |
| Engineering Mechanics:  Statics, by Russell Hibbeler, 14th Edition | Pearson | $ 104.00 | $ 44.98 | $ 17.19 | | |
| Voces de Hispanoamerica, by Raquel Chang-Rodriguez, Malva E. Filer, 5th Edition | Cengage | $ 31.00 | $ 30.15 | $ 20.49 | | |
| Essentials of Psychology, by Jeffrey S. Nevid, 5th Edition | Cengage | $ 72.00 | $ 34.06 | | $ 25.83 | $ 31.04 |
| Cities and Urban Life, by John Macionis and Vincent Parrillo, 7th Edition | Pearson | $ 36.00 | $ 39.99 | | $ 38.01 | |
| Nutritional Sciences:  From Fundamentals to Food, Enhanced Edition, by Michelle McGuire and Kathy A. Beerman, 3rd Edition | Cengage | $ 27.00 | $ 38.45 | $ 19.99 | | |

156.   As these examples illustrate, foreclosing the secondary marketplace for Inclusive

Access courses does not lower students' course material expenses. These findings are consistent

with "[t]he conventional view in economics" that secondary marketplaces are welfare enhancing

and should be encouraged. According to one 2014 study,

> The conventional view in economics is that resale is
> welfare-enhancing, because voluntary trading leads
> to more efficient allocations. The textbook
> explanation is that low-value buyers who purchased
> the good in the primary market can sell it to higher-
> value buyers in the secondary market at prices that
> make both buyer and seller better off. . . .
> [I]nterfer[ing] with such transactions would
> therefore decrease total surplus.[101]

   3.   *Inclusive Access Does Not Represent a Technological Innovation and in Fact*
        *Degrades Traditional Textbooks.*

157.   The Defendants herald Inclusive Access as a technological "innovation" that

addresses the textbook affordability crisis, which they themselves produced. Notwithstanding the

absurdity of this marketing pitch, Inclusive Access offers virtually no technological innovation.

Electronic textbooks have been available for years, as have e-rentals and textbooks bundled with

quizzes and homework assignments; in fact, all of these products were offered by the Publisher

Defendants prior to the Scheme. The only difference is that under Inclusive Access, these same

products are being made available to students on an essentially mandatory basis, in an electronic-

only format, with term-limited access codes, and only through on-campus bookstores.

158.   Inclusive Access is an example of product degradation rather than innovation.

Through the Inclusive Access Scheme, the Defendants are replacing traditional textbooks (durable

---

[101] Phillip Leslie & Alan Sorensen, *Resale and Rent-Seeking:  An Application to Ticket Markets* at 266-267, REV. OF
ECON. STUDIES (Jan. 2014).

goods that with lasting use value and resale value) with transitory educational services, which expire upon the end of a particular course term.

159.    Inclusive Access, moreover, wastes time for faculty and students, requiring professors to spend classroom time explaining how to use the system. Students can also be cut off from the materials when there are technical problems or when they do not have Internet access. These problems do not exist with standard textbooks.

160.    Stripping away the Defendants' marketing bluster reveals Inclusive Access to be simply another attempt to extract monopoly rents from college students for the use of textbooks, as publishers have done for decades. If the Defendants succeed in eliminating the secondary marketplace, there will be no mechanism to discipline prices of textbooks, ensure competition, and prevent publishers from resuming their historical pattern of steep price increases.

161.    Inclusive Access, moreover, exposes students to data collection by the Defendants. On information and belief, a central goal of Inclusive Access (in addition to wiping out the secondary marketplace), is analytics, the process of examining (and selling) datasets to draw conclusions about the information they contain. Once students are forced to transition to Inclusive Access subscriptions, the Defendants (and other commercial vendors) have access to their physical locations, study habits, learning profiles, grades, and other information about their academic performance. This poses privacy issues for students and creates barriers to entry for future competitors, who will not have the benefit of this consumer data, thereby enabling the Defendants to continue their monopolies. Such data harvesting and leveraging is the subject of high-profile antitrust claims against Facebook and Google, among others.

> 4.  *Any Supposed Procompetitive Justification for Inclusive Access Can Be Achieved through Less Restrictive Alternatives.*

162.    There is no procompetitive justification for the anticompetitive conduct in which the Defendants have engaged. The intent and effect of Inclusive Access is to exclude competition from the secondary market, including from independent bookstores, and to charge students supra-competitive prices for inferior course materials.

163.    Notwithstanding that fact, any conceivable procompetitive benefit suggested by the Defendants could have been delivered by means less restrictive of competition. The Defendants could allow independent online and brick-and-mortar retailers to sell Inclusive Access Materials and compete on price for students. The Defendants could unbundle Inclusive Access e-textbooks from Ancillary Required Course Materials so that students are not required to purchase Inclusive Access products in order to pass their courses. The Defendants could sell or rent digital textbooks without precluding the use of print and other alternatives, and without reducing the capacity and supply of print textbooks. They could also make the use of Inclusive Access "opt in" as opposed to the default of "opt out."

164.    The Defendants engaged in all of these coercive measures because Inclusive Access, despite its supposed "innovations," could not have "competed on the merits" against products available on the secondary market given students' preference for cheaper textbooks available in a variety of formats, especially print.

**L.  The Inclusive Access Scheme Is Successful in Excluding Competition from the Secondary Marketplace.**

165.    By all accounts, the Defendants' Inclusive Access Scheme "is working."[102] The Scheme has allowed the Defendants to arrest the decline in profits that resulted from reduced

---

[102] Pearson 2020 Q2 Earnings Call (July 24, 2020) (statement of Pearson CEO John Joseph Fallon).

market penetration, declining student spending on textbooks, and stagnant new textbook prices, all arising from increased competition from the secondary marketplace.

166.    Earlier this year, Pearson's CEO John Fallon reported that the company's "[d]igital volumes [were] up 5% with a 26% increase in e-book rentals, which is an early indication of secondary [market] recapture."[103] According to its 2020 Interim Results Presentation, Pearson has now signed Inclusive Access agreements with nearly 900 institutions and has increased its Inclusive Access revenues by 28% compared to 2019.[104] According to its April 2020 Form-20F, Pearson surpassed 1.8 million annual enrollments in Inclusive Access in 2019, with Inclusive Access representing 9% of Pearson's U.S. higher education courseware revenues (approximately $105 million).[105]

---

[103] *Id*.

[104] Pearson 2020 Interim Results, July 24, 2020 at p. 22.

[105] Pearson PLC Form 20-F, April 1, 2020.

