UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE INCLUSIVE ACCESS COURSE MATERIALS ANTITRUST LITIGATION | MASTER FILE NO. 20 MDL NO. 2946 (DLC) |
| This Document relates to: 20cv6314 | |

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS' MOTION TO DISMISS
STUDENT PLAINTIFFS' SECOND CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
*On behalf of Defendant Cengage Learning, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
*On behalf of Defendant McGraw Hill LLC*

**STEPTOE & JOHNSON LLP**

1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
*On behalf of Defendant Pearson Education, Inc.*

**GIBSON, DUNN & CRUTCHER LLP**

555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
*On behalf of Defendants Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc.*

**WILLKIE FARR & GALLAGHER LLP**

300 N LaSalle Street
Chicago, IL 60654
Telephone: (312) 728-9000
Facsimile: (312) 728-9199
*On behalf of Defendant Follett Higher Education Group, Inc.*

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................... 1

Statement of Alleged Facts ............................................................................. 5

Legal Standard ................................................................................................ 9

Argument ......................................................................................................... 9

    I.      The Section 1 Claims Should Be Dismissed (Counts 1, 2, 4, and 5) ..................... 9

        A.    Student Plaintiffs Fail To Allege a Plausible Horizontal Agreement (Counts 1 and 4) ..................................................................... 10

            1.    Student Plaintiffs' Allegations Show That Independent Self-Interest Is an Obvious Alternative Explanation for Each Defendant's Conduct ......................................................... 11

            2.    Student Plaintiffs Do Not Allege Parallel Conduct .................... 15

            3.    Student Plaintiffs Do Not Allege Plus Factors ........................... 16

        B.    Student Plaintiffs Fail To Allege an Unreasonable Restraint of Trade (Counts 1, 2, 4, and 5) ................................................................. 20

            1.    Student Plaintiffs Fail To Allege Any *Per Se* Violation ............. 21

            2.    Student Plaintiffs Fail To Define a Plausible Relevant Market ........................................................................................ 23

            3.    Student Plaintiffs Fail To Allege Adverse Effects on Competition .............................................................................. 28

    II.    The Section 2 Claims Should Be Dismissed (Counts 1 through 6) .................... 31

    III.    Student Plaintiffs Lack Antitrust Standing (Counts 4, 5, and 6) ........................ 32

    IV.    The State Law Claims Should Be Dismissed (Count 7) ...................................... 37

Conclusion ...................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC,*
241 F. Supp. 3d 461 (S.D.N.Y. 2017)......................................................................38

*Ahlgrim v. Keefe Grp., LLC,*
2016 WL 9819520 (D.N.M. Oct. 19, 2016), *adopted by*
........................................................................................................................40

*In re Aluminum Warehousing Antitrust Litig.,*
2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) ..........................................................................................................................38

*In re Am. Express Anti-steering Rules Antitrust Litig.,*
361 F. Supp. 3d 324 (E.D.N.Y. 2019) ...................................................................25

*Anderson News, L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)...................................................................................10

*In re Androgel Antitrust Litig. (No. II),*
687 F. Supp. 2d 1371 (N.D. Ga. 2010)..................................................................39

*Apple Inc. v. Pepper,*
139 S. Ct. 1514 (2019).....................................................................................33, 35

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................................9

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983)..................................................................................................9

*AstraZeneca AB v. Mylan Labs., Inc.,*
2010 WL 2079722 (S.D.N.Y. May 19, 2010) .......................................................21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...........................................................................9, 10, 11, 13, 19

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979)...................................................................................21

*Biocad JSC v. F. Hoffmann-La Roche,*
942 F.3d 88 (2d Cir. 2019).....................................................................................38

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2013) .................................................................27

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ..............................................................................................25

*Buena Vista Estates, Inc. v. Santa Fe Solid Waste Mgmt. Agency*,
   2016 WL 3574170 (D.N.M. Mar. 30, 2016) ......................................................38

*Byre v. City of Chamberlain*,
   362 N.W.2d 69 (S.D. 1985) ..................................................................................38

*Cancall PCS, LLC v. Omnipoint Corp.*,
   2001 WL 293981 (S.D.N.Y. Mar. 26, 2001) ......................................................23

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ................................................................................21

*Caraang v. PNC Mortg.*,
   795 F. Supp. 2d 1098 (D. Hawaii 2011) ...........................................................38

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
   2015 WL 5166014 (E.D. Tenn. June 24, 2015) .................................................39

*Cenedella v. Metro. Museum of Art*,
   348 F. Supp. 3d 346 (S.D.N.Y. 2018) ................................................................28

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ................................................................................19

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008) ................................................................................24

*City of N.Y. v. Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011) ................................................................................24

*Concord Assocs., L.P. v. Entm't Properties Tr.*,
   817 F.3d 46 (2d Cir. 2016) .............................................................................24, 27

*Coniglio v. Highwood Servs., Inc.*,
   495 F.2d 1286 (2d Cir. 1974) ..............................................................................23

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ............................................................................38

*Dane v. United Healthcare Ins. Co.*,
   974 F.3d 183 (2d Cir. 2020) ..................................................................................9

iii

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*,
    436 F. Supp. 3d 754 (S.D.N.Y. 2020)........................................................24

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)..............................................................30, 31

*In re Effexor Antitrust Litig.*,
    357 F. Supp. 3d 363 (D.N.J. 2018) .......................................................40

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012).................................................16, 18

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
    129 F.3d 240 (2d Cir. 1997)..........................................................28, 29

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).............................................................16, 31

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*,
    2019 WL 3503240 (N.D. Tex. Aug. 1, 2019).........................................38

*Friedman v. Adams Russell Cable Servs.-New York, Inc.*,
    624 F. Supp. 1195 (S.D.N.Y. 1986).......................................................23

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)..........................................................................22

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993)...........38

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)..................................................................29

*GEICO Corp. v. Autoliv, Inc.*,
    345 F. Supp. 3d 799 (E.D. Mich. 2018)................................................39

*Gray v. Marshall Cnty. Bd. of Educ.*,
    367 S.E.2d 751 (1988) ......................................................................38

*Hack v. President and Fellows of Yale College*,
    237 F.3d 81 (2d Cir. 2000).................................................................25

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005).......................................................33, 34, 37

*In re Humira (Adalimumab) Antitrust Litig.*,
    465 F. Supp. 3d 811 (N.D. Ill. 2020) ....................................................38

*Ill. Brick v. Illinois*,
  431 U.S. 720 (1977)...........................................................5, 32, 33

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)....................................................12

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir. 1995) ......................................................35

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)...................................11, 15, 17, 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)...................................................................22

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) .....................................39

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
  61 F.3d 123 (2d Cir. 1995).......................................................29

*Kanne v. Visa USA, Inc.*,
  723 N.W.2d 293 (Neb. 2006)...................................................38

*Kaufman v. Time Warner*,
  836 F.3d 137 (2d Cir. 2016).................................................22, 23

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) ...................................................34

*Law Offices of Curtis V. Trinko L.L.P. v. Bell Atlantic Corp.*,
  305 F.3d 89 (2d Cir. 2002), *rev'd and remanded on other grounds sub nom.*,
  *Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398
  (2004).................................................................................34

*Leider v. Ralfe*,
  2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003) .........................37

*LLM Bar Exam, LLC v. Barbri, Inc.*,
  271 F. Supp. 3d 547 (S.D.N.Y. 2017).................................12, 16

*Loren Data Corp. v. GXS, Inc.*,
  2011 WL 3511003 (D. Md. Aug. 9, 2011) ...............................38

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
  2014 WL 3739322 (S.D.N.Y. July 28, 2014) ...........................27

*Mahaska Bottling Co. v. PepsiCo Inc.*,
   271 F. Supp. 3d 1054 (S.D. Iowa 2017) ...................................................38

*Mathias v. Daily News, L.P.*,
   152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...............................................25, 28

*Matusovsky v. Merrill Lynch*,
   186 F. Supp. 2d 397 (S.D.N.Y. 2002) ..................................................35

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ............................10, 11, 12, 16, 17, 18, 20

*Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc.*,
   2016 WL 2939164 (S.D.N.Y. May 19, 2016) ......................................35

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
   937 F.3d 1056 (7th Cir. 2019) ............................................................38

*Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*,
   123 F. Supp. 2d 945 (W.D.N.C. 2000) ...............................................38

*Mothershed v. Justices of Supreme Court*,
   410 F.3d 602 (9th Cir. 2005) ..............................................................38

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ......................................................16, 19

*In re Novartis & Par Antitrust Litig.*,
   2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019) ....................................39

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) ...........................................................................20

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
   1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ....................................38

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..................................................................21, 24

*Oreck Corp. v. Whirlpool Corp.*,
   579 F.2d 126 (2d Cir. 1978) ...............................................................22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ...........................................................................32

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002) ...............................................................24

*Pro Music Rights, LLC v. Apple, Inc.*,
2020 WL 7406062 (D. Conn. Dec. 16, 2020) ........................................................38

*Rio Vista Oil, Ltd. v. Southland Corp.*,
667 F. Supp. 757 (D. Utah 1987) ..........................................................................38

*Rockholt Furniture, Inc. v. Kincaid Furniture Co.*,
1998 WL 1661384 (E.D. Tenn. July 6, 1998), *aff'd*, 188 F.3d 509 (6th Cir. 1999) ........................................................................................................................38

*Sargent-Welch Sci. Co. v. Ventron Corp.*,
567 F.2d 701 (7th Cir. 1977) ................................................................................21

*Simon v. KeySpan Corp.*,
694 F.3d 196 (2d Cir. 2012) ............................................................................33, 36

*Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*,
414 F. App'x 372 (2d Cir. 2011) .....................................................................26, 27

*Spinelli v. Nat'l Football League*,
903 F.3d 185 (2d Cir. 2018) ..................................................................................23

*State of N.Y. v. Dairylea Co-op. Inc.*,
570 F. Supp. 1213 (S.D.N.Y. 1983) ......................................................................37

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) ..................................................................................................29

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
740 F. Supp. 381 (D. Md. 1990) ...........................................................................38

*In re Tamoxifen Citrate Antitrust Litig.*,
277 F. Supp. 2d 121 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006) ............38

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006) ..................................................................................................21

*TRI Inc. v. Boise Cascade Office Prods., Inc.*,
2001 WL 1230647 (D. Minn. Oct. 15, 2001), *aff'd*, 315 F.3d 915 (8th Cir. 2003) ........................................................................................................................38

