UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE INCLUSIVE ACCESS COURSE MATERIALS ANTITRUST LITIGATION | MASTER FILE NO. 20 MDL NO. 2946 (DLC) |

This Document relates to:

20cv6339

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS RETAILER PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
*On behalf of Defendant Cengage Learning, Inc.*

**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
*On behalf of Defendants Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
*On behalf of Defendant McGraw Hill LLC*

**WILLKIE FARR & GALLAGHER LLP**
300 N LaSalle Street
Chicago, IL 60654
Telephone: (312) 728-9000
Facsimile: (312) 728-9199
*On behalf of Defendant Follett Higher Education Group, Inc.*

**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
*On behalf of Defendant Pearson Education, Inc.*

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Statement of Alleged Facts ................................................................................... 3

Legal Standard ...................................................................................................... 6

Argument .............................................................................................................. 7

    I.      Retailer Plaintiffs Do Not Allege Antitrust Injury (Counts 1-9) ........................... 7

    II.     The Section 1 Claims Should Be Dismissed (Counts 1-3) ................................. 13

         A.     Retailer Plaintiffs Do Not Allege a Plausible Horizontal Conspiracy ................................................................................. 13

         B.     Retailer Plaintiffs Do Not Allege an Unreasonable Restraint of Trade ....................................................................................... 22

    III.    The Section 2 Claims Should Be Dismissed (Counts 4-6) ................................. 30

         A.     Retailer Plaintiffs Do Not Allege Monopoly Power ............................... 30

         B.     Retailer Plaintiffs Do Not Allege Anticompetitive Conduct .................. 33

    IV.   The Robinson-Patman Act Claims Should Be Dismissed (Counts 7-8)............. 34

    V.    Section 16 Is Not Independently Actionable (Count 9)....................................... 37

    VI.   Retailer Plaintiffs' State Law Claims Should Be Dismissed (Counts 10-14)...... 37

         A.     The Statutory State Law Claims Are Derivative and Inapplicable .......... 37

         B.     The Unjust Enrichment Claims Should Be Rejected .............................. 39

Conclusion ........................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*AD/SAT, a Div. of Skylight, Inc. v. Associated Press*,
   885 F. Supp. 511 (S.D.N.Y. 1995) ....................................................................14

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999)............................................................................31

*In re Aluminum Warehousing Antitrust Litig.*,
   2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014).......................................................39

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016)..............................................................................8

*Anderson News, LLC v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)............................................................................13

*Andrews v. Metro N. Commuter R.R. Co.*,
   882 F.2d 705 (2d Cir. 1989)..............................................................................7

*In re Androgel Antitrust Litig. (No. II)*,
   687 F. Supp. 2d 1371 (N.D. Ga. 2010) ............................................................37

*Apani Sw., Inc. v. Coca-Cola Enterps., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ..........................................................................38

*Apex Oil Co. v. DiMauro*,
   713 F. Supp. 587 (S.D.N.Y. 1989) ....................................................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................6

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)........................................................................................6

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)......................................................................................12

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)........................................................................29, 30

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ........................................................................36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................. *passim*

*Bennett v. Cardinal Health Marmac Distribs., Inc.*,
2003 WL 21738604 (E.D.N.Y. July 14, 2003) ....................................................35

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013) ...............................................................26

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979) .............................................................................................22, 23

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ...........................................................................................2, 7

*Cancall PCS v. Omnipoint Corp.*,
2000 WL 272309 (S.D.N.Y. Mar. 10, 2000) ......................................................35

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
799 F.3d 202 (2d Cir. 2015)................................................................................34

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
2015 WL 5166014 (E.D. Tenn. June 24, 2015) ..................................................39

*Cenedella v. Metro. Museum of Art*,
348 F. Supp. 3d 346 (S.D.N.Y. 2018).................................................................27

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)...........................................................................25, 30

*Checker Motors Corp. v. Chrysler Corp.*,
405 F.2d 319 (2d Cir. 1969)................................................................................23

*City of N.Y. v. Grp. Health Inc.*,
649 F.3d 151 (2d Cir. 2011)................................................................................25

*Code Rebel, LLC v. Aqua Connect, Inc.*,
2014 WL 46696 (C.D. Cal. Jan. 3, 2014) ...........................................................36

*Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*,
2012 WL 511485 (W.D. Ark. Feb. 15, 2012) ......................................................39

*Conradt v. NBC Universal, Inc.*,
536 F. Supp. 2d 380 (S.D.N.Y. 2008).................................................................40

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ...............................................................................................9

*Cornwell Quality Tools Co. v. C. T. S. Co.*,
446 F.2d 825 (9th Cir. 1971) ..............................................................................34

*In re Credit Default Swaps Antitrust Litig.*,
  2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ............................................................3, 31, 32

*Dane v. United Healthcare Ins. Co.*,
  974 F.3d 183 (2d Cir. 2020) ........................................................................................6

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ....................................................................................8, 13

*DePriest v. AstraZeneca Pharms., LP*,
  351 S.W.3d 168 (Ark. 2009) ........................................................................................40

*Discover Fin. Servs., Inc. v. Visa U.S.A., Inc.*,
  2005 WL 8178487 (S.D.N.Y. Nov. 4, 2005) ..........................................................31, 32

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
  598 F. Supp. 2d 394 (S.D.N.Y. 2008) ........................................................................28

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*,
  436 F. Supp. 3d 754 (S.D.N.Y. 2020) ........................................................................24

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enter., Inc.*,
  672 F. Supp. 1489 (D.S.C. 1987) ................................................................................10

*E. & G. Gabriel v. Gabriel Bros., Inc.*,
  1994 WL 369147 (S.D.N.Y. July 13, 1994) ..............................................................27

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) ........................................................................................23

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
  360 F. Supp. 2d 465 (E.D.N.Y. 2005) ........................................................................34

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
  129 F.3d 240 (2d Cir. 1997) ............................................................................. *passim*

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ........................................................................................30

*F.T.C. v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ....................................................................................................24

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ......................................................................29

*First Comics, Inc. v. World Color Press, Inc.*,
  884 F.2d 1033 (7th Cir. 1989) ....................................................................................36

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) ...................................................................39

*Freedom Holdings, Inc. v. Cuomo*,
    624 F.3d 38 (2d Cir. 2010)...............................................................................37

*Gandydancer, LLC v. Rock House CGM, LLC*,
    453 P.3d 434 (N.M. 2019) ...............................................................................39

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)...................................................................8, 11, 12

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)..............................................................................25

*Great Atl. & Pac. Tea Co. v. F.T.C.*,
    440 U.S. 69 (1979)...........................................................................................34

*H.L. Hayden Co. of New York v. Siemens Med. Sys.*,
    879 F.2d 1005 (2d Cir. 1989).........................................................30, 31, 32, 35

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
    832 S.W.2d 39 (Tex. 1992)...............................................................................40

*Ideal Plumbing Co. v. Benco, Inc.*,
    382 F. Supp. 1161 (W.D. Ark. 1974).................................................................38

*Innomed Labs, LLC v. ALZA Corp.*,
    368 F.3d 148 (2d Cir. 2004)..............................................................................36

*Int'l Audiotext Network, Inc. v. AT&T Co.*,
    62 F.3d 69 (2d Cir. 1995)...................................................................................7

*In re Interest Rate Swaps Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)..............................................14, 16, 17, 21

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981)...........................................................................................8

*Jay Walton Enters., Inc. v. Rio Grande Oil Co.*,
    738 P.2d 927 (N.M. Ct. App. 1987) ...................................................................38

*Juster Assocs. v. City of Rutland, Vt.*,
    901 F.2d 266 (2d Cir. 1990)..............................................................................12

*K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)................................................................................28

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)......................................................................................................9

*LLM Bar Exam, LLC v. Barbri, Inc.*,
    271 F. Supp. 3d 547 (S.D.N.Y. 2017)......................................................15, 17, 30

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
    2014 WL 3739322 (S.D.N.Y. July 28, 2014).......................................................26

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)................................................................... *passim*

*In re Microsoft Corp. Antitrust Litig.*,
    241 F. Supp. 2d 563 (D. Md. 2003)......................................................................39

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ......................................................................18, 21

*Nat'l Coll. Athletic Ass'n v. Bd. of Regents of U. of Okla.*,
    468 U.S. 85 (1984)..............................................................................................3, 9

*Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*,
    808 F. Supp. 1131 (S.D.N.Y. 1992)..................................................................3, 36

*Nat'l Tire Wholesale, Inc. v. Wash. Post Co.*,
    441 F. Supp. 81 (D.D.C. 1977), *aff'd*, 595 F.2d 888 (D.C. Cir. 1979)..................36

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)............................................................................................22

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)...................................................................................22, 25

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .............................................................................29

*Oreck Corp. v. Whirlpool Corp.*,
    579 F.2d 126 (2d Cir. 1978)................................................................................24

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009)............................................................................................34

*Paine Coll. v. S. Ass'n of Colleges & Sch. Comm'n on Colleges, Inc.*,
    342 F. Supp. 3d 1321 (N.D. Ga. 2018), *aff'd*, 810 F. App'x 852 (11th Cir.
    2020) ....................................................................................................................37

*Pearson Educ., Inc. v. Allen Air Conditioning Co.*,
    2014 WL 2154099 (S.D.N.Y. 2014).....................................................................9

*Pepsico, Inc. v. Coca-Cola Co.*,
  1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ........................................................25

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ..............................................................25, 31, 32

*Phila. Taxi Ass'n Inc. v. Uber Techs, Inc.*,
  886 F.3d 332 (3d Cir. 2018) .........................................................................2, 9

*Poindexter v. EMI Record Grp. Inc.*,
  2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ...............................................7

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ............................................................................26

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
  2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) .....................................................23

*Shipper v. Am. Auto. Ass'n*,
  1997 WL 135672 (N.D. Tex. Mar. 12, 1997) ...............................................38

*Sidibe v. Sutter Health*,
  4 F. Supp. 3d 1160 (N.D. Cal. 2013) .............................................................39

*Simpson v. Champion Petfoods, USA, Inc.*,
  397 F. Supp. 3d 952 (E.D. Ky. 2019) ............................................................40

*Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*,
  414 F. App'x 372 (2d Cir. 2011) ....................................................................26

*Spinelli v. NFL*,
  903 F.3d 185 (2d Cir. 2018) ..............................................................22, 23, 24

*Spinelli v. NFL*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................30

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) .............................................................................................28

*Sulton v. Wright*,
  265 F. Supp. 2d 292 (S.D.N.Y. 2003) .............................................................7

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ........................................................................................28

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .............................................................................................22

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998) ................................................................................13

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
  454 F. Supp. 2d 62 (E.D.N.Y. 2006) ...............................................................28

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)..............................................................................22

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)...........................................................................................33

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)....................................................................................33, 34

*Vigil v. Taintor*,
  2019 WL 6768676 (N.M. Ct. App. Dec. 11, 2019) .........................................39

*Volvo N. Am. Corp. v. Men's Intern. Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)..........................................................................21, 30

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
  546 U.S. 164 (2006)....................................................................................34, 36

