```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
                                        :   20 MDL NO. 2946
 IN RE: INCLUSIVE ACCESS COURSE         :        (DLC)
 MATERIALS ANTITRUST LITIGATION         :
                                        :   OPINION & ORDER
--------------------------------------- :
                                        :
 This Opinion and Order applies to the  :
 following action:                      :
                                        :
 20cv6339.                              :
                                        :
--------------------------------------- X
```

APPEARANCES:

For the plaintiffs:

Bruce Steckler
Stuart Cochran
L. Kirstine Rogers
Steckler Wayne Cochran PLLC
12720 Hillcrest Rd Suite 1045
Dallas, TX 75230

Nicole L. Williams
Mackenzie Wallace
Thompson Coburn LLP
2100 Ross Avenue, Suite 600
Dallas, TX 75201

Jasmine S. Wynton
Thompson Coburn LLP
1919 McKinney Ave., Suite 100
Dallas, TX 75201

Christine Couvillon
Thompson Coburn LLP
1909 K Street N.W., Suite 600
Washington, D.C. 20006

For defendant McGraw Hill LLC:

William F. Cavanaugh, Jr.
Saul B. Shapiro
Amy N. Vegari
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

For defendant Pearson Education, Inc.:

Jennifer Quinn-Barabanov
Zachary B. Schreiber
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Michael Dockterman
Steptoe & Johnson LLP
227 West Monroe St. Suite 4700
Chicago, IL 60606

For defendant Cengage Learning, Inc.:

Eric Mahr
Andrew J. Ewalt
Richard Snyder
Lauren Kaplin
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW, 10th Floor
Washington DC, DC 20005

For defendants Barnes & Noble College Booksellers, LLC and
Barnes & Noble Education, Inc.:

Rachel S. Brass
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

Adam J. Di Vincenzo
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

For defendant Follett Higher Education Group, Inc.:

Craig C. Martin
Matt D. Basil
Willkie Farr & Gallagher LLP
300 N. LaSalle Street
Chicago, IL 60654


DENISE COTE, District Judge:

The plaintiffs, on behalf of a class of businesses that
sell college textbooks online or through off-campus bookstores,
assert that the defendants have conspired to eliminate
competition in the market for college textbooks.  The defendants
are the three principal publishers of textbooks, two large
operators of on-campus bookstores, and a textbook industry trade
association.  The plaintiffs assert that the publishers'
promotion of digital textbooks to colleges and their faculty at
the expense of traditional hardcopy textbooks has reduced the
size of the secondary market for textbooks.  Pointing to
contracts between colleges and on-campus bookstore operators
that make the latter the exclusive sellers of digital textbooks
at each college's campus, the plaintiffs claim that they have
been denied the opportunity to distribute digital textbooks, and
that competition in the market for textbooks has suffered as a
result.  The defendants have moved for dismissal of the entire
complaint.  For the reasons stated below, the defendants'
motions are granted.

**Background**

The following facts are taken from the Second Consolidated
Amended Class Action Complaint ("SAC") and documents integral to
it, unless otherwise noted, and are taken to be true for
purposes of this motion.  Coal. for Competitive Elec. v.
Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018).  The plaintiffs are
independent off-campus bookstores and online sellers of college
textbooks.  They bring this action as representatives of a class
defined as "All persons or entities in the United States who
were in the business of selling Course Materials at off-campus
retail outlets serving students at the Universities or online"
from January 1, 2015 to the present.  The SAC defines "Course
Materials" as "traditional printed textbooks . . . as well as
digital textbooks and e-textbooks."[1]  It defines "Universities"
as "colleges and universities . . . throughout the United
States."  For simplicity, this Opinion will use the term
Institutions rather than colleges or universities except when
quoting directly from the SAC.

A.   Secondary Market for Textbooks

The three Publisher Defendants -- Cengage Learning, Inc.
("Cengage"); McGraw Hill, LLC ("McGraw Hill"); and Pearson
Education, Inc. ("Pearson") -- are the dominant publishers of

---

[1] The SAC does not separately define digital and e-textbooks.
This Opinion therefore only uses the term digital textbooks.

4

college textbooks in the United States.  Together, they control
80-90% of the market for new textbooks.

In the early 2000s, the Publisher Defendants began to face
increasing competition from the rapidly growing secondary
marketplace for textbooks.  At online sites such as Amazon and
Chegg, and at brick-and-mortar vendors, college students could
buy, sell, and rent used textbooks at prices dramatically below
the prices for new textbooks.

On-campus bookstores also suffered from the rapid growth of
the secondary market for textbooks.  Although on-campus
bookstores sold both new and used textbooks, they faced
competition in the market for used textbooks from off-campus and
online bookstores.  The majority of on-campus bookstores are
operated by the Retailer Defendants: Barnes & Noble College
Booksellers, LLC and Barnes & Noble Education, Inc.
(collectively, "Barnes & Noble") and Follett Higher Education
Group, Inc. ("Follett").

B.   Inclusive Access

1.   Origins

In response to the rise of the secondary market for college
textbooks, the Publisher Defendants adopted a "digital-first
strategy" that aimed to curtail the growth of the secondary
market by reducing sales of new hardcopy textbooks.  As part of
that strategy, the Publisher Defendants developed "Inclusive

Access," a program through which a professor at a participating
Institution may designate her chosen textbook to be offered
digitally to students.[2]  Subscriptions to Inclusive Access last
only for the length of the course.  Once the course concludes,
students lose access to the textbooks that they received through
Inclusive Access.

The Publisher Defendants first experimented with products
similar to Inclusive Access in 2014 and 2015 through "pilot
programs," but the product "was not well-received" and failed to
take root.  The plaintiffs claim that:

> [A] variety of studies showed the products did <u>not</u>
> evidence improvement in areas such as affordability,
> quality, or learning outcomes, and further showed that
> the students (and in many cases, the faculty) did not
> like the products.  There were no significant
> movements of the market to Inclusive-Access-style
> products at that time.

On May 18, 2015, the United States Department of Education
("DOE") published for comment a proposed rule pursuant to Title
VII of the Higher Education Act of 1965 that would permit, among
other things, postsecondary institutions to include the cost of
textbooks as part of tuition and fees ("Notice").  80 Fed. Reg.
28484 (2015).  In the Notice, the DOE stated that it "initially

---

[2] The SAC notes that digital textbooks, whether offered through
Inclusive Access or otherwise, are sometimes accompanied by
other educational materials, such as digital homework, quizzes,
and exams.

considered prohibiting institutions from including books and
supplies as part of tuition and fees," but had

> decided against a total prohibition on including books
> and supplies as part of tuition and fees, and agreed
> to a compromise position that would still benefit
> students, allow institutional flexibility when
> materials are integral to the course, and hold
> institutions accountable through cost transparency.

Id. at 28521-22.

On October 30, 2015, the DOE published the final rule,
which became effective on July 1, 2016 ("Rule 164").  Id. at
67126.  Rule 164 allows postsecondary institutions in some
circumstances to directly bill students for textbooks and
supplies on their tuition statements.  It provides:

> An institution may include the costs of books and
> supplies as part of tuition and fees under paragraph
> (c)(1)(i) of this section if -
>
>> (i) The institution -
>>
>>> (A) Has an arrangement with a book publisher
>>> or other entity that enables it to make
>>> those books or supplies available to
>>> students below competitive market rates;
>>>
>>> (B) Provides a way for a student to obtain
>>> those books and supplies by the seventh day
>>> of a payment period; and
>>>
>>> (C) Has a policy under which the student may
>>> opt out of the way the institution provides
>>> for the student to obtain books and supplies
>>> under this paragraph (c)(2). . . .
>>
>> (ii) The institution documents on a current basis
>> that the books or supplies, including digital or
>> electronic course materials, are not available
>> elsewhere or accessible by students enrolled in

> that program from sources other than those
> provided or authorized by the institution[] . . .
> .