*Chart from Pearson 2020 Interim Report*



167.    McGraw Hill estimates that the number of campuses participating in its Inclusive

Access program now exceeds 1,100, with opt-out rates below 2 percent. According to the

company's August 2020 investor update, 77 percent of its higher education revenues are now

digital, with an "Inclusive Access model" that is "highly accretive, growing substantially (+43

78

Y/Y in Fiscal Q1) with a course enrollment capture rate of nearly 100%."[106]



168.    As of 2019, Cengage reported having "somewhere between 400 to 500 institutional deals" with Universities for subscription services like Inclusive Access.[107]

169.    Based on these figures, the Defendants have sold over 10 million subscriptions to Inclusive Access. The total student market likely exceeds $250 million in annual revenues.

170.    As a direct result of the anticompetitive conduct admitted by Fallon and others, the Inclusive Access Scheme has allowed the Defendants to preserve and increase their profits in the growing Inclusive Access sector by excluding competition from the secondary marketplace and charging supra-competitive prices for Inclusive Access Materials, without justification.

---

[106] McGraw Hill Fiscal 2021 Q1 Investor Update (Aug. 28, 2020).

[107] Cengage Q2 2020 Earnings Call (Nov. 15, 2019).

## VI.    RELEVANT MARKETS

171.    The Defendants' conduct is *per se* illegal. The Publisher Defendants along with the Retailer Defendants have, on an ongoing basis, (1) colluded to establish and operate the Inclusive Access system in order to eliminate the secondary marketplace for textbooks so that they can raise prices and increase their profits, (2) established a group boycott to prevent Inclusive Access Materials from being sold through independent booksellers, and (3) tied Inclusive Access e-textbooks (which students could otherwise purchase more cheaply through the secondary marketplace) to required digital quizzes and homework assignments (which are required of students, are necessary to perform successfully in courses, and cannot be obtained through other sources).

172.    To the extent that the Student Purchaser Plaintiffs' claims require the definition of a relevant product market or markets, the relevant markets are the markets for each textbook assigned in courses subject to Inclusive Access (the "Textbook Markets").

173.    The relevant geographic market is the United States. Absent the Scheme, the natural marketplace for course materials is national. Prior to the advent of Inclusive Access, students in one state could seek out alternatives to assigned texts sold at their local bookstores from retailers in other states (which sell the same texts) or from e-commerce website like Chegg and Amazon, which service the entire country. Therefore, absent the Scheme, the price of textbooks in one state or at one campus bookstore affects the market for textbooks in other states and at other schools.

174.    The Publisher Defendants are in the same position vis-à-vis the national markets for assigned textbooks as drug makers are relative to the national markets for prescribed drugs: once a University or University department decides to assign a particular publisher's textbook for a particular course, students in that course are required to purchase that same textbook, and no

other. If a professor assigns Mankiw's *Principles of Microeconomics*, *9th edition*, for example, a student cannot substitute a different introductory microeconomics textbook, let alone a chemistry or English textbook. The only products that students can functionally substitute for new editions of Mankiw's *Principles of Microeconomics* are used or electronic versions of that same textbook available on the secondary market, which can (absent the Inclusive Access restrictions) be obtained from any number of vendors across the country. In some cases, earlier version of textbooks can also be substituted for more recent editions, as when they have been released with only modest or trivial updates.

175.    A small but significant and non-transitory artificial inflation of the price of one textbook would not cause any significant number of consumers to purchase other potentially substitutable products—such as books by different authors or regarding different subject matters—instead, so as to make price inflation unprofitable.

176.    Prior to Inclusive Access, the textbook prices set by the Defendants were constrained by the availability of functional substitutes for their products on the secondary marketplace. To maintain prices profitably at supra-competitive levels, the Defendants had to exclude competition from the secondary marketplace.

177.    This is the purpose of the Scheme. In each Textbook Market, the Scheme blocks competition from the secondary marketplace by coercing students to purchase Inclusive Access textbooks. That coercion occurs through, *inter alia*, automatically subscribing students to Inclusive Access Materials, tying e-textbook subscriptions to Ancillary Required Course Materials, restricting the output and supply of print textbooks, and preventing Inclusive Access Materials from being sold through independent booksellers. As a result of this coercive and exclusionary

conduct, used, electronic, and earlier versions of textbooks, which are available on the secondary

market, are no longer interchangeable with Inclusive Access textbooks.

178.    At all relevant times, the Publisher Defendants had substantial market power in

each Textbook Market. The Publisher Defendants had the power to maintain the price of Inclusive

Access Materials at supra-competitive levels (and to do so without losing substantial sales), to

exclude competitors (including from the secondary market), and to impose unwanted distribution

policies.

179.    On information and belief, a Publisher Defendant has a market share of over 95%

in each Textbook Market.

180.    There are high and substantial barriers to entry for potential competitors due to,

*inter alia*, the Publisher Defendants' longstanding relationships with professors and Universities,

as well as their contractual relationships with textbook authors, which render them unavailable for

other potential market entrants. The Publisher Defendants also possess growing caches of valuable

consumer data, which potential new entrants do not possess, representing another barrier to entry.

181.    At all relevant times, the Retailer Defendants had substantial market power in the

Textbook Markets at all Universities in which they operate official on-campus bookstores that

have Inclusive Access programs. The Retailer Defendants had the power to maintain the price of

Inclusive Access Materials on those campuses at supra-competitive levels (due to the exclusion of

competition under the Scheme), and to do so profitably without losing substantial sales. The

Retailer Defendants had the power to control prices, to exclude competitors (including from the

secondary market), and to impose unwanted distribution policies.  The Retailer Defendants operate

over 50 percent of all official on-campus bookstores, and they serve nearly two-thirds of the

nation's college and graduate students. They therefore have a very high share in all Textbook Markets.

182.     There are substantial barriers to entry for potential competitors to the Retailer Defendants. Significantly, University requests for proposals for on-campus bookstore operators typically require bidders to already operate numerous on-campus stores, such that Defendant Retailers are the only market participants that can submit bids. Moreover, Bookstore Operating Agreements currently in effect between Universities and the Retailer Defendants have durations that can range from three and fifteen years. The extended durations of many agreements between the Retailer Defendants and Universities represents another substantial barrier to entry for potential competitors.

183.     Under the Scheme, students at one University cannot purchase Inclusive Access textbooks from another University's bookstores, and generally cannot purchase them from any source other than their own on-campus bookstore. The official on-campus bookstore, whether run by a Retailer Defendant or by a University itself, therefore has an effective total monopoly on the Textbook Markets on its own college.

184.     Each Textbook Market is susceptible to collusion due to a small number of dominant publishers, the monopoly position of on-campus bookstores, the selection of products by Universities and their staffs who do not themselves pay for the products, and high barriers to entry.

185.     If the Defendants' actions are not enjoined, the Defendants, through their Scheme, are likely to take over more and more University textbook and course materials sales, resulting in higher prices and reduced choice for more students in more courses on more campuses.