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*,
998 F.2d 1073 (1st Cir. 1993) ...............................................................................38

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
454 F. Supp. 2d 62 (E.D.N.Y. 2006) .....................................................................29

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.*,
146 F. Supp. 2d 385 (S.D.N.Y. 2001) .................................................................23

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ..............................................................................20

*United States v. Apple Inc.*,
952 F. Supp. 2d 638 (S.D.N.Y. 2013) ..............................................................9, 20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .............................................................................31, 32, 34

*Volm v. Legacy Health Sys., Inc.*,
237 F. Supp. 2d 1166 (D. Or. 2002) ..................................................................38

*Westerfield v. Quizno's Franchise Co.*,
527 F. Supp. 2d 840 (E.D. Wis. 2007), *j. vacated in part*, 2008 WL 2512467
(E.D. Wis. 2008) ..............................................................................................38

*Westgo Indus., Inc. v. W.J. King Co.*,
1981 WL 2064 (D.N.D. Mar. 31, 1981) ............................................................38

*Wheeler v. Mobil Chem. Co.*,
1994 WL 730404 (D.N.H. Nov. 17, 1994) ........................................................38

**Statutes**

15 U.S.C. § 1 ...................................................4, 9, 10, 20, 21, 24, 28, 29, 30, 31

15 U.S.C. § 2 .........................................................................................31, 32

**Rules and Regulations**

34 C.F.R. § 668.164(c)(2) ...........................................................................7, 12, 30

80 Fed. Reg. 67,126, 67,195-96 (Oct. 30, 2015) .............................................7, 12

Fed. R. Civ. P 12(b)(6).................................................................................1, 9, 24

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* ¶ 2002f1 (4th ed. 2013) ..............................20, 25

Defendants Cengage Learning, Inc. ("Cengage"), McGraw Hill LLC ("McGraw Hill"), and Pearson Education, Inc. ("Pearson," and, with Cengage and McGraw Hill, "Publishers"), and Barnes & Noble Education, Inc., Barnes & Noble College Booksellers, LLC (collectively, "BNED"), and Follett Higher Education Group, Inc. ("Follett," and, with BNED, "Retailer Defendants") move for an order dismissing the Second Consolidated Amended Class Action Complaint ("Complaint" or "SAC") filed by the Representative Student Purchaser Plaintiffs ("Student Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

Every semester, professors choose which learning materials to assign to the students in their courses. Accordingly, and as described in the Complaint, higher education publishers— including Cengage, McGraw Hill, Pearson, and others—compete intensely to persuade universities and their professors to adopt their course materials. Historically, those materials were limited to printed textbooks, new or used, that students could buy at brick-and-mortar bookstores, including on-campus stores operated by BNED, Follett, or universities themselves, or independent off-campus bookstores.

The Complaint recognizes that the course materials marketplace has evolved significantly since the days when hardcopy textbooks were the only option. Like so many other products, course materials have become increasingly digital and dynamic. Over time, publishers have expanded their product lines beyond printed textbooks to offer digital versions of the same content, along with digital homework and quizzes. Similarly, the methods of delivery have evolved: online competitors like Amazon and Chegg have emerged and a range of retailers and publishers have started renting course materials (in addition to selling new and used copies). Meanwhile, the traditional print format and mechanisms for obtaining course materials through physical bookstores have declined in popularity; according to the Complaint, in recent years, only about

1

one-quarter of students purchased new materials that generate revenues for publishers. As a result, each Publisher searched for new ways to compete and to deliver their products, including through Inclusive Access.

Inclusive Access is an innovative mechanism for selling and distributing digital courseware to college students through universities. Universities arrange with Publishers and sometimes Retailer Defendants for students to obtain access automatically to the digital materials (which may include digital textbooks, homework, and quizzes) assigned in the courses for which they register. Students are then charged for those materials on their university tuition bills. As the Complaint acknowledges, Publishers encouraged universities to implement Inclusive Access programs by offering course materials at lower prices than new printed textbooks. Once a university establishes an Inclusive Access program, it can choose for each course whether to take advantage of the discounted course materials through Inclusive Access, and if it does, all students in the course (other than those who opt out) benefit from the discount.

Student Plaintiffs—four individuals purporting to represent the interests of millions of current and former students—claim that the introduction and adoption of Inclusive Access programs were the product of an implausibly vast conspiracy that forced them to pay more for course materials. Yet they fail to connect the dots of this supposed conspiracy, which they claim involves not only Publishers and Retailer Defendants but also hundreds of universities (many of which are public or non-profit institutions). That theory stands in sharp contrast with their allegations that Publishers compete against each other to offer Inclusive Access as one mechanism to obtain course materials and how some universities have chosen to implement Inclusive Access programs, while others have declined. Student Plaintiffs admit that, on campuses where Inclusive Access is available, universities and their faculty not only choose what course materials to assign,

but also have the *added* option of making those materials available through the Inclusive Access mechanism. At bottom, Student Plaintiffs' claims rest on a mischaracterization of Inclusive Access as if it were the educational materials *themselves*, rather than one of several mechanisms for the distribution and sale of those materials. Moreover, the lengthy Complaint contains not a single example of course materials purchased through an Inclusive Access program that cost more than the same course materials outside of Inclusive Access (much less any allegation that Student Plaintiffs could have bought those same course materials for less). While the Complaint purports to compare the cost of some materials available through Inclusive Access to the cost of textbooks, it is not accurate to compare Inclusive Access products that may include digital homework and quizzes bundled with the e-textbooks to the cost of textbooks alone.

Student Plaintiffs also allege that Publishers experimented with Inclusive Access programs in 2014 and 2015 as a way to sell more course materials—a procompetitive effort that was in each Publisher's independent self-interest, regardless of what other publishers did. After the U.S. Department of Education finalized regulations explicitly authorizing universities to include the costs of course materials on students' tuition bills (a key aspect of Inclusive Access programs) in late 2015, more universities and professors have taken advantage of Inclusive Access.

These flaws pervade the Complaint and provide multiple independent grounds for dismissing all of Student Plaintiffs' claims.

First, the claims based on a horizontal agreement about Inclusive Access among the competing Publishers and Retailer Defendants (Counts 1 and 4) fail to allege facts plausibly suggesting that such an agreement existed. The gradual, multi-year expansion of Inclusive Access is nothing like the tightly parallel conduct that might, if coupled with other "plus factors," give rise to an inference of agreement. Critically, the Complaint itself explains that it would have been

in each Defendant's independent self-interest to offer Inclusive Access as a way to increase its own sales, regardless of what competitors did. And because each Publisher and each Retailer Defendant could reap the benefits of Inclusive Access independently, without the participation of any competitor, no Defendant had any motive to conspire. Nor have Student Plaintiffs alleged any facts about specific communications between competitors concerning Inclusive Access.

Second, Student Plaintiffs have failed to show that Defendants' conduct unreasonably restrained trade, a necessary element for all of their claims under Section 1 of the Sherman Act (Counts 1, 2, 4, and 5). 15 U.S.C. § 1. The Complaint does not allege any conduct that is *per se* illegal, and it also lacks the plausible market definition needed to claim that the conduct was anticompetitive under a rule of reason analysis. Instead, the Complaint alleges that the purported misconduct occurred in innumerable nationwide markets for *each textbook* assigned in courses sold through Inclusive Access (what Student Plaintiffs call "Textbook Markets")—markets improperly defined by the alleged contractual restraints (i.e., the contracts surrounding universities' implementation of Inclusive Access)—rather than to include all products that could be reasonably substituted for one another. Nor have Student Plaintiffs explained how Inclusive Access programs adversely affected competition in the alleged Textbook Markets.

Third, the monopolization claims against Publishers (Counts 3 and 6) suffer from similar deficiencies. They depend on the same implausible market definition, and they also fail to allege that Publishers engaged in anticompetitive conduct.

Fourth, long-standing Supreme Court precedent bars Student Plaintiffs from pursuing claims for damages (Counts 4, 5, and 6). Their own allegations show that, through the mechanism of Inclusive Access, students purchase course materials directly from universities, not from

Publishers or Retailer Defendants. As indirect purchasers from Defendants, they may not recover damages on any federal antitrust claim. *See Ill. Brick v. Illinois*, 431 U.S. 720 (1977).

Finally, Student Plaintiffs' derivative claims under the laws of 26 states and the District of Columbia (Count 7) rely on the same allegations as their federal antitrust claims and are deficient for the same reasons. For all of these reasons, the Complaint should be dismissed in its entirety.

## STATEMENT OF ALLEGED FACTS

Professors—not publishers or retailers—choose "which products to require" their students to acquire for their classes. SAC ¶ 58. To compete for professors' favor, Cengage, McGraw Hill, and Pearson "employ sales representatives to visit Universities to persuade them to assign the Publisher Defendants' course materials to students." *Id.* ¶¶ 59, 93. If "a University or University department decides to assign a particular publisher's textbook for a particular course, students in that course are required to purchase that same textbook, and no other." *Id.* ¶ 174.

For years, students have been able to buy a new textbook or a used one, or they could rent a copy. SAC ¶¶ 2, 75. Although retailers could rent as well as sell new and used texts, publishers allegedly earned revenues primarily from sales of new textbooks. *Id.* ¶¶ 2-4, 6, 93. When students began to purchase more used textbooks or rent them on the "secondary market," publishers increasingly lost sales, until in 2015, on average, only 25 percent of the students in a course were buying the printed textbook new. *Id.* ¶¶ 74-75. Publishers sought to curb their sinking sales by offering new digital products like e-textbooks, as well as ancillary digital course materials, like quizzes and online homework. *Id.* ¶ 83. They also experimented with new ways of distributing those digital course materials, including what Student Plaintiffs refer to collectively as "Inclusive Access."[1] *Id.* ¶¶ 9, 83, 85. Publishers promote Inclusive Access because, by charging less for

---

[1] In addition to "Inclusive Access," this model has been called by various brand names, such as

course materials, they make more sales and "arrest the decline in profits that resulted from reduced market penetration, declining student spending on textbooks, and stagnant new textbook prices." SAC ¶¶ 94, 152, 165.