*Wachter, Inc. v. Cabling Innovations, LLC*,
  387 F. Supp. 3d 830 (M.D. Tenn. 2019) ..........................................................40

*Zamora v. Wells Fargo Bank*,
  2020 WL 4708153 (S.D. Tex. Aug. 13, 2020) .................................................40

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)...........................................................................................37

*Zhejiang Med. Co. v. Kaneka Corp.*,
  2012 WL 12893418 (S.D. Tex. Aug. 13, 2012) ...............................................38

**Statutes**

15 U.S.C. § 1.........................................................................................22, 24, 33

15 U.S.C. § 13...............................................................................................34

15 U.S.C. § 26...............................................................................................37

Ark. Code Ann. §§ 4-75-207 .........................................................................39

Ark. Code Ann. §§ 4-75-208 .........................................................................39

Ark. Code Ann. §§ 4-75-209 .........................................................................39

KRS § 365.020 ........................................................................................................38

Tex. Bus. & Com. Code § 15.04 ...........................................................................38

**Other Authorities**

Christopher R. Leslie, *Trust, Distrust, and Antitrust*, 82 Tex. L. Rev. 515 (2004) ......................20

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2013) ....................................................21

**Rules**

Fed. Civ. P. R. 12 ..................................................................................................6, 7

**Regulations**

34 C.F.R. § 668.161 ...............................................................................................37

34 C.F.R. § 668.164 ......................................................................................4, 14, 37

# INTRODUCTION

Every semester, professors across the country assign their students course materials.  They decide which books to require, homework to assign, and quizzes to administer.  Textbook publishers, like Defendants Cengage Learning, Inc. ("Cengage"), McGraw Hill LLC ("McGraw Hill"), and Pearson Education, Inc. ("Pearson," and, with Cengage and McGraw Hill, the "Publishers"), compete with each other to have their course materials selected by individual faculty members. To remain competitive, Publishers have constantly experimented with new products, collections, technology, distribution methods, and services to meet the evolving needs and preferences of professors and students.  Over time, as technology has advanced, digital course materials offerings have gradually replaced traditional print books.  Industry participants, including Publishers, have sought to adapt.

Inclusive Access is an innovative mechanism for distributing digital course materials to students that was developed and offered over time as part of a broader shift to digital materials. With Inclusive Access programs, universities arrange—either through their self-operated or third-party-operated bookstores—for students enrolled in participating courses (other than those who opt out) to receive access to assigned course materials automatically and without visiting a physical bookstore, and to be charged for those materials on their tuition bills.  Inclusive Access also allows students to obtain textbooks, homework, and quizzes for less than competitive rates.  Publishers and retailers recoup their losses from lower prices through increased sales because more students purchase the assigned course materials.

Retailer Plaintiffs are bookstores who say their bottom lines suffered as more schools chose Inclusive Access.  Rather than chalk up those alleged losses to the fact that they are tethered to a fading business model, Retailer Plaintiffs accuse Defendants and hundreds of unnamed universi-

ties of violating the antitrust laws.  But those laws were enacted to protect "competition not com-petitors."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  They encour-age, not condemn, experimentation with new business models that benefit consumers "even if it serve[s] to eliminate competitors."  *Phila. Taxi Ass'n Inc. v. Uber Techs, Inc.*, 886 F.3d 332, 340 (3d Cir. 2018).  As a result, Retailer Plaintiffs' claims falter on several grounds.

Retailer Plaintiffs lack antitrust standing.  They do not allege any set of facts showing that offering Inclusive Access harmed competition.  To the contrary, their alleged injury is based on their own bottom lines and their inability to join the alleged conspiracy.

Even if they had antitrust standing, Retailer Plaintiffs' allegations of a conspiracy are im-plausible.  There are no direct allegations of horizontal agreement between either competing pub-lishers or competing retailers, nor are there allegations that support an inference of horizontal agreement.  Instead, Retailer Plaintiffs' allegations establish that Inclusive Access programs were a natural response to external market forces.  Changes in the marketplace incentivized each pub-lisher independently to offer these lower-cost, higher-revenue programs, while universities became more receptive to Inclusive Access after new federal regulations expressly authorized adding course materials to tuition bills.  Retailers like Barnes & Noble Education, Inc., Barnes & Noble College Booksellers, LLC (collectively, "BNED"), and Follett Higher Education Group, Inc. ("Follett," and, with BNED, the "Retailer Defendants"), were similarly incentivized by the pro-spect of increased sales—regardless of what competing retailers chose to do.  Indeed, as Retailer Plaintiffs admit, they sought (and continue to seek) to participate in Inclusive Access programs.

Retailer Plaintiffs' claims fail on other grounds as well.  Notwithstanding the conclusory allegations to the contrary, Inclusive Access is a fundamentally procompetitive innovation.  These programs provide options that schools and their faculty may select if they fit their needs,

"widen[ing] consumer choice." *Nat'l Coll. Athletic Ass'n v. Bd. of Regents of U. of Okla.*, 468 U.S. 85, 102 (1984). It is therefore unsurprising that each of Retailer Plaintiffs' claims falls outside the narrow categories of conduct condemned as *per se* illegal and fails under the applicable rule of reason. To start, Retailer Plaintiffs fail to define plausible relevant markets and fail to allege adequate anticompetitive effects—essential elements of the rule of reason analysis. Their monopolization claims also fail because Retailer Plaintiffs do not allege that any Defendant had monopoly power, relying instead on a market-share aggregation theory rejected by courts in this Circuit. *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *13 (S.D.N.Y. Sept. 4, 2014).

Nor do Retailer Plaintiffs assert any other viable cause of action. Their claims under the Robinson-Patman Act ("RPA") do not include the required allegations of price discrimination, and Inclusive Access is not a "commodit[y]" but rather a distribution model. *Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*, 808 F. Supp. 1131, 1136 (S.D.N.Y. 1992). The myriad state law claims either are derivative of federal claims with identical flaws, target conduct not alleged here, provide standing only to consumers, or are spun from whole cloth and not cognizable under applicable state law.

The Complaint therefore should be dismissed in its entirety.

## STATEMENT OF ALLEGED FACTS

Cengage, McGraw Hill, and Pearson publish course materials. Second Amended Class Action Complaint ("SAC" or "Complaint") ¶¶ 9, 50-58. They generally distribute their products to retailers, including university-run bookstores, Defendants BNED and Follett, and Retailer Plaintiffs. *Id.* ¶¶ 7, 11, 59, 61, 88. "[A]lthough students are the Course Materials' end consumers, the Universities select which Course Materials the students must purchase." *Id.* ¶ 10. Thus, "the

Publishers market Course Materials to the Universities, not their students." *Id.*[1]

Before Inclusive Access, students' primary options for obtaining course materials were to either buy or rent them from brick-and-mortar stores or online.  SAC ¶ 13.  Over time, however, this traditional distribution system became increasingly unworkable not only for publishers and retailers, but also for universities, faculty, and their students.  *Id.* ¶¶ 117-121.  Due to the high costs associated with print materials, significant numbers of college students began "resorting to other strategies" for obtaining course materials, such as "borrowing," "sharing," or "not using course materials" at all.  *Id.* ¶ 120.   In 2015, for example, Plaintiffs allege that only 25% of students bought course materials in a format that generated revenue for Publishers.  *Id.* ¶¶ 120-121.   According to the Complaint, this state of affairs made the "old model" unsustainable, as "the industry could no longer compensate for lost volume by increasing unit prices."  *Id.* ¶ 121.

In response to these trends, each Publisher independently began experimenting with innovative offerings—such as new digital distribution formats, delivery services, specialized packaging, and materials designed for specific courses.  SAC ¶¶ 8, 15, 30, 81, 119-122.  At the same time, the Department of Education ("DOE") promulgated new regulations permitting universities to incorporate course materials fees into tuition bills.  *See id.* ¶ 409 (citing 34 C.F.R. § 668.164(c)(2)).

To be sure, the evolution toward digital distribution "did not happen overnight."  SAC ¶ 131.  As the Complaint concedes, "[t]hat would [have been] impossible."  *Id.*  Rather, each Publisher developed its own digital products and strategies, including its own version of "Inclusive Access," the form of digital distribution challenged here.  *Id.*  Allegedly beginning with "pilot

---

[1]  Defendants use the term "Course Materials" only when discussing Plaintiff's allegations.  Use of the term "Course Materials" does not reflect acceptance of any alleged market definitions.

programs" in 2014, these new digital-based distribution models were introduced gradually on some college campuses and adopted on a course-by-course basis. *Id.* ¶¶ 125-30, 133-38, 148.

Enhancing digital offerings through Inclusive Access made business sense for each Defendant because digital offerings instantly available to students could increase each Defendant's sales while reducing their costs, thereby increasing profits. SAC ¶¶ 36-37, 263. The appeal of Inclusive Access programs specifically to universities and their faculties and students is also clear. As Retailer Plaintiffs acknowledge, Inclusive Access enables students to obtain course materials more efficiently. *Id.* ¶¶ 16, 141, 147. When a university decides to give its faculty the Inclusive Access option, it ordinarily partners with publishers and, in some cases, its on-campus bookstore operator, to implement a technological solution enabling automatic digital delivery of any course materials that individual faculty members choose to assign. *Id.* ¶¶ 16, 133. Inclusive Access provides students with "the same content" as a "physical copy or digital format" textbook but also can be sold with "some type of software component, including homework or lab assignments." *Id.* ¶¶ 141-42. And Inclusive Access allows the student to pay the university through "direct billing or automatic deductions from a student's account with the[ir] University." *Id.* ¶ 161.

Of course, whether to use Inclusive Access for a given course is the exclusive decision of the university and its faculty. SAC ¶¶ 10, 66.[2] Publishers continue to produce and sell a wide variety of course materials, including print and digital textbooks, and even where a school has

---

[2] Although Plaintiffs now allege that "Universities . . . choos[e] materials for the faculty," including Inclusive Access, "regardless of faculty choices," SAC ¶ 67, Plaintiffs have already recognized and admitted the important role of faculty who "are responsible for selecting which Course Materials students are required to purchase," First Amended Class Action Complaint, Dkt. 49 ("CAC") ¶ 64, *see also id.* ¶ 10. Such admissions in previous pleadings are relevant in considering an amended pleading. *Infra* p. 7. Those prior admissions also align with Plaintiffs' cited sources in the SAC, as well as common sense that university professors choose their own teaching materials for a given course. SAC ¶¶ 6 n. 1, 129 n. 23, 217 n. 39.

adopted Inclusive Access, faculty remain free to assign course materials in whatever format and from whichever publishers or sources they choose. *See id.* ¶¶ 66, 148, 169-71.

Inclusive Access has only increased the options available to universities and faculties, and competition at every level of the course materials supply chain remains robust. As they always have, Publishers continue to compete to have their course materials selected by the professor for each class. SAC ¶¶ 10, 66, 84, 129. And "operators of physical and virtual retail bookstores and online sellers[] compete with . . . [Retailer Defendants] . . . [in submitting] bids to become the [chosen] 'on-campus' [bookstore operator]" at many schools, *id.* ¶ 11, and retailers compete with each other to sell course materials of all types (print and digital) to students. *Id.* ¶¶ 87-88, 96; *see also id.* ¶ 232 (describing the university-driven on-campus bookstore request for proposal process). Thus, schools and their faculties have many options when it comes to selecting course materials and how their students will purchase and access them. *See id.* ¶¶ 7, 11-14, 81-82, 169-70.