34 C.F.R. § 668.164(c)(2) (2016) (emphasis supplied).

The DOE explained that it was motivated by its statutory mandate to protect "the rights of students as consumers."  80 Fed. Reg. 67138 (2015).  Commentators had persuaded it "that including books and supplies [in tuition] would not only enable an institution to negotiate better prices for its students, it would result in students having acquired course materials at the beginning of a term or payment period."  Id.  Aware, however, that the inclusion of the cost of books as part of tuition would mean that "students will not have the option of seeking even lower cost alternatives such as used books, rentals, or e-books," the Rule requires the Institution to provide the student an opt-out.  Id. at 67139.

The DOE also justified its adoption of the Rule by reference to the increased demand for digital course material:

> We are convinced that digital platforms, and digital
> course content in general, will become more ubiquitous
> and that including digital content as part of tuition
> and fees ensures that students have access to this
> technology.

Id. at 67126-01.[3]  The DOE cited "the best financial interests of students" as its guiding principle in drafting the Rule.  Id. at 67138.

### 2.   Adoption of Inclusive Access

The SAC alleges that in 2016, Inclusive Access was implemented "in its current form" by "all of the Publishers practically simultaneously."  They began to "evangelize" Inclusive Access, and Inclusive Access programs were introduced at Institutions across the United States.  For example, between July 2016 and November 2017, Pearson executed agreements to implement Inclusive Access with over 200 Institutions.  The Publisher Defendants have announced "that they would be restricting and eventually discontinuing their production of all Course Materials other than Inclusive Access Materials."  The SAC defines "Inclusive Access Materials" as textbooks delivered through Inclusive Access.

### 3.   Features

Digital textbooks delivered through Inclusive Access programs are typically cheaper than new hardcopy textbooks.  On

---

[3] The SAC does not highlight the enactment of Rule 164 in its description of the adoption of Inclusive Access, but it does assert that the Publisher Defendants coordinated their efforts related to the DOE rulemaking that resulted in the Rule's promulgation.  The SAC also asserts that the Defendants have violated Rule 164 because textbooks distributed through Inclusive Access are not offered at a lower-than-competitive market rate and students are not allowed to opt out.

the other hand, they are more expensive than used hardcopy textbooks sold or rented on the secondary market.

Students are "automatically" subscribed to Inclusive Access when they enroll in a college course that has adopted it and are automatically charged for the digital textbooks on their tuition bills. Students may elect to purchase "print upgrades" for an additional fee, but the Publisher Defendants limit the number of students who may do so in any given course. Although students nominally have the right to opt out of Inclusive Access, they are often warned that opting out of Inclusive Access will make passing the course "impossible" since the students will not have access to Inclusive Access if they opt out.

C.   Bookstore Operating Agreements

The plaintiffs allege that the Defendants entered into agreements that "compel" Institutions and students "to deal with the Defendants on an exclusive or nearly exclusive basis" for textbooks delivered through Inclusive Access. The SAC describes in particular agreements between Institutions and their on-campus bookstores, which are referred to as Bookstore Operating Agreements.

Through Bookstore Operating Agreements, the Institutions engage the Retailer Defendants to operate and provide services for their on-campus bookstores. Under a Barnes & Noble

Bookstore Operating Agreement ("B&N Agreement"),[4] for example,
Barnes & Noble "shall fill orders for books and required supply
items from term to term in accordance with textbook and supply
adoptions by the faculty," and shall contact "all faculty
members for their textbook and supply adoptions."  The
Institution is "not . . . responsible for compiling, nor shall
it maintain, a list of such adoptions."

The B&N Agreement made Barnes & Noble the exclusive buyer
and seller of the Institution's textbooks, including digitally
published or distributed course materials.  To underscore the
exclusive nature of the relationship between Barnes & Noble and
the Institution, the Agreement states:

> [The Institution] shall not contract with any third
> party to provide any services of the type outlined in
> this Agreement whether on or off campus, through e-
> commerce sites, hyperlinks to alternate sources, or
> otherwise endorsed or supported by [the Institution].

The B&N Agreement gives the Institution commissions on the
gross sales of any hardcopy and digital textbooks.  The SAC
explains that "in some instances" the Retailer Defendants also
pay the Institutions up-front signing bonuses of $1 million or
more when the Institution signs an on-campus bookstore contract.

---

[4] Two B&N Agreements that were excerpted in the SAC were provided
as exhibits to the Defendants' motion to dismiss.  This Opinion
refers only to the agreement between Barnes & Noble and Eastern
Kentucky University, dated June 30, 2017.  The other exemplar
B&N Agreement, which is with Northwest Arkansas Community
College, dates from 2012.

A Follett Bookstore Operating Agreement ("Follett Agreement") that is described in the SAC has many provisions that are similar to those in the B&N Agreement, including the duty to "develop and maintain strong relationships with faculty at each campus and market and promote course materials to students at each campus."  It also has a provision requiring Follett to protect the campus bookstore's market share.[5]  It also adds that Follett "shall provide a non-exclusive digital delivery program that addresses the changing types" of textbooks.  It adds:

> [Follett] shall provide an Inclusive Access/Course Fee Program at [the Institution], if required by [the Institution].  Inclusive/Course Fee Program course materials commissions and gross profit margins shall be mutually agreed upon by [Follett] and [the Institution] prior to implementation.

An amendment to the Follett Agreement addresses the implementation of Inclusive Access.[6]  The amendment states:

> The parties will agree at the outset of each academic term which students or courses are automatically part of the [Inclusive Access] Program.  [The Institution] will provide Follett with the student data necessary to administer the Program . . . . [The Institution] will be responsible for the collection of [Inclusive Access] Fees . . . from students . . . .

---

[5] The Follett Agreement that was excerpted in the SAC was provided as an exhibit to the Defendants' motion to dismiss. The Agreement is between Follett and the Tennessee Board of Regents and is dated April 2, 2018.

[6] The amendment to the Follett Agreement is dated September 6, 2018.

It further provides:

> [Inclusive Access] course material adoptions will
> continue to be the responsibility of [the Institution]
> and [its] faculty. . . . Follett will work with [the
> Institution] to set adoption guidelines to be used by
> faculty that respect the academic integrity and
> freedom of the faculty but strive to keep the
> [Inclusive Access] fees low.

In addition, the amendment states that Follett will

determine the fees for Inclusive Access for each semester, and

if the Institution accepts the fee, the Institution will "record

the appropriate Fee . . . for each student enrolled in a class

participating in the program."  Then, Follett "shall invoice

[the Institution] with supporting data (including student name,

enrollment numbers and the Program course materials) . . . .

[The Institution] shall pay Follet the Fees . . . ."

D.   Electronic Publishers Enforcement Group

In 2016, the Publisher Defendants and two other publishing

companies formed a trade association, Electronic Publishers

Enforcement Group ("EPEG").  EPEG maintains a website and

promulgates anti-counterfeiting "best practices" guidelines (the

"EPEG Guidelines") for the purpose of eliminating counterfeit

textbooks.[7]

---

[7] The website for EPEG is located at
https://stopcounterfeitbooks.com/.

E.   Procedural History

This action was filed on January 22, 2020 in the District of Delaware.  Over a dozen actions filed on behalf of a class of student plaintiffs were filed thereafter.  On April 24, the Defendants moved to dismiss this action.

On August 11, the Judicial Panel on Multidistrict Litigation (the "JPML") ordered the centralization of Inclusive Access-related class action cases in this Court.[8]  Lead counsel for both the retailer plaintiffs class action and the consolidated student plaintiffs class action ("Student Plaintiffs Action") were chosen at a September 3 conference.

The plaintiffs in this action filed a consolidated amended complaint on October 16.  In response to a December 4 motion to dismiss, on December 18, the plaintiffs filed the SAC.  The Defendants renewed their motions to dismiss on January 22, 2021, which became fully submitted on March 9.  Meanwhile, the defendants in the Student Plaintiffs Action moved to dismiss that action as well.  That motion is addressed in a separate Opinion filed today.