## VII.    ANTITRUST INJURY

186.    The Student Purchaser Plaintiffs have suffered antitrust injury as a result of the Defendants' conduct and the Scheme.

187.    At Universities that participate in Inclusive Access whose bookstores are run by the Retailer Defendants, the Defendants' actions have forced students to purchase Inclusive Access textbooks exclusively from the Defendants, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary marketplace.

188.    At Universities that participate in Inclusive Access whose bookstores are University-run, the Defendants' actions have forced students to purchase Inclusive Access textbooks exclusively from their official college-run bookstore, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary marketplace.

189.    Absent the Inclusive Access Scheme, the Student Purchaser Plaintiffs would have a variety of options for obtaining their textbooks. These include buying new and used versions of print textbooks, buying electronic versions of textbooks, and purchasing or renting from on-campus bookstores, off-campus bookstores, and online sources, including the secondary marketplace, and competition between those options would result in lower prices.

## VIII.    FRAUDULENT CONCEALMENT

190.    The Defendants concealed their Scheme from the Representative Student Purchaser Plaintiffs and other members of the Class as defined below.  The Defendants' actions in developing and implementing the Inclusive Access Scheme occurred in private communications, including through trade associations that claimed publicly to have other purposes.  The Defendants' public

statements promoted Inclusive Access to students and universities as a technological advance, cheaper, and/or in response to consumer demand.

191.     Plaintiffs did not have access to information that would have alerted them to the possibility of the Scheme between the Publisher Defendants and Retailer Defendants.  A college student informed that the textbook for a certain course will only be available through Inclusive Access would not reasonably suspect that this exclusivity was the result of a conspiracy to increase profits by eliminating competition at the student's expense.

192.     In light of the above, the Publisher Defendants' and Retailer Defendants' knowing and active efforts to conceal the Scheme and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop the Defendants from using any statute of limitations defense in this Action.

### IX.    NATIONWIDE FEDERAL DIRECT PURCHASER CLASS ACTION ALLEGATIONS

#### A.  Plaintiffs Are Direct Purchasers

193.     Prior to Inclusive Access, the Retailer Defendants (as well as Universities that operate their own bookstores) acted as resellers of textbooks, setting retail prices in response to market forces.

194.     In contrast, under the Inclusive Access model, the Publisher Defendants are able to set the retail prices of Inclusive Access Materials charged to consumers and sell the materials directly to consumers. Many students who purchase Inclusive Access subscriptions therefore engage in unmediated transactions with publishers and are billed for Inclusive Access products by the Publisher Defendants.

195.    The Defendants themselves make clear that the Publisher Defendants sell directly to consumers. As Pearson CEO John Joseph Fallon explained in 2019, Inclusive Access is a business model in which publishers "build direct relationships with . . . learners, **who pay us directly to use our products**, thus over time, eliminating the currently large secondary market.[108]

196.    Likewise, the Defendants conceded that students purchase directly from the Defendants when they argued in the District of Delaware that any alleged damages resulting from Inclusive Access—including, "high prices", "reduced quality" course materials, and the constriction of "consumer choice"—were injuries that "**would be borne by students.**" *See Campus Book Co., Inc., et al. v. McGraw-Hill Global Educ. Holdings, LLC, et al.*, No. 20-102 (D. Del. 2020), Defendants' Reply Br. (ECF 46), at 7-8 (contesting antitrust standing of independent retailer plaintiffs).

197.    Other students who purchase Inclusive Access subscriptions engage in transactions with retailers and are billed for Inclusive Access products by the Retailer Defendants. Students who purchase Inclusive Access Materials from the Retailer Defendants are direct purchasers from the Retailer Defendants. The Defendants' stated and planned attempts to compel arbitration in this action against the Plaintiffs based on Barnes & Noble's Terms of Service is a tacit concession that students directly purchase products from the Retailer Defendants. *See* Defs.' Rule 12(e) Letter Motion, ECF 57 (Dec. 2. 2020) at 1 ("On November 12, 2020, BNED notified Plaintiffs that its Terms of Service contain binding arbitration agreements and class action waivers. BNED asked Plaintiffs to identify their universities and when they purchased the materials at issue, as that information bears on their arbitration obligations . . . .").

198.     In some cases, Universities, which are completely involved in the Inclusive Access Scheme, facilitate the sale of Inclusive Access Materials to students, acting as sales agents of the Publisher Defendants. In these instances, Universities secure offers from buyers of the Publisher Defendants' Inclusive Access products, *i.e.*, students; they have little to no discretion concerning terms under which Inclusive Access is sold and can change the price charged to students only marginally, within a pre-agreed range, typically capped at 20 percent. The Publisher Defendants' use of Universities as agents does not constitutes a separate step in the vertical distribution of Inclusive Access Materials.

199.     Among other agency functions, the Universities operate as order acquisition agents. Under agreements developed by the Publisher Defendants, Universities agree to assign Inclusive Access Materials for certain courses. Universities also agree to procure a certain number of students to purchase Inclusive Access subscriptions from the Publisher Defendants (the "minimum usage rate") at prices based on the publishers' "National List Prices." Under the agreements, the Publisher Defendants may agree to pay the University (or its authorized distributor, frequently the Retailers Defendants, Follett or Barnes & Noble) a commission each time a student subscribes to Inclusive Access Materials, typically of no more than twenty percent (the maximum allowed "mark-up").

200.     The Publisher Defendants maintain control of the distribution of Inclusive Access Materials, including pricing, logistics, purchaser and user eligibility, and terms of use language. After students subscribe to Inclusive Access Materials, some Universities facilitate payments to the Defendants through automatic tuition billing. The Publisher Defendants reserve the right to increase prices for their Inclusive Access products the following term or year if the University does not procure enough student subscribers (*i.e.*, if the minimum usage rate is not met).

201.    Each agreement between a Publisher Defendant and a University delineates specific, limited responsibilities that the University may perform. Typically, the University may make Inclusive Access products available solely to authorized student users (student purchasers enrolled in the classes subject to Inclusive Access). The University may not sell, resell, license, sublicense, distribute, make accessible, rent, or lease Inclusive Access products to any students, individuals, institutions or third parties who are not authorized student users. The University also agrees to ensure that only authorized users access Inclusive Access Materials.

202.    Each agreement states that authorized student users may access Inclusive Access Materials only after agreeing to terms of use set by the Publisher Defendants. These terms control, superseding any terms of use between the University and the student users.

203.    The Publisher Defendants bear any risk from sales to consumers. Universities pay no sums to the Publisher Defendants unless students purchase Inclusive Access Materials and Universities collect their payment. Universities face no risks associated with the purchase and storage of tangible goods, such as loss, theft, or surplus. Each agreement contains reporting provisions that ensure the University and/or its authorized distributor will not bear the burden of any surplus purchases, returns or student drops. Universities do not function as independent entrepreneurs.