Universities and professors also benefit from Inclusive Access, which offers a mechanism for students to access digital textbooks automatically on the first day of class and, for some courses, also delivers related materials (like homework and quizzes) at lower prices than new print textbooks, with the added benefit of charging these costs directly to the students' tuition bills. SAC ¶¶ 130, 152. Inclusive Access is attractive to retailers as well. SAC ¶ 13. When a university gives its faculty the option to assign course materials through Inclusive Access, it ordinarily partners with one or more publishers and its on-campus bookstore (potentially operated by BNED, Follett, or another entity) to provide students with digital access to the assigned materials. *Id.* ¶¶ 6, 9, 42. After a university has made the necessary arrangements, professors can choose for students in their courses to receive the assigned course materials through Inclusive Access. *Id.* ¶ 58 ("Universities and their personnel choose which products to require"); *id.* ¶ 88 ("Decisions regarding which textbooks to assign or purchase must be made by numerous University stakeholders (including academic departments and administrators)."). When professors choose to assign course materials to students via an Inclusive Access program, all students in their classes (other than those who opt out) automatically receive electronic access to their course materials on the first day of class and are charged for them along with their tuition. *Id.* ¶ 129.

Although course materials purchased through Inclusive Access programs sometimes cost more than a standalone rented textbook, SAC App'x. A, that is a false comparison. Inclusive

_____

"Direct Access, IncludED, 'ALL-Inclusive and Digital Direct Access,' 'All Students Acquire,' 'AutoAccess,' 'Immediate Access,' 'First Day Access,' and 'day-one access.'" SAC ¶ 9 n.14.

Access materials often include not only a digital textbook, but also supplemental materials like homework and quizzes.  *Id.* ¶¶ 9, 12, 130.  Student Plaintiffs never allege that students paid more through Inclusive Access for course materials (including homework and quizzes) than they would have paid for an equivalent set of materials obtained through other means.

Despite Student Plaintiffs' characterization of Publishers' individual decisions to offer Inclusive Access as the product of a highly-coordinated "hard switch," SAC ¶ 94, the facts alleged in the Complaint demonstrate that each Publisher developed its Inclusive Access program independently and this option grew organically at different universities and across "different systems and timelines," *id.* ¶ 105.  Student Plaintiffs acknowledge that Publishers experimented with pilot programs in 2014 and 2015, but "did not get much traction." *Id.* ¶¶ 97, 121.  As Student Plaintiffs' own chart demonstrates, Inclusive Access did not really catch on until late in 2015, when the U.S. Department of Education finalized regulations that expressly authorize universities to "include the costs of books and supplies as part of tuition and fees." *See* 80 Fed. Reg. 67,126, 67,195-96 (Oct. 30, 2015) (finalizing 34 C.F.R. § 668.164(c)(2), which is cited in SAC ¶¶ 14 n.19, 22 n.35, 129 n.80); *see also* SAC ¶ 166 (bar graph showing growing numbers of non-profit institutions signed up for Pearson's Inclusive Access programs each year from 2016 to the first half of 2020).  Inclusive Access expanded gradually as different universities and faculty made separate decisions about whether and how to implement Inclusive Access. *See* SAC ¶ 105.  While many universities and faculty saw the benefits of Inclusive Access and opted to expand their programs, others "rolled [them] back." *Id.* ¶ 121 n.74; *see also id.* ¶¶ 166-69.

Even when a school has arranged for students to receive course materials through Inclusive Access, Publishers continue to compete vigorously to have their materials assigned because individual faculty always can assign materials from different publishers or outside of Inclusive

Access, SAC ¶¶ 58-59, 88, in whatever format and from whichever sources they choose. *See id.* ¶ 23 (discussing prices and availability of various formats of the same textbook, ranging from hardcover rental to used purchase to e-book to loose-leaf print purchase and more). Thus, Inclusive Access has increased the options available to universities and faculty, and competition at every level of the course materials supply chain remains robust: Publishers compete to have professors adopt their course materials and Retailer Defendants compete against each other to win exclusive contracts to operate on-campus bookstores. *Id.* ¶¶ 59, 119-24, 182. Retailer Defendants also compete against each other, against online retailers like Amazon and Chegg, and against smaller independent bookstores to sell course materials to students. *Id.* ¶¶ 6, 74.

Against this background of intense and varied competition, Student Plaintiffs seek to represent a putative nationwide class of "students at colleges or graduate schools in the United States who purchased subscriptions to Inclusive Access Materials," SAC ¶ 211, without identifying any specific course materials that they purchased or explaining how those same materials would have cost less outside of Inclusive Access. Student Plaintiffs allege that Defendants have "force[d]" them to purchase course materials via Inclusive Access programs at supracompetitive prices, *id.* ¶ 12, despite acknowledging that their *professors* (not Defendants) select course materials from numerous competing products, *id.* ¶¶ 58-59, 174, and that each Inclusive Access program allows students the opportunity to opt out, *id.* ¶ 12. Student Plaintiffs' allegations also assume that Inclusive Access, rather than reflecting a natural and independent response to common market stimuli described elsewhere in the Complaint, is the product of an elaborately orchestrated conspiracy ostensibly among all Defendants and hundreds of universities across the country to stymie competition and "raise the prices students pay for textbooks." *Id.* ¶¶

11, 41, 83-92, 128, 223-307. Student Plaintiffs seek relief under the Sherman and Clayton Acts, as well as under various state antitrust statutes. Defendants move to dismiss the Complaint in full.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's claim must be "plausible on its face" such that a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Courts must treat the allegations in the Complaint as true, but they "are not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Dane v. United Healthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (quotation marks and alterations omitted); *see also Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged.").

## ARGUMENT

## I.   THE SECTION 1 CLAIMS SHOULD BE DISMISSED (COUNTS 1, 2, 4, AND 5)

Counts 1, 2, 4, and 5 should be dismissed because Student Plaintiffs fail to allege adequately either of the two elements necessary to state a claim under Section 1 of the Sherman Act. *See* 15 U.S.C. § 1. All Section 1 claims require plaintiffs to "show (1) 'a combination or some form of concerted action between at least two legally distinct economic entities' that, (2) 'constituted an unreasonable restraint of trade either per se or under the rule of reason.'" *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 687 (S.D.N.Y. 2013) (quoting *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir. 2000)). Courts analyze Section 1 claims

differently depending on whether the agreements alleged are "horizontal" (i.e., between competitors at the same level of the market structure) or "vertical" (i.e., between firms at different levels of the market structure, such as a manufacturer and a distributor). *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182-83 (2d Cir. 2012).

Student Plaintiffs allege Section 1 violations based on both horizontal and vertical agreements. Counts 1 and 4 claim that all Defendants, along with hundreds of non-party universities, participated in what Student Plaintiffs (wrongly) contend is a single horizontal "Inclusive Access Scheme." *See* SAC ¶¶ 228-29, 261-62. Counts 2 and 5 challenge countless vertical "exclusive agreements" among "each grouping of Defendants involved in each Textbook Market." *See id.* ¶¶ 236-40, 270-74. The claims based on the alleged Inclusive Access Scheme fail to allege a plausible horizontal agreement, and all claims fail to allege an unreasonable restraint of trade. Accordingly, all of Student Plaintiffs' Section 1 claims should be dismissed.

**A. Student Plaintiffs Fail To Allege a Plausible Horizontal Agreement (Counts 1 and 4)**

"The crucial question in a Section 1 case is [] whether the challenged conduct stems from independent decision or from an agreement." *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (internal quotation marks omitted). "At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.*, it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557). This can be accomplished by adequately asserting direct evidence or "circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136 (emphasis in original).

Student Plaintiffs fail to plead direct evidence of any horizontal agreement among Publishers, Retailer Defendants, or all Defendants, much less one joined by hundreds of

universities as well. Direct evidence is "'evidence that is explicit and requires no inferences to establish'" that an unlawful conspiracy occurred, *see In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011)), such as "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Citigroup*, 709 F.3d at 136. The Student Complaint does not identify any document, conversation, or other communication that manifests a horizontal agreement among Publishers, Retailer Defendants, or all Defendants to stifle competition in any market.

Without direct evidence, to survive dismissal, Student Plaintiffs must make "allegations plausibly suggesting (not merely consistent with) agreement." *Twombly*, 550 U.S. at 557. In this Circuit, allegations of parallel conduct and "facts or circumstances" supporting certain "plus factors" can be sufficient to plead circumstantial evidence of an agreement—but only if Student Plaintiffs' allegations "lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137. Here, no inference of conspiracy is plausible because the Complaint explains why it was in each Defendant's independent self-interest to offer Inclusive Access, describes how Inclusive Access programs grew gradually over several years, and lacks any other allegations suggesting a horizontal agreement.

### 1. Student Plaintiffs' Allegations Show That Independent Self-Interest Is an Obvious Alternative Explanation for Each Defendant's Conduct

"An inference of conspiracy will not arise when the conspirators' parallel conduct made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggest competition at least as plausibly as they suggest anticompetitive conspiracy." *Interest Rate Swaps*, 261 F. Supp. 3d at 462 (internal quotation marks, citations, and alterations omitted). Here, no inference of conspiracy arises because "the facts alleged . . . show that independent self-interest is an obvious alternative explanation for defendants' common behavior."

*Id.*; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327-28 (3d Cir. 2010) (same). The Complaint "fail[s] plausibly to suggest that this parallel conduct flowed from a preceding agreement rather than from [each Defendant's] own business priorities." *Citigroup*, 709 F.3d at 138.

To the contrary, Student Plaintiffs describe how, over a period of years, each Publisher experienced "dramatically reduc[ed]" sales of new textbooks, making the old business model of selling print textbooks "unsustainable." SAC ¶¶ 75-77. The decline accelerated in 2016, Student Plaintiffs allege, when each Publisher experienced lower revenue due in large part to the same economic stimulus—"the secondary market"—which represented a "massive 'disruptor' for the industry" and a "grave threat." *Id.* ¶¶ 3, 74, 78, 79, 83. As Student Plaintiffs allege, these industry-wide pressures naturally incentivized each Publisher to pursue digital offerings. *Id.* ¶¶ 29, 84. Around the same time, Inclusive Access programs became more attractive to universities because the U.S. Department of Education promulgated new regulations that permitted them to implement a key aspect of those programs—adding fees for course materials to student tuition bills. *See* 80 Fed. Reg. 67,126, 67,195-96 (Oct. 30, 2015) (finalizing 34 C.F.R. § 668.164(c)(2), which permits universities to "include the costs of books and supplies as part of tuition and fees").