Despite this, Retailer Plaintiffs claim that Inclusive Access is the product of several elaborately orchestrated conspiracies among not only the Defendants, but also among hundreds of universities nationwide (who also are, according to the Complaint, victims of the schemes they perpetrated). SAC ¶¶ 48, 71, 323, 334, 345.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's claim must be "plausible on its face" such that a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Courts "are not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Dane v. United Healthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020); *see also Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council*

*of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged[.]").

Allegations in previous pleadings are relevant in considering an amended pleading. *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party."); *see also Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) (internal citation omitted) ("[A]dmissions in earlier complaints remain binding. . . . As such, the Court may consider them on a motion to dismiss under Rule 12(b)(6)."); *Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("[E]ven though the [a]mended [c]omplaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits."). This is particularly true where new allegations contradict prior allegations concerning a lawsuit's central issues. *Andrews*, 882 F.2d at 707 ("A party . . . cannot advance one version of the facts in [his] pleadings, conclude that [his] interests would be better served by a different version, and amend [his] pleadings to incorporate that version . . ."). The Court may also consider contracts and documents that the Complaint "relies heavily upon" in addition to the allegations in the Complaint. *Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

## ARGUMENT

Retailer Plaintiffs seek relief under Sections 1 and 2 of the Sherman Act, the RPA, the Clayton Act, and various state laws. Each of these claims fails on the merits.

## I.    Retailer Plaintiffs Do Not Allege Antitrust Injury (Counts 1-9)

The federal antitrust laws were enacted for "the protection of competition not competitors." *Brunswick Corp.*, 429 U.S. at 488. Retailer Plaintiffs therefore must allege they suffered antitrust injury; that is, their injuries must be "of the type the antitrust laws were intended to prevent and

that flow[] from that which makes [or might make] defendants' acts unlawful." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981) (dismissing the RPA claim for failure to allege "actual injury attributable to something the antitrust laws were designed to prevent").

Courts in this Circuit "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). First, they consider whether "the party asserting that it has been injured" has "identif[ied] the practice complained of and the reasons such a practice is or might be anticompet-itive." *Id.* (citation and quotation marks omitted). Second, courts "identify the actual injury . . . alleg[ed]," and whether the plaintiff is in a "worse position as a consequence of the defendant's conduct." *Id.* (citation and quotation marks omitted). Finally, they "compare the anticompetitive effect of the specific practice at issue to the actual injury . . . alleg[d]." *Id.* (citation and quotation marks omitted). Because Retailer Plaintiffs' allegations fail this "threshold, pleading-stage in-quiry," *id.* at 75-76, the Court "must dismiss [the case] as a matter of law." *In re Aluminum Ware-housing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016).

*First*, Retailer Plaintiffs do not allege any set of facts showing that offering Inclusive Ac-cess harmed competition. *Gatt*, 711 F.3d at 76. The Complaint instead underscores that Inclusive Access provides students with features that add convenience and universities and faculty with ad-ditional choice—hallmarks of robust competition. SAC ¶¶ 4, 16, 161 (automatic subscription and billing); *see also id.* ¶ 97 ("many student-consumers are looking for a one-stop-shop").

When a university *chooses* to make Inclusive Access available, that decision gives the fac-ulty the *option* to assign course materials through such programs from the participating publisher, SAC ¶¶ 16, 187; First Amended Class Action Complaint, Dkt. 49 ("CAC") ¶¶ 10, 16, 64, thereby

*enhancing* the marketplace through an *additional* offering.  *See Nat'l Coll. Athletic Ass'n v. Bd. of Regents of U. of Okla.*, 468 U.S. 85, 102 (1984) (noting that the alleged actions "widen consumer choice" and were thus "procompetitive"); *Pearson Educ., Inc. v. Allen Air Conditioning Co.*, 2014 WL 2154099 , at *8 (S.D.N.Y. 2014) ("[P]ublication of new editions with up-to-date information and/or bundled additional materials are output-enhancing" and "do not amount to the type of harm the antitrust laws were designed to address."); *Phila. Taxi Ass'n Inc.*, 886 F.3d at 340 (Uber's entry "bolstered competition by offering customers lower prices, more available taxicabs, and a high-tech alternative to the customary method of hailing taxicabs and paying for rides").

The Complaint's allegations also demonstrate why more options were needed.  Plaintiffs allege that, before Inclusive Access was offered, college students began "resorting to other strate-gies" to obtain course materials, such as "borrowing," "sharing," or "not using course materials at all," due to the higher cost of print materials.  SAC ¶ 120, *see also* CAC ¶ 116 ("costs associated with printing and distribution would be reduced" because of Inclusive Access).  Inclusive Access allows universities and faculty to address this lack of uniform access—the very kind of innovation courts view as efficiency-enhancing and thus procompetitive.  *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 896 (2007) (efficient distribution is procompetitive as it serves both suppliers' and consumers' interests); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54 (1977) (enhancing "efficiencies in the distribution of [a supplier's] products" promotes competi-tion).  Retailer Plaintiffs highlight this by admitting that *they also want to offer Inclusive Access*.  SAC ¶¶ 286-93.  Indeed, that Retailer Plaintiffs filed this lawsuit to do so contradicts any conten-tion that Inclusive Access is not welcome by students (*i.e.*, Plaintiffs' customers).  *See id.* ¶ 298.

Retailer Plaintiffs' allegations show vigorous competition between Publishers and between Retailer Defendants at all times.  They allege that Publishers "compete" to sell course materials to

9

universities based on "type, content, quality, and service," through traditional distribution methods as well as through the Inclusive Access model.  SAC ¶ 10.  They also allege Retailer Defendants have "increased the incentives" to universities to "become or remain the lease-operator of the University bookstore locations."  *Id.* ¶ 262.  Although Retailer Plaintiffs call "this process less competitive," *id.* ¶ 232, it is quintessential price competition—leading to better terms for Retailer Defendants' customers (the universities), *id.* ¶¶ 232, 264, and Retailer Plaintiffs do not allege any connection between this competition and course material prices, *see id.* ¶ 35.  That Retailer Defendants are able to outbid their competitors, including Retailer Plaintiffs, to secure on-campus retailer status from the universities, is not evidence of harm to competition, but evidence of robust competition itself.  *See* SAC ¶¶ 265; s*ee also Drs. Steuer & Latham, P.A. v. Nat'l Med. Enter., Inc.*, 672 F. Supp. 1489, 1516 (D.S.C. 1987) (while the results of "a competitive bidding process" are "understandably not to the liking of plaintiffs" who do not offer the best terms, "[t]he mere fact that one aspiring competitor has been refused a [contract] does not entitle him to a remedy under the antitrust laws," which are "designed to protect competition, not competitors").

Indeed, the Complaint is littered with examples of vigorous competition to sell course materials.  SAC ¶¶ 1, 3, 5, 32-33.  For example, the Complaint alleges that Retailer Plaintiffs sell course materials on their websites and in their brick-and-mortar stores, and that they compete not only with Retailer Defendants, but also with other on- and off-campus retailers (including Retailer Defendants), and online retailers like Amazon and Chegg.  *See id.* ¶¶ 7, 11, 14, 86 ("The Plaintiff Retailers have been market leaders in providing lower-cost alternatives, formats and delivery methods"); *id.* ¶¶ 87-88, 90, 169, 287 (Retailer Plaintiffs are "directly competing" against the "Defendant Retailers . . . for the same student customers" today); *id.* ¶¶ 288, 290; *see also id.* ¶¶ 287-

88 (noting Retailer Plaintiffs' sale of substitute materials to those available through Inclusive Access). Retailer Plaintiffs depict Amazon and Chegg, which do not participate in Inclusive Access programs, as offering the same course-material content available through Inclusive Access, and in some instances, their prices are alleged to be lower than those of Retailer Plaintiffs—demonstrating that price competition between retailers remains vigorous. *Id.* ¶ 169. Together, these allegations underscore that retailers of all kinds continue to compete by selling alternatives to course materials delivered via Inclusive Access. *See id.* ¶¶ 169-71 (alleging multiple examples of course materials available through Inclusive Access *and* other retailers at seven universities), *id.* ¶ 290 (detailing competition for print materials sold by both Retailer Plaintiff CBSKY and BNED).

*Second*, any "actual injury" alleged by Retailer Plaintiffs is to *their own* bottom lines and preferred business plans, not to competition in general. *Gatt*, 711 F.3d at 76. Retailer Plaintiffs allege falling sales, but this alleged downward trend is the result of a complex web of individual decisions by universities, faculty, and students—not any allegedly anticompetitive scheme. *See* SAC ¶¶ 10, 66, 141, 158-59, 304 (alleging universities decide which course materials to assign and whether to participate in an Inclusive Access program, whether to distribute materials through a self-run retailer or one operated by a third party, and whether a retailer has exclusive rights to distribute the relevant course materials); *id.* ¶¶ 13, 15, 90, 169 (noting students choose to buy from competitors such as Amazon and Chegg); *see also* CAC ¶¶ 10, 64, 140, 161-63, 239 (faculty decide which course materials to assign and whether to use an Inclusive Access program). For example, Retailer Plaintiffs allege they were unable "to gain access to the ability to purchase the Inclusive Access Materials," SAC ¶ 282, because of alleged "exclusive dealing arrangements and/or exclusive distributorships," *id.* ¶ 345; *see also id.* ¶¶ 17, 40. They posit that this lack of access will lead to future lost sales and speculative market exit at some unspecified point in the future. *See id.* ¶ 301

("lost sales"); ¶ 308 ("loss of business" and "profits"); ¶¶ 393, 397 ("damage to their business, reputation, customer goodwill, lost sales, and lost profits").  While this alleged injury puts Retailer Plaintiffs in a "worse position" generally, it is not an antitrust injury because any such lost sales and profits are a consequence of competition for hundreds of universities and professors: They do not "flow[] from that which makes [the alleged conduct] unlawful."  *Gatt*, 711 F.3d at 76.

*Third*, as the Second Circuit explained in *Gatt*, a company cannot establish antitrust injury by claiming "lost revenue . . . from its . . . exclusion from a distribution network that, allegedly, featured . . . price-fixing, and in which it had no right *ab initio* to participate."  711 F.3d at 77. There, the alleged antitrust violation (a bid rigging scheme), was only unlawful because of the harm it could cause—increased prices to purchasers of a product (Vertex) that was no longer available to the plaintiff to sell.  *Id.*  "Gatt's lost revenue resulting from the Vertex termination . . . [was] not an injury from that which makes bid-rigging unlawful" because Gatt was "not [] forced to pay higher prices for a product."  *Id.*  Thus, retailers who allege they were not allowed to sell allegedly supracompetitively priced products or services have not suffered antitrust injury.  *Id.*

To hold otherwise here would turn the antitrust laws on their head.  In essence, Retailer Plaintiffs complain that they were injured because they were not allowed to sell an allegedly "unwanted" product of "inferior quality" and reap the alleged monopoly profits they claim Defendants were extracting.  SAC ¶¶ 1, 24, 286.  So "[e]ven if the antitrust laws seek to prevent [Defendants'] alleged activities because of resulting harms to competition, these laws are not concerned with injuries to competitors such as [Retailer Plaintiffs] resulting from their participation in or exile from such schemes."  *Gatt*, 711 F.3d at 77 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)); *see also Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990) (affirming motion to dismiss and noting that a plaintiff "may thus well be in a worse

position than [it] would have been [had the alleged anticompetitive action not occurred] . . . but

that fact does not by itself establish an antitrust injury" (citation and quotation marks omitted)).