The SAC alleges that the Defendants entered into a conspiracy to restrain trade in several textbook markets through

---

[8] An additional student purchaser class action that is before this Court, Cabral v. Cengage Learning, Inc., et al., 20cv3660, is related to this multi-district litigation.

the implementation of Inclusive Access.  The plaintiffs claim
that the conspiracy is an unreasonable restraint of trade in
violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  The SAC
also alleges that each Defendant monopolized each of the
textbook markets it describes, has attempted to do so, and has
conspired to do so, in violation of § 2 of the Sherman Act, 15
U.S.C. § 2.  In addition, the plaintiffs bring price
discrimination claims under the Robinson-Patman Act, 15 U.S.C.
§§ 13(a) and (f), and a variety of state law claims.  The
plaintiffs seek damages and injunctive relief under the Clayton
Act.  15 U.S.C. §§ 15, 26.

## Discussion

When deciding a motion to dismiss under Rule 12(b)(6), Fed.
R. Civ. P., a court must "constru[e] the complaint liberally,
accept[] all factual allegations as true, and draw[] all
reasonable inferences in the plaintiff's favor."  Zibelman, 906
F.3d at 48-49.  To survive a motion to dismiss, "a complaint
must contain sufficient factual matter, accepted as true, to
state a claim to relief that is plausible on its face."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A complaint must
do more than offer "naked assertions devoid of further factual
enhancement," and a court is not "bound to accept as true a
legal conclusion couched as a factual allegation."  Id. (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In

determining the adequacy of a complaint, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

This Opinion will first address the plaintiffs' claims under the Sherman Act.  It will then turn to their claims under the Robinson-Patman Act and various state antitrust statutes. Finally, it will determine whether EPEG may be named as a defendant.

I.   Sherman Act Claims

To survive a motion to dismiss, a Sherman Act claim must allege an antitrust injury, define a relevant market, and plausibly allege conduct in violation of the antitrust laws. Concord Assocs., L.P. v. Ent. Properties Tr., 817 F.3d 46, 52 (2d Cir. 2016).  After addressing the plaintiffs' standing to bring an antitrust claim, the adequacy of the plaintiffs' claims brought under § 1 and then § 2 of the Sherman Act will be discussed.

A.   Antitrust Standing

The Defendants move to dismiss counts 1 through 9 on the ground that the plaintiffs lack antitrust standing.  Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws.  It entitles "[a]ny

16

person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws" to treble damages.  15 U.S.C. § 15.  The Supreme Court has explained that "Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices."  <u>Associated</u> <u>Gen. Contractors of Ca., Inc. v. Ca. State Council of</u> <u>Carpenters</u>, 459 U.S. 519, 530 (1983).  But Congress did not "intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  <u>Id.</u> at 534 (citation omitted).  Courts have therefore imposed "limiting contours" on the right to pursue private actions.  <u>Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.</u>, 711 F.3d 68, 75 (2d Cir. 2013).  "Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to -- and potentially in disservice of -- the purpose of the antitrust laws: to protect competition."  <u>Id.</u>

The "limiting contours" imposed on the private right to pursue actions for treble damages under § 4 "are embodied in the concept of 'antitrust standing.'"  <u>Id.</u> (citation omitted).  "To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege two things: (1) that it suffered a special kind of antitrust injury, and (2) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is

an efficient enforcer of the antitrust laws."  IQ Dental Supply,
Inc. v. Henry Schein, Inc., 924 F.3d 57, 62 (2d Cir. 2019)
(citation omitted).  The Defendants do not contest that the
plaintiffs are efficient enforcers of the antitrust laws.

"[W]hether seeking relief in law or equity, an antitrust
plaintiff must demonstrate "antitrust injury."  Freedom
Holdings, Inc. v. Cuomo, 624 F.3d 38, 52 n.14 (2d Cir. 2010).
Courts consider three factors in determining whether a private
plaintiff satisfies the antitrust injury requirement:

> (1) the court must identify the practice complained of
> and the reasons such a practice is or might be
> anticompetitive, (2) the court must identify the
> actual injury the plaintiff alleges which requires us
> to look to the ways in which the plaintiff claims it
> is in a worse position as a consequence of the
> defendant's conduct, and (3) the court compares the
> anticompetitive effect of the specific practice at
> issue to the actual injury the plaintiff alleges.

IQ Dental Supply, 924 F.3d at 62-63 (citation omitted).

At the first step of the analysis, plaintiffs "need allege
only that the Defendants have engaged in unlawful
anticompetitive conduct."  Id. at 63.  Although "[t]he bar for
such a showing is a low one," id., plaintiffs must demonstrate
standing.  Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408,
437 (2d Cir. 2005).  Courts have noted the difficulty of
"distinguish[ing] the question of whether an antitrust violation
occurred from whether plaintiffs have standing to pursue it."
Id.  "To avoid confusing these issues, some courts and

commentators have suggested assuming the existence of a violation in addressing the issue of standing." Id.

Once a plaintiff has identified its injuries at the second step of the test, the third step requires a court to compare that alleged injury to the anticompetitive effect of the challenged practice. Gatt, 711 F.3d at 76. This comparison requires more than an allegation that the practice and injury are "causally linked." Id. (citation omitted). "Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that [it] flows from that which makes or might make defendants' acts unlawful." Id. (citation omitted). In other words, the plaintiff must plead that its injury "stems from a competition-reducing aspect or effect of the defendant's behavior." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990). If a plaintiff can make such a showing, then its injury falls within the "zone of interests" protected by the antitrust laws. Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129 (2014) (citation omitted).

The plaintiffs contend that they have antitrust standing because they participate in a market restrained by the anticompetitive conduct of the Defendants and have been injured.

The injury that the plaintiffs identify is their exclusion from the retail market for the sale of Inclusive Access textbooks.

It will be assumed, for purposes of analyzing the plaintiffs' standing, that the SAC identifies a practice that is anticompetitive.  It is worth noting, however, that the plaintiffs argue that the Defendants' conduct has been anti-competitive largely by focusing on the students' lack of choice when a faculty member or Institution has decided that the textbooks for the student's course will be digital textbooks provided through Inclusive Access.  They assert as well that Inclusive Access provides students with an inferior product in comparison to hardcopy textbooks.  The plaintiffs fail to grapple with the fact that the creation of Inclusive Access increases the options available to the faculty members and Institutions who make the choices about which textbooks will be required reading for any particular course.

But even if it is assumed that the Defendants' conduct is anticompetitive, the plaintiffs have not carried their burden to demonstrate that the injury they have suffered -- the decline in their textbook sales due to their exclusion from the Inclusive Access market -- resulted from any competition-reducing aspects of the Defendants' conduct.  Rather, it is the result of the Institutions' decisions to adopt digital textbooks and to use on-campus bookstores to manage that digital program.  And, as

significantly, any injury to the plaintiffs is due to the
Institutions selecting brick-and-mortar retailers other than the
plaintiffs as their on-campus bookstores.  The harm to the
plaintiffs' revenue and profits, therefore, is not due to any
anticompetitive harm that this lawsuit challenges.  The
antitrust laws "are not concerned with injuries to competitors .
. . resulting from their participation in or exile from
[anticompetitive] schemes."  Gatt, 711 F.3d at 77.

The SAC therefore fails to plead that the plaintiffs have
suffered a cognizable antitrust injury, and the plaintiffs do
not have standing to pursue their Sherman Act claims.  Even if
the plaintiffs had standing, however, their Sherman Act claims
would fail on the merits, as explained next.