204.    Universities market, solicit, and obtain orders for Inclusive Access Materials from customers, thereby securing offers for the Publisher Defendants' Inclusive Access products. They provide students with access to Inclusive Access Materials. And they facilitate orders and payment to the Defendants and engage in similar activities that are merely incidental to the sale.

205.    There is no intermediate transfer of the Inclusive Access products to Universities or Retailers physically or digitally. Under the agreements, no physical product is transferred from

the publisher to retailer or from retailer to consumer. Instead, the Publisher Defendants sell access to a digital copy (*e.g.*, in the form of a non-exclusive license) to a given Inclusive Access offering directly to students, facilitated by a University's delivery system. Universities never receive title to the Inclusive Access Materials to which consumers subscribe. Rather, Publisher Defendants retain all rights, title and interest to all Inclusive Access offerings.

206.   All members of the class are direct purchasers, whether they purchased directly from the Retailer Defendants or the Publisher Defendants, and regardless of whether the Publisher Defendants used one or more Universities as agents. They may therefore maintain an action for damages and injunctive relief under the Sherman Act against the Defendants.

207.   Additionally, because the price that Plaintiffs paid directly is the one that was unlawfully fixed, the Student Purchaser Plaintiffs are direct purchasers of Inclusive Access.

208.   Because the simultaneous adoption of the Inclusive Access model represents a conspiracy among horizontal competitors at the retail level to fix retail prices, the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), does not prevent this garden variety price-fixing claim.

209.   The role of the co-conspirator Universities in the Inclusive Access Scheme is to mandate the use of Inclusive Access among students and to serve as a sales agent for the publishers in collecting payment from those students.

210.   When the Scheme is looked at as a whole and the roles of the co-conspirators are considered, it is clear that the students are the direct purchasers.

## B. Direct Purchaser Class Action Allegations

211.    The Representative Student Purchaser Plaintiffs bring this Action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as representatives of a Class defined as follows:

> All students at colleges or graduate schools in the United States who purchased subscriptions to Inclusive Access Materials. Excluded from the Class are the Defendants and their employees.

212.    Members of the Class are so numerous that joinder is impracticable. There are at least hundreds of thousands (if not millions) of University students who were required to purchase Inclusive Access textbooks and other course materials from the Defendants (or non-named co-conspirators) pursuant to the Scheme.

213.    There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, *inter alia*:

a.   Whether the Publisher Defendants and Retailer Defendants colluded to create, promote, and maintain the Inclusive Access system;

b.   Whether the Publisher Defendants and Retailer Defendants colluded with Universities to create, promote, and maintain the Inclusive Access system;

c.   Whether the Publisher Defendants colluded with University-run campus bookstores to create, promote, and maintain the Inclusive Access system on those campuses;

d.   Whether the Publisher Defendants colluded among themselves to fix and raise the price of textbooks and course materials under the Inclusive Access system;

e.   Whether the Publisher Defendants refused to deal with independent retailers who sought to sell Inclusive Access Materials;

f.   The time period, number of universities, and number of students affected by the Inclusive Access system;

g. Whether the Publisher Defendants had market power in the market(s) for University textbooks and course materials assigned in courses subject to Inclusive Access;

h. Whether the Publisher Defendants substantially foreclosed competition in the market(s) for University textbooks and course materials assigned in courses subject to Inclusive Access;

i. Whether the Retailer Defendants had market power in the market(s) for University textbooks and course materials assigned in courses subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

j. Whether Inclusive Access has anticompetitive effects;

k. Whether Inclusive Access has one or more legitimate pro-competitive benefits;

l. Whether any procompetitive benefits from Inclusive Access could have been achieved through less restrictive means;

m. Whether the Representative Student Purchaser Plaintiffs and the Class suffered injury as a result of the Defendants' actions, and if so, the extent of those damages;

n. Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Publisher Defendants' market power in the market(s) for University textbooks and course materials assigned in courses subject to Inclusive Access;

o. Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Retailer Defendants' market power in the market(s) for University textbooks and course materials assigned in courses subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

p. Whether the actions of the Publisher Defendants as described herein were in violation of the Sherman Act;

q. Whether the actions of the Retailer Defendants as described herein were in violation of the Sherman Act;

r. The operative time period and extent of the Defendants' antitrust violations;

s. The appropriate injunctive and equitable relief for the Class; and

t. The appropriate measure of damages for the Class.

91

214.    The Representative Student Purchaser Plaintiffs' interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that they can fairly and adequately represent and protect their interests.

215.    The Representative Student Purchaser Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions.

216.    If individual Class members prosecuted many separate actions, there would be a risk that the outcomes of those actions would be inconsistent with one another.

217.    Class treatment of the Student Purchaser Plaintiffs' federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

218.    The Class is ascertainable in that the Defendants have records of the students who purchased Inclusive Access Materials.

219.    Class treatment would allow Class members who have comparatively small claims to prosecute those claims, instead of finding it uneconomical to do so.

220.    The Representative Student Purchaser Plaintiffs know of no difficulty likely to be encountered in the maintenance of this Action as a class action under Federal Rule of Civil Procedure 23.

## X.    <u>INDIRECT PURCHASER CLASS ACTION ALLEGATIONS</u>

221.    In the event that certain student purchasers are determined not to be direct purchasers, they bring the following alternative class allegations.

222.    In the alternative, the Plaintiffs bring this Action on their own behalf and as a class

action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s),

on behalf of all persons and entities who indirectly purchased Inclusive Access Materials from the

Defendants or co-conspirators for personal use.

## XI.    CAUSES OF ACTION

### Claims Under the Sherman Act

223.    The Student Purchaser Plaintiffs bring claims under federal antitrust laws to enjoin

the Defendants' illegal conduct and to obtain damages.

### FIRST CLAIM FOR RELIEF

### CLAIM UNDER SECTION 16 OF THE CLAYTON ACT FOR INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTIONS 1 & 2 OF THE SHERMAN ACT (AGAINST ALL THE DEFENDANTS, JOINTLY AND SEVERALLY)

224.    The Student Purchaser Plaintiffs incorporate and reallege, as though fully set forth

herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

225.    This claim for relief arises under Section 16 of the Clayton Act.  It seeks injunctive

and equitable relief against all the Defendants, jointly and severally, for (a) violation of Section 1

of the Sherman Act, 15 U.S.C. § 1, for entering into, and performing under, an agreement or

combination to unreasonably restrain trade in the United States, and (b) violation of Section 2 of

the Sherman Act, 15 U.S.C. § 2, for conspiring to monopolize the Textbook Markets.