The Complaint concedes that these market conditions created strong economic incentives for each Publisher individually to move "from a business model based on the sale of print textbooks . . . to one based on digital subscriptions"—irrespective of the actions of its competitors. SAC ¶ 84. Student Plaintiffs point out that Inclusive Access programs were significantly more profitable for each Publisher due to increased unit sales and lower costs. *Id.* ¶ 154, 170; *see also id.* ¶ 165 (Inclusive Access has "allowed the Defendants to arrest the decline in profits"). These "independent responses to common stimuli," *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp.

3d 547, 580 (S.D.N.Y. 2017), provide an "obvious alternative explanation" to collusion. *Twombly*, 550 U.S. at 567.

While admitting that offering the Inclusive Access mechanism to universities was in Publishers' self-interest, Student Plaintiffs speculate that, "if any individual publisher had moved, on its own, to introduce . . . Inclusive Access, that publisher . . . would have risked losing sales to competitors willing to sell textbooks in multiple formats, including . . . print format." SAC ¶ 88. That claim wrongly assumes that *offering* Inclusive Access equates to a *refusal* by each Publisher to sell printed textbooks or other course materials, an assumption contradicted by Student Plaintiffs' own allegations showing that Inclusive Access was one of a number of options that Publishers made available to universities and faculty, each with its own "features and benefits." *Id.* ¶ 59. Indeed, the Complaint's allegations about the slow growth of Inclusive Access over several years demonstrate that Publishers simultaneously offered course materials through Inclusive Access programs and outside of Inclusive Access. *See id.* ¶¶ 166-68. The success of each Publisher's Inclusive Access program did not depend on whether other Publishers followed suit; if anything, any given Publisher's program would have been more successful if none of its competitors had offered Inclusive Access because that Publisher would have provided the only Inclusive Access option for universities and professors that wanted to participate.

Student Plaintiffs concede that each Publisher's objective is simply to sell "as many units as possible," SAC ¶ 117, and that Inclusive Access programs allow them to do just that, *see id.* ¶ 13 (alleging that "almost 100 percent" of students purchase course materials when enrolled in courses for which professors have adopted Inclusive Access). They concede that adopting Inclusive Access increases each Defendant's sales, contradicting Student Plaintiffs' conclusory contention that "[a]rtificially reducing the output of print textbooks would contravene the

independent economic self-interest of any individual Publisher Defendant." *Id.* ¶ 15. In fact, the Complaint alleges that it *would* be in each Publisher's independent self-interest to reduce sales of print textbooks and increase sales of other formats of course materials because the availability of print textbooks fuels the secondary market. *See id.* ¶¶ 15, 141.

Since each Publisher's objective is simply to sell "as many units as possible," SAC ¶ 117, there is no basis for Student Plaintiffs' conclusion that, "[a]bsent the Scheme, any individual Publisher Defendant's refusal to sell Inclusive Access materials to independent retailers (while other publishers did) would have been contrary to its economic self-interest in selling course materials to as many retailers as possible." *Id.* ¶ 87. Nothing in the Complaint suggests that any Publisher would have sold more units by allowing more retailers—independent or not—to distribute its course materials through Inclusive Access programs. To the contrary, Student Plaintiffs allege that existing arrangements allow Publishers to reach almost every student enrolled in courses for which professors have adopted Inclusive Access without involving independent retailers. *Id.* ¶ 12.

Likewise, Student Plaintiffs do not assert that any Retailer Defendant acted against its own self-interests. Instead, their allegations show the opposite—that each Retailer Defendant independently benefited from Inclusive Access programs through higher revenue resulting from increased unit sales. SAC ¶ 13 (Inclusive Access has allowed Retailer Defendants to sell to "almost 100 percent" of students, when previously "only about 35 percent of students purchased their course materials through them"); *id.* ¶ 19 (Retailer Defendants "directly benefit" from Inclusive Access); *id.* ¶ 20 ("Inclusive Access is a win for the Publisher and the Retailer Defendants"). These financial benefits do not depend upon both Retailer Defendants agreeing to offer Inclusive Access programs. As Inclusive Access is described in the Complaint, each

university relies on only one Retailer Defendant to implement its Inclusive Access program, *see id.* ¶ 123, so both Retailers *cannot* be necessary for the program to succeed at any given university.

Because Defendants' alleged conduct "made perfect business sense," and Student Plaintiffs themselves have pleaded "obvious alternative explanations for the facts alleged," no plausible inference of conspiracy arises from their allegations. *See Interest Rate Swaps*, 261 F. Supp. 3d at 462 (internal quotation marks and citations omitted). The horizontal conspiracy claims should be dismissed on this basis alone.

### 2. Student Plaintiffs Do Not Allege Parallel Conduct

Counts 1 and 4 also should be dismissed because Student Plaintiffs do not plead parallel conduct that could support an inference of horizontal agreement. Setting aside the Complaint's conclusory (and false) allegations that Publishers launched their Inclusive Access programs at the same time, SAC ¶ 18, its specific fact-based allegations actually show that Publishers introduced their programs at differing times over a three-year period. For instance, the Complaint alleges that one or more unspecified Publishers began offering pilot programs "in 2014 and 2015," *id.* ¶ 121; *see also id.* ¶ 149 n.92, that McGraw Hill launched a precursor program in 2015, *id.* ¶ 97, and that Cengage and Pearson launched their Inclusive Access programs in 2016. *Id.* ¶¶ 98-99.

Student Plaintiffs also acknowledge that "hundreds" of universities gradually and individually adopted Inclusive Access programs over at least a five-year period—a trend that continues to the present. SAC ¶¶ 111, 166-68. The Complaint includes a graph purporting to show that the number of institutions offering Pearson's Inclusive Access program was comparatively low in 2016 and steadily increased each year to 2020. *Id.* ¶ 166. Another graph likewise purports to show the gradual increase in McGraw Hill's "Inclusive Access Net Sales" from 2017 to 2020. *Id.* ¶ 167. These allegations demonstrate that many universities and professors waited *years* before deciding to begin offering Inclusive Access, and "[a]llegations of such slow

adoption of similar policies does not raise the specter of collusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195-96 (9th Cir. 2015) (finding no parallel conduct where, "according to the complaint, the manufacturer defendants adopted the policies over a period of several years, not simultaneously"); *see also LLM Bar Exam*, 271 F. Supp. 3d at 579 (no evidence of parallel conduct because the complaint "makes plain that these schools banned [plaintiffs] from marketing on their campuses *at different times over the span of several years*") (emphasis added); *cf. In re Elec. Books Antitrust Litig.* ("*eBooks*"), 859 F. Supp. 2d 671, 683 (S.D.N.Y. 2012) (parallelism plausibly alleged because, *inter alia*, each defendant "signed [] an agreement with Apple *in the days leading up* to the January 27, 2010 iPad Launch event") (emphasis added).

Apart from the alleged temporal parallelism, Student Plaintiffs also claim that supposed similarities in certain contractual provisions suggest a larger conspiracy among Defendants. *See* SAC ¶¶ 111-25. On their faces, the contracts are not as similar as Student Plaintiffs assert. *See, e.g.*, Declaration of J. Quinn-Barabanov ("JQB Decl.") Exs. A, B, C; *see also infra* note 7. But even if they were, "similar contract terms" are insufficient to plausibly infer a horizontal agreement because they "can reflect similar bargaining power and commercial goals (not to mention boilerplate)." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).

### 3. Student Plaintiffs Do Not Allege Plus Factors

Even if Student Plaintiffs had alleged parallel conduct (which they do not), such allegations are "not enough to survive a motion to dismiss" by themselves because they would "risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy." *See Citigroup*, 709 F.3d at 137. Rather, "parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement." *Id.* (internal quotation marks omitted). The Second Circuit recognizes that the necessary context may be supplied by "plus factors," including (1)

whether "evidence . . . shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators"; (2) whether the alleged co-conspirators had "a common motive to conspire"; and (3) whether there is "evidence of a high level of interfirm communications." *Id.* at 136. The Court should dismiss the complaint when consideration of plus factors can "lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Id.* at 137 (internal quotation marks omitted).

**Student Plaintiffs Fail To Allege Action Against Self-Interest.** The Complaint does not plausibly plead that it was against the individual economic self-interest of any Publisher or either Retailer Defendant to offer Inclusive Access, regardless of what other Publishers and the other Retailer Defendant chose to do. Action against self-interest can be shown where, for example, defendants appear to forego individual profits for the sake of participating in the alleged conspiracy. *Cf. Interest Rate Swaps*, 261 F. Supp. 3d at 477 (explaining that conduct was not against self-interest where alleged individual co-conspirators' overall profits were enhanced, even where they gave up smaller amounts of fees). As discussed above, however, the facts alleged here reveal the opposite: each Defendant acted in its own independent economic self-interest in response to a common set of market conditions—increased competition from used and rental course materials. *See supra* Part I.A.1.

**Defendants' Alleged Motives Do Not Suggest Agreement.** Student Plaintiffs' claim that Defendants share an "incentive to destroy the secondary marketplace" merely restates that Publishers faced common market and regulatory conditions and, as a result, it was in each Publisher's *independent* self-interest to move to a digital format that would decrease or eliminate the secondary market for *its own products*, regardless of actions taken by other Publishers. *See*

SAC ¶¶ 79-80; *see also supra* Part I.A.1. So too for Retailer Defendants, which each independently benefited from offering Inclusive Access. *See* SAC ¶¶ 19, 20, 92. None of this suggests that any companies reached a horizontal agreement, as there is simply nothing surprising or suspicious about all Defendants wanting to reduce used book sales to increase their own sales. As the Second Circuit has explained, "evidence that the defendant had a motive to enter into an antitrust conspiracy may indicate simply that the defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Citigroup*, 709 F.3d at 139 (internal quotation marks omitted); *see also* SAC ¶ 64 (alleging "[t]he oligopolistic structure of the publishing industry").

In contrast, the *eBooks* plaintiffs alleged that defendants' common motive to conspire was based on their need to work together because otherwise, Amazon would have prevented them from independently achieving their business objective. *See eBooks*, 859 F. Supp. 2d at 675 (explaining that defendants "believed they could not successfully pressure Amazon [] to increase prices for eBooks on their own, so they conspired to do so together"). Here, Student Plaintiffs have failed to provide any sensible explanation for why any Publisher or Retailer Defendant could not have successfully offered Inclusive Access on its own, regardless of whether its competitors did so, too. And offering an Inclusive Access program would have given a Publisher a *greater* competitive edge in winning adoptions from professors who value the opportunity for their students to receive discounted access to the assigned digital course materials on the first day of class, if none of its competitors offered anything similar. *See supra* Part I.A.1.