For good reason, courts reject such attempts to use the antitrust laws "to gain entry into an exclu-

sive arrangement" rather than to "reduc[e] the cost of [the relevant product or service offered] to

consumers." *Daniel*, 428 F.3d at 444.  And no facts in the Complaint suggest that permitting

Retailer Plaintiffs to participate in Inclusive Access would have lowered prices for anyone or had

any procompetitive effect.  To the contrary, even universities that directly offer students Inclusive

Access, with no Retailer Defendant involvement, allegedly do so on the same terms.  SAC ¶ 71.

## II.     The Section 1 Claims Should Be Dismissed (Counts 1-3)

To state a claim under Section 1 of the Sherman Act, a plaintiff must "show (1) a combi-

nation or some form of concerted action between at least two legally distinct economic entities;

and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or

under the rule of reason." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95–96 (2d Cir.

1998).  Retailer Plaintiffs have failed to plead either.

### A.     Retailer Plaintiffs Do Not Allege a Plausible Horizontal Conspiracy

"The crucial question in a Section 1 case is [] whether the challenged conduct stems from

independent decision or from an agreement, tacit or express." *Mayor & Council of Baltimore v.

Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).  To plead such a claim, Retailer Plaintiffs "must

provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that

would be 'merely consistent' with an agreement." *Anderson News, LLC v. Am. Media, Inc.*, 680

F.3d 162, 184 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 549, 556-57)).

Retailer Plaintiffs allege no direct evidence of a horizontal conspiracy—no document, con-

versation, or other communication that manifests a horizontal agreement—in any alleged market.

*See In re Interest Rate Swaps Litig.*, 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017) (direct allegations are "explicit and require[] no inferences to establish" an unlawful conspiracy, such as "a recorded phone call in which two competitors agreed to fix prices at a certain level").  In the absence of such direct evidence, Retailer Plaintiffs must plead sufficient circumstantial allegations of "parallel conduct" coupled with "plus factors" that together "make it plausible to infer an agreement among competitors." *Id.* at 463.  Yet Retailer Plaintiffs have neither pled parallel conduct nor identified any conduct "motivated by anything other than independent self-interest," *AD/SAT, a Div. of Skylight, Inc. v. Assoc. Press*, 885 F. Supp. 511, 521 (S.D.N.Y. 1995), much less plus factors that give rise to an inference of concerted action.  *In re Interest Rate Swaps Litig.*, 261 F. Supp. 3d at 463.

> ***Each Defendant Pursued Inclusive Access Based on its Independent Self-Interest.***  No inference of collusion "arise[s] when the conspirators' parallel conduct made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggest competition at least as plausibly as they suggest anticompetitive conspiracy." *In re Interest Rate Swaps Litig.*, 261 F. Supp. 3d at 462 (citations and alterations omitted); *see also Twombly*, 550 U.S. at 567.  Yet that is precisely what the allegations establish: According to Plaintiffs, over a period of years, each Publisher experienced "a decline in sales of new textbooks" and "sinking" profits, making the old business model of selling print textbooks or e-books untenable.  SAC ¶ 121.  The decline spurred by this outdated business model allegedly accelerated in 2016, when each Publisher experienced sharply declining revenue as students increasingly turned to "the secondary marketplace." *Id.*  Simultaneously, the DOE promulgated new regulations permitting universities to include course material costs in tuition bills.  *See id.* ¶ 409 (citing 34 C.F.R. § 668.164(c)(2)).

Significant shifts in demand, technology adoption, and regulatory conditions thus created obvious opportunities and economic incentives for each Publisher to give universities and faculty

more choices, including a new option for students to be charged for digital course materials on their tuition bills. SAC ¶¶ 120-22. As Retailer Plaintiffs point out, "[t]he advantages" to Publishers pursuing Inclusive Access programs "were considerable." SAC ¶ 122. Indeed, they acknowledge that Inclusive Access programs were significantly more profitable for each Publisher and each Retailer Defendant because they could lead to more sales (which Retailer Plaintiffs refer to as "100% sell-through"). *Id.* ¶¶ 36-37, 122, 248, 263. Inclusive Access programs also allowed the Publishers to produce course materials at "a reduced cost due to reduced materials and labor." *Id.* ¶ 143. And digital distribution models also reduced the supply of used print books for the secondary market, enhancing, Retailer Plaintiffs allege, each Defendant's sales and profits. *Id.* ¶¶ 121-22. Thus, each Defendant's "independent responses to common stimuli," *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 580 (S.D.N.Y. 2017), "made perfect business sense," *Citigroup*, 709 F.3d at 138. That each Publisher allegedly decided to offer Inclusive Access over the same multi-year stretch was at most "conscious parallelism," "a common reaction of firms in a concentrated market [to] their shared economic interests and their interdependence with respect to price and output decisions." *Citigroup*, 709 F.3d. at 139-40 (quoting *Twombly*, 550 U.S. at 553-54); *see also* SAC ¶¶ 216, 217 n.39 (alleging the relevant market is oligopolistic and concentrated).

As noted above, Retailer Plaintiffs allege that Defendants' profits fell as competition from the secondary market led more students to seek out used and rented course materials. SAC ¶ 121. Therefore, the rational economic response was not to flood stores with more new hard-copy textbooks but to shift to digital offerings and new distribution systems with lower costs and better sales. *See id.* ¶¶ 36, 122, 133, 143. As Retailer Plaintiffs' allegations make clear, persisting in a business model with "sinking" profits was far more "risky" for Publishers (and far less rational) than "shifting their business models" to a new, more flexible, cheaper delivery system. *Id.* ¶¶ 121,

125, 324.  Thus, while Retailer Plaintiffs suggest "restricting print output . . . would go against each Publisher Defendants' independent economic self-interest," *id.* ¶ 155, their own allegations directly contradict that theory.  As they acknowledge, Publishers' digital sales grew as their print sales declined, resulting in Publishers' increased overall sales (*i.e.*, output).  *Id.* ¶ 179.  It was also in each Retailer Defendant's independent self-interest to offer universities and faculty the Inclusive Access option.  *See id.* ¶ 37 (noting Retailer Defendants "also win" from participating in Inclusive Access).  Retailer Defendants allegedly experienced "the rise of lower cost alternative retailers and retailers offering online platforms, like Retailer Plaintiffs, Amazon, and Chegg," *id.* ¶ 238, and Inclusive Access offered a new vehicle through which universities could make digital content available to students.  Moreover, Inclusive Access programs increased their sales (again, what Retailer Plaintiffs call "sell-through") by capturing all or almost all students in a given course— enabling Retailer Defendants to improve their sales and profits even if prices were lower.  *Id.* ¶ 248.  Those benefits do not hinge on horizontal collusion as no agreement between Retailer Defendants is needed to achieve them.  *See, e.g.*, *In re Interest Rate Swaps Litig.*, 261 F. Supp. 3d at 477 (conduct not against self-interest where alleged individual co-conspirators' overall profits were enhanced, even where they gave up smaller amounts of fees).  And in light of those benefits, it is no wonder Retailer Plaintiffs themselves sought to offer Inclusive Access programs and now complain about their inability to do so.  SAC ¶¶ 156, 282, 287.

Retailer Plaintiffs also allege robust competition to become a university's on-campus bookstore operator among themselves, Retailer Defendants, other retailers, and the universities' own operations.  According to the Complaint, Retailer Defendants now pay universities amounts "far beyond [what] would be justified by the Defendant Retailers' typical profitability of a University location."  SAC ¶ 262.  These *upfront* payments allegedly secure exclusive arrangements

with universities that ensure the on-campus bookstore operator can recoup the investment through increased sales.  *Id.* ¶ 263.  Such agreements are "presumptively legal" and pay long-term dividends—increased sales, revenue, and profitability.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997); *see also* SAC ¶¶ 6, 266 (acknowledging that each Publisher's Inclusive Access program with Retailer Defendants has been profitable).  And such large payments are *inconsistent* with horizontal collusion because they confirm ongoing and intense competition among retailers jockeying to operate the on-campus bookstore.  *Id.* ¶¶ 147, 149, 262-63.  Moreover, as the Complaint concedes, Retailer Defendants are far from indispensable to any alleged conspiracy, as universities can and do have their own contracts with publishers and make Inclusive Access available through their own, institution-run bookstores.  *Id.* ¶¶ 16, 147.

Because Defendants' conduct as alleged in the Complaint "made perfect business sense," and Retailer Plaintiffs have pleaded "obvious alternative explanations for the facts alleged," no plausible inference of conspiracy arises from their allegations.  *In re Interest Rate Swaps Litig.*, 261 F. Supp. 3d at 462.  The horizontal conspiracy claims should be dismissed on this basis alone.

***Retailer Plaintiffs Do Not Allege Parallel Conduct.***  Even putting aside the obvious independent self-interested reasons for each Defendant to adopt Inclusive Access, Retailer Plaintiffs fail to plead parallel conduct.  To be sure, they say Publishers launched Inclusive Access programs "at nearly identically the same time."  SAC ¶ 30.  But they allege actions over *six years* that involved not only Publishers and Retailer Defendants, but also hundreds of unnamed universities— each of which supposedly joined the conspiracy when they agreed to adopt Inclusive Access programs (at unidentified times).  *Id.* ¶ 131; *see also LLM Bar Exam*, 271 F. Supp. 3d at 579 (no evidence of parallel conduct because "schools banned LBE from marketing on their campuses *at different times over the span of several years*") (emphasis added); *cf. Elec. Books Litig.*, 859 F.

17

Supp. 2d 671, 683 (S.D.N.Y. 2012) (parallelism plausibly alleged because each defendant "signed [] an agreement with Apple *in the days leading up* to the . . . iPad Launch") (emphasis added).

Retailer Plaintiffs admit that parallel implementation of Inclusive Access would have been "impossible." SAC ¶¶ 127, 131.  The "nature of the market" simply did not allow for an "overnight" effort, so each Publisher tested digital distribution in pilot programs, and universities gradually and individually adopted the programs.  *Id.* ¶ 131.  For example, Northwest Arkansas Community College allegedly had just six Inclusive Access classes in Spring 2018 and increased to 94 classes a year later.  *Id.* ¶ 134.  This was allegedly "common across many Universities."  *Id.*  "Allegations of such slow adoption of similar policies does not raise the specter of collusion."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195-96 (9th Cir. 2015).