B.   Section 1

Defendants move to dismiss the plaintiffs' § 1 claims,
counts 1 through 3, on the ground that the SAC fails to plead an
agreement with respect to any of these alleged conspiracies.
Section 1 of the Sherman Act prohibits contracts, combinations,
or conspiracies in restraint of trade.  US Airways, Inc. v.
Sabre Holdings Corp., 938 F.3d 43, 54 (2d Cir. 2019).  "Although
the Sherman Act, by its terms, prohibits every agreement 'in
restraint of trade,' the Supreme Court has long recognized that
Congress intended to outlaw only unreasonable restraints."
United States v. Apple, Inc., 791 F.3d 290, 320 (2d Cir. 2015)

(citation omitted).  "Thus, to succeed on an antitrust claim, a plaintiff must prove that the common scheme designed by the conspirators constituted an unreasonable restraint of trade either per se or under the rule of reason."  Id. at 320-21. Section 1 embraces both horizontal and hub-and-spoke conspiracies.  Id. at 313-14; Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012).

"The first crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express."  Apple, 791 F.3d at 314-15 (citation omitted).  At the pleading stage, a plaintiff must allege sufficient facts to support the inference that a conspiracy existed.  Mayor and City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).  An allegation of parallel conduct, standing alone, is not sufficient to plead the existence of a conspiracy.  Apple, 791 F.3d at 315.  "[S]uch behavior could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  Id. (citation omitted).

Antitrust conspiracies are "rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  Gelboim v. Bank of Am. Corp., 823 F.3d 759, 781

22

(2d Cir. 2016) (citation omitted).  Therefore, the existence of
"additional circumstances, often referred to as 'plus' factors,
which, when viewed in conjunction with the parallel acts" can
serve to permit an inference that a conspiracy exists.  Apple,
791 F.3d at 315 (citation omitted).  A non-exhaustive list of
plus factors includes: "(1) a common motive to conspire; (2)
evidence that shows that the parallel acts were against the
apparent individual economic self-interest of the alleged
conspirators; and (3) evidence of a high level of interfirm
communications."  Gelboim, 823 F.3d at 781 (citation omitted).
"Coerced parallelism," that is, coerced participation in a
conspiracy, can serve as a plus factor as well.  Ambook
Enterprises v. Time Inc., 612 F.2d 604, 616 & n.19 (2d Cir.
1979).

The SAC alleges three forms of conspiracies that violate §
1 of the Sherman Act: (1) A horizontal conspiracy among the
Publisher Defendants, (2) a horizontal conspiracy among the
Retailer Defendants, and (3) hub-and-spoke conspiracies between
each Publisher Defendant and the Retailer Defendants.  The SAC
fails to plausibly allege any of these conspiracies.

### 1.   Horizontal Conspiracy: Publisher Defendants

The SAC fails to plausibly allege that the three Publisher
Defendants agreed with each other to restrain trade.  The SAC
does not describe any direct evidence of such an agreement.  Nor

does it plead facts that circumstantially suggest a meeting of the minds to restrain trade as alleged here.  Instead, the SAC describes market conditions that would have independently suggested to any publisher of textbooks that digital innovations such as Inclusive Access might help their bottom line.  As detailed in the SAC, there was a flourishing secondary marketplace for textbooks and the sales of new textbooks had declined.  These phenomena had a negative impact on publishers' revenue and profits.  Then, in 2016, the DOE adopted rules that permitted Institutions to include the cost of books and supplies, including digital textbooks, in tuition bills.  Meanwhile, the digital revolution was well underway and both faculty and students were accustomed to using electronic devices to access information.  These phenomena affected every textbook publisher and gave each of them an incentive to develop digital textbooks that could be charged on a tuition bill.  Underscoring this commonsense reaction to market phenomena, the SAC pleads that the adoption of the Inclusive Access program for courses was significantly more profitable for a publisher than the sale of hardcopy textbooks.  Digital materials are less expensive to produce and reduce the opportunity for competition in the secondary market.  Taken together, these allegations suggest that the Publisher Defendants' decisions to implement Inclusive Access were likely the result of "independent responses to

24

common stimuli." Apple, 791 F.3d at 315. They do not support
an inference that Inclusive Access was adopted and promoted
because there was a conspiracy among the Publisher Defendants.

The plaintiffs argue that they have plausibly alleged a
horizontal conspiracy among the three Publisher Defendants by
pointing principally to four "plus" factors. Taken singly or
together, these allegations in the SAC do not plausibly plead a
conspiratorial agreement.

First, the plaintiffs argue that the Publisher Defendants
had a common motive to conspire to protect their historical
prices and market shares. This argument confuses two phenomena.
While the SAC describes a commercial environment that would
motivate any textbook publisher to independently consider the
advantages of adopting a digital textbook regime like Inclusive
Access, it does not describe an environment that encouraged or
required them to conspire with each other to do so. After all,
a motive to innovate is different than a motive to conspire. At
best, the SAC describes conscious parallelism, and that is
insufficient to plead that the Publisher Defendants conspired
with each other. Connecticut Fine Wine & Spirits, LLC v.
Seagull, 932 F.3d 22, 38 (2d Cir. 2019); Twombly, 550 U.S. at
553-54.

As a second plus factor, the plaintiffs claim that each
Publisher Defendant acted against its own economic self-interest

25

when it introduced Inclusive Access.  In opposing the
Defendants' motion, the plaintiffs argue that it was in each
Publisher Defendant's self-interest to sell Inclusive Access
through as many retailers and in as many different formats as
possible.  The plaintiffs also argue that the Institutions would
never have adopted a restrictive format such as Inclusive Access
unless given no other choice, suggesting that it was not in an
individual Publisher Defendant's self-interest to introduce
Inclusive Access unless it could be certain that the other
Publisher Defendants would do so as well.  The plaintiffs point
to the independent efforts by the Publisher Defendants to
promote programs like Inclusive Access before 2016 and allege
that it was only in 2016 that each of the Publisher Defendants
"practically simultaneously" adopted Inclusive Access in its
current form.

There are at least two problems with this argument.  First,
the plaintiffs' claims regarding the timing of Inclusive Access
ignore the impact of the DOE's adoption of Rule 164 in 2016.
With that adoption, Inclusive Access became a government-
sanctioned billing option for Institutions, allowing the costs
of Inclusive Access to be added to tuition bills.  The DOE
justified its adoption of the Rule on the ground that digital
textbooks will inevitably become "more ubiquitous" and that
including those materials as part of students' tuition would

26

"ensure that students have access to this technology."  80 Fed. Reg. 67126-01 (2015).

Second, the plaintiffs' argument about the Publisher Defendants' economic self-interest contradicts the other allegations in the SAC.  The SAC explains that it is in each Publisher Defendant's interest to sell digital textbooks and that it is up to each Institution to decide whether to purchase Inclusive Access and add the cost of those digital materials to tuition (with the appropriate mark-up).  According to the SAC as well, it is in the financial interest of each Institution to grant its on-campus bookstore the exclusive right to supply the Institution's students with all course materials.  Thus, as much as anything else, it is the structure of the relationship between each Institution and its on-campus bookstore, a relationship that long predated the adoption of Inclusive Access, that has excluded other retailers from Inclusive Access. Simply put, the SAC does not plausibly plead that the exclusion of the plaintiff retailers from the Inclusive Access market was against the self-interest of any Publisher Defendant.

As a third plus factor, the SAC alleges that there was a high level of interfirm communication among the Publisher Defendants and that their trade association EPEG served as a convenient forum for their conspiratorial planning.  This description of opportunities to conspire to restrict competition

does not raise the inference that the Publisher Defendants actually engaged in any unlawful activity.

As a fourth and final plus factor, the SAC alleges that the Defendants coerced Institutions into joining their conspiracy. This allegation fails because the SAC does not identify coercion but only describes financial incentives that were provided to Institutions by the Defendants.  The SAC explains that Institutions increasingly took textbook choice away from the faculty and entered into contracts that required all or many core classes to use Inclusive Access.  While the SAC asserts that coercive activity by the Publisher Defendants prevented Institutions from making "any truly free choice," that conclusory statement is not a plausible allegation of actual coercion.  For instance, the SAC does not allege that the Institutions that adopted Inclusive Access did not have the option of selecting hardcopy textbooks for their courses.[9] Instead, the SAC pleads that, principally for financial reasons, hundreds of Institutions elected to adopt Inclusive Access for some courses.