226.    Beginning at a time currently unknown to the Student Purchaser Plaintiffs, the

Defendants and their co-conspirators entered into a continuing agreement to restrain trade and

monopolize the Textbook Markets through implementation of the Inclusive Access program. This

agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1, and is a conspiracy to monopolize the Textbook Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

227.    The actions of the Publisher Defendants and the Retailer Defendants as described herein were and are part of an overarching scheme to restrain trade and an unlawful conspiracy to restrain trade in the Textbooks Markets in the United States. These actions were designed to, did in fact, and are continuing to work together to damage competition to the Textbook Markets (including by eliminating competition from the secondary textbook marketplace) and raise prices.

228.    The Publisher Defendants conspired and acted (and continue to conspire and act) to restrain trade in textbooks and other course materials through the Inclusive Access Scheme by, among other things:

(1) engaging in a group boycott of and a concerted refusal to deal with independent retailers to prevent Inclusive Access Materials from being sold through sources other than official on campus bookstores (*e.g.*, by refusing to sell Inclusive Access Materials to retailers other than official on-campus bookstores, vesting the Retailer Defendants with exclusive rights to distribute Inclusive Access Materials, and imposing pretextual anti-counterfeiting standards);

(2) tying the sale of Inclusive Access e-textbooks (which are interchangeable with products available on the secondary marketplace) to the sale of Ancillary Required Course Materials (which students need to pass their courses and which can be obtained from no other source);

(3) engaging in a "hard switch" from print textbooks (durable goods with lasting use value and resale value) to time-limited, digital-only subscription services, which cannot be resold on the secondary marketplace;

(4) limiting the capacity and reducing the supply of print textbooks (including through releasing digital-only editions of course materials that are not substitutable for print copies in circulation, refusing to sell print copies of Inclusive Access Materials as standalone products, capping the number of students who can obtain "print upgrades" of Inclusive Access Materials, producing only loose-leafed versions of print textbooks as opposed to more durable bound copies, etc.);

(5) arranging with Universities to coerce students to purchase Inclusive Access Materials (including by setting up automatic billing and subscription regimes, creating onerous or functionally impossible opt-out processes, enacting

prohibitions on the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and imposing academic penalties for students who refuse to purchase Inclusive Access Materials), all with the intention of eliminating competition and raising prices.

229.    The Retailer Defendants colluded and acted (and continue to collude and act) to restrain trade in textbooks and other course materials on the Universities on which they operate official on-campus bookstores through the Inclusive Access Scheme described herein by, *inter alia*,

> (1) working with the Publisher Defendants and Universities to impose Inclusive Access on students;
>
> (2) arranging with Universities to coerce students to purchase Inclusive Access Materials (including by setting up automatic billing and subscription regimes, creating onerous or functionally impossible opt-out processes, enacting prohibitions on the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and imposing academic penalties for students who refuse to purchase Inclusive Access Materials); and
>
> (3) financially inducing Universities to mandate Inclusive Access through sales commissions and direct payments, all with the intention of eliminating competition and raising prices.

230.    The relevant product markets are the Textbook Markets. The relevant geographic market is the United States.

231.    The Defendants possess market power in the relevant markets. The Defendants' market power includes the power to control prices, exclude competitors, and impose unwanted distribution policies.

232.    The Defendants' Scheme-related conduct was done with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access. The Defendants' further intention was to conspire to monopolize the Textbook Markets by eliminating competition.

233.   The Defendants' conduct had the effect of (1) reducing and suppressing competition in the Textbook Markets in the United States and (2) inflating the price of textbooks.

234.   The Student Purchaser Plaintiffs seek an injunction against the Defendants, preventing and restraining the violations alleged above, under Section 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### CLAIM UNDER SECTION 16 OF THE CLAYTON ACT FOR INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTIONS 1 & 2 OF THE SHERMAN ACT (AGAINST EACH GROUPING OF DEFENDANTS INVOLVED IN EACH TEXTBOOK MARKET, JOINTLY AND SEVERALLY).

235.   The Student Purchaser Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Action.

236.   This claim for relief arises under Section 16 of the Clayton Act. It seeks injunctive and equitable relief against each grouping of Defendants involved in each Textbook Market, jointly and severally, for (a) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for entering into, and performing under, agreements or combinations to unreasonably restrain trade in the United States, and (b) violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for conspiring to monopolize each of the separate Textbook Markets.

237.   As detailed herein, the Publisher and Retailer Defendants have engaged (and continue to engage) in coercive combinations that restricted trade and commerce in each of the Textbook Markets.

238.   The Publisher Defendants have entered (and continue to enter) into specific exclusive agreements with Universities and with the Retailer Defendants for selling Inclusive Access Materials at specific schools.

239.   The Retailer Defendants have entered (and continue to enter) into specific exclusive agreements with Universities for selling Inclusive Access Materials at specific schools.

240.    The Publisher Defendants have entered (and continue to enter) into specific exclusive agreements with Universities that mandate the use of Inclusive Access Materials by students at specific schools.

241.    Each of these agreements constitutes an unreasonable restraint of trade, in violation of 15 U.S.C. § 1, and a conspiracy to monopolize the Textbook Markets, in violation of 15 U.S.C. § 2.

242.    These conspiratorial agreements have caused unreasonable restraints in the Textbook Markets by foreclosing competition.

243.    These conspiratorial agreements constitute a conspiracy to monopolize the Textbook Markets.

244.    These conspiratorial agreements have had the anticompetitive effects of increasing prices and foreclosing competition.

245.    The illegal agreements in restraint of trade between and among the Publisher Defendants, the Retailer Defendants, and Universities caused the Student Purchaser Plaintiffs to pay artificially high and supra-competitive prices for textbooks.

246.    The Student Purchaser Plaintiffs have been harmed by injury to competition in the Textbooks Markets and by being forced to pay inflated prices for course materials.

247.    These violations are continuing and will continue unless enjoined by the Court. The Student Purchaser Plaintiffs seek injunctive relief as to each agreement between a Publisher Defendant and a Retailer Defendant, a Publisher Defendant and a University, and between a University and a Retailer Defendant executed under or in furtherance of the Inclusive Access Scheme.

**THIRD CLAIM FOR RELIEF**

**CLAIM UNDER SECTION 16 OF THE CLAYTON ACT FOR INJUNCTIVE RELIEF FOR VIOLATION OF SECTION 2 OF THE SHERMAN ACT (AGAINST EACH PUBLISHER DEFENDANT, SEPARATELY)**

248.    The Student Purchaser Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

249.    This claim for relief arises under Section 16 of the Clayton Act.  It seeks injunctive and equitable relief against each Publisher Defendant, separately, for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for unlawful monopolization of each Textbook Market in which a Publisher Defendant participates.