**Student Plaintiffs Fail To Plead Interfirm Communications.** The Complaint does not allege even a single communication about Inclusive Access between Publishers, between Retailer Defendants, or between all Defendants—let alone the "high level" of communication necessary to

suggest a horizontal agreement. At most, the Complaint alleges that Publishers and/or Retailer Defendants were common members in several trade organizations and industry groups, SAC ¶¶ 101-09, and Student Plaintiffs concede that most of those organizations served purposes unrelated to Inclusive Access.[2] For example, Student Plaintiffs point to Publishers' participation in the Educational Publishers Enforcement Group (EPEG)—along with other publishers that are not alleged conspirators—to develop anti-counterfeiting best practices, and they concede that EPEG did promulgate such best practices. *Id.* ¶¶ 106-07. Further, Student Plaintiffs do not allege that Defendants actually reached a horizontal agreement, or otherwise conspired or colluded through these groups, only that EPEG presented an "opportunity" to conspire. *Id.* ¶¶ 101, 103, 108, 110. And "a mere opportunity to conspire at legitimate meetings does not support an inference that an illegal combination actually occurred." *Interest Rate Swaps*, 261 F. Supp. 3d at 471 (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 567 n.12 ("belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

The absence of allegations concerning interfirm communications is particularly revealing in light of Student Plaintiffs' claim that hundreds of universities participated in the alleged conspiracy. SAC ¶¶ 11, 111. Conspiracies with many members often must use "express methods

---

[2] Although the Complaint discusses conferences sponsored by the "Inclusive Access Conference Consortium," SAC ¶¶ 103, 110, the press release relied on by Student Plaintiffs to support those allegations discusses a conference organized by third parties RedShelf and indiCo, without mentioning any Defendant. *See id.* ¶ 103 n.73 (citing https://www.businesswire.com/news/home/20170817005841/en/RedShelf-indiCo-Co-host-2017-Inclusive-Access-Conference). The Court may consider this press release on a motion to dismiss because Student Plaintiffs have "actual notice" of the announcement and "relied upon [it] in framing the complaint." *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

of communication" because it is too "difficult to organize secret meetings or other communications." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2002f1 (4th ed. 2013). But the Complaint is devoid of any plausible explanation as to how so many firms, at three levels of the distribution chain, agreed with each other, detected defections, and punished cheaters. The Complaint also lacks any allegation as to how the hundreds of alleged conspirators coordinated over time as Inclusive Access programs changed or any plausible reason why hundreds of universities, many of which are non-profit or public institutions, would join a conspiracy to their students' alleged detriment. Such a far-flung, fantastical conspiracy is simply implausible on its face.

Because Student Plaintiffs have failed to "allege enough facts to support the inference that a conspiracy actually existed," *Citigroup*, 709 F.3d at 136, their Section 1 claims premised on a horizontal agreement (Counts 1 and 4) should be dismissed.[3]

## B. Student Plaintiffs Fail To Allege an Unreasonable Restraint of Trade (Counts 1, 2, 4, and 5)

Even if Student Plaintiffs had pled *some* agreement, Section 1 "prohibits only agreements that *unreasonably* restrain trade." *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (emphasis in original). In evaluating the reasonableness of an agreement, courts apply either the *per se* rule or a rule of reason analysis. *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 687-88 (S.D.N.Y. 2013). Here, the *per se* rule does not apply to any of the conduct alleged to violate Section 1. Student Plaintiffs' claims also fail under a rule of reason analysis because they have

---

[3] Student Plaintiffs' failure to allege a horizonal agreement is also fatal to any claim premised on an alleged "hub-and-spoke" conspiracy. *See United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (requiring "both vertical agreements between the hub and each spoke *and a horizontal agreement among the spokes*") (emphasis added); *see also* SAC ¶¶ 84, 111 (characterizing Publishers as the "hub").

not properly defined Textbook Markets and they have not adequately alleged adverse effects on competition in those markets.

### 1. Student Plaintiffs Fail To Allege Any *Per Se* Violation

Student Plaintiffs claim that three types of alleged conduct are *per se* Section 1 violations: (1) establishing and operating Inclusive Access; (2) engaging in a group boycott; and (3) tying the sale of e-textbooks to quizzes and assignments. SAC ¶ 171. All of these claims fall outside the "narrow" categories of activity that qualify for *per se* treatment. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 8 (2006). Because Student Plaintiffs fail to allege *per se* unlawful conduct, all of their Section 1 claims must be analyzed under the rule of reason. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*") ("Restraints that are not unreasonable *per se* are judged under the rule of reason.") (internal quotation marks omitted); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (explaining that the rule of reason applies "outside the[] narrow, carefully demarcated categories held to be illegal per se").

***Establishing and Operating Inclusive Access.*** Student Plaintiffs allege that Publishers and Retailer Defendants, along with hundreds of independent universities, "colluded to establish and operate the Inclusive Access system." SAC ¶ 171; *see also id.* ¶¶ 14, 129. But the introduction of a new sales mechanism is not the type of conduct to which the *per se* rule applies. Quite the opposite: a defendant is "not forbidden from improving his efficiency in manufacturing or marketing, even though the effect of doing so will be to maintain or improve his sales." *Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701, 712 (7th Cir. 1977); *cf. Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979) ("[E]ven a monopolist, may generally bring its products to market whenever and however it chooses."); *AstraZeneca AB v. Mylan Labs., Inc.*, 2010 WL 2079722, at *6 (S.D.N.Y. May 19, 2010) (recognizing that "introducing new products— is generally considered pro-competitive").

***Group Boycott.***  Student Plaintiffs claim that Publishers "engag[ed] in a group boycott of . . . independent retailers," SAC ¶¶ 228(1), 261(1), but the *per se* approach to group boycotts "has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986); *see also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978) ("While the boycott concept is infinitely expandable, the Per se doctrine ought not to be.") (internal quotations omitted).  Here, the Complaint does not allege that Publishers tried to prevent the independent bookstores from dealing with Publishers' competitors (e.g., Macmillan, Wiley, Sage), so the *per se* rule does not apply.

***Tying.***  Although Student Plaintiffs accuse Publishers of "tying the sale of Inclusive Access e-textbooks . . . to the sale of Ancillary Required Course Materials," like homework and quizzes, SAC ¶¶ 228(2), 261(2); *see also id.* ¶ 177, their Complaint fails to allege two of the essential elements of any tying claim (whether *per se* or rule of reason).  *First*, Student Plaintiffs do not allege facts showing that Ancillary Required Course Materials (the alleged tying product) are sold separately from printed or digital textbooks (the alleged tied product), or that they are a "separate product" in a "separate and distinct product market[]." *See* SAC ¶ 131; *Kaufman v. Time Warner*, 836 F.3d 137, 141, 145 (2d Cir. 2016).  The Complaint is "[n]otably lacking . . . any allegation that there has ever been separate sales" of the tying and tied products).  Nor do Student Plaintiffs allege "the sale of products separately in similar markets." *Id.* at 145.  There are simply no allegations of "sufficient demand for the purchase of [Ancillary Required Course Materials] separate from [digital textbooks]." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984).  Instead, Student Plaintiffs allege the opposite: "[p]rior to Inclusive Access, Ancillary

Required Course Materials were either drafted by faculty members or other University employees or were given to faculty by textbook publishers." SAC ¶ 131.

*Second*, the Complaint fails to allege that "the tie-in has anticompetitive effects in the tied market." *See Kaufman*, 836 F.3d at 141. In alleging the Textbook Markets for the tied products, however, Student Plaintiffs assert that "once a University . . . decides to assign a particular publisher's textbook for a particular course, students in that course are required to purchase that same textbook, *and no other*." SAC ¶ 174 (emphasis added); *id.* ¶ 179. Because each e-textbook is "available from only one" Publisher whether there was a tying arrangement or not, "there can be no anticompetitive effects" in any alleged Textbook Market. *See United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 399 (S.D.N.Y. 2001); *see also Cancall PCS, LLC v. Omnipoint Corp.*, 2001 WL 293981, at *4 (S.D.N.Y. Mar. 26, 2001) (dismissing tying claim when defendant "had a monopoly" over tied product because the "alleged tie did not foreclose any [tied product] sales by any other entity"); *Friedman v. Adams Russell Cable Servs.-New York, Inc.*, 624 F. Supp. 1195, 1196 (S.D.N.Y. 1986) ("no competitor is harmed" when "defendant enjoys an absolute lawful monopoly in the relevant . . . market for the tied product"); *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1291 (2d Cir. 1974) (plaintiff could not "demonstrate an anti-competitive effect in the tied . . . market" when "there were neither actual nor potential competitors").

## 2. Student Plaintiffs Fail To Define a Plausible Relevant Market

Because the alleged conduct "is not per se illegal, [Student Plaintiffs'] claims are subject to a rule of reason analysis." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 211 (2d Cir. 2018). "[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the

relevant market."[4]  *Amex*, 138 S. Ct. at 2285; *see also City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act . . . , a plaintiff must allege a plausible relevant market in which competition will be impaired.").  A relevant market consists of two components: a product market and a geographic market.  *Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).  Here, Student Plaintiffs base their claims on implausible nationwide Textbook Markets, SAC ¶¶ 172-73, and both the product and geographic dimensions of those markets are flawed.

The product dimension of Student Plaintiffs' Textbook Markets fails the basic requirement that markets must include all products that are reasonably interchangeable with each other.  "[T]o survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible."  *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008).  In other words, products are only in the same relevant market when "consumers treat them as 'acceptable substitutes'" for one another.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  As a result, Student Plaintiffs' definition of "the markets for *each* textbook assigned in courses subject to Inclusive Access" impermissibly limits the product market in two ways.  SAC ¶ 172 (emphasis added).