Nor do Retailer Plaintiffs identify any parallel conduct among Retailer Defendants.  Rather, Plaintiffs *concede* that Inclusive Access can be (and is) employed without Retailer Defendants, evincing that they are not necessary to any conspiracy.  *See* SAC ¶¶ 16, 87, 147, 260 & n.8.  While they suggest BNED's and Follett's contracts are similar, *id.* ¶ 275, the cited agreements bear little resemblance on their faces.  *Compare* Brass Decl. Ex. A *with* Ex. B.  In particular, the contracts have different commission structures and pricing provisions:  Follett's agreement with the Tennessee Board of Regents allows it to sell course packs at 25% above its cost and includes commissions varying by school from 7% to 14.5%, for example.  *See* Brass Decl. Ex. A Attach. A § A.5 & Attach. D.  By contrast, BNED's agreement with Eastern Kentucky University provides for "up to a 30% gross margin" and commissions escalating over time from 2% to 14% based on gross sales brackets.  *See Brass* Decl. Ex. B §§ 19-20; *see also* SAC ¶ 284 (alleging agreements range

from 5 to 15-year terms).  And because many of these agreements *predate* a given school's adoption of Inclusive Access, any apparent similarities have no relevance at all to Retailer Plaintiffs' claims.  *See, e.g.*, Brass Decl. Ex. C.

**Retailer Plaintiffs Do Not Adequately Allege "Plus Factors."**  Retailer Plaintiffs also fail to allege any plus factors that elevate parallel behavior into "a context that raises a suggestion of a preceding agreement" instead of "identical, independent action."  *Twombly*, 550 U.S. at 549, 557.  Indeed, because the Complaint lacks allegations of (i) "a common motive to conspire," (ii) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators," or (iii) "evidence of a high level of interfirm communications," nothing suggests Defendants' logical "responses to common stimuli" were in fact the product of "an advance understanding." *Citigroup*, 709 F.3d at 136-37.

To start, Defendants had no plausible motive to conspire.  Retailer Plaintiffs point to a purported shared interest in eliminating secondary sales.  *See* SAC ¶ 155.  But they identify no facts explaining why that required collusion.  Under existing market and regulatory conditions, it was squarely in *every* Publisher's *individual* self-interest to move toward digital distribution and eliminate the secondary sales of *its own products*, from which Publishers derive no revenue.  *See supra* pp. 16; *see also* SAC ¶ 121 (alleging each Publisher's "profits were sinking" with the "old model" of selling exclusively print textbooks).  Plus, if (as Retailer Plaintiffs allege) Publishers "avoid competing with each other within Topic Markets," *id.* ¶ 217, then they provide no reason why Pearson, for example, which focuses on math and science, would need to collude with Cengage, a publisher of economic texts, for either or both to stifle used book sales. *Id.*

BNED and Follett also had no motive to conspire.  If the alleged conspiracy among Publishers was intended to reduce the supply of print materials into the secondary market, SAC ¶¶ 153-

19

54, Publishers did not need to include Retailer Defendants in any alleged scheme.  Nor was there any need for BNED or Follett to collude with one another, as each stood to reap the economic advantages of Inclusive Access programs absent collusion.  *See id.* ¶ 248 (Inclusive Access increased Retailer Defendants' sell-through); *see also supra* pp. 14-17 (explaining how the adoption of Inclusive Access programs was in each defendant's self-interest).

In any event, the hypothetical conspiracy imagined by the Retailer Plaintiffs is fundamentally implausible to the extent it would require coordination and enforcement by not only the Defendants but *hundreds* of universities nationwide.  *See, e.g.*, Christopher R. Leslie, *Trust, Distrust, and Antitrust*, 82 Tex. L. Rev. 515, 527-28 (2004) (observing that "cartels [are] inherently unstable" and face "coordination problems" that are exacerbated when "many firms" are involved).  Despite the obvious challenges associated with the elephantine conspiracy alleged, Retailer Plaintiffs cannot muster even a single collusive communication among horizontal competitors—*i.e.*, among the Publisher Defendants or the Retailer Defendants—let alone the "high level" of communication among competitors required for this plus factor.  *Citigroup, Inc.*, 709 F.3d at 139-40.

At most, the Complaint identifies Defendants as members of certain trade organizations and industry groups.  SAC ¶¶ 102-16.  Yet these entities served *bona fide* purposes.  *See id.* ¶ 107 (conceding EPEG "did in fact" develop anti-counterfeiting best practices, its "stated common objective").  EPEG also includes two publisher members—Elsevier and Macmillan Learning—that are not even alleged to be co-conspirators, making it even less plausible that the Publisher Defendants used the organization as a forum to enter into unlawful agreements.  *Id.* ¶ 110.  Plaintiffs nowhere allege that participation in any of these groups amounted to more than, at most, an "opportunity" to conspire, *id.* ¶¶ 33, 65, 108, 114, and "a mere opportunity to conspire at legitimate

meetings does not support an inference that an illegal combination actually occurred." *In re Interest Rate Swaps Litig.*, 261 F. Supp. 3d at 471 (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 567 n.12 ("belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

Also absent is a single communication with the universities that shows they knowingly joined, much less participated in, the allegedly anticompetitive scheme—even though Retailer Plaintiffs have already obtained internal documents from many universities through FOIA requests.  SAC ¶ 264.  Conspiracies with many members often must use "express methods of communication" as it is too "difficult to organize secret meetings or other communications," Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2002f1 (4th ed. 2013).  But the Complaint is devoid of any explanation as to how so many entities, at three levels of the distribution chain, agreed with each other, detected defections, and punished cheaters.  The Complaint also lacks any allegation as to how the *hundreds* of alleged conspirators coordinated over time as Inclusive Access programs changed, and provides no tenable reason why so many non-profit and public institutions of higher learning would join a conspiracy to their students' alleged detriment.  *See Volvo N. Am. Corp. v. Men's Intern. Prof'l Tennis Council*, 857 F.2d 55, 67 (2d Cir. 1988) (discussing the instability of multi-defendant conspiracies).

Retailer Plaintiffs have thus provided no allegations to justify the "risk [of] propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy." *Citigroup*, 709 F.3d at 137.  Absent "facts to support the inference that a conspiracy actually existed," *id.* at

136, the Section 1 claims premised on a horizontal agreement should be dismissed.[3]

### B.      Retailer Plaintiffs Do Not Allege an Unreasonable Restraint of Trade

Even if Retailer Plaintiffs had pled *some* agreement (which they have not), they have not alleged an agreement that "unreasonably restrain[ed] trade." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). Because none of the alleged agreements fall within the "small group of restraints [deemed] unreasonable *per se*," each must be "judged under the 'rule of reason.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018); *accord Spinelli v. NFL*, 903 F.3d 185, 211 (2d Cir. 2018). Retailer Plaintiffs have failed to plead a rule of reason claim as they allege neither anticompetitive effects in a plausible relevant market, nor the substantial foreclosure of competition required to sustain an exclusive dealing claim. The Court should dismiss Counts 1, 2, and 3.

#### 1.      Retailer Plaintiffs Do Not Allege Any *Per Se* Violation

The categories of conduct condemned as *per se* anticompetitive are "narrow." *Texaco Inc. v. Dagher*, 547 U.S. 1, 8 (2006). *Per se* treatment is reserved for restraints that "considerable experience," *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979), shows "always or almost always tend to restrict competition and decrease output," *Amex*, 138 S. Ct. at 2283. None of Retailer Plaintiffs' theories fit within those recognized categories.

***Exclusive Dealing.*** Count 3 alleges that "through a series of vertical agreements," Defendants "restrict distribution of Inclusive Access to the Defendant Retailer(s)." SAC ¶¶ 344-356. Retailer Plaintiffs assert that the *per se* rule applies to such "Exclusive Dealing," *id.* ¶¶ 345, 350,

---

[3] Retailer Plaintiffs' failure to allege a horizonal agreement, *i.e.*, rim, at any level (publisher, retailer, university) dooms any asserted "hub-and-spoke" conspiracy. *See United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (requiring "both vertical agreements between the hub and each spoke *and a horizontal agreement among the spokes*.") (emphasis added).

but "[i]t is a well-settled tenet of antitrust law that exclusive agreements . . . are not *per se* anti-competitive, and therefore these agreements must be analyzed under the rule of reason." *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at \*10 (S.D.N.Y. Jan. 8, 2007); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) (recognizing that "exclusive distributorship arrangements are presumptively legal").

**EPEG Guidelines.**   Retailer Plaintiffs claim in Count 1 that Publishers used "EPEG to agree upon and implement standardized conduct." SAC ¶ 323.  This too, they suggest, is "a per se violation." *Id.* ¶ 326.  But joint defense of the Publishers' "intellectual property is not per se illegal," particularly given that EPEG includes publishers who are not alleged co-conspirators. *See Spinelli*, 903 F.3d at 211; *see also* SAC ¶¶ 107-109 (describing the EPEG publishers' anti-counterfeiting activities).

**Price Fixing.**   Although Retailer Plaintiffs bandy accusations of "Price Fixing," SAC ¶¶ 323, 334, 345, "mere talismanic invocation" does not "bring the *per se* rule to bear." *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 596 (S.D.N.Y. 1989); *see also Broad. Music*, 441 U.S. at 23 ("Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints.").  Retailer Plaintiffs do not allege facts suggesting any horizontal agreement between any group of Defendants to stabilize, fix, or raise the prices charged for course materials whether provided through Inclusive Access or otherwise.  Nor do they allege that Defendants agreed to limit independent price setting, nor facts suggesting that Defendants discussed the prices they would charge.  Far from suggesting any uniformity in pricing, the Complaint alleges that Inclusive Access prices range from $41.62 all the way to $113.87.  SAC ¶¶ 170-171; *see also, e.g.*, *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 322-23 (2d Cir. 1969) (manufacturer's rebate program was not a per se price-fixing

arrangement because the "pricing independence of the individual dealer remain[ed] unimpeded").

*Group Boycott.* Finally, Retailer Plaintiffs assert a "group boycott" theory. SAC ¶ 323. But the *per se* approach to group boycotts "has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986); *see also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978) ("While the boycott concept is infinitely expandable, the Per se doctrine ought not to be.") (citations omitted). Here, the Complaint lacks any allegation that Defendants tried to prevent Retailer Plaintiffs from dealing with competitors of Publishers (e.g., Macmillan, Wiley, Sage). Further, Retailer Plaintiffs do not allege that Publishers refused to sell them course materials. *See* SAC ¶¶ 86, 292 (recognizing that Retailer Plaintiffs purchase course materials from Publishers). Nor do they allege that they even tried to establish the relationships with universities that are necessary to participate in Inclusive Access (e.g., access to university computer systems to add to students' tuition bills the cost of course materials provided through Inclusive Access, *see id.* ¶¶ 87, 141), much less that Defendants have prevented them from competing for those relationships.[4]

## 2. Retailer Plaintiffs Do Not Allege Plausible Relevant Markets

"Because the [Defendants' conduct] is not per se illegal, Plaintiffs' claims are subject to a rule of reason analysis, *Spinelli*, 903 F.3d at 211, which requires "an accurate definition of the relevant market." *Amex*, 138 S. Ct. at 2285; *see also City of N.Y. v. Grp. Health Inc.*, 649 F.3d

---

[4] Even if the *per se* rule applied to some part of their Section 1 claims, Retailer Plaintiffs do not define a plausible relevant product market. *See infra* § II.B.2. This failure is fatal to Counts 1, 2, and 3. *See Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 765 n.5 (S.D.N.Y. 2020) ("[I]t is an element of a per se case to describe the relevant market in which [courts] may presume the anticompetitive effect would occur. . . . Thus, regardless of which standard applies, [the plaintiff] must articulate a relevant market.") (internal quotation marks omitted).