---

[9] The SAC asserts that the Publisher Defendants announced that they "would be" restricting and eventually discontinuing their production of hardcopy textbooks, but stops short of alleging that hardcopy textbooks are not available.

Having failed to plausibly plead an agreement, the SAC fails to allege a horizontal conspiracy among the Publisher Defendants.  Accordingly, count 1 is dismissed.

2.   Horizontal Conspiracy: Retailer Defendants

The SAC alleges that the two Retailer Defendants conspired with each other to restrain trade in violation of § 1 of the Sherman Act.  The SAC fails to plead sufficient facts, however, to support a plausible claim that the Retailer Defendants entered into a conspiratorial agreement.

Barnes & Noble and Follett compete with each other and with other retailers for the opportunity to become an Institution's on-campus bookstore.  This competition presents a significant hurdle to the SAC's assertion of collusion.  It is unsurprising, therefore, that the SAC contains no direct allegation that Barnes & Noble and Follett conspired together to sell Inclusive Access.  Moreover, the SAC describes a commercial environment in which every on-campus bookstore faced competition from the secondary textbook market.  Faced with this competition, the willingness to support an Institution's adoption of Inclusive Access was in each Retailer Defendant's own interest and did not require collusion with its co-defendant.  Therefore, agreeing to be an Institution's exclusive partner in providing that Institution's students with all of their textbooks, including

digital textbooks sold through Inclusive Access, was very much in its independent financial interest.

In opposing the motion to dismiss the § 1 claim, the plaintiffs chiefly focus on the § 1 claim against the Publisher Defendants.  They argue in passing that the SAC adequately pleads this claim of collusion by the two Retailer Defendants by pointing to the large up-front bonuses that each Retailer Defendant paid to the Institutions that adopted Inclusive Access.  Nothing about these payments, however, raises the inference that the Retailer Defendants conspired with each other.  Rather, it suggests that they acted in accordance with their own self-interest to become the on-campus bookstore. Because the SAC fails to plead an agreement between the Retailer Defendants, count 2 is dismissed.

### 3.   Hub-and-Spoke Conspiracy

The third form of conspiracy that the SAC pleads is a so-called "hub-and-spoke" conspiracy among the Defendants, with each Publisher Defendant at the hub of a conspiracy with the two Retailer Defendants.  "[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" Apple, 791 F.3d at 314 (citation omitted).  "These arrangements consist of both vertical agreements between the hub and each

spoke and a horizontal agreement among the spokes 'to adhere to
the hub's terms,' often because the spokes 'would not have gone
along with the vertical agreements except on the understanding
that the other spokes were agreeing to the same thing.'"   Id.
(citation omitted).

The SAC does not allege that there is direct evidence of an
agreement among the Defendants to form a hub-and-spoke
conspiracy.  It also fails to plead that the Retailer
Defendants, the "spokes" in the alleged hub-and-spoke
conspiracy, entered into a horizontal agreement with each other.
This alone is fatal to the plaintiffs' claim.  The SAC pleads a
series of vertical agreements between each Retailer Defendant
and each Publisher Defendant.  It does not, however, plead that
any of the Publisher Defendants used these vertical agreements
to coordinate a horizontal agreement between the Retailer
Defendants.  The plaintiffs' claim for a hub-and-spoke
conspiracy fails, and count 3 is dismissed.

C.   Section 2

The SAC asserts that each of the Defendants violated § 2 in
three ways: each of them monopolized each of the textbook
markets that the SAC describes, attempted to do so, and
conspired to do so.  The Defendants have moved to dismiss each
of these claims.  Although the § 2 claims are purportedly
brought against each Defendant, the plaintiffs' opposition to

31

the motion defends the § 2 claims solely as brought against the three Publisher Defendants.  After a discussion of the SAC's definition of the relevant markets, the § 2 claims as to each Publisher Defendant are addressed.

1.   Market Definition

For purposes of the Sherman Act, "the relevant market is the area of effective competition within which the defendant operates."  Concord, 817 F.3d at 52 (citation omitted).  "[A] market consists of an area where sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level."  Id. (citation omitted).  "[T]he concept of a market has two components: a product market and a geographic market."  Id.

"A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced -- price, use and qualities considered."  Id. (citation omitted).  The "outer boundaries" of the relevant product market are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Sabre, 938 F.3d at 64 (citation omitted); see Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481-82 (1992).  Thus, products will be considered to be reasonably interchangeable "if consumers treat them as acceptable substitutes."  PepsiCo, Inc.

v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted).  "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product."  Todd v. Exxon Corp., 275 F.3d 191, 201–02 (2d Cir. 2001) (citation omitted).

Within a relevant product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  Sabre, 938 F.3d at 64 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  Commentators have cautioned, however, that "speaking of submarkets is both superfluous and confusing in an antitrust case," and "nothing would be lost by deleting the word 'submarket' from the antitrust lexicon."  Phillip E. Areeda et al., Antitrust Law ¶ 510b, at 170, 173 (Supp. 1998).

The inquiry into the relevant geographic market, on the other hand, "seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market."  Concord, 817 F.3d at 52-53 (citation omitted).  "Courts generally measure a market's geographic scope, the area of effective competition, by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."  Id. at 53 (citation omitted).  "Taken together, the product and geographic components illuminate the

relevant market analysis, which is essential for assessing the potential harm to competition from the defendants' alleged misconduct."  Id. (citation omitted).

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes -- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be 'plausible.'"  Todd, 275 F.3d at 200 (citation omitted).  "Although market definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage, there is no absolute rule against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way."  Concord, 817 F.3d at 53 (citation omitted).  "Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market."  Id.

The plaintiffs allege that the relevant product market in this action is the market for "higher education course materials," which consists of traditional hardcopy textbooks as well as digital textbooks (collectively, the "Course Materials Market").  The SAC also alleges several submarkets, which are

themselves relevant product markets.  These include: (1) Topic Markets, such as History Course Materials; (2) Individual Course Markets, such as the European History Course Market; (3) the Inclusive Access Course Materials Market; (4) Inclusive Access Topic Markets; and (5) Inclusive Access Individual Course Markets.

The SAC alleges that the relevant geographic market for the Course Materials Market, Topic Markets, and Individual Course Markets is the United States.  For the Inclusive Access Markets, the SAC alleges that each individual Institution or the United States as a whole is the relevant geographic market.

The Defendants do not dispute that the Individual Course Markets, such as the European History Course Market, can serve as the relevant product market.  In addition, they do not take issue with the SAC's proposed geographic markets.  They do dispute, however, that the Course Materials Market, Topic Markets, or any of the Inclusive Access Markets is a relevant product market.

In support of their Inclusive Access market definitions, the plaintiffs emphasize that the students, as the purchasers of Inclusive Access, have no choice as to which textbook they must buy.  Those choices are made by the faculty member teaching the

course or by the Institution.[10]  The SAC adds that students are
discouraged from opting out of Inclusive Access.

It is unnecessary to resolve the many disputes among the
parties regarding the relevant market definitions because the
plaintiffs fail to allege that any one of the Publisher
Defendants possesses monopoly power in any of the plaintiffs'
proposed markets or has engaged in anticompetitive behavior in
that market.  Even at its narrowest -- an Inclusive Access
Individual Course Market at a single Institution -- the SAC
fails to plead a market in which a Publisher Defendant has a
monopoly.

### 2.   Monopolization

The SAC alleges that each of the three Publisher Defendants
monopolized each of the Relevant Markets in violation of § 2 of
the Sherman Act.  The Publisher Defendants move to dismiss the
plaintiffs' monopolization claim on the ground that the SAC does
not plausibly allege that any of the three Publisher Defendants
possessed either monopoly power or engaged in anticompetitive
conduct.