250.    The relevant product markets are the Textbook Markets. The relevant geographic market is the United States.

251.    Each Publisher Defendant possesses monopoly power with respect those Textbook Markets involving course materials it publishes. There are substantial barriers to entry for each of the Textbook Markets. Once a professor or academic department head assigns a particular textbook, the only products that students can functionally substitute for new editions of that textbook are used or electronic versions of that same textbook, or in some cases, an earlier version of the textbook. Under the Scheme, the interchangeability of these products has been disabled, meaning there are no substitutes for Inclusive Access Materials. A Publisher Defendant has a market share of over 95% in each Textbook Market. The Publisher Defendants' monopoly power is also shown by their demonstrated ability to devise and implement the Inclusive Access Scheme.

252.    The Publisher Defendants acquired and maintained (and continue to maintain and expand) their market power through anticompetitive means—including excluding competitors from the secondary marketplace and independent retailers through imposition of the Inclusive Access Scheme.

253.     The Publisher Defendants' market power has allowed them to charge supra-competitive prices for textbooks sold through the Inclusive Access Scheme. The Publisher Defendants' anticompetitive conduct has had the effect of raising prices and foreclosing competition in the Textbook Markets.

254.     There is no procompetitive justification for the anticompetitive conduct in which the Publisher Defendants have engaged and continue to engage. Any conceivable procompetitive benefit could have been delivered by means less restrictive of competition.

255.     The Student Purchaser Plaintiffs were and are harmed by the Publisher Defendants' conduct, which has increased the price of course materials sold through Inclusive Access. Additionally, the Publisher Defendants' conduct has foreclosed competition, which has further harmed the Plaintiffs. These violations are continuing and will continue unless enjoined by the Court.

256.     The Student Purchaser Plaintiffs seek an injunction under Section 16 of the Clayton Act against the Publisher Defendants, preventing and restraining the violations alleged herein.

**FOURTH CLAIM FOR RELIEF**

**CLAIM UNDER SECTION 4 OF THE CLAYTON ACT FOR COMPENSATORY RELIEF FOR VIOLATIONS OF SECTIONS 1 & 2 OF THE SHERMAN ACT (AGAINST ALL THE DEFENDANTS, JOINTLY AND SEVERALLY)**

257.     The Student Purchaser Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.     This claim for relief arises under Section 4 of the Clayton Act.  It seeks damages against all the Defendants, jointly and severally, for (a) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for entering into, and performing under, an agreement or combination to

unreasonably restrain trade in the United States, and (b) violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for conspiring to monopolize the Textbook Markets.

259.    Beginning at a time currently unknown to the Student Purchaser Plaintiffs, the Defendants and their co-conspirators entered into a continuing agreement to restrain trade and monopolize the Textbook Markets through implementation of the Inclusive Access program. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and a conspiracy to monopolize the Textbook Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

260.    The actions of the Publisher Defendants and the Retailer Defendants as described herein were and are part of an overarching scheme to restrain trade and an unlawful conspiracy to restrain trade in the Textbook Markets in the United States. These actions were designed to, did in fact, and are continuing to work together to damage competition to the Textbook Markets (including by eliminating competition from the secondary textbook marketplace) and raise prices.

261.    The Publisher Defendants conspired and acted (and continue to conspire and act) to restrain trade in textbooks and other course materials through the Inclusive Access Scheme by, among other things:

(1) engaging in a group boycott of and a concerted refusal to deal with independent retailers to prevent Inclusive Access Materials from being sold through sources other than official on campus bookstores (*e.g.*, by refusing to sell Inclusive Access Materials to retailers other than official on-campus bookstores, vesting the Retailer Defendants with exclusive rights to distribute Inclusive Access Materials, and imposing pretextual anti-counterfeiting standards);

(2) tying the sale of Inclusive Access e-textbooks (which are interchangeable with products available on the secondary marketplace) to the sale of Ancillary Required Course Materials (which students need to pass their courses and which can be obtained from no other source);

(3) engaging in a "hard switch" from print textbooks (durable goods with lasting use value and resale value) to time-limited, digital-only subscription services, which cannot be resold on the secondary marketplace;

(4) limiting the capacity and reducing the supply of print textbooks (including through releasing digital-only editions of course materials that are not substitutable for print copies in circulation, refusing to sell print copies of Inclusive Access Materials as standalone products, capping the number of students who can obtain "print upgrades" of Inclusive Access Materials, producing only loose-leafed versions of print textbooks as opposed to more durable bound copies, etc.);

(5) arranging with Universities to coerce students to purchase Inclusive Access Materials (including by setting up automatic billing and subscription regimes, creating onerous or functionally impossible opt-out processes, enacting prohibitions on the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and imposing academic penalties for students who refuse to purchase Inclusive Access Materials), all with the intention of eliminating competition and raising prices.

262.    The Retailer Defendants colluded and acted (and continue to collude and act) to restrain trade in textbooks and other course materials on the Universities on which they operate official on-campus bookstores through the Inclusive Access Scheme described herein by, *inter alia*,

(1) working with the Publisher Defendants and Universities to impose Inclusive Access on students;

(2) arranging with Universities to coerce students to purchase Inclusive Access Materials (including by setting up automatic billing and subscription regimes, creating onerous or functionally impossible opt-out processes, enacting prohibitions on the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and imposing academic penalties for students who refuse to purchase Inclusive Access Materials); and

(3) financially inducing Universities to mandate Inclusive Access through sales commissions and direct payments, all with the intention of eliminating competition and raising prices.

263.    The relevant product markets are the Textbook Markets. The relevant geographic market is the United States.

264.    The Defendants possess market power in the relevant markets. The Defendants' market power includes the power to control prices, exclude competitors, and impose unwanted distribution policies.

265.    The Defendants' Scheme-related conduct was done with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access. The Defendants' further intention was to conspire to monopolize the Textbook Markets by eliminating competition.

266.    The Defendants' conduct had the effect of (1) reducing and suppressing competition in the Textbook Markets in the United States and (2) inflating the price of textbooks.

267.    As a direct and proximate result of the Defendants' Inclusive Access Scheme (as described herein), the Student Purchasers Plaintiffs have had to pay higher prices for textbooks because of the elimination of competition, including from the secondary marketplace. The Scheme has therefore caused them injury, including overcharge damages.

268.    The Student Purchaser Plaintiffs seek to recover damages, to the maximum extent allowed under the applicable laws, and the entry of joint and several judgments in favor of the Student Purchaser Plaintiffs against all the Defendants in an amount to be trebled to the extent such laws permit.