*First*, a single product is not a "relevant market" simply because it might differ in some respects from competing products.  It is well established that a "differentiated product within a

---

[4] Even if the *per se* rule applied to some part of their Section 1 claims, Student Plaintiffs' failure to define a plausible relevant market would still be fatal to Counts 1, 2, 4, and 5.  *See Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 765 n.5 (S.D.N.Y. 2020) ("But, it is an element of a per se case to describe the relevant market in which [courts] may presume the anticompetitive effect would occur. . . . Thus, regardless of which standard applies, [the plaintiff] must articulate a relevant market.") (internal citations omitted).

product class is presumptively not a separate market." Areeda & Hovenkamp, *supra*, ¶ 563d; *see also In re Am. Express Anti-steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) ("It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single brand markets."). Student Plaintiffs cannot plausibly allege, on the one hand, that "Publishers compete for University business" by sending "sales representatives to visit Universities to persuade them to assign the Publisher Defendants' course materials," SAC ¶ 59, and then argue there are no reasonable substitutes for a single textbook. The Complaint offers the example that McGraw Hill seeks to persuade professors to adopt its "popular textbook, *Economics*" by McConnell (and others) rather than Cengage's *Principles of Microeconomics* by Mankiw. *See* SAC ¶¶ 23, 155 App. A, 174. Having admitted that professors can and do choose between textbooks covering the same subject matter, it is simply implausible that "each textbook" should be isolated in a separate relevant product market. *Cf. Hack v. President and Fellows of Yale College*, 237 F.3d 81, 86-87 (2d Cir. 2000) (rejecting single brand "Yale education" market because "there are many institutions of higher learning providing superb educational opportunities" to prospective students).

Student Plaintiffs' description of their Textbook Markets – which place McConnell's, Mankiw's and *every other economics textbook* in separate markets – denies this commercial reality. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) (market definition must "correspond to the commercial realities of the industry") (internal quotation marks omitted); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482-83 (S.D.N.Y. 2001) (dismissing claim based on "artificially constricted market definition"). The Complaint alleges that students cannot substitute between textbooks (such as McConnell and Mankiw) after their professors have

assigned one, *see* SAC ¶ 174, but if each textbook constitutes a separate relevant product market, then the Publishers do not compete with each other and therefore, could not have conspired to harm competition. *See also infra*, Part I.B.3.

*Second*, the alleged Textbook Markets are purportedly comprised of only the digital course materials that professors have "assigned in courses subject to Inclusive Access" and exclude all other formats, such as the digital formats available outside of Inclusive Access and all printed formats (*i.e.*, new, used, and rental). *See* SAC ¶ 172. But a "court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 414 F. App'x 372, 377 (2d Cir. 2011) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997)).

Here, Student Plaintiffs admit there are substitute products because, "once a professor . . . assigns a particular textbook, . . . students can *functionally substitute* for new editions of that textbook [with] used or electronic versions of that same textbook, or in some cases, an earlier version of the textbook." SAC ¶ 251 (emphasis added); *see also* SAC ¶ 22 ("Inclusive access textbooks are, in fact, *more expensive* **than interchangeable products**. . . ") (emphasis added). They also recognize that Publishers' sales suffered because students substituted away from new textbooks in favor of used and rental textbooks from the secondary marketplace. *Id.* ¶¶ 2, 74-76. In addition, they concede that, "*[p]rior to Inclusive Access*," the secondary market constrained pricing of new course materials, *id.* ¶ 176 (emphasis added), and that the secondary market would continue to provide "functional[] substitute[s] . . . *absent the Inclusive Access restrictions*." *Id.* ¶ 174 (emphasis added); *see also id.* ¶ 177 ("In each Textbook Market, the [Inclusive Access]

Scheme blocks competition from the secondary marketplace."); *id.* ¶ 111 (describing contracts used to "effectuate the Inclusive Access Scheme").

Having admitted that course materials available outside of Inclusive Access are interchangeable substitutes for those available through Inclusive Access, Student Plaintiffs cannot define a plausible product market that includes only course materials provided through Inclusive Access and excludes products provided through all other formats. *See Smugglers' Notch*, 414 F. App'x at 377; *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 2014 WL 3739322, at *10 (S.D.N.Y. July 28, 2014) (dismissing complaint because plaintiffs defined a market based on a "contractually created class of consumers") (internal citations omitted); *cf. Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621-22 (S.D.N.Y. 2013) (dismissing claim based on market for e-books because "print books are an obvious potential substitute for e-books" and plaintiffs did not allege that "print books and e-books are not, in consumers' minds, 'acceptable substitutes'").

The geographic market described in the Complaint also is irreconcilable with the proposed product market. If each "Textbook Market" includes only "each textbook assigned in [a] course[] subject to Inclusive Access," *see* SAC ¶ 172, then "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product" would be limited to the vicinity of each university. *See Concord Assocs.*, 817 F.3d at 53; SAC ¶ 183 (alleging that "students at one University cannot purchase Inclusive Access textbooks from another University's bookstores, and generally cannot purchase them from any source other than their own on-campus bookstore."). Put another way, if the "relevant geographic market is the United States," *id.* ¶ 230, then the product markets must include more than just the course materials available through Inclusive Access. But if the relevant geographic market is defined by the allegations that students

can obtain course materials only from their own on-campus bookstores, *id.* ¶ 183, then the geographic market must be narrower than the entire United States. Student Plaintiffs cannot have it both ways. *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001) (dismissing complaint, in part, because the alleged geographic market is "contradictory").

### 3. Student Plaintiffs Fail To Allege Adverse Effects on Competition

"The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff . . . allege an actual adverse effect on competition." *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018) (internal quotation marks omitted); *see also Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) ("Under rule of reason[] analysis, an agreement will not violate the antitrust laws unless it can be shown that it will have an actual adverse effect on competition in the relevant market.").

Here, the Complaint contains no allegations whatsoever that competition between the Retailer Defendants has been reduced. Instead, it highlights that the Retailer Defendants compete with each other and other retailers by offering universities "large upfront payments . . . in exchange for being named on-campus bookstore operators" and that those payments have "ballooned" because of the fierce competition among retailers for the "higher sales" that would come from Inclusive Access. SAC ¶ 92; *see also id.* ¶¶ 6, 13, 19. Having failed to allege either a *per se* or rule of reason violation, each of Student Plaintiffs' Section 1 claims should be dismissed

Student Plaintiffs concede that the Publishers compete vigorously by "market[ing] course materials directly to Universities" and "employ[ing] sales representatives to visit Universities to persuade them to assign the Publisher Defendants' course materials to students." SAC ¶ 59. Student Plaintiffs pointedly do not allege that Publishers reduced their competition with each other and other publishers to have their titles adopted. The only alleged effect of Inclusive Access is that it limits the number of retailers who might sell a Publisher's course materials once a professor

has adopted the materials. *See, e.g.*, SAC ¶¶ 93-94 (describing "tectonic shift" from "[c]ompetition between retailers" to sales made "exclusively via on-campus bookstores"). But this does not have the adverse effect on interbrand competition that Student Plaintiffs' claims require. At most, it reflects a choice by a Publisher to distribute course materials through one sales model over another. That might impact intrabrand competition, but it would have no effect on competition among publishers. And "[t]o prevail on a § 1 claim, a plaintiff must . . . show more than just an adverse effect on competition among different sellers of the same product ('intrabrand' competition)." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("[T]he primary purpose of the antitrust laws is to protect interbrand competition."); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013) ("inhibitions on intrabrand competition . . . lie far from . . . core § 1 violations"); *Elecs. Commc'ns Corp.*, 129 F.3d at 245 (affirming dismissal where plaintiff pled, "at most, a slight reduction in competition . . . regarding the distribution of" one brand); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 72 (E.D.N.Y. 2006) ("So long as the exclusive dealing arrangement between the [Manufacturer] and the Retail Defendants does not prevent *competing brands'* access to the market in whatever quantities customers demand, it is unclear that the relationship imposes any negative restriction on competition in the market whatsoever.") (emphasis added).

Student Plaintiffs' unsupported allegations concerning "higher prices" are not enough to plead an adverse effect on competition. SAC ¶¶ 187-88. As an initial matter, Student Plaintiffs have not alleged facts to support their conclusory assertion that prices for the course materials purchased through Inclusive Access are any higher than prices for the same materials available elsewhere. Indeed, they have not identified any course materials that they allegedly were required

to buy, much less that they could have obtained those materials elsewhere for less. And the price comparisons alleged in Appendix A to the Complaint misleadingly suggest that rental materials (columns B through E) are equivalent to Publishers' Inclusive Access offerings (column A), even though Student Plaintiffs allege that the course materials provided through Inclusive Access frequently include additional materials like homework and quizzes, *see id.* ¶¶ 12, 57, 130, 155, while rental materials do not. As a more apt comparison, Student Plaintiffs allege that one McGraw Hill title can be "rented as an e-textbook for 180 days for $55" outside of Inclusive Access, SAC ¶ 23, while McGraw Hill's Inclusive Access agreement with San Diego State University offers a longer, one-year e-book rental for just $35, *see* SAC ¶ 115. U.S. Department of Education regulations *require* that prices be "below competitive market rates" for course materials available through Inclusive Access. *See* 34 C.F.R. § 668.164(c)(2)(i)(A) (2020). Consistent with the regulations, the other contracts cited in the Complaint provide discounts, *see, e.g.*, JQB Decl. Ex. A ¶ 4.1 ("[McGraw Hill] shall provide access for each of the Registered Students in each Course for the discounted fees set forth in Exhibit A."); *id.* Ex. B, at 9 (providing 20-25% discounts off then-current prices for Pearson products); *see also infra* note 7.

Even accepting the claims of higher prices at face value, such allegations are insufficient to state a rule of reason claim in this Circuit. In *E & L Consulting, Ltd. v. Doman Industries Ltd.*, 472 F.3d 23 (2d Cir. 2006), a distributor brought a Section 1 claim against a monopolist lumber company that stopped selling to it after entering an exclusive arrangement with a different distributor. Although the plaintiff alleged that end consumers of lumber "have fewer options . . . and are now required to pay artificially inflated prices," the Second Circuit held that there was "not a sufficient allegation of harm to competition" because there was "no increase in the restriction of output" or "resultant misallocation of resources." *Id.* at 29-30. So too here: Student Plaintiffs

concede that Publishers developed Inclusive Access programs not to restrict, but to increase, their output (i.e., sales of course materials), *see* SAC ¶ 165 (alleging that Inclusive Access "is working" to increase Defendants' "market penetration"), and antitrust law allows them to choose how to distribute that output. *See E & L Consulting*, 472 F.3d at 29-30.

## II.   THE SECTION 2 CLAIMS SHOULD BE DISMISSED (COUNTS 1 THROUGH 6)

Each of Student Plaintiffs' claims purports to allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and each should be dismissed. Counts 1, 2, 4, and 5, which combine a conspiracy-to-monopolize theory under Section 2 with a restraint-of-trade theory under Section 1, *see* SAC ¶¶ 225, 236, 258, 270, fail for the same reasons that the Section 1 theory fails. *See supra* Part I; *see also In re Elevator Antitrust Litig.*, 502 F.3d at 50 (affirming dismissal of conspiracy claims under Section 1 and Section 2 because "plaintiffs are unable to allege facts that would provide plausible grounds to infer an agreement") (internal quotation marks omitted).