151, 155 (2d Cir. 2011) ("To state a claim, . . . a plaintiff must allege a plausible relevant market

in which competition will be impaired.").  A plaintiff must allege a product market that is both

"plausible" and "bear[s] a rational relation to the methodology courts prescribe to define a market

for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand."

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008).[5]

     Here, Retailer Plaintiffs assert a host of allegedly relevant markets:

- ***Course Materials Market***.  Retailer Plaintiffs' broadest alleged market includes printed and digital textbooks, e-textbooks, homework, assignments, exams, quizzes, tests, and other learning software.  *See* SAC ¶¶ 8, 81, 203.[6]

- ***Topic Markets***.  Within the alleged Course Materials market, Retailer Plaintiffs allege separate submarkets for course materials used in each of five academic disciplines (Economics, History, Mathematics, English, and Science).  *See id.* ¶ 204.

- ***Individual Course Markets***.  Retailer Plaintiffs also allege even narrower submarkets for individual courses, "too numerous to set out individually."  *See id.* ¶ 204.

- ***Inclusive Access Materials***.  Retailer Plaintiffs further allege a submarket for course materials delivered via Inclusive Access ("Inclusive Access Materials"), which they allege includes submarkets for specific disciplines ("IA Topic Markets") and courses ("IA Individual Course Markets").  *See id.* ¶¶ 1, 206.

Yet apart from the Individual Course Markets, none of these alleged markets heed the basic re-

quirement that product markets include materials that "consumers treat [] as 'acceptable substi-

tutes'" for one another.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

    *First*, the alleged Inclusive Access Materials market—and its sub-markets, the IA Topic

Markets and the IA Individual Course Markets—are defined by reference to contractual restraints.

---

[5] Definition of a submarket "turns on the same inquiry."  *See Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998); *see also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).

[6] Retailer Plaintiffs previously alleged that the Course Materials market (and its submarkets) excluded used and rental course materials.  *See* CAC ¶ 198.  Having now stricken that allegation, Brass Decl. Ex. E (Complaint Redline) p. 163, they apparently concede that the alleged Course Materials market (and its submarkets) includes used, rental, and new course materials.

Retailer Plaintiffs concede that "Inclusive Access Materials are not *themselves* fundamentally different from other electronic or physical textbook and ancillary products" and that those other course materials could "function as substitutes," if they were not "isolate[ed] from competition by their delivery mechanism."  SAC ¶ 1; *see also id.* ¶ 206 ("[A]bsent Defendants' market-constraining conduct, print and digital Course Materials would be substitutes for Inclusive Access Materials."); *id.* ¶ 178 (absent "the described anticompetitive conduct . . . Inclusive Access Materials . . . cannot be meaningfully differentiated from identical . . . [m]aterials (both new and used).").  This attempt to use the Inclusive Access "mechanism" to cleave some course materials from others ignores black letter law that relevant product markets must be defined by "the uses to which the product is put by consumers in general," "not to the contractual restraints assumed by a particular plaintiff."  *Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 414 F. App'x 372, 377 (2d Cir. 2011) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997)); *see also Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 2014 WL 3739322, at *10 (S.D.N.Y. July 28, 2014) (dismissing complaint because market definition based on a "contractually created class of consumers"); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (dismissing claim based on e-books market because "print books are an obvious potential substitute for e-books" absent allegation that "print books and e-books are not, in consumer's minds, 'acceptable substitutes'").

*Second*, the alleged Course Materials, Inclusive Access Materials, Topic, and IA Topic markets are too broad.  For instance, the Course Materials and Inclusive Access Materials markets include materials for all courses, SAC ¶¶ 203, 206, even though Plaintiffs allege "Science Course Materials cannot be purchased and used as a substitute for Economics Course Materials," *id.* ¶ 209. So too for the Topic and IA Topic markets, which encompass all materials for particular disciplines

(Economics, History, Mathematics, English, and Science), *id.* ¶ 204, even though "United States History course materials are not an adequate substitute for European History course materials," *id.* ¶ 209.  Retailer Plaintiffs thus concede that these alleged markets include products that are not interchangeable substitutes.  *See E. & G. Gabriel v. Gabriel Bros., Inc.*, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (finding alleged relevant market "implausible" because it contained products that were "obviously not reasonable substitutes").

### 3.      Retailer Plaintiffs Do Not Allege Harm to Competition

In addition to a plausible relevant market, "[t]he rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff . . . allege an actual adverse effect on competition." *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018) (citations omitted); *see also Elecs. Commc'ns Corp.*, 129 F.3d at 244 ("Under rule of reasons analysis, an agreement will not violate the antitrust laws unless it can be shown that it will have an actual adverse effect on competition in the relevant market.").  Here, the Complaint contains no allegations whatsoever that competition between Retailer Defendants has been reduced.  Instead, it describes how competition to be selected as the operator for on-campus bookstores has "significantly increased."  *See* SAC ¶ 87.  As for the Publishers, Retailer Plaintiffs allege that they continue to compete vigorously by "market[ing] Course Materials to the Universities," which are "responsible for selecting which Course Materials students are required to purchase."  *Id.* ¶ 66.

The only competition that Inclusive Access allegedly affected is *intra*brand competition among retailers, including Retailer Plaintiffs, to sell a publisher's title *after* it has been assigned.  *See* SAC ¶ 178 (alleging Inclusive Access was "specifically timed to defeat the pro-competitive effects of available alternative sources for Course Materials").  But "[t]o prevail on a § 1 claim, a plaintiff must . . . show more than just an adverse effect on competition among different sellers of

the same product ('intrabrand' competition)."  *K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("[T]he primary purpose of the antitrust laws is to protect interbrand competition."); *Elecs. Commc'ns Corp.*, 129 F.3d at 245 (affirming dismissal where plaintiff pled, "at most, a slight reduction in competition . . . regarding the distribution of" one brand); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 72 (E.D.N.Y. 2006) ("So long as the exclusive dealing arrangement between the [Manufacturer] and the Retail Defendants does not prevent competing brands' access to the market in whatever quantities customers demand, it is unclear that the relationship imposes any negative restriction on competition in the market whatsoever.").

### 4.   Retailer Plaintiffs Do Not Allege an Exclusive Dealing Claim

Retailer Plaintiffs' exclusive dealing claim, SAC ¶ 345, also fails to allege that Defendants have "foreclosed . . . a substantial share" of the alleged Course Materials market.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961).  While Retailer Plaintiffs state that "approximately 90% of the Course Materials market [is] controlled by the Publishers," SAC ¶ 285, they do not specify what proportion of the Publishers' "Course Materials" sales are affected by the challenged exclusive arrangements.  That omission is fatal to Retailer Plaintiffs' claims based on the alleged Course Materials market.  If, hypothetically, course materials distributed through Inclusive Access programs account for 20% of Publishers' collective course materials sales, the alleged exclusive dealing would foreclose only 18% (20% of 90%) of the alleged Course Materials market—far below the threshold required for such claims.  *See Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.") (citations omitted); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1032 (N.D. Cal. 2015) (dismissing exclusive dealing claim

that "fail[ed] to explain . . . the logical leap" from defendant's alleged market share in a broad "general" market to alleged foreclosure in smaller market "only cover[ing] a subset" of products).

Even this hypothetical far overstates the alleged foreclosure. The Second Amended Complaint expanded the alleged Course Materials market to include the used and rental materials from which they allege Publishers generate no revenue. *See supra* n. 6; SAC ¶ 121 ("publishers only realize revenue from the first sale of any textbook or e-book"). The broader market definition should have reduced Defendants' alleged shares of the Course Materials market, but Plaintiffs did not adjust the shares to reflect their new market definition. Compare CAC ¶ 269 with SAC ¶ 285. Another hypothetical illustrates this issue: If *new* Course Materials represent only 25% of *all* Course Materials sales, *see* SAC ¶ 120, then the alleged exclusive dealing in Inclusive Access would foreclose at most ***4.5%*** of the alleged Course Materials market (25% of 20% of 90%). *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals . . . .").

Retailer Plaintiffs' allegations concerning the duration of Defendants' Inclusive Access agreements likewise fail to show a substantial foreclosure of competition. To start, all of the agreements on which Retailer Plaintiffs rely "may be cancelled without cause [within] six-months[]," so they "actually encourage, rather than discourage, competition." *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994); *see also* Brass Decl. Ex. A (Follett-TBR Agreement) ¶ D.2 (terminable with 150 days' notice); Brass Decl. Ex. B (BNED-EKU Agreement) ¶ 2 (terminable with 120 days' notice); Brass Decl. Ex. D (BNED-NW Arkansas Community College) ¶ 2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Moreover, while Retailer Plaintiffs aver that "many" of the contracts are "in the three-year range," SAC ¶ 284, agreements of such short duration do not support a claim of exclusive dealing. *See Spinelli v. NFL*, 96 F. Supp. 3d 81, 117-18 (S.D.N.Y. 2015) (dismissing

exclusive dealing claim when contracts "had exclusivity periods of no more than three years").  To the extent certain agreements have a longer exclusivity period, they do not foreclose competition when they are freely terminable on short notice.  *See, e.g., Balaklaw*, 14 F.3d at 799.

## III.    The Section 2 Claims Should Be Dismissed (Counts 4-6)

In Counts 4-6, Retailer Plaintiffs assert claims for monopolization, conspiracy to monopolize, and attempted monopolization.  *See* SAC ¶¶ 357-85.  But Retailer Plaintiffs cannot sustain a conspiracy-to-monopolize claim (Count 5) because they fail to allege a plausible horizontal agreement.  *See supra* § II.A.  And their failure to define plausible relevant markets dooms Counts 4 and 6.  *See supra* pp. 25–27; *see also In re Elevator Antitrust Litig*., 502 F.3d 47, 50 (2d Cir. 2007) (affirming dismissal of conspiracy claims because "plaintiffs are unable to allege facts that would provide plausible grounds to infer an agreement") (internal quotation marks omitted); *Chapman*, 546 F.3d at 238 (affirming dismissal of monopolization claim for failure to define market); *LLM Bar Exam*, 271 F. Supp. 3d at 584-85 (similar).  The monopolization and attempted monopolization claims also fail for the independent reasons that Retailer Plaintiffs do not allege either monopoly power (or a dangerous proximity of achieving it) or anticompetitive conduct.  *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 73 (2d Cir. 1988).