Section 2 of the Sherman Act provides that it is unlawful
to "monopolize, or attempt to monopolize . . . any part of the

---

[10] It is unnecessary to decide here whether the consumers, for
purposes of a relevant market analysis, should be defined as the
Institution and its faculty or the students.

trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  To plead a monopolization claim under § 2, a plaintiff must allege both: (1) "the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  PepsiCo, 315 F.3d at 105 (citation omitted).

i.    Possession of Monopoly Power

"The core element of a monopolization claim is market power."  Id. at 107.  "Market power is the ability to raise price profitably by restricting output."  Ohio v. Am. Express Co., 138 S. Ct. 2274, 2288 (2018) (emphasis in original) (citation omitted).  A plaintiff can plead market power through either direct evidence that the defendant can control prices or exclude competitors from the market, or through indirect evidence, such as the defendant's share of the relevant market.  Kaufman v. Time Warner, 836 F.3d 137, 143 (2d Cir. 2016).

Thus, a defendant's share of the relevant market "can be used as a proxy for market power."  Pepsico, 315 F.3d at 108.  A market share of over 70% is "usually strong evidence of monopoly power."  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 99 (2d Cir. 1998) (citation omitted).  See also United States v. Grinnell Corp., 384 U.S. 563, 571 (1966) (87%); Am.

Tobacco Co. v. United States, 328 U.S. 781, 797 (1946) (80%);
United States v. Aluminum Co. of Am., 148 F.2d 416, 424 (2d Cir.
1945) (Hand, J.) (90%).  Absent additional evidence, however, "a
64 percent market share is insufficient to infer monopoly
power."  PepsiCo, 315 F.3d at 109.  "A high market share alone,
however, is insufficient to infer a seller's market power if
other characteristics of the product market, such as low
barriers to entry, high cross elasticity of demand, or
technological developments in the industry, interfere with the
seller's control of prices."  Kaufman, 836 F.3d at 143.

     "Antitrust analysis must always be attuned to the
particular structure and circumstances of the industry at
issue," and "[p]art of that attention to economic context is an
awareness of the significance of regulation."  Verizon Commc'ns
Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 411
(2004).  "One factor of particular importance is the existence
of a regulatory structure designed to deter and remedy
anticompetitive harm."  Id.  at 412.  "Where such a structure
exists, the additional benefit to competition provided by
antitrust enforcement will tend to be small, and it will be less
plausible that the antitrust laws contemplate such additional
scrutiny."  Id.  Where, by contrast, there is nothing built into
the regulatory scheme which performs the antitrust function,

38

"the benefits of antitrust are worth its sometimes considerable disadvantages."  Id.

The SAC fails to plead direct evidence of monopoly power. The plaintiffs do not plausibly allege that any Publisher Defendant was able to control prices within any one of their Relevant Markets or exclude another publisher from that market.

In opposition to this motion, the plaintiffs assert, with little explanation, that the SAC does allege that the Publisher Defendants have excluded competition and engaged in supracompetitive pricing.  The paragraphs in the SAC to which the plaintiffs point to support that assertion do not plausibly allege direct evidence of monopoly power.  Those paragraphs appear to allege first that Inclusive Access textbooks are more expensive than used hardcopy textbooks.  This does not constitute supracompetitive pricing.  For example, the SAC does not assert that Inclusive Access textbooks are more expensive than new hardcopy textbooks.  Nor could it.  Rule 168 explicitly requires Institutions to make Inclusive Access available at "below competitive market rates."  34 C.F.R. § 668.164(c)(2) (2016).

Next, the paragraphs to which the plaintiffs point appear to assert that the adoption of digital textbooks eliminates competition in the secondary market.  This feature of the digital revolution is not direct evidence of monopolistic power.

To successfully plead that a Publisher Defendant has excluded competitors, the SAC would have to plead that the Publisher Defendant excluded other publishers from developing and marketing digital textbooks.  This the SAC does not plead.

The SAC also fails to plead indirect evidence of monopoly power.  To the extent it pleads market share at all, the SAC relies on joint market shares, for example, that the three Publisher Defendants control 70% or more of the relevant market. But a shared monopoly does not state a § 2 claim.  See In re Credit Default Swaps Antitrust Litig., No. 13MD2476 (DLC), 2014 WL 4379112, at *13 (S.D.N.Y. Sept. 4, 2014) (citing H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1018 (2d Cir. 1989)) (attempt and conspiracy to monopolize claims).

In opposition to this motion, the plaintiffs argue that the SAC does succeed in one paragraph in pleading that the Publisher Defendants had a monopolistic market share in the Individual Course Markets.  That paragraph asserts: "On information and belief, a significant number (if not all) of the Individual Course Markets are monopolistic, with each Publisher having specific monopoly control over a subset of these markets."  Even if this sentence is read to suggest that each one of the Publisher Defendants has a monopolistic market share in the hardcopy and digital textbook market for at least one individual course, for instance European History, it fails to give the fair

notice required to plead such a central element of its monopolization claim.  This failure is not surprising.  The SAC brings a monopolization claim against three publishers, each of which is a significant publisher of U.S. textbooks.  If any one of them attempted to charge supracompetitive prices for textbooks, it would run the risk of competition from another publisher.  To the extent this allegation is an effort to plead a § 1 claim against the three Publisher Defendants for dividing the market, it is far too conclusory to do so.

ii.  Anticompetitive Conduct

The SAC also fails to plausibly allege that a Publisher Defendant willfully acquired or maintained monopoly power through anticompetitive means.  "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014) (quoting Trinko, 540 U.S. at 407).  "Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition."  Id. (citation omitted).

The plaintiffs claim that each Publisher Defendant willfully maintained its alleged monopoly power by refusing to sell Inclusive Access to the plaintiffs.  "[A]s a general matter, the Sherman Act does not restrict the long recognized

41

right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." <u>Trinko</u>, 540 U.S. at 408 (quoting <u>United States v. Colgate & Co.</u>, 250 U.S. 300, 307 (1919)). "However, the high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." <u>Id.</u> (quoting <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585, 601 (1985)). There are "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability." <u>Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.</u>, 555 U.S. 438, 448 (2009). Under the "limited exception recognized in <u>Aspen Skiing</u>," a case that is "at or near the outer boundary of § 2 liability," the "unilateral termination of a voluntary (<u>and thus presumably profitable</u>) course of dealing" can suggest "a willingness to forsake short-term profits to achieve an anticompetitive end." <u>Trinko</u>, 540 U.S. at 409.

The SAC fails to plausibly plead that a Publisher Defendant's refusal to distribute Inclusive Access through the plaintiffs exhibits anticompetitive behavior. According to the SAC, the preexisting course of dealing between the Publisher Defendants and the plaintiffs continues to exist -- the Publisher Defendants continue to distribute textbooks other than Inclusive Access through the plaintiffs. It is only a new

product, Inclusive Access, that the Publisher Defendants refuse
to distribute through the plaintiffs.  When an Institution
selects Inclusive Access for its courses, it distributes
Inclusive Access through its on-campus bookstore.  Thus, unlike
in Aspen Skiing, the Publisher Defendants have not unilaterally
terminated a preexisting course of dealing.  Rather, they have
declined to extend their dealings with the plaintiffs to their
newest product.  Accordingly, the SAC fails to plead that any
one of the Publisher Defendants willfully acquired or maintained
its alleged monopoly power through anticompetitive means.  The
SAC's monopolization claims, in count 4, are dismissed.

> 3.   Attempted Monopolization

The SAC claims that the Defendants attempted to monopolize
the Relevant Markets in violation of § 2 of the Sherman Act.
The Defendants move to dismiss this claim, count 6, arguing that
it fails for the same reasons that the plaintiffs'
monopolization claim does -- namely, that the SAC does not
allege monopoly power or any anticompetitive conduct.