## FIFTH CLAIM FOR RELIEF

**CLAIM UNDER SECTION 4 OF THE CLAYTON ACT FOR COMPENSATORY RELIEF FOR VIOLATIONS OF SECTIONS 1 & 2 OF THE SHERMAN ACT (AGAINST EACH GROUPING OF DEFENDANTS INVOLVED IN EACH TEXTBOOK MARKET, JOINTLY AND SEVERALLY).**

269.    The Student Purchaser Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270.    This claim for relief arises under Section 4 of the Clayton Act. It seeks damages against each grouping of Defendants involved in each Textbook Market, jointly and severally, for (a) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for entering into, and performing under, agreements or combinations to unreasonably restrain trade in the United States, and (b)

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for conspiring to monopolize each of the separate Textbook Markets.

271.    As detailed herein, the Publisher and Retailer Defendants have engaged (and continue to engage) in coercive combinations that restricted trade and commerce in each of the Textbook Markets.

272.    The Publisher Defendants have entered (and continue to enter) into specific exclusive agreements with Universities and with the Retailer Defendants for selling Inclusive Access Materials at specific schools.

273.    The Retailer Defendants have entered (and continue to enter) into specific exclusive agreements with Universities for selling Inclusive Access Materials at specific schools.

274.    The Publisher Defendants have entered (and continue to enter) into specific exclusive agreements with Universities that mandate the use of Inclusive Access Materials by students at specific schools.

275.    Each of these agreements constitutes an unreasonable restraint of trade, in violation of 15 U.S.C. § 1, and a conspiracy to monopolize the Textbook Markets, in violation of 15 U.S.C. § 2.

276.    These conspiratorial agreements have caused unreasonable restraints in the Textbook Markets by foreclosing competition.

277.    These conspiratorial agreements constitute a conspiracy to monopolize the Textbook Markets.

278.    These conspiratorial agreements have had the anticompetitive effects of increasing prices and foreclosing competition.

279.    The illegal agreements in restraint of trade between and among the Publisher Defendants, the Retailer Defendants, and Universities caused the Student Purchaser Plaintiffs to pay artificially high and supra-competitive prices for textbooks.

280.    The Student Purchaser Plaintiffs have been harmed by injury to competition in the Textbooks Markets and by being forced to pay inflated prices for course materials.

281.    The Student Purchaser Plaintiffs seek to recover damages, to the maximum extent allowed under the applicable laws, and the entry of joint and several judgments in favor of the Student Purchaser Plaintiffs against all the Defendants in an amount to be trebled to the extent such laws permit.

## SIXTH CLAIM FOR RELIEF

### CLAIM UNDER SECTION 4 OF THE CLAYTON ACT FOR COMPENSATORY RELIEF FOR VIOLATION OF SECTION 2 OF THE SHERMAN ACT (AGAINST EACH PUBLISHER DEFENDANT, SEPARATELY)

282.    The Student Purchaser Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

283.    This claim for relief arises under Section 4 of the Clayton Act. It seeks damages against each Publisher Defendant, separately, for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, for unlawful monopolization of each Textbook Market in which a Publisher Defendant participated.

284.    The relevant product markets are the Textbook Markets. The relevant geographic market is the United States.

285.    Each Publisher Defendant possesses monopoly power with respect to those Textbook Markets involving course materials it publishes. There are substantial barriers to entry for each of the Textbook Markets. Once a professor or academic department head assigns a

particular textbook, the only products that students can functionally substitute for new editions of that textbook are used or electronic versions of that same textbook, or in some cases, earlier versions of the textbook. Under the Scheme, the interchangeability of these products has been disabled, meaning there are no substitutes for Inclusive Access Materials. A Publisher Defendant has a market share of over 95% in each Textbook Market. The Publisher Defendants' monopoly power is also shown by their demonstrated ability to devise and implement the Inclusive Access Scheme.

286.    The Publisher Defendants acquired and maintained (and continue to maintain and expand) their market power through anticompetitive means—including excluding competitors and independent retailers from the secondary marketplace through imposition of the Inclusive Access Scheme.

287.    The Publisher Defendants' market power has allowed them to charge supra-competitive prices for textbooks sold through the Inclusive Access Scheme. The Publisher Defendants' anticompetitive conduct has had the effect of raising prices and foreclosing competition in the Textbook Markets.

288.    There is no procompetitive justification for the anticompetitive conduct in which the Publisher Defendants have engaged and continue to engage. Any conceivable procompetitive benefit could have been delivered by means less restrictive of competition.

289.    The Student Purchaser Plaintiffs were and are harmed by the Publisher Defendants' conduct, which has increased the price of course materials sold through Inclusive Access. Additionally, the Publisher Defendants' conduct has foreclosed competition, which has further harmed the Student Purchaser Plaintiffs. These violations are continuing and will continue unless enjoined by the Court.

290.     The Student Purchaser Plaintiffs seek to recover damages, to the maximum extent allowed under the applicable laws, and the entry of joint and several judgments in favor of the Student Purchaser Plaintiffs against the Publisher Defendants in an amount to be trebled to the extent such laws permit.

### *Claims Under State Antitrust Law*

291.     The Student Purchaser Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

292.     The following claims for relief are pleaded under the antitrust law of each jurisdiction identified. These state antitrust laws are all at least as broad as (and in many cases are broader than) federal antitrust law, such that any violation of federal antitrust law is also a substantive violation of each state antitrust law.

### SEVENTH CLAIM FOR RELIEF

### CONSPIRACY AND COMBINATION IN
### RESTRAINT OF TRADE UNDER STATE LAW
### (AGAINST ALL DEFENDANTS)

293.     The Student Purchaser Plaintiffs incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

294.     Beginning at a time currently unknown to the Plaintiffs, the Defendants and their co-conspirators entered into a continuing agreement to restrain trade and monopolize the Textbook Markets through implementation of the Inclusive Access program in violation of the various state antitrust and consumer protection statutes set forth below.

295.     The actions of the Publisher Defendants and the Retailer Defendants as described herein were and are part of an overarching scheme to restrain trade and an unlawful conspiracy to restrain trade in the Textbook Markets in the United States. These actions were designed to, did in

fact, and are continuing to work together to damage competition to the Textbook Markets (including by eliminating competition from the secondary textbook marketplace) and raise prices.