Counts 3 and 6 charge Publishers—but not Retailer Defendants—with monopolizing unspecified Textbook Markets. SAC ¶¶ 249-250, 283-284. Those claims should be dismissed because Student Plaintiffs have failed to define the relevant markets properly, *see supra* Part I.B.2, and for the independent reason that they have failed to identify any anticompetitive Publisher conduct. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.").

*First*, the Publisher conduct highlighted in the Complaint—"excluding . . . independent retailers through imposition of the Inclusive Access Scheme," SAC ¶ 252; *see also id.* ¶ 286—is not actionable. "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal,'" *Trinko*, 540 U.S. at 408

(quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)), and the Complaint does not allege the "limited circumstances" under which a refusal to sell can give rise to Section 2 liability, *see Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Such a claim would require allegations that Publishers had previously sold course materials through Inclusive Access to "independent retailers" in a prior "voluntary (and thus presumably profitable) course of dealing." *See Trinko*, 540 U.S. at 409. But the Complaint nowhere alleges such a prior course of dealing in Inclusive Access, much less that Publishers sacrificed short-term profits by changing past practices. To the contrary, it claims that Publishers "refuse to sell Inclusive Access Materials to any retailers other than official on-campus bookstores," SAC ¶ 86, and that doing so has allowed them "to preserve and increase their profits," *id.* ¶ 170.

*Second*, the Complaint does not show that Inclusive Access has reduced competition among Publishers. Student Plaintiffs do not allege that the competition for faculty adoptions (*see* SAC ¶ 59) has diminished since Publishers began offering Inclusive Access, nor do they allege post-adoption competition among Publishers has changed either. As demonstrated above, the Complaint acknowledges continued competition among Publishers to place their education materials in university courses. *See supra* I.B.3. These failures to allege anticompetitive conduct are an additional ground for dismissing the monopolization claims against Publishers (Counts 3 and 6).

## III. STUDENT PLAINTIFFS LACK ANTITRUST STANDING (COUNTS 4, 5, AND 6)

*Illinois Brick bars these indirect purchaser claims.* Student Plaintiffs' claims for damages (Counts 4-6) are barred under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The Supreme Court has long held that indirect purchasers—those who purchase from intermediaries, rather than directly from colluding manufacturers—do not have standing to seek overcharge damages. *Id.* at 736. The Court reasoned that "the antitrust laws will be more effectively enforced" by direct

purchasers, as indirect purchasers' claims would "weigh[] down treble-damages actions" with the "massive evidence and complicated theories" required to trace the effects of an overcharge. *Id.* at 735, 741. The Supreme Court recently reaffirmed the "bright line" bar on indirect-purchaser actions, holding again that a purchaser may sue only "when there is no intermediary between the purchaser and the antitrust violator." *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1522 (2019); *see also Simon v. KeySpan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012) ("The Supreme Court has . . . established a general rule that the direct purchaser is the only appropriate antitrust plaintiff.").

Student Plaintiffs' damages claims fail because they purchase directly from the universities. In an attempt to obfuscate, they now allege "[m]any" (but not all) students "engage in unmediated transactions with publishers" (whatever that means). SAC ¶ 194. But they continue to acknowledge elsewhere that *universities* "market, solicit, and obtain orders" from students, SAC ¶ 204, automatically subscribe students to Inclusive Access when they register for classes, *id.* ¶¶ 14, 129, 177, and bill students for course materials "included in a course charge or tuition," SAC ¶ 155 n.100; *see also* ¶¶ 14, 129.[5] Because the universities are intermediaries, under *Illinois Brick*, Student Plaintiffs have no damages claim against any of the Defendants.

Courts regularly dismiss consumer complaints against indirect sellers in analogous situations. For instance, in *Howard Hess Dental Laboratories Inc. v. Dentsply International*, *Inc.*, 424 F.3d 363 (3d Cir. 2005), customers who received "drop shipments" of orders directly from the defendant manufacturer were nevertheless held to be indirect purchasers because they paid

---

[5] Student Plaintiffs fail to explain how Plaintiff Kira Cloonan's alleged direct purchase from Pearson, made through Pearson's website or by other means, qualifies as Inclusive Access, whose signature characteristics, according to the Complaint, include automatic subscription and direct billing by the university. *See* SAC ¶¶ 33, 9, 129. Student Plaintiffs' direct purchase allegations, devoid of any facts as to how they are allegedly made or relate to Inclusive Access, are hopelessly confused and do not state a coherent antitrust claim.

intermediary dealers (not the manufacturer) for their orders. As indirect purchasers, those customers could not pursue damages claims against the manufacturer because the manner of delivery did not "affect the economic substance of the transaction." *Id.* at 372-73. Similarly, in *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006), the court held that *Illinois Brick* barred the plaintiffs' damages claim against Microsoft for licensed software. Focusing on "the economic realities of the transaction," the court explained that the plaintiffs "acquired their licenses by purchases from [original equipment manufacturers ("OEMs")] and retailers, paying them, not Microsoft, for their licenses at prices set by the OEMs and retailers." *Id.* at 320-21. As in *Howard Hess* and *Microsoft*, the economic "substance" and "realities" alleged in the Complaint—students paying universities for the course materials made available through Inclusive Access—establish that Student Plaintiffs cannot overcome the *Illinois Brick* bar.[6]

Student Plaintiffs' conclusory assertions that they made direct purchases from Publishers and Retailers are not only inconsistent with their own factual allegations demonstrating that they purchase from the universities, SAC ¶ 155 n.100; ¶¶ 14, 129, 177, but are belied by the very contracts excerpted in the Complaint. *See* JQB Decl. ¶ 4 & Ex. A (McGraw Hill-San Diego State University contract cited in SAC ¶ 117); *id.* ¶ 5 & Ex. B (Pearson-University of Florida contract cited in SAC ¶ 116).[7] These contracts make clear that the *universities* purchase from the

---

[6] By contrast, this case is nothing like *Law Offices of Curtis V. Trinko L.L.P. v. Bell Atlantic Corp.*, 305 F.3d 89 (2d Cir. 2002), *rev'd and remanded on other grounds sub nom., Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). In *Trinko*, the Second Circuit allowed a customer of AT&T, Bell Atlantic's competitor, to sue Bell Atlantic for allegedly anticompetitive conduct that led to poorer service from AT&T because, unlike in *Illinois Brick*, the plaintiffs did not assert an "overcharge claim." *Trinko*, 305 F.3d at 100 n.6, 106-07. Here, the essence of Student Plaintiffs' claim is their express allegation that they *were* overcharged. SAC ¶¶ 30, 231.

[7] The Court may consider these contracts, which are quoted and excerpted at length in the Complaint, because Student Plaintiffs "rel[y] heavily upon [their] terms and effect," making them

Publishers. *Id.* Ex. A at § 8.2 ("MHE will invoice Subscriber . . . and Subscriber shall pay such invoice"); *id.* Ex. B at 1, 2 (defining Authorized Student User as someone for whom the university ("Customer") "has purchased access" and detailing that "Pearson will charge Customer the Net Price" and "Customer will pay all amounts invoiced").  Student Plaintiffs understand the problem with their approach and seek to paint the universities as not truly being buyers because universities supposedly bear no risk and their payments to the Publishers are tied to students' payments to the universities. SAC ¶ 203.  But the contracts show that universities bear such risks in Inclusive Access programs, *see* JQB Decl. Ex. A at § 8.4 ("Invoiced amounts are payable by Subscriber irrespective of the fees charged to Registered Students or received by Subscriber") and at 4 (subscription codes provided only for the number of enrolled students at the end of the add/drop period and the university invoiced based on that number).

Student Plaintiffs' theory that the university intermediaries can be disregarded because Publishers set the price paid by students, SAC ¶ 194, is deficient as a matter of law and again, contradicted by the very contracts Student Plaintiffs cite in the Complaint.  In *Apple v. Pepper*, the Supreme Court reaffirmed the indirect purchaser bar requiring that damage claims be brought against the intermediary from whom purchases were made; the Court specifically rejected the argument that claims should be brought against the entity in the distribution chain that possesses price-setting authority. 139 S. Ct. at 1522.  Student Plaintiffs concede that universities "can change the price charged to students," SAC ¶ 198, and the contracts they cite confirm that universities

---

"integral" to the Complaint. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *see also Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc.*, 2016 WL 2939164, at *3, *5 (S.D.N.Y. May 19, 2016) (relying on an anti-assignment provision in contracts integral to the complaint to dismiss the claims arising under those contracts). "If a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

have pricing discretion. McGraw Hill, for example, allows a university to "determine, in its sole discretion, the fees it charges . . . Students for" course materials delivered through Inclusive Access. JQB Decl. Ex. A at § 8.4. And Pearson expressly recognizes that its university customer can capture a margin by marking up the price that students pay for such materials. *See id.* Ex. B at 9 (limiting maximum resale price to a "twenty percent (20%) margin"). Universities' ability to mark up the prices of course materials delivered through Inclusive Access makes it "nearly impossible for a court to determine which portion of an overcharge is actually borne by [a university] and which portion is borne by" students, creating exactly the kinds of intractable pass-on analyses that *Illinois Brick* guards against. *See Simon*, 694 F.3d at 202.

While recognizing universities as "completely involved" in Inclusive Access, the Student Plaintiffs also posit that universities act only as "sales agents of the Publisher Defendants." SAC ¶ 198. Again, this allegation cannot be credited because the actual contracts cited by the Student Plaintiffs explicitly disclaim an agency relationship. *See* JQB Decl. ¶ 6 & Ex. C (Cengage-Central Washington University contract cited in SAC ¶ 116), at § 11.f ("Neither party nor its employees, agents or subcontractors are agents or employees of the other party."); *id.* ¶ 7 & Ex. D (Barnes & Noble-Eastern Kentucky University contract cited in SAC ¶ 122), at § 12 ("each party is at all times acting and performing as an independent contractor with, and not an employee, agent, or joint venture of, the other party. Barnes & Noble shall operate the Bookstore with its own credit and preferred vendors[.]").