### A.    Retailer Plaintiffs Do Not Allege Monopoly Power

It is beyond dispute that aggregating multiple defendants' alleged market shares cannot "sustain a charge of monopolization or attempted monopolization"; instead, "a plaintiff must allege the necessary market domination of a *particular* defendant."  *H.L. Hayden Co. of New York v. Siemens Med. Sys.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (emphasis added) (citations omitted); *see also In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *13 (S.D.N.Y. Sept. 4, 2014) ("district [ ] courts in this and other districts have uniformly held" that "a 'shared monopoly'

theory cannot support a Section 2" claim).  Further, shares below 60% generally have been deemed insufficient to plead monopoly power.  *See PepsiCo*, 315 F.3d at 109 ("Absent additional evidence . . . a 64 percent market share is insufficient to infer monopoly power.").  And for a claim of attempted monopolization, "a 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power."  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999).  Retailer Plaintiffs ignore these principles.[7]

*Alleged Course Materials Market.*  No single Defendant is alleged to have a share greater than 40% in the alleged Course Materials market.  *See* SAC ¶¶ 84, 87 n.7, 216, 225.  Although Defendants' alleged shares are naturally higher when combined, courts universally reject "aggregating the market shares of individual defendants to satisfy the monopoly power requirements for actual and attempted monopoly under section 2."  *Discover Fin. Servs., Inc. v. Visa U.S.A., Inc.*, 2005 WL 8178487, at *2 (S.D.N.Y. Nov. 4, 2005); *accord H.L. Hayden*, 879 F.2d at 1018; *In re Credit Default Swaps*, 2014 WL 4379112, at *13.

*Alleged Topic Markets.*  The Complaint fails to allege *any* market share for either Retailer Defendant in any of the Topic Markets, and the allegations concerning Publishers' market shares fail to plead monopoly power.  *See* SAC ¶¶ 217, 361.  For instance, the claims that "McGraw Hill and Pearson appear to share the English Course Materials submarket" and "Cengage and McGraw Hill dominate the History Course Materials submarket," *id.* ¶ 217, say nothing about whether any Publisher alone has monopoly power in either of those alleged submarkets—and indeed these allegations of "share[d]" domination suggest they do not.  The Complaint makes no allegations about

---

[7]  Given the expansion of the products allegedly within the so-called "Course Materials" market (and its submarkets) after amendment, it is implausible that Defendants' alleged market shares would stay the same.  *See supra* n. 6; *compare* CAC ¶¶ 80, 83 n.6, 205-06, 210, 214, 343 *with* SAC ¶¶ 84, 87 n.7, 216-17, 221, 225, 361.  For that reason, and for the failure to define a plausible market, *see supra* pp. 25–27, the attempted monopolization claims (Count 6) should be dismissed.

McGraw Hill's individual share of any Topic Market.  And while either Pearson or Cengage is alleged to have a greater than 50% share of the alleged Math, Science, and Economics Course Materials markets, *id.*, higher shares are required to state a monopolization claim.  *See PepsiCo*, 315 F.3d at 109 (64% share insufficient to infer monopoly power).

   ***Alleged Inclusive Access Materials Market.***  In the alleged Inclusive Access Materials market, the Complaint alleges that Publishers' "shares are generally in excess of 70%," SAC ¶¶ 223, 362, and that "more than 90% of the sales . . . are made by the three Publishers," *id.* ¶ 221. But Plaintiffs do not allege any individual Publisher's share, and their allegations of combined shares cannot state a claim for monopolization.  *See H.L. Hayden*, 879 F.2d at 1018; *In re Credit Default Swaps*, 2014 WL 4379112, at *13; *Discover Fin. Servs.*, 2005 WL 8178487, at *2.  Moreover, Plaintiffs' allegations directly contradict each other insofar as the Complaint states not only that Retailer Defendants "have a market share of 100%" in Inclusive Access at each university, but also that Publishers control "in excess of 70%" of Inclusive Access—implying a collective share of 170%.  SAC ¶ 362.  Publishers and Retailers do not compete with each other, making the alleged shares in the same market impossible.

   ***Alleged Individual Course Markets, IA Individual Course Markets, and IA Topic Markets.***  For the Individual Course Markets, the IA Individual Course Markets, and the IA Topic Markets, Plaintiffs aver that "[i]n each of these markets, one Publisher has . . . or . . . two Publishers have . . . a dominant market share, in *most* instances over 50% and in *many* instances nearing 100%."  SAC ¶ 361 (emphasis added).  But even if true, that allegation would show that no Publisher has a dominant market share in certain of those alleged markets.  It also necessarily implies that in the remainder (putting aside the improper attempt to aggregate multiple Publishers' market shares) there is only one dominant Publisher, with the other two combined having substantially

lower shares, sometimes approaching zero.  As to Retailer Defendants, the Complaint contains no

allegations whatsoever about either of their individual shares of the alleged Individual Course, IA

Individual Course, or IA Topic markets.  As a result, in *every* one of these alleged markets, Plain-

tiffs have failed to plead that at least four of the five Defendants have monopoly power, and they

have admitted that, in some of those markets, no Defendant does.

In short, Retailer Plaintiffs' scattershot approach misses the mark.  They have not plausibly

alleged that any Defendant has a large enough market share to monopolize any specific alleged

market (or come dangerously close to doing so).

### B.    Retailer Plaintiffs Do Not Allege Anticompetitive Conduct

Even if Retailer Plaintiffs had adequately alleged that Defendants have monopoly power,

"the possession of monopoly power will not be found unlawful unless it is accompanied by an

element of anticompetitive *conduct*."  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V.*

*Trinko, LLP*, 540 U.S. 398, 407 (2004).  But the only allegedly anticompetitive conduct was the

Publishers' refusal to deal with Retailer Plaintiffs.  *See* SAC ¶ 364.[8]  And that conduct cannot serve

as the basis of a Section 2 claim because, "as a general matter, the Sherman Act 'does not restrict

the long recognized right of [a] trader or manufacturer engaged in an entirely private business,

freely to exercise his own independent discretion as to parties with whom he will deal,'" *Trinko*,

549 U.S. at 408 (*quoting United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)), and the

Complaint does not allege the "limited circumstances" under which a refusal to sell can give rise

to Section 2 liability, *see Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

---

[8]  Retailer Plaintiffs also characterize the Publishers' conduct as "Exclusive Dealing," SAC ¶ 364,
but that claim is indistinguishable from a claim that they refused to deal with Retailer Plaintiffs.
Moreover, the infirmities that required dismissal of the exclusive dealing claim under Section 1
likewise require dismissal under Section 2.  *See supra* pp. 27–28; *Elecs. Commc'ns Corp.*, 129
F.3d at 246 (affirming dismissal of Section 1 and Section 2 claims for largely the same reasons).

Such a claim would require allegations that Publishers had included Retailer Plaintiffs in Inclusive Access programs in a prior "voluntary *(and thus presumably profitable*) course of dealing." *See Trinko*, 540 U.S. at 409. But the Complaint nowhere alleges such a prior course of dealing, much less that Publishers sacrificed short-term profits by changing past practices. To the contrary, it claims that Publishers "have refused to sell Inclusive Access Materials" to Retailer Plaintiffs and other independent bookstores, SAC ¶ 156, and that they did so to "increase their own profits," *id.* ¶ 247. For that reason too, the Section 2 claims against Publishers should be dismissed.

## IV.    The Robinson-Patman Act Claims Should Be Dismissed (Counts 7-8)

Retailer Plaintiffs fail to state an actionable claim that Publishers and Retailer Defendants have violated Sections 2(a) and 2(f) of the RPA. Plaintiffs' failures to allege antitrust injury, *see supra* pp. 8–13, and define valid relevant markets, *see supra* pp. 25–27, are each also dispositive here. *Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825, 829 (9th Cir. 1971) ("proof of a well-defined relevant market upon which the challenged anticompetitive actions would have had a substantial impact" required to establish claims under the RPA); *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 476 (E.D.N.Y. 2005) (dismissing RPA claim for failure to allege "actual injury attributable to something the antitrust laws were designed to prevent"). In addition, Plaintiffs also do not allege (1) discrimination in price; (2) discrimination between two buyers of the same seller in interstate commerce; (3) or that Inclusive Access was a commodity—all required elements. 15 U.S.C. § 13(a); *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176-77 (2006); *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 209 (2d Cir. 2015); *see also Great Atl. & Pac. Tea Co. v. F.T.C.*, 440 U.S. 69, 70 (1979) ("[B]uyer liability under § 2(f) is dependent on seller liability under § 2(a)."). Dismissal is therefore required.

*First*, according to the Complaint, Publishers did not regularly charge retailers different prices for course materials provided via Inclusive Access.  Rather, Retailer Plaintiffs allege that "in almost every case where the Plaintiff Retailers have encountered Inclusive Access Materials, the Publishers refused to sell [them] to the Plaintiff Retailers in any format and under any terms." SAC ¶ 287; *see also id.* ¶ 348.  Assuming this allegation is accurate, refusing to sell Inclusive Access materials is not price discrimination.  *Bennett v. Cardinal Health Marmac Distribs., Inc.*, 2003 WL 21738604, at *6 (E.D.N.Y. July 14, 2003) ("[T]he Robinson-Patman Act 'does not prohibit a seller from choosing its customers and from refusing to deal with prospective purchasers to whom, for whatever reason, it does not wish to sell.'"); *see also H.L. Hayden*, 879 F.2d at 1022 (since defendant no longer sells to plaintiff, "as is its right, there is no danger that it will sell to them on discriminatory terms") (citation omitted).  That alone dooms these claims.

*Second*, the Complaint fails to allege that each Publisher made two sales at different prices—one at a higher price to a Retailer Plaintiff and the other at a lower price to another retailer. *Cancall PCS v. Omnipoint Corp.*, 2000 WL 272309, at *8 (S.D.N.Y. Mar. 10, 2000) (dismissing RPA claim because "plaintiffs do not allege that there have been two contemporaneous sales of the same commodity at different prices").  Indeed, the Complaint lacks any facts regarding price discrimination in actual sales involving Cengage or McGraw Hill and Retailer Plaintiffs, so there is no basis for an RPA claim against those Defendants.  And as to Pearson and Retailer Defendants, the Complaint alleges only a single instance in which, "upon information and belief," Pearson sold "Inclusive Access Materials" to one Plaintiff at a higher price than it sold them to Follett, SAC ¶ 288, and one instance as to BNED, *id.* ¶¶ 290-93.  Such isolated sales, standing alone, are insufficient to satisfy the first (price discrimination) and fifth (substantial injury to competition)

elements of a RPA claim, warranting dismissal of Counts 7 and 8 as to Pearson and Retailer Defendants as well.  *See Volvo Trucks*, 546 U.S. at 180 (rare price differences do not give rise to an "inference of injury to competition") (citation omitted).