In order to plead attempted monopolization, the plaintiff
must allege: "(1) that the defendant has engaged in predatory or
anticompetitive conduct with (2) a specific intent to monopolize
and (3) a dangerous probability of achieving monopoly power."
New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 651
(2d Cir. 2015) (citation omitted).  "Attempted monopolization,

43

unlike monopolization, requires a finding of specific intent."
<u>Id.</u>

As was true for the monopolization claim, in opposing this motion, the plaintiffs focus on the conduct of the Publisher Defendants.  The SAC fails to plausibly allege that any Publisher Defendant attempted to monopolize any one of the Relevant Markets or engaged in anticompetitive conduct.  Also, the SAC fails to allege either a specific intent by a Publisher Defendant to monopolize or a dangerous probability that a defendant would succeed in achieving monopoly power.  Count 6 is dismissed.

4.   Conspiracy to Monopolize

The SAC also alleges the Defendants conspired to monopolize the Relevant Markets.  The Defendants move to dismiss this claim, count 5, on the ground that the SAC fails to plead evidence of an agreement.

Section 2 of the Sherman Act prohibits entities from "combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ."  15 U.S.C. § 2.  The elements of a § 2 conspiracy to monopolize are: "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy."  <u>AD/SAT, Div. of Skylight, Inc.</u>

44

v. Associated Press, 181 F.3d 216, 233 (2d Cir. 1999).  "[I]n deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2."  2 Julian von Kalinowski, Peter Sullivan, & Maureen McGuirl, Antitrust Laws and Trade Regulation § 26.02 (2d ed. 2021).

The SAC fails to allege that one or more of the Defendants entered into an agreement with others to monopolize a Relevant Market for the same reasons that it fails to allege that they violated § 1.  Count 5 is therefore dismissed.

II.  Robinson-Patman Act Claims

The SAC brings two claims for violation of the Robinson-Patman Act.  It alleges that the Publisher Defendants sold textbooks, which it refers to as Course Materials, to the Retailer Defendants at prices that were "substantially less" than those that they charged the plaintiffs.  The SAC claims that this conduct amounts to price discrimination in violation of § 13(a) of the Act.  15 U.S.C. § 13(a).  The plaintiffs separately allege that the Retailer Defendants "knowingly induced" and "received" discriminatory pricing for those materials in violation of § 13(f) of the Act.  15 U.S.C. § 13(f).  The Defendants move to dismiss both claims, counts 7 and 8.

Section 2(a) of the Robinson–Patman Act makes it unlawful

> to discriminate in price between different purchasers
> of commodities of like grade and quality . . . where
> the effect of such discrimation may be substantially
> to lessen competition . . . or to injure, destroy, or
> prevent competition with any person who either grants
> or knowingly receives the benefit of such
> discrimination, or with customers of either of them[.]

15 U.S.C. § 13(a).  Section 2(f) provides that "[i]t shall be
unlawful for any person . . . knowingly to induce or receive a
discrimination in price which is prohibited by this section."
Id. § 13(f).  "'Price discrimination' in this context means a
difference in the price charged for the items of like grade and
quality to two different buyers."  Cash & Henderson Drugs, Inc.
v. Johnson & Johnson, 799 F.3d 202, 209 (2d Cir. 2015).

The competitive injury that the plaintiffs assert is what
is known as "secondary-line injury," which is "an injury to
competition between different purchasers of the same product.
Id.  To state a claim for secondary-line injury through price
discrimination, a plaintiff must allege:

> (1) that the seller's sales were made in interstate
> commerce; (2) that the seller discriminated in price
> as between the two purchasers; (3) that the product or
> commodity sold to the competing purchasers was of the
> same grade and quality; and (4) that the price
> discrimination had a prohibited effect on competition.

Id. at 209-10 (citation omitted).  "Plaintiffs attempting to
establish competitive injury generally have two routes available
to them: showing substantial discounts to a competitor over a
significant period of time, known as the Morton Salt inference,

or proof of sales lost to favored purchasers." Id. at 210.
"[I]f the loss attributable to impaired competition is de
minimis, then the challenged practice cannot be said to have had
a 'substantial' affect on competition." Id.; see also Volvo
Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 180
(2006).

The SAC alleges that "in almost every case" where the
plaintiffs "encountered Inclusive Access Materials," the
Publisher Defendants refused to sell them Inclusive Access
textbooks.  In a "very few instances," however, the Publisher
Defendants did offer to sell Inclusive Access textbooks to the
plaintiffs, but only "at a higher price compared to that offered
to the [Retailer Defendants] operating at the same"
Institutions.  The SAC provides just two examples of instances
in which Pearson allegedly sold Inclusive Access textbooks to
one of the plaintiffs at a discriminatory price.  It contains no
examples of any discriminatory pricing by either McGraw Hill or
Cengage.

First, at one Institution's campus, after "originally
refus[ing]" to sell digital textbooks to one of the plaintiffs
through Inclusive Access, Pearson "sold [the] product to [that
plaintiff] at prices that were substantially higher than those
for sales to Defendant Follett . . . ."  Second, at a different
Institution's campus, Pearson offered to sell a print upgrade

for a digital textbook to one of the plaintiffs for a course that was subscribed to Inclusive Access.  It charged that plaintiff "a significantly higher price" than it charged Barnes & Noble, however.  Citing these examples, the plaintiffs allege that "[i]n these few instances where the Plaintiff Retailers were sold any product related to Inclusive Access Materials (including the supplemental print products)," they were offered higher prices than the Retailer Defendants were given.

The SAC does not state a claim for price discrimination under either § 2(a) or § 2(f) of the Robinson-Patman Act. According to the SAC, the plaintiffs assert the central feature of Inclusive Access is its exclusivity: The Publisher Defendants distribute digital textbooks through the Retailer Defendants and refuse to offer those products to the plaintiffs.  The SAC relies on only two examples in which Pearson offered one of the plaintiffs the chance to distribute either a digital textbook or its print upgrade.  These two isolated incidents fall far short of the "significant period of time" that is required to plead a substantial effect on competition in a secondary-line price discrimination case.

The SAC does not contain any developed allegations against the Retailer Defendants in support of the § 2(f) claim and the

plaintiffs do not oppose its dismissal.  Accordingly, counts 7
and 8 are dismissed.[11]

III. State Law Claims

The Defendants move to dismiss the plaintiffs' state law
claims, counts 10 through 14, on the ground that they are
inapplicable or derivative of the plaintiffs' federal claims.
The SAC fails to state a claim under any of its state law causes
of action.

The SAC brings state law price discrimination claims under
the Arkansas Unfair Practices Act ("AUPA"), Ark. Code Ann. §§ 4-
75-201, et seq.; the Kentucky Unfair Trade Practices Act
("KUTPA"), Ky. Rev. Stat. Ann. §§ 365.020, et seq.; and the New
Mexico Price Discrimination Act ("NMPDA"), N.M. Stat. Ann. §§
57-14-1, et seq.  The AUPA and KUTPA are broader than the
federal Robinson-Patman Act in that they prohibit price
discrimination in the sale of a "product" or "service" in
addition to a "commodity."  They are narrower, however, in that
they only prohibit price discrimination among different
localities within the state.  Because the SAC does not allege

---

[11] The Defendants also move to dismiss the plaintiffs' Robinson-
Patman Act claims on the ground that digital textbooks are not
"commodities" within the meaning of the Act.  They describe
Inclusive Access as a method of delivering content.  This
Opinion assumes without deciding that discriminatory pricing of
Inclusive Access is subject to redress under the Robinson-Patman
Act.

discrimination on that basis, its claims under those statutes fail.  The NMPDA, on the other hand, "closely parallels" the Robinson-Patman Act.  Jay Walton Enterprises, Inc. v. Rio Grande Oil Co. of Bernalillo Cty., 106 N.M. 55, 56-57 (N.M. Ct. App. 1987).  Because of this similarity, courts "look to the federal law for assistance in interpretation and application of the state act."  Id. at 57.  Since the SAC fails to state a claim under the Robinson-Patman Act, its claim under the NMPDA fails as well.