296.    The Publisher Defendants conspired and acted (and continue to conspire and act) to restrain trade in textbooks and other course materials through the Inclusive Access Scheme by, among other things:

(1) engaging in a group boycott of and a concerted refusal to deal with independent retailers to prevent Inclusive Access Materials from being sold through sources other than official on campus bookstores (*e.g.*, by refusing to sell Inclusive Access Materials to retailers other than official on-campus bookstores, vesting the Retailer Defendants with exclusive rights to distribute Inclusive Access Materials, and imposing pretextual anti-counterfeiting standards);

(2) tying the sale of Inclusive Access e-textbooks (which are interchangeable with products available on the secondary marketplace) to the sale of Ancillary Required Course Materials (which students need to pass their courses and which can be obtained from no other source);

(3) engaging in a "hard switch" from print textbooks (durable goods with lasting use value and resale value) to time-limited, digital-only subscription services, which cannot be resold on the secondary marketplace;

(4) limiting the capacity and reducing the supply of print textbooks (including through releasing digital-only editions of course materials that are not substitutable for print copies in circulation, refusing to sell print copies of Inclusive Access Materials as standalone products, capping the number of students who can obtain "print upgrades" of Inclusive Access Materials, producing only loose-leafed versions of print textbooks as opposed to more durable bound copies, etc.);

(5) arranging with Universities to coerce students to purchase Inclusive Access Materials (including by setting up automatic billing and subscription regimes, creating onerous or functionally impossible opt-out processes, enacting prohibitions on the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and imposing academic penalties for students who refuse to purchase Inclusive Access materials), all with the intention of eliminating competition and raising prices.

297.    The Retailer Defendants colluded and acted (and continue to collude and act) to restrain trade in textbooks and other course materials on the Universities on which they operate

official on-campus bookstores through the Inclusive Access Scheme described herein by, *inter alia*,

    (1) working with the Publisher Defendants and Universities to impose Inclusive Access on students;

    (2) arranging with Universities to coerce students to purchase Inclusive Access materials (including by setting up automatic billing and subscription regimes, creating onerous or functionally impossible opt-out processes, enacting prohibitions on the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and imposing academic penalties for students who refuse to purchase Inclusive Access materials); and

    (3) financially inducing Universities to mandate Inclusive Access through sales commissions and direct payments, all with the intention of eliminating competition and raising prices.

298.    The relevant product markets are the Textbook Markets. The relevant geographic market is the United States.

299.    The Defendants possess market power in the relevant markets. The Defendants' market power includes the power to control prices, exclude competitors, and impose unwanted distribution policies.

300.    The Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the relevant markets.

301.    The Defendants' Scheme-related conduct was done with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access. The Defendants' further intention was to conspire to monopolize the Textbook Markets by eliminating competition.

302.    The Defendants' conduct had the effect of (1) reducing and suppressing competition in the Textbook Markets in the United States and (2) inflating the price of textbooks.

303.    In the alternative, by engaging in the foregoing conduct, the Defendants intentionally, willfully, and wrongfully monopolized the relevant market in violation of the following state laws:

(1) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in Arizona by members of the class.

(2) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California by members of the class.

(3) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut by members of the class.

(4) D.C. Code §§ 28-4502, et seq., with respect to purchases in the District of Columbia by members of the class.

(5) Haw. Rev. Stat. §§ 480-2, 480-4, et seq., with respect to purchases in Hawaii by members of the class.

(6) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois by members of the class.

(7) Iowa Code § 553.4, et seq., with respect to purchases in Iowa by members of the class.

(8) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas by members of the class.

(9) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by consumer members of the class.

(10)    MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland by members of the class.

(11)    Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan by members of the class.

(12)    Minn. Stat. §§ 325D.51, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota by members of the class.

(13)    Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi by members of the class.

(14)    Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by members of the class.

(15)    Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in
Nevada by members of the class.

(16)    N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New
Hampshire by members of the class.

(17)    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico
by members of the class.

(18)    N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York
by members of the class, and to the extent New York law so requires, the
Plaintiffs hereby forego any penalty or minimum recovery in order to preserve
the right of New York class members to recover by way of a class action.

(19)    N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina
by members of the class.

(20)    N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North
Dakota by members of the class.

(21)    Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by
members of the class.

(22)    R.I. Gen. Laws §§ 6-36-4 et seq., with respect to purchases in Rhode Island
by members of the class.

(23)    S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South
Dakota by members of the class.

(24)    Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in
Tennessee by members of the class.

(25)    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah
by members of the class, including citizens or residents of Utah.

(26)    W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia
by members of the class.

(27)    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by
members of the class.

304.    As a direct and proximate result of the Defendants' monopolistic conduct, the

Plaintiffs and the class have suffered injury in that they have paid more for course materials than

they would have paid in the absence of the Defendants' unlawful conduct. The Plaintiffs and the

class seek damages and multiple damages as permitted by law.

305.    The injuries to the Plaintiffs and the class are the type of injury antitrust laws were designed to prevent, and injury flows from the Defendants' unlawful conduct. The full amount of their damages is currently unknown, but will be determined after discovery and upon proof at trial.

306.    The Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate.

307.    The Plaintiffs have delivered, or are contemporaneously delivering, notice of this Action and copies of this complaint to the Attorneys General of Arizona, Connecticut, Hawaii, Minnesota, Missouri, Nevada, New York, Oregon, Rhode Island, South Carolina, and Utah.

## XII.    DEMAND FOR JUDGMENT

**WHEREFORE, the Student Purchaser Plaintiffs hereby respectfully request:**

(1) That the Court determine that the Representative Student Purchaser Plaintiffs' claims regarding the Class alleged herein are suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(2) That the Court appoint the Representative Student Purchaser Plaintiffs as the representatives of the Class;

(3) That the Representative Student Purchaser Plaintiffs' counsel be appointed as counsel for the Class;

(4) That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from the Defendants' violations of the Sherman Act;

(5) That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing the Defendants from continuing their unlawful acts in violation of the Sherman Act;

(6) That, in the alternative, the Representative Student Purchaser Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that joint and several judgments in favor of the Representative Student Purchaser Plaintiffs and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

(7) That the Representative Student Purchaser Plaintiffs and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this Action;

(8) That the Representative Student Purchaser Plaintiffs and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(9) Such other and further relief as this Court may deem just and proper.


Dated:  December 18, 2020                                    Respectfully submitted,

*/s/ Natasha J. Fernández-Silber*
Natasha J. Fernández-Silber
John Radice
April Lambert (*pro hac vice*)
Daniel Rubenstein
Rishi Raithatha

**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Phone: (646) 245-8502
Fax: (609) 385-0745
nsilber@radicelawfirm.com
jradice@radicelawfirm.com
alambert@radicelawfirm.com
drubenstein@radicelawfirm.com
rraithatha@radicelawfirm.com


*/s/ Lauren G. Barnes*
Lauren G. Barnes (*pro hac vice* pending)
Thomas M. Sobol (*pro hac vice* pending)
Abbye Klamann Ognibene (*pro hac vice*)
Hannah Schwarzchild (*pro hac vice* forthcoming)
Rochella T. Davis (*pro hac vice* forthcoming)

**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com
abbyeo@hbsslaw.com
hannahs@hbsslaw.com
rochellad@hbsslaw.com

112

Steve W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com