***Any co-conspirator exception to Illinois Brick does not apply.*** Having chosen not to name the universities as defendants, Student Plaintiffs cannot salvage their damages claims by alleging that the selling universities are "non-named co-conspirators." SAC ¶ 41. Putting aside the implausibility of this conclusory allegation, the Second Circuit has never recognized a co-

conspirator exception to *Illinois Brick*. To the extent that district courts in this Circuit have carved out an exception, they have done so when co-conspirators are ***named as parties***. *See Leider v. Ralfe*, 2003 WL 22339305, at *4 (S.D.N.Y. Oct. 10, 2003) (barring claim under *Illinois Brick* because the alleged co-conspirator not named as defendant and the "presence of an intermediary unjoined in this lawsuit creates precisely the risk that the indirect-purchaser rule was designed to avoid"); *State of N.Y. v. Dairylea Co-op. Inc.*, 570 F. Supp. 1213, 1215-16 (S.D.N.Y. 1983) ("[S]ketchy and conclusory" allegations that "unnamed milk retailers were either willing or coerced co-conspirators" are not sufficient to avoid *Illinois Brick* because the unnamed retailers were not named as co-defendants); *see also Howard Hess*, 424 F.3d at 370 (rejecting "attempt[] to invoke a co-conspirator exception to *Illinois Brick*'s bar on indirect purchaser standing when plaintiffs have not named the co-conspirators immediately upstream as defendants"). Student Plaintiffs chose not to name universities as defendants and may not rely on an exception to *Illinois Brick* to prevent their claims for damages (Counts 4-6) from being dismissed.

Nor can Student Plaintiffs ignore the consequences of their decision to allege universities—the actual sellers of Inclusive Access—are co-conspirators. According to Student Plaintiffs' allegations, the universities are intermediaries who purchase from the Publishers and resell to students, either directly or through authorized distributors at prices they set, either without limitations or within a wide range permitted by the contracts with Publishers. The economic realities of these transactions therefore describe indirect purchases barred by *Illinois Brick*.

## IV.  THE STATE LAW CLAIMS SHOULD BE DISMISSED (COUNT 7)

Based on the same allegations as their federal antitrust claims, Student Plaintiffs also seek analogous relief under the antitrust statutes of 26 states and the District of Columbia. Because

these statutes are all coextensive or construed in harmony with federal antitrust law,[8] however, Student Plaintiffs' state law claims, which rely only on the assertion that "any violation of federal antitrust law is also a substantive violation of each state antitrust law," SAC ¶ 292, should be dismissed for the reasons discussed above. *E.g.*, *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing antitrust claims under 17 state laws because "Plaintiffs fail[ed] to state a claim under the Sherman Act, and . . . the state antitrust law claims [were] based on the same allegations"), *aff'd*, 466 F.3d 187 (2d Cir. 2006); *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020) (dismissing tagalong

---

[8] *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 609-10 (9th Cir. 2005) (**Ariz.**); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (**Cal.**); *Pro Music Rights, LLC v. Apple, Inc.*, 2020 WL 7406062, at *10 (D. Conn. Dec. 16, 2020) (**Conn.**); *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 395 (D. Md. 1990) (**D.C.**); *Caraang v. PNC Mortg.*, 795 F. Supp. 2d 1098, 1125-26 (D. Hawaii 2011) (**Hawaii**); *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1062 (7th Cir. 2019) (**Ill.**); *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1080 (S.D. Iowa 2017) (**Iowa**); *EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, *19 (N.D. Tex. Aug. 1, 2019) (**Kan.**); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993) (**Me.**); *Loren Data Corp. v. GXS, Inc.*, 2011 WL 3511003, at *12-13 (D. Md. Aug. 9, 2011) (**Md.**); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *2 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) (**Mich.**); *TRI Inc. v. Boise Cascade Office Prods., Inc.*, 2001 WL 1230647, at *4 n. 9 (D. Minn. Oct. 15, 2001), *aff'd*, 315 F.3d 915 (8th Cir. 2003) (**Minn.**); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 780 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993) (**Miss.**); *Kanne v. Visa USA, Inc.*, 723 N.W.2d 293, 297 (Neb. 2006) (**Neb.**); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 488-89 (S.D.N.Y. 2017) (**Nev.**); *Wheeler v. Mobil Chem. Co.*, 1994 WL 730404, at *1 (D.N.H. Nov. 17, 1994) (**N.H.**); *Buena Vista Estates, Inc. v. Santa Fe Solid Waste Mgmt. Agency*, 2016 WL 3574170, at *10 (D.N.M. Mar. 30, 2016) (**N.M.**); *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019) (**N.Y.**); *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 955 (W.D.N.C. 2000) (**N.C.**); *Westgo Indus., Inc. v. W.J. King Co.*, 1981 WL 2064, at *6 (D.N.D. Mar. 31, 1981) (**N.D.**); *Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1174 (D. Or. 2002) (**Or.**); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, 1999 WL 1201701, at *8 (S.D.N.Y. Dec. 15, 1999) (**R.I.**); *Byre v. City of Chamberlain*, 362 N.W.2d 69, 73 (S.D. 1985) (**S.D.**); *Rockholt Furniture, Inc. v. Kincaid Furniture Co.*, 1998 WL 1661384, at *7 (E.D. Tenn. July 6, 1998), *aff'd*, 188 F.3d 509 (6th Cir. 1999) (**Tenn.**); *Rio Vista Oil, Ltd. v. Southland Corp.*, 667 F. Supp. 757, 762 (D. Utah 1987) (**Utah**); *Gray v. Marshall Cnty. Bd. of Educ.*, 367 S.E.2d 751, 755 (1988) (**W. Va.**); *Westerfield v. Quizno's Franchise Co.*, 527 F. Supp. 2d 840, 856 n.5 (E.D. Wis. 2007), *j. vacated in part*, 2008 WL 2512467 (E.D. Wis. 2008) (**Wis.**).

claims brought under same 27 statutes asserted here "for the same reasons [the Court] dismissed the federal antitrust claims"); *In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371, 1376, 1382 (N.D. Ga. 2010) (dismissing claims brought under "common law and antitrust laws of about forty states" when plaintiffs failed to state a claim under federal antitrust law and the "allegations for both types of claims [were] the same").

Student Plaintiffs' state law claims fail for a variety of additional, independent reasons as well. *First*, Student Plaintiffs' claims under District of Columbia, Kansas, Michigan, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin law should be dismissed because those states' statutes require the anticompetitive conduct to have a substantial intrastate nexus, which is not alleged here. *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *23-26 (E.D. Tenn. June 24, 2015) (dismissing D.C., Miss., Nev., N.Y., N.C., S.D., Tenn., W. Va., and Wis. antitrust claims where the complaint failed to "address[] any connection between the individual state and the wrongful conduct"); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923-25 (N.D. Cal. 2019) (rejecting the argument that allegations of a "national conspiracy" that produced "increased prices in a given state" were sufficient and dismissing D.C., Kan., Miss., N.Y., N.C., S.D., Tenn., W. Va., and Wis. antitrust claims because the complaint was "devoid of any allegations concerning effects within these particular states"). Student Plaintiffs' Oregon claim fails for related reasons because Oregon's antitrust law applies only to "intrastate trade or commerce" or "anticompetitive activities [that] . . . threatened or caused injury 'to a person or property located in' Oregon," *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 841 (E.D. Mich. 2018), and neither are alleged in the Complaint. *Second*, Student Plaintiffs' indirect purchaser claim under the Illinois Antitrust Act should be dismissed because the Act specifically "prohibits indirect purchaser class actions." *In re Novartis & Par Antitrust Litig.*,

2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019). *Third*, Student Plaintiffs' Utah Antitrust Act claim is barred because that statute's residency/citizenship criteria "require[s] at least one Utah citizen or resident be a named plaintiff," and none is named here. *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 393 (D.N.J. 2018) (collecting cases). *Fourth*, the New Mexico Antitrust Act is enforceable only by the state Attorney General and does not afford Student Plaintiffs any private right of action. *Ahlgrim v. Keefe Grp., LLC*, 2016 WL 9819520, at *5 (D.N.M. Oct. 19, 2016), *adopted by* 2016 WL 7246110 (D.N.M. Nov. 30, 2016).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Student Plaintiffs' Second Consolidated Amended Class Action Complaint in full and with prejudice.

Dated: January 22, 2021        Respectfully Submitted,

*s/ Rachel S. Brass (by consent)*       *s/ Eric Mahr (by consent)*

Rachel S. Brass                Eric Mahr
GIBSON, DUNN & CRUTCHER LLP    Andrew J. Ewalt
555 Mission Street, Suite 3000       Richard Snyder
San Francisco, California 94105-0921   Lauren Kaplin
Telephone: (415) 393-8293         FRESHFIELDS BRUCKHAUS
rbrass@gibsondunn.com           DERINGER US LLP
                                 700 13th Street NW, 10th Floor
Adam J. Di Vincenzo          Washington, DC 20005
GIBSON, DUNN & CRUTCHER LLP    Telephone: (202) 777-4500
1050 Connecticut Avenue, N.W.      eric.mahr@freshfields.com
Washington, DC 20036-5306        andrew.ewalt@freshfields.com
Telephone: (202) 887-3704         richard.snyder@freshfields.com
adivincenzo@gibsondunn.com       lauren.kaplin@freshfields.com

*On behalf of Defendants Barnes & Noble*     *On behalf of Defendant Cengage*
*College Booksellers, LLC and Barnes &*     *Learning, Inc.*
*Noble Education, Inc.*

s/ Craig C. Martin (by consent)
Craig C. Martin
Matt D. Basil
WILLKIE FARR & GALLAGHER LLP
300 N LaSalle Street
Chicago, IL 60654
Telephone: (312) 728-9000
cmartin@willkie.com
mbasil@willkie.com

*On behalf of Defendant Follett Higher Education Group, Inc.*

s/ W. Cavanaugh, Jr. (by consent)
William F. Cavanaugh, Jr.
Saul B. Shapiro
Amy N. Vegari
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
wfcavanaugh@pbwt.com
sbshapiro@pbwt.com
avegari@pbwt.com

*On behalf of Defendant McGraw Hill LLC*

s/ J. Quinn-Barabanov
Jennifer Quinn-Barabanov
Zachary B. Schreiber
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
jquinnbarabanov@steptoe.com
zschreiber@steptoe.com

Michael Dockterman
STEPTOE & JOHNSON LLP
227 W Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300
mdockterman@steptoe.com

*On behalf of Defendant Pearson Education, Inc.*