*Third*, the RPA "applies only to 'commodities.'"  *Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*, 808 F. Supp. 1131, 1136 (S.D.N.Y. 1992).  "Commodities" under the RPA are limited to tangible goods.  *See id.* (noting "intangible goods and services" are not commodities); *see also Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (recognizing that courts have "strictly construed" what qualifies as a commodity).  Plaintiffs concede that Inclusive Access is a "delivery mechanism," not a tangible good, and it is accordingly beyond the scope of the RPA. SAC ¶ 1; *see also id.* ¶ 185 (referring to Inclusive Access as a "subscription service[]"); *id.* ¶ 24 (and as a "digital subscription[]"); *id.* ¶ 140 (explaining that "students are not purchasing physical Course Materials" when they buy through Inclusive Access); *id.* ¶ 241 (defining it as a "delivery system" for "digital-only . . . mandatory courseware enrollments."); *see also supra* n. **Error! Bookmark not defined.**.  In similar situations, courts have consistently held that all manner of services, even those that involve or produce tangible goods, such as book-printing services, are not commodities under the RPA.  *See, e.g.*, *Innomed Labs, LLC*, 368 F.3d at 148 (intangible products are not commodities); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986) ("Medical services are not 'commodities.'"); *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1037 (7th Cir. 1989) (printing services are not commodities); *Code Rebel, LLC v. Aqua Connect, Inc.*, 2014 WL 46696, at *5 (C.D. Cal. Jan. 3, 2014) ("[S]oftware lacks the requirement of a 'tangible component.'"); *Nat'l Tire Wholesale, Inc. v. Wash. Post Co.*, 441 F. Supp. 81, 85 (D.D.C. 1977), *aff'd*, 595 F.2d 888 (D.C. Cir. 1979) (newspaper advertising is an intangible service, not a commodity).

## V.       Section 16 Is Not Independently Actionable (Count 9)

A Section 16 claim requires a threat of injury from "an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (discussing 15 U.S.C. § 26); *see also Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 52 (2d Cir. 2010) ("[A]n antitrust plaintiff—whether seeking relief in law or equity—must demonstrate 'antitrust injury[.]'"). Because each of Retailer Plaintiffs' other antitrust claims fail for the reasons set forth above, Count 9 should be dismissed, too.

## VI.      Retailer Plaintiffs' State Law Claims Should Be Dismissed (Counts 10-14)

In addition to their federal claims, Retailer Plaintiffs seek related relief under a slew of state laws. These tag-along claims are meritless and should be dismissed. *See, e.g.*, *In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371, 1376, 1382 (N.D. Ga. 2010) (dismissing claims brought under "common law and antitrust laws of about forty states" when plaintiffs failed to state a claim under federal antitrust law and the "allegations for both types of claims [were] the same").[9]

### A.       The Statutory State Law Claims Are Derivative and Inapplicable

Retailer Plaintiffs assert claims under Arkansas, Kentucky, New Mexico, and Texas unfair competition statutes. But each fails because it is predicated on the exact same allegations as the federal antitrust claims: Defendants allegedly "restrain[ed] competition in the marketplace of Course Materials" through the "Horizontal Price Fixing, Horizontal Group Boycott, the Trade Association Violations, the Exclusive Dealing, and the price discrimination set forth in th[e Retailer

---

[9]  In their state law claims, Retailer Plaintiffs allude to purported violations of DOE regulations. *See* SAC ¶ 409 (citing 34 C.F.R. § 668.164(c)(2)). These regulations provide no private right of action. *Paine Coll. v. S. Ass'n of Colleges & Sch. Comm'n on Colleges, Inc.*, 342 F. Supp. 3d 1321, 1332–33 (N.D. Ga. 2018), *aff'd*, 810 F. App'x 852 (11th Cir. 2020). They also are irrelevant, as they apply to educational "institutions," not Defendants. *See* 34 C.F.R. § 668.164(c)(2) (describing when "an *institution* may include the costs of books and supplies as part of tuition and fees") (emphasis added); 34 C.F.R. § 668.161 (establishing rules for "a participating institution").

Plaintiffs'] Complaint."  SAC ¶¶ 404, 408, 416, 420, 434, 438, 450, 454.

First, the Texas Free Enterprise & Antitrust Act of 1983 ("TFEAA") is substantively identical to the Sherman Act and must be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes."  Tex. Bus. & Com. Code § 15.04; *see also Zhejiang Med. Co. v. Kaneka Corp.*, 2012 WL 12893418, at \*3 (S.D. Tex. Aug. 13, 2012) (dismissing TFEAA claim because plaintiff "failed to allege sufficient facts" under the Sherman Act); *Shipper v. Am. Auto. Ass'n*, 1997 WL 135672, at \*6 (N.D. Tex. Mar. 12, 1997) (TFEAA "mirrors" the Sherman Act).  As the TFEAA claim is entirely derivative of the federal claims, it fails for the same reasons. *See Apani Sw., Inc. v. Coca-Cola Enterps., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (affirming dismissal of TFEAA claim as plaintiff failed to state a Sherman or Clayton Act claim).

The three other state statutes—the Arkansas Unfair Practices Act ("AUPA"), Kentucky Unfair Practices Act ("KUPTA"), and the New Mexico Price Discrimination Act ("NMPDA")— are similar to the RPA.  Indeed, the NMPDA prohibits the same type of price discrimination proscribed by the RPA, and the AUPA and KUPTA are even narrower, limiting price discrimination among only different intrastate geographic localities, which is not alleged here.  *See supra* pp. 34–37 (discussing Plaintiffs' RPA claims); *see also Ideal Plumbing Co. v. Benco, Inc.*, 382 F. Supp. 1161, 1168 (W.D. Ark. 1974) (finding the "reasoning and interpretation of the court decisions under the [RPA] also apply to the [AUPA]"); KRS § 365.020 (KUPTA prohibits locality "price discrimination" only, not discrimination among purchasers); *Jay Walton Enters., Inc. v. Rio Grande Oil Co.*, 738 P.2d 927, 929-30 (N.M. Ct. App. 1987) (rejecting NMPDA claim and noting that the NMPDA "closely parallels" and is "interpret[ed] and appl[ied]" like the RPA).

The claims under the AUPA and NMUPA also fail because Plaintiffs lack statutory standing.  The AUPA confers a private right of action only under circumstances not alleged here—for

secret payments, sales below cost, or intrastate price discrimination among different intrastate geographic localities.  Ark. Code Ann. §§ 4-75-207–209; *see also, e.g.*, *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *22 (E.D. Tenn. June 24, 2015) (AUPA does not provide private right of action for antitrust conspiracy); *Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*, 2012 WL 511485, at *4 (W.D. Ark. Feb. 15, 2012) ("There is no private right to a cause of action pursuant to the subchapter of the Arkansas Code relating to unfair monopolies."). And the NMUPA provides standing only to consumers, and "does not provide a cause of action for competitive injury claims" like those alleged here.  *Gandydancer, LLC v. Rock House CGM, LLC*, 453 P.3d 434, 438 (N.M. 2019); *see also Vigil v. Taintor*, 2019 WL 6768676, at *7-9 (N.M. Ct. App. Dec. 11, 2019) (rejecting non-consumer's NMUPA claim because the NMUPA "gives standing only to *buyers* of goods and services") (citation and quotation marks omitted).

### B.  The Unjust Enrichment Claims Should Be Rejected

Retailer Plaintiffs' state law unjust enrichment claims also should be dismissed as they rely entirely on the insufficient allegations of "wrongful conduct described herein."  *See* SAC ¶¶ 411, 422, 440, 445, 456.  It is well established that a party who cannot recover under federal or state antitrust or trade practices statutes cannot recover on an unjust enrichment claim arising from the same alleged conduct.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014) (dismissing claim "predicated on" dismissed antitrust and consumer protection claims); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1181 (N.D. Cal. 2013) (same); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010) (prohibiting recovery under an unjust enrichment theory where the defendant's "conduct cannot give rise to liability under state antitrust and consumer protection laws"); *In re Microsoft Corp. Antitrust Litig.*, 241 F. Supp. 2d 563, 565 (D. Md. 2003) (dismissing Kentucky unjust enrichment claim for the

"same reason[s]" claims failed under "Kentucky's version of the Sherman Act"); *DePriest v. AstraZeneca Pharms., LP*, 351 S.W.3d 168, 179 (Ark. 2009) (affirming dismissal of Arkansas unjust enrichment claim because "[t]here cannot be any 'unjust' enrichment where [the] alleged conduct falls within what is permitted by federal law").

Additional state-specific reasons require dismissal of the Kentucky, Tennessee, and Texas claims.  Under both Kentucky and Tennessee law, Retailer Plaintiffs must allege that they "directly" or "willingly" conferred a benefit on Defendants.  *See Simpson v. Champion Petfoods, USA, Inc.*, 397 F. Supp. 3d 952, 974 (E.D. Ky. 2019) (granting motion to dismiss because the "general purpose of an unjust enrichment claim" is to "compensate for benefits conferred, not loss suffered"); *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 848 (M.D. Tenn. 2019) (failure to allege that any benefit was "*willingly* conferred" required dismissal of Tennessee claim) (emphasis in original).  The Complaint is devoid of any such allegation.

The last remaining claim, for unjust enrichment under Texas law, fails because "unjust enrichment is not an independent cause of action under Texas law." *Zamora v. Wells Fargo Bank*, 2020 WL 4708153, at *5 (S.D. Tex. Aug. 13, 2020); *see also Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 399 (S.D.N.Y. 2008) (dismissing Texas unjust enrichment claim because it "is not an independent cause of action").  To the extent any analogous relief would be available, Retailer Plaintiffs can recover only if Defendants "obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  The Complaint alleges no such thing.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Retailer Plaintiffs' Second Amended Class Action Complaint in full and with prejudice.

Dated: January 22, 2021

Respectfully Submitted,

s/ Rachel S. Brass

Rachel S. Brass
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: (415) 393-8293
rbrass@gibsondunn.com

Adam J. Di Vincenzo
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 887-3704
adivincenzo@gibsondunn.com

*On behalf of Defendants Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc.*

s/ Craig C. Martin (by consent)

Craig C. Martin
Matt D. Basil
WILLKIE FARR & GALLAGHER LLP
300 N LaSalle Street
Chicago, IL 60654
Telephone: (312) 728-9000
cmartin@willkie.com
mbasil@willkie.com

*On behalf of Follett Higher Education Group, Inc.*

s/ Eric Mahr (by consent)

Eric Mahr
Andrew J. Ewalt
Richard Snyder
Lauren Kaplin
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
eric.mahr@freshfields.com
andrew.ewalt@freshfields.com
richard.snyder@freshfields.com
lauren.kaplin@freshfields.com

*On behalf of Defendant Cengage Learning, Inc.*

s/ W. Cavanaugh, Jr. (by consent)

William F. Cavanaugh, Jr.
Saul B. Shapiro
Amy N. Vegari
PATTERSON BELKNAP WEBB & TY-
LER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
wfcavanaugh@pbwt.com
sbshapiro@pbwt.com
avegari@pbwt.com

*On behalf of McGraw Hill LLC*

s/ J. Quinn-Barabanov (by consent)

Jennifer Quinn-Barabanov
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
jquinnba@steptoe.com

Michael Dockterman
STEPTOE & JOHNSON LLP

41

227 W Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300
mdockterman@steptoe.com

*On behalf of Defendant Pearson Education, Inc.*