The plaintiffs also bring unjust enrichment claims under Arkansas, Kentucky, New Mexico, Tennessee, and Texas common law.[12]  Each of these claims fails as well.  In connection with these claims, the SAC alleges that the Defendants "received higher prices for Course Materials and Inclusive Access Materials" by "engaging in the wrongful conduct described herein."  Since the SAC fails to plead that the Defendants engaged in any unlawful conduct, its unjust enrichment claims fail.

The SAC also asserts claims under the New Mexico Unfair Practices Act ("NMUPA"), N.M. Stat. Ann. §§ 57-12-1, et seq. and the Texas Free Enterprise and Antitrust Act of 1983 ("TFEAA"),

---

[12] The Arkansas, New Mexico, and Texas unjust enrichment claims are brought against both the Publisher and Retailer Defendants. The Kentucky and Tennessee unjust enrichment claims are directed toward the Publisher Defendants alone.

Tex. Bus. & Com. Code §§ 15.01, et seq.  The NMUPA "does not

provide a cause of action for competitive injury claims."

Gandydancer, LLC v. Rock House CGM, LLC, 453 P.3d 434, 438 (N.M.

2019).  The plaintiffs' claim under the TFEAA must be dismissed

because it is derivative of their federal antitrust claims.  See

Tex. Bus. & Com. Code § 15.04 (providing that the TFEAA "shall

be construed in harmony with federal judicial interpretations of

comparable federal antitrust statutes").  Counts 10 through 14

are therefore dismissed.

IV.  Claims Against EPEG

The Publisher Defendants[13] move to dismiss the claims

against EPEG, counts 1, 3, and 9, on the ground that the SAC

fails to plausibly allege two related issues: that EPEG has the

capacity to be sued and that EPEG has a legal existence such

that there is jurisdiction over it.[14]  The SAC asserts that EPEG

is an "unincorporated association recognized as a legal entity

under the laws of Delaware and federal law."[15]

---

[13] The Publisher Defendants, as members of EPEG, have standing to
move to dismiss the claims against EPEG.  The plaintiffs'
argument to the contrary is rejected.

[14] Counts 1, 3, and 9 plead that EPEG violated § 1 of the Sherman
Act.

[15] Where a legal standard is supplied by state law, Delaware law
will be applied since this lawsuit was filed in Delaware.  "An
MDL transferee court 'applies the substantive state law,
including choice-of-law rules, of the jurisdiction in which the
action was filed.'"  In re Mirena IUD Prod. Liab. Litig., 29 F.

Under Rule 17(b)(3), the capacity of an unincorporated association to be sued is determined in the first instance by the law of the state where the court is located, except that an "unincorporated association with no such capacity under that state's law may . . . be sued in its common name to enforce a substantive right existing under the United States Constitution or laws." Fed. R. Civ. P. 17(b)(3). The purpose of the federal law exception in Rule 17(b)(3)(A) is to "prevent[] state law from frustrating the enforcement of federal substantive rights where state law does not grant unincorporated associations and partnerships the capacity to be sued." E.E.O.C. v. St. Francis Xavier Parochial Sch., 77 F. Supp. 2d 71, 77 (D.D.C. 1999), aff'd sub nom. E.E.O.C. v. St. Francis Xavier Sch., 254 F.3d 315 (D.C. Cir. 2000).[16]

---

Supp. 3d 345, 350 (S.D.N.Y. 2014) (quoting Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993)). In any event, the parties' briefs assume that Delaware rather than New York law controls. This "implied consent . . . is sufficient to establish choice of law." Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 296 (2d Cir. 2000) (citation omitted).

[16] The Advisory Committee Notes to Rule 17(b) identify Charles E. Clark, A New Federal Civil Procedure – II. Pleadings and Parties, 44 Yale L.J 1291 (1935) and United Mine Workers of Am. v. Coronado Coal Co., 259 U.S. 344 (1922), among other authorities, as influences on the Rule's development. Advisory Committee Notes of 1937, Rule 17, Fed. R. Civ. P. In United Mine Workers, the Supreme Court "treated a defendant unincorporated association as an entity, though the state court of the forum had earlier refused to recognize the association as such." Clark, A New Federal Civil Procedure, 44 Yale L.J. at 1316. Professor Clark notes with approval that the rule of

Delaware law grants unincorporated associations the
capacity to bring suits and to be sued.  Under Delaware law,
"[a]n unincorporated association of persons[] . . . using a
common name may sue and be sued in such common name . . . ."
Agar v. Judy, 151 A.3d 456, 488 (Del. Ch. 2017) (quoting 10 Del.
C. § 3904).

The question next becomes which body of law governs the
determination of whether EPEG is in fact an unincorporated
association capable of being sued.  The Court of Appeals for the
Second Circuit does not appear to have addressed this question,
but the Ninth Circuit has explained that federal law should
govern this determination.  "For purposes of [Rule 17(b)(3)(A)],
the determination of what constitutes an 'unincorporated
association' is a question of federal law" when the action
arises under federal law.  Comm. for Idaho's High Desert, Inc.
v. Yost, 92 F.3d 814, 820 (9th Cir. 1996) (citation omitted);
Sierra Ass'n for Env't v. F.E.R.C., 744 F.2d 661, 662 (9th Cir.
1984).  See also Goldenberg v. Indel, Inc., 741 F. Supp. 2d 618,
628 (D.N.J. 2010).; In re Magnetic Audiotape Antitrust Litig.,
No. 99 CIV. 1580 (LMM), 2000 WL 1855119, at *1 (S.D.N.Y. Dec.
19, 2000); St. Francis, 77 F. Supp. 2d at 76.  Federal courts
have generally defined an unincorporated association as "a

---

United Mine Workers is "desirable" when a "federal right would
otherwise be impaired."  Id.

voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective." <u>Yost</u>, 92 F.3d at 820 (citation omitted); <u>Goldenberg</u>, 741 F. Supp. 2d at 628; <u>In re Magnetic</u>, 2000 WL 1855119, at *1.

The SAC pleads that EPEG is a voluntary association formed by the mutual consent of the Publisher Defendants for the purpose of engaging in anti-counterfeiting efforts.  The SAC has plausibly plead that EPEG is an unincorporated association, and as such, it has the capacity to be sued under Delaware law.[17] Nonetheless, because the SAC fails to plead an agreement with respect to any of the Defendants, the plaintiffs' claims against EPEG, counts 1, 3, and 9, are dismissed.

Even if Delaware law controlled the question of whether EPEG was an unincorporated association such that it had the capacity to sue and be sued, it appears that the SAC adequately pleads such existence.  The Delaware cases that have addressed this issue do not describe the minimum characteristics that an organization must have to qualify as an unincorporated association.  <u>See, e.g.</u>, <u>Furek v. Univ. of Delaware</u>, 594 A.2d 506 (Del. 1991); <u>Twardowski v. Jester</u>, 39 Del. Ch. 221 (1960).

---

[17] The Defendants' motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction is denied.  The SAC has pleaded sufficient facts to make a prima facie showing of jurisdiction.  <u>See</u> <u>SPV Osus Ltd. v. UBS AG</u>, 882 F.3d 333, 342 (2d Cir. 2018).  The plaintiffs' assertion that the Rule 12(b)(2) motion is untimely is rejected.

While both of these decisions found the entity under consideration to have a more formal existence than EPEG has, neither purports to set out the boundaries for this determination.  They do not supply a basis to find therefore that Delaware law is in conflict with federal law on this issue.

## Conclusion

The Defendants' January 22, 2021 motions to dismiss are granted.  The Clerk of Court shall close the case and enter judgment for the Defendants.

Dated:    New York, New York
          June 14, 2021

_____
DENISE COTE
United States District